**COLE SCHOTZ P.C.**
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
Michael D. Sirota, Esq.
Gerald H. Gline, Esq.
Ryan T. Jareck, Esq.
(201) 489-3000
(201) 489-1536 Facsimile
*Proposed Attorneys for Saint Michael's*
*Medical Center, Inc., et al.,*
*Debtors-in-Possession*

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY
CASE NO. 15-

Chapter 11
(Joint Administration Pending)

|  |
|---|
| In re: |
| SAINT MICHAEL'S MEDICAL CENTER, INC., *et al.*,[1] |
| Debtors-in-Possession. |

**DECLARATION OF DAVID A. RICCI IN SUPPORT OF DEBTORS' FIRST DAY PLEADINGS**

I, DAVID A. RICCI, pursuant to 28 U.S.C. § 1746, hereby declares:

1.      I am the President and Chief Executive Officer ("**CEO**") of Saint Michael's

Medical Center, Inc. ("**SMMC**" or the "**Hospital**"), a New Jersey not-for-profit corporation and

one of the debtors and debtors-in-possession (the "**Debtors**") in these Chapter 11 cases. I have

served in this capacity since December 2010, first as a consultant serving as interim CEO and

President, and in July 2011, as the full time President and CEO, appointed by SMMC's Board of

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal identification number are: Saint Michael's Medical Center, Inc. (6046); Columbus Acquisition Corp. (6342); Saint James Care, Inc. (6230); and University Heights Property Company, Inc. (0162).

Directors.[2]  I have worked as a hospital executive for over thirty (30) years.  I earned a

bachelor's degree from Mount Saint Mary's College and a master's degree in administration

from American University.  I am a Fellow of the American College of Healthcare Executives.

2.       I am fully familiar with the Hospital's business, financial affairs and day-to-day

operations, and am duly authorized to make this declaration on behalf of the Hospital and the

other Debtors, which include: (a) Saint James Care, Inc. ("**SJC**"); (b) Columbus Acquisition

Corp. ("**Columbus**"); and (c) University Heights Property Company, Inc. ("**UHPC**").[3]  I submit

this declaration (the "**Declaration**"): (a) in support of the Debtors' petitions for relief under

Chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"); (b) to assist the

Court and other interested parties in understanding the circumstances giving rise to the

commencement of these Chapter 11 cases; and (c) to provide general information about the

Debtors and their business operations that are germane to the form of motions and applications

that the Debtors have requested of the Court (the "**First Day Motions**").

3.       The purposes of the First Day Motions are, among other things, to: (a) protect the

Debtors' patients and the public during the Debtors' Chapter 11 cases by ensuring the Hospital's

ability to continue to provide vital medical services; (b) maintain and bolster employee morale so

as to reduce employee attrition during the Debtors' Chapter 11 proceeding; (c) enable the

Debtors to continue operating as they pursue a sale of their assets to Prime Healthcare Services –

---

[2] Although I serve as President and CEO of the Hospital, I am a full time employee of Trinity Health Corporation, the Hospital's indirect parent and the DIP lender in these Chapter 11 cases.  Trinity Health Corporation bills the Hospital on a monthly basis all of the costs associated with my position as President and CEO of the Hospital.  I understand that Trinity Health Corporation and the Hospital intend to continue this practice post-petition.

[3] The factual statements in this declaration are based on my personal knowledge, information supplied to me by others under my supervision, my review of relevant documents, and my experience and knowledge of the Debtors' operations and financial condition.

54020/0001-11810829v4
August 09, 2015

Saint Michael's, LLC ("**Prime**"); and (d) preserve the value of the Debtors' estates.  I have reviewed the First Day Motions or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to the uninterrupted operation of the Debtors' business, will prevent immediate and irreparable harm to the Debtors' estates, will facilitate the orderly transition into Chapter 11 and advance the Debtors' restructuring efforts.

4.      Part I of this Declaration provides an introduction to the Debtors and their Chapter 11 cases.  Part II provides an overview of the Debtors' organizational and capital structure, the Debtors' business operations and the pre-petition efforts to sell the Debtors' assets. Part III describes the circumstances giving rise to the commencement of these Chapter 11 cases. Part IV sets forth the relevant facts and a summary of the law in support of the First Day Motions.

## I.      INTRODUCTION

5.      On the date herein (the "**Petition Date**"), the Debtors filed voluntary petitions for relief pursuant to Chapter 11 of the Bankruptcy Code.  Since the Petition Date, the Debtors have remained in possession of their assets and continued to manage their business as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

## II.      FACTUAL BACKGROUND

### A.      The Debtors' Business

6.      Established by the Franciscan Sisters of the Poor in 1867, the Hospital is a 357-bed licensed regional tertiary-care, teaching, and research center in the heart of Newark's business and educational district and is accredited by The Joint Commission.  Combining state-of-the-art technology, the latest diagnostic and therapeutic procedures, leading-edge research, and a network of highly qualified physicians, nurses, and allied health professionals, the Hospital provides top-quality health care services delivered with compassionate care.

54020/0001-11810829v4
August 09, 2015

7.      The Hospital is home to the Heart and Vascular Institute, which offers a

comprehensive array of innovative cardiac treatments and procedures, and the Regional Cancer

Center, which provides patients with state-of-the-art cancer treatment through the seamless

integration of medical, surgical, and radiation oncology services.  The Hospital has long enjoyed

an outstanding reputation as a premier teaching and research institution and remains an

international leader in the treatment and study of infectious diseases, such as HIV/AIDS and

hepatitis.  The mission of the Hospital is to provide excellence in health care to the communities

it serves.

**B.**      **Organizational Structure**

8.      By way of brief history, SMMC was incorporated in 2008 to serve as the party to

a change of control transaction by which certain assets and liabilities of St. Michael's Medical

Center and 2 other now defunct hospitals (Saint James Hospital and Columbus Hospital) was

acquired from Cathedral Healthcare System Inc., a New Jersey nonprofit corporation. That

transaction closed in August, 2008.

9.      SMMC is a second tier subsidiary of Trinity Health Corporation.  The immediate

sole corporate member of SMMC is Maxis Health System, a Pennsylvania not-for-profit

corporation.  Trinity is the sole corporate member of Maxis.  From August 2008 until July 1,

2014, the sole corporate member of SMMC was Catholic Health East ("**CHE**"), a Pennsylvania

not-for-profit corporation.  By virtue of the July 2014 merger of CHE, CHE-Trinity Inc. and

Trinity Health Corporation ("**Trinity**"), Trinity succeeded to the interests of CHE, as the

surviving corporation in the merger.  As that transaction is subject to the New Jersey Community

Health Assets Protection Act, the merger transaction was subject to the review of the New Jersey

Attorney General's Office.  It was also subject to review by the New Jersey Department of

Health under the certificate of need review and application process.  As that transaction remains

pending regulatory review in New Jersey, in order to facilitate the completion of the merger in other states, Trinity, CHE and the New Jersey Attorney General's Office reached an agreement whereby, pending the conclusion of that regulatory review process, Maxis Health System, then a subsidiary of CHE , would serve as sole corporate member of SMMC.

10.     SMMC is the sole member of SJC, Columbus and UHPC.  SJC and Columbus are not operating and are inactive entities.[4]  UHPC owns the land upon which a parking lot for employees and visitors of the Hospital sits and certain other parcels contained on the Hospital campus.[5]

**C.    Employees**

11.     As of the Petition Date, the Hospital employed 271 full-time salaried employees, and 1,197 hourly employees, for a total of 1,468 employees (collectively, the "**Employees**"). The Hospital is a party to five (5) separate collective bargaining agreements covering 932 union employees[6] with (1) District 1199J, National Union of Hospital and Healthcare Employees, AFSCME, AFL-CIO (Service Employees) (308 employees), (2) District 1199J, National Union of Hospital and Healthcare Employees, AFSCME, AFL-CIO (Guild) (100 employees), (3) Committee of Interns and Residents/SEIU (82 employees), (4) JNESO, District Council 1, IUOE, AFL-CIO (422 employees), and (5) International Union of Operating Engineers, Local 68-68A-68B, affiliated with the AFL-CIO (20 employees).

---

[4] According to the June 30, 2015 consolidated financial statements, as of June 30, 2015, SJC's balance sheet included cash of $51,000 and third party payor receivables of approximately $112,000.  Columbus's balance sheet included cash of $52,000 and third party payor liabilities of approximately $796,000.

[5] According to the June 30, 2015 consolidated financial statements, as of March 31, 2015, UHPC had assets (surface parking lots) with a book value of approximately $5.1 million.

[6] The Hospital employs 536 non-union employees.

D.    **The Debtors' Pre-Petition Capital Structure**

(i)    Series 2008A State Contract Bonds

12.    On July 31, 2008, the New Jersey Health Care Facilities Financing Authority (the "**Authority**") issued $252,545,000 in state contract bonds, Series 2008A (the "**Series 2008A State Contract Bonds**"), and then loaned the proceeds of such bond issuance to SMMC through the Hospital Asset Transformation Program ("**HATP**").  Consistent with the HATP and as part of CHE's purchase of SMMC, Saint James Hospital and Columbus Hospital from Cathedral Healthcare System Inc., the proceeds were used to pay off outstanding debt on the two closed hospitals (Saint James Hospital and Columbus Hospital) and renovate and expand the facilities at SMMC.

13.    SMMC entered into the following in connection with the loan from the Authority: (1) Loan Agreement, dated as of July 1, 2008, by and between the Company and the Authority (the "**Loan Agreement**"); (2) State Contract Promissory Note, dated July 31, 2008, issued by SMMC to the Authority (the "**State Contract Note**"); (3) Mortgage and Security Agreement dated July 31, 2008 (the "**Mortgage**"); (4) Master Trust Indenture, dated as of July 1, 2008, between SMMC and the Bank of New York Mellon ("**BONY**"), as Master Trustee (as amended, the "**Master Indenture**"); (5) First Supplemental Indenture, dated as of July 1, 2008, between SMMC and BONY, as Master Trustee (as amended, the "**First Supplemental Indenture**," and together with the Master Indenture, collectively, the "**Indenture Documents**"); and (6) Hospital Asset Transformation Program State Contract Bond Resolution (Saint Michael's Medical Center, Inc., Newark, N.J. Issue), adopted April 24, 2008, as supplemented by a Series Certificate dated as of July 22, 2008 (the "**Resolution**," and together with the Loan Agreement, the State Contract Note, the Mortgage and the Indenture Documents, collectively, the "**Loan Documents**").

6

14.    The State Contract Note was issued pursuant to and is secured under the Indenture

Documents between SMMC and BONY.  Under the Indenture Documents, SMMC sold,

assigned, transferred, set over, pledged and granted a security interest to BONY in all of its

rights, title and interest in and to: (i) the "Collateral," which includes (a) all receipts, revenues,

income and other moneys received by or on behalf of an the Debtors, including, without

limitation, contributions, donations and pledges whether in the form of cash, securities, deposit

accounts, or other personal property, revenues derived from the operation of the Debtors'

facilities, and all rights to receive the same, whether in the form of accounts receivable, contract

rights, chattel paper, instruments or other rights, and the proceeds thereof, and any insurance or

condemnation proceeds thereon, whether now existing or hereafter coming into existence and

whether now owned or held or hereafter acquired by the Debtors (the "**Gross Receipts**");

provided, however, that Gross Receipts shall not include (1) gifts, grants, bequests, donations

and contributions heretofore or hereafter made, designated at the time of making thereof by the

donor or maker as being for certain specific purposes, and the income therefrom, to the extent

required by such designation, and (2) rents, profits or revenues of any nature derived exclusively

from property securing non-recourse indebtedness; (b) any and all property of the Debtors,

including, without limitation, all accounts, as-extracted collateral, chattel paper, commercial tort

claims, deposit accounts, documents, farm products, fixtures, general intangibles, goods

(including, without limitation, inventory and equipment), instruments, investment property and

letter of credit rights, whether presently owned or hereafter acquired, together with all Proceeds

(as defined in the UCC) and products thereof; provided, however, that Collateral shall not

include gifts, grants, bequests, donations and contributions heretofore or hereafter made which

are designated at the time of the making thereof by the donor or maker as being for certain

54020/0001-11810829v4
August 09, 2015

specified dedicated purposes, and the income therefrom, to the extent required by such

designation; (ii) all moneys, securities and investments held in the Revenue Fund, and (iii) all

Proceeds (as defined in the UCC) of any and all of the property described in clauses (i) and (ii)

(collectively, the "**BONY Collateral**").  In addition, to further secure the Debtors' obligations

under the Loan Documents, the Debtors granted BONY a mortgage on the Debtors' real

property, buildings, structures, improvements and fixtures located at 111 Central Avenue,

Newark, NJ 07102 (the "**Mortgaged Property**") and general intangibles related thereto, (b) all

rents and moneys payable in respect of any lease agreements executed by the Debtors with

respect thereto, (c) all proceeds of insurance or condemnation awards with respect thereto and

(d) warranties or service contracts existing with respect thereto.

15.    On August 7, 2008, BONY filed a UCC-1 financing statement perfecting its

interest in the BONY Collateral.  On July 11, 2013, BONY filed a UCC-3 continuation

statement.

16.    As of the Petition Date, the Debtors owed approximately $227.8 million on

account of the obligations under the Loan Documents.

(ii)    <u>Trinity Unsecured Debt</u>

17.    Trinity maintains a centralized cash management program for its hospitals.  As of

June 30, 2015, the Debtors maintained an overdraft in the cash management program and owed

Trinity approximately $137 million.

(iii)    <u>Other Unsecured Debt</u>

18.    As of June 30, 2015, the Debtors had approximately $21.3 million of accounts

payable and accrued expenses and $4.1 million in due to third party payors on its balance sheet.

E.      **Recent Financial Performance**

19.      According to the June 30, 2015 consolidated financial statements, the Debtors maintain current assets of $74.1 million, which was primarily cash of $34.7 million, net patient accounts receivable of approximately $23.5 million, prepaid expenses and inventories of approximately $7.5 million, and the State of New Jersey controlled debt service fund of $5.4 million.  Other long-term assets included property, plant and equipment of $80.8 million.

20.      Currently liabilities of $173 million of the Debtors as of June 30, 2015 included accounts payable and accrued expenses of approximately $21.3 million, due to third party payors of approximately $4.1 million and an overdraft in the cash management program with Trinity of $137 million.  Noncurrent liabilities include $222.9 million of bond indebtedness and $9.1 million of capital leaseback financing.

21.      For the six-month period ending June 30, 2015, the Debtors generated approximately $101.5 million in net operating revenue.  With operating expenses of approximately $113 million for that same period, the Hospital incurred a net operating loss of approximately $11.5 million for the six-month period ending June 30, 2015.

F.      **The Debtors' Efforts to Sell the Hospital**

22.      On February 8, 2013, the Debtors entered into an asset purchase agreement (the "**Prime APA**") with Prime Healthcare Services – Saint Michael's, LLC ("**Prime**") whereby Prime would purchase substantially all of the Debtors' assets.  More than two years later, the Debtors are still awaiting approval from the State of New Jersey.  Indeed, the Debtors have yet to be advised from the Attorney General or the Department of Health that their applications are complete.

23.      On March 2, 2015, Navigant Consulting, Inc. ("**Navigant**") issued a report (the "**Navigant Report**") on behalf of the Authority that recommended a consolidation of healthcare

services in Newark that included the closing of inpatient services at the Hospital and

transforming the Hospital into an ambulatory care facility.  Further, the Navigant Report

concluded that a transfer of assets to Prime would not resolve the underlying overcapacity and

unnecessary service duplication in Newark.

24.    On April 6, 2015, Honigman Miller Schwartz and Cohn LLP issued a response to

the Navigant Report on behalf of the Debtors, which concluded that if the recommendations in

the Navigant Report were followed, an unregulated monopoly in inpatient hospital services

would be created in Newark.  That unregulated monopoly and concomitant dramatic reduction in

competition in health care would result in higher prices and harm consumers.  According to the

response, the Navigant Report recommendations could easily cost Newark area consumers $180

million or more annually.  Additionally, most of the conclusions made by Navigant were based

on incorrect facts and a flawed analysis.

### III.    FACTORS THAT PRECIPITATED THE DEBTORS' CHAPTER 11 FILING AND PURPOSE THEREOF

25.    The Debtors' financial performance continues to be hampered by a number of

factors.  Included among them are the following:

(a)    Disproportionately low reimbursement rates, both in the governmental and private payor context.  Of the inpatients at the Hospital, 65% were covered by Medicare or Medicaid and an additional 15% were self-pay / indigent. The high proportion of government payment continues to be a significant challenge to the Hospital's financial performance given reimbursement reductions from Medicare and Medicaid;

(b)    Poor, below market reimbursement rates in the Hospital's managed care contracts that were negotiated by the Hospital's former parent company;

(c)    Unsustainable debt levels relating to the Series 2008A State Contract Bonds.  Noteworthy here is that of the $252,549,000 total bond amount, only approximately $80,000,000 was actually used by the Hospital, with the balance (i) being used to pay down the debt of Cathedral Health Services, the Hospital's former parent company, and (ii) clawed back by

the State and used for continued debt service payments under the Loan Documents;

(d)    Long-term and above-market lease obligations relating to the Hospital's former Columbus and Saint James operations that ceased; and

(e)    Reduction in inpatient average daily census and revenue due to the uncertainty surrounding the Hospital's future as a result of the State's failure to timely process the Hospital's certificate of need and CHAPA applications.

26.    Moreover, in the coming months, the Hospital will be converting from ICD-9 to ICD-10, which is an unprecedented event in the modern healthcare environment. This conversion affects both diagnostic codes (DRG) and procedural codes.  The industry is moving from approximately 14,000 codes to an environment with approximately 70,000 outpatient codes and 80,000 inpatient codes.  Even with flawless implementation (which is unlikely given the expectation that there will be internal coding issues, undercoding, and denials), there will still be issues and payment delays from exterior payors.  The short term impact could likely be a 30-50% increase in accounts receivable or greater, which will have a significant negative impact on the Hospital's liquidity.  The Hospital projects the negative impact of the ICD-10 conversion to begin in October 2015.

27.    In light of the State's inaction, the recommended closure of inpatient services at the Hospital pursuant to the Navigant Report, the Debtors' recent financial performance, and the expected negative impact from the industry-wide ICD-10 conversion, the Debtors' management and Board of Directors, along with their advisors, evaluated various restructuring options and determined that the best way to maximize the Debtors' going concern value for the benefit of all stakeholders was to commence these Chapter 11 cases and pursue a sale of substantially all the Debtors' assets pursuant to Section 363 of the Bankruptcy Code.

11

28.     To prepare for Chapter 11, the Debtors in recent weeks have engaged in extensive

negotiations with Trinity, Prime, the Authority, the Department of Health and the State of New

Jersey to develop a consensual path forward in these cases that will minimize costs and

maximize value for the benefit of all stakeholders.  Although those negotiations continued

literally up to the filing of these Chapter 11 cases, I would characterize those discussions as

moderately successful.

29.     As a result, the Debtors have secured a "stalking horse" asset purchase agreement

with Prime on substantially the same terms as the asset purchase agreement on February 8, 2013

with the following timeline:

- entry of a bidding procedures order within ten (10) days of
the Petition Date;

- entry of a sale order within one hundred (100) days of the
Petition Date; and

- closing on a sale of the Debtors' assets no later than one
hundred twenty (120) days from the Petition Date.

30.     In addition, the Debtors have negotiated and secured DIP financing from Trinity

and intend to finance ongoing operations of the Hospital during these Chapter 11 cases and

contemplated Section 363 sale process through the DIP financing and the use of cash collateral.

The Debtors have an immediate and critical need to obtain postpetition financing and to use cash

collateral as such term is defined in Section 363(a) of the Bankruptcy Code (the "**Cash

Collateral**") to continue in business and run an expedited and orderly sale process under Section

363 of the Bankruptcy Code.  Without access to the postpetition financing and Cash Collateral,

the Debtors and their estates would suffer immediate and irreparable harm because they could

not effectuate a sale of their assets or continue to operate.

54020/0001-11810829v4
August 09, 2015

31.     In addition, as set forth in the Debtors' Cash Management Motion (as defined

below), Trinity has agreed to keep intact its centralized cash management system and shared

services as it relates to the Hospital and to continue to support the Hospital in connection with:

(a) contract development; (b) materials and supplied cost sourcing; (c) risk management; (d)

payroll and benefits; (e) public and physician relations; (f) insurance; (g) cash and revenue cycle

management; (h) vendor contracting; (i) regulatory compliance and auditing; and (j) managing

payer contracts, patient financial services, patient access, health information management and

reimbursement activities (collectively, the "**Trinity Shared Services**").

## IV.     KEY FIRST DAY RELIEF RELATED TO ACHIEVING TIMELINE AND OBJECTIVES

32.     To avoid the potentially disruptive impact the commencement of these Chapter 11

cases might have on the Hospital, to facilitate the Debtors' orderly transition into Chapter 11 and

to maintain going concern value of the Debtors' assets while a sale is pursued, the Debtors have

requested the Court to consider, on an expedited basis, the following substantive First Day

Motions:

> (a)     Motion for (A) Entry of Interim and Final Orders (I) Authorizing the
> Debtors to Obtain Post-Petition Service Financing Pursuant to 11 U.S.C.
> §§ 362 and 364(c), (II) Granting Liens and Superpriority Claims to the
> DIP Lender Pursuant to 11 U.S.C. §§ 364 and 507, (III) Authorizing Use
> of Cash Collateral Pursuant to 11 U.S.C. § 363 and (IV) Granting
> Adequate Protection to the Prepetition Secured Parties Pursuant to 11
> U.S.C. §§ 361, 362, 363, 364 and 507; and (B) Scheduling a Final Hearing
> Pursuant to Bankruptcy Rule 4001 and Local Bankruptcy Rule 4001-4 (the
> "**DIP Financing Motion**");

> (b)     Motion for an Order: (A) Granting Interim Relief Pursuant to 11 U.S.C. §
> 366(b); (B) Authorizing the Payment of Adequate Assurance for Post-
> Petition Utility Services; (C) Fixing Final Hearing Date to Determine
> Adequate Assurance; and (D) Granting Other Related Relief ("**Utility
> Motion**");

> (c)     Motion for an Order: (I) Authorizing the Debtors to (A) Satisfy and, to the
> Extent Applicable, Directing Any Payroll Banks to Honor, Pre-Petition

Gross Salaries, Payroll Taxes and Related Obligations to or for the Benefit of the Debtors' Employees; and (B) Honor, in their Discretion, Pre-Petition Sick, Vacation, Personal and Similarly Themed Days; and (II) Granting Related Relief (the "**Employee Motion**"); and

(d)     Motion for an Order (A) Authorizing the Debtors to Continue Using Their Existing Cash Management System; (B) Authorizing the Debtors to Continue Using their Bank Accounts and Business Forms; (C) Waiving Compliance with Investment Guidelines Under 11 U.S.C. § 345(b); and (D) Authorizing Continued Use of Trinity Health Corporation Shared Services Arrangement (the "**Cash Management Motion**").

33.     The substantive First Day Motions[7] are further summarized herein:

## A.     DIP Financing Motion

34.     The Debtors seek authority to enter into the DIP Facility (as defined in the DIP Financing Motion) which will provide the Debtors with access to as much as $15,000,000, which the Debtors have determined should be sufficient to support the Debtors' operations and sale process through the pendency of these Chapter 11 cases.  Additionally, the Debtors propose to use Cash Collateral, which relieves the Debtors of the cost of borrowing additional amounts to replace that cash.  The Debtors negotiated the DIP Facility as part of their larger discussions with Trinity with respect to a court-approved sale process.  The DIP financing is a reflection of the cooperation among the Debtors and Trinity, which is critical to the Debtors' ability to expeditiously and successfully conclude these Chapter 11 Cases.

35.     I believe that the Debtors have an immediate and critical need to obtain post-petition financing under the DIP Facility and to use Cash Collateral to pay, in accordance with the Budget (as defined in the DIP Financing Motion) various parties in the ordinary course of business and as authorized by the Court.  These include employees, third party vendors, and

---

[7] In addition to the substantive First Day Motions, the Debtors intend to file on or shortly following the Petition Date, a motion to approve the Prime "stalking horse" asset purchase agreement for the sale of substantially all the Debtors' assets and bidding procedures in connection therewith.

54020/0001-11810829v4
August 09, 2015

utilities, who in the judgment of the Debtors' management, provide the essential services needed

to operate, maintain and insure the Debtors' assets.  In addition, the Debtors require funds to

retain and pay costs of professionals, consultants and advisors who will enable the Debtors to

conduct a sale of their assets in a manner that maximizes value for the Debtors' estates and their

creditors. Taken together, the services provided by all of the foregoing parties and other entities

are absolutely critical to the preservation of the Debtors' business and asset value.

36.     The Debtors reasonably believe that the Budget will be adequate, considering all

available assets, to pay all administrative expenses due or accruing during the period covered by

the Budget.  Without access to the DIP Facility and use of Cash Collateral, the Debtors would

suffer immediate and irreparable harm and the entire bankruptcy proceedings will be jeopardized

to the significant detriment of the Debtors' estates and their creditors.

37.     Furthermore, I believe that the use of Cash Collateral alone would be insufficient

to meet the Debtors' post-petition liquidity needs.  The Debtors require both additional financing

under the DIP Facility and the continued use of Cash Collateral in order to satisfy their post-

petition liquidity needs.  Moreover, financing on a post-petition basis is not otherwise available

without granting the DIP Lender the protections it required pursuant to the DIP Term Sheet (as

defined in the DIP Financing Motion).

38.     Trinity has indicated a willingness to provide the Debtors with certain financing

commitments, but solely on the terms and conditions set forth in the DIP Term Sheet and the

Interim Order (as defined in the DIP Financing Motion).  After considering all of their

alternatives, the Debtors have concluded, in an exercise of their sound business judgment, that

the financing to be provided by Trinity pursuant to the terms of the DIP Term Sheet and the

Interim Order represents the best financing presently available to the Debtors.  These funds will be used to maintain the Debtors' assets during an orderly sale process.

39.     The Debtors have negotiated the DIP Facility and the DIP Term Sheet in good faith and at arm's length with Trinity.  The Debtors believe that the terms of the DIP Facility are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

40.     The Debtors' decision to enter into the DIP Facility is an exercise of their sound business judgment that warrants approval by the Court.  Before the Petition Date, the Debtors and their advisors undertook a detailed investigation as to the Debtors' projected financing needs during the pendency of a bankruptcy case and determined that the Debtors would require post-petition financing to support their sale process.  Accordingly, the Debtors negotiated the DIP Term Sheet with Trinity in good faith, at arm's length and with the assistance of outside counsel, to obtain the required post-petition financing on terms favorable to the Debtors.  Based on the advice of counsel and other professionals, and the Debtors' own analysis, the Debtors have determined in their sound business judgment that the DIP Term Sheet provides a greater amount of financing on more favorable terms than any other reasonably available alternative.

**B.     The Utility Motion**

41.     By the Utility Motion, the Debtors are requesting entry of an interim Order that, among other things: (a) prohibits utilities from altering, refusing, or discontinuing services to, or discriminating against, the Debtors; (b) authorizes adequate assurance payments to utilities for post-petition utility services; and (c) fixes a final hearing date to determine the sufficiency of the adequate assurance payments.

42.     In connection with their business operations, the Debtors obtain electric, gas, water, telephone, internet and other utility services (the "**Utility Services**") from numerous

16

utility providers (the "**Utility Companies**").  The Debtors believe their estimated average

monthly utility payments to the Utility Companies ranges between $300,000 to $400,000.

43.    I believe that for the Debtors to operate without disruption and to ensure a smooth

transition into Chapter 11, the Debtors must continue to receive post-petition services from the

Utility Companies.  Loss of any Utilities Services or even a temporary interruption thereof would

be extremely harmful to the Debtors' business operations and their estates.  It is therefore critical

that Utility Services continue uninterrupted during these Chapter 11 cases.

44.    The Debtors propose to provide "assurance of payment" to the Utility Companies,

within twenty (20) business days after entry of the interim Order, by paying a cash deposit

equivalent to ten (10) days of utility service to each of the Utility Companies in the amounts set

forth on Exhibit "A" to the Utility Motion.

45.    Therefore, I believe that the Utility Providers will have adequate assurance of

future performance, and the relief sought in the Utility Motion should be granted.

**C.    The Employee Motion**

46.    By the Employee Motion, the Debtors are requesting entry of an Order

authorizing, but not directing, the Debtors to: (A) (i) pay prepetition wages, salaries, contractual

compensation, sick pay, vacation pay, personal pay, holiday pay, and other accrued

compensation, and withholding and payroll related taxes for prepetition periods (the

"**Prepetition Wages**"); (ii) honor incurred workers' compensation claims of up to $1.75 million

and incurred employee medical claims of up to $3 million to the Debtors' ultimate parent,

Trinity, for reimbursement of  incurred claims which are applicable to the Employees; and (iii)

pay certain critical prepetition debts of physicians and physician groups performing critical

patient services; and (B) continue their prepetition policies with respect to such payments and

benefits during the Chapter 11 cases.  Additionally, the Debtors request that the Order direct all banks to honor prepetition checks for payment of the foregoing.

47.    In addition, the Debtors have contracts and/or service relationships with approximately 96 physicians and physician groups (collectively, the "**Physician Contractors**"). The Physician Contractors provide vital care to the Debtors' patients.  The Physician Contractors are owed a total prepetition amount of approximately $1.4 million.  The continued services of the Physician Contractors are critical to the Debtors' continued operation and to their ability to provide patient care.  I believe that without the continued service of the Physician Contractors, the Debtors would not be able to operate, and patients' lives would be at risk.

48.    For these reasons, and for the reasons and legal arguments set forth in the Employee Motion, I believe that the relief sought in the Employee Motion should be granted.

**D.    The Cash Management Motion**

49.    By the Cash Management Motion, the Debtors are requesting entry of an Order: (a) authorizing the Debtors to continue using their existing cash management system (the "**Cash Management System**"); (b) authorizing the Debtors to continue using their existing bank accounts and business forms; (c) waiving compliance with investment guidelines under Section 345(b) of the Bankruptcy Code; and (d) authorizing the Debtors to continue to receive the Trinity Shared Services.

50.    As of the Petition Date, the Debtors maintained seventeen (17) bank accounts (collectively, the "**Bank Accounts**") in five (5) separate banking institutions as follows:

- six (6) accounts at Wells Fargo Bank;
- three (3) accounts at Santander Bank;
- four (4) accounts at PNC Bank;
- two (2) accounts at Bank of America; and
- two (2) accounts at Investors Bank.

18

51.    Although the Debtors maintain numerous hospital receipts and disbursement

accounts, the majority of the Debtors' Cash Management System and activity centers around the

Debtors' main operating account (ending 0040) at Wells Fargo Bank, a sweep account (ending

4347) at Wells Fargo Bank, and an operating account at PNC Bank (ending 7244), which

receives sweeps from the sweep account (ending 4347) at Wells Fargo Bank, which are then

transferred to a centralized investment operating pool maintained by Trinity.  The Cash

Management System enables the Debtors to (i) monitor closely the collection and disbursement

of funds; (ii) maintain control over the administration of their Bank Accounts; and (iii) forecast

and report their cash position with greater certainty.

52.    In addition, in the ordinary course of business, the Debtors use checks,

correspondence and numerous other business forms including, but not limited to, invoices,

purchase orders and envelopes (collectively, the "**Business Forms**").

53.    Moreover, the Debtors seek authority for the continued use of the Trinity Shared

Services.  I believe that if the Debtors were required to open all new bank accounts, alter their

existing Cash Management System, and cease receiving the benefit of the Trinity Shared

Services, the Debtors' ability to operate would be significantly compromised.  Without the Cash

Management System and Trinity Shared Services in place, the Debtors would be unable to

monitor closely the flow of their cash and to continue operating in the manner to which they are

accustomed, which would unnecessarily jeopardize the value of the Debtors' assets.

54.    I believe that the relief requested in the Cash Management Motion will help to

ensure the Debtors' orderly entry into Chapter 11 protection and will avoid many of the possible

disruptions and distractions that could divert Debtors' attention from more pressing matters

during the initial days of these Chapter 11 cases.  Any disruption in the Debtors' cash

management procedures will hamper the Debtors' efforts to preserve and enhance the value of their estates, and altering the Cash Management System may disrupt payments to key vendors and Employees, and likewise may disrupt patient care.

55.     Further, due to the nature and scope of the Debtors' business operations and the large number of suppliers of goods and services with whom the Debtors deal on a regular basis, I believe it is important that the Debtors be permitted to continue to use the Business Forms without reference to their status as debtors-in-possession.  Otherwise, the estates will be required to bear a potentially significant expense that I believe is unwarranted.

56.     I believe that the relief requested in the Cash Management Motion is essential to avoid unnecessary and potentially costly disruptions to the Debtors' operations, is in the best interest of the estates and, therefore, should be granted.

## V.       CONCLUSION

57.     In light of their challenging financial position, the Debtors' paramount goal is to maximize the recovery of their creditor constituencies and other stakeholders.  Following careful consideration of all alternatives, the Debtors have determined that the contemplated Section 363 sale process is the best way to maximize the value of the Debtors' business.  The Debtors anticipate that they will complete a sale of substantially all their assets in the near term and will close on the sale following satisfaction of certain conditions, including receipt of approvals from New Jersey authorities.  Implementing the sale will ensure the Debtors' business continues as a going concern, enabling the Debtors to emerge from Chapter 11 as a healthy, viable enterprise and maximizing the value of the Debtors' estates while minimizing disruption to employees, vendors, and patients.

54020/0001-11810829v4
August 09, 2015

58.      The First Day Motions will enable the Debtors to stabilize and continue their

operations in the ordinary course while the Debtors seek to sell their assets pursuant to Section

363 of the Bankruptcy Code.  Accordingly, the Debtors respectfully request that the Court enter

Orders granting the First Day Motions.

54020/0001-11810829v4
August 09, 2015

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

_____

DAVID A. RICCI
President and CEO

Date:  August 10, 2015

54020/0001-11810829v4
August 06, 2015