# EXHIBIT A

Execution Copy

**FIRST AMENDED AND RESTATED ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**SAINT MICHAEL'S MEDICAL CENTER, INC.,**

**SAINT JAMES CARE, INC.,**

**COLUMBUS ACQUISITION CORP., and**

**UNIVERSITY HEIGHTS PROPERTY COMPANY,**

**As Debtors and Debtors-In-Possession**

**and**

**As the Seller Parties**

**and**

**PRIME HEALTHCARE SERVICES – SAINT MICHAEL'S, LLC**

**As Purchaser**

**DATED:  AUGUST 10, 2015**

**Table of Contents**

**Page**

ARTICLE 1 DEFINITIONS; SALE AND TRANSFER OF ASSETS;
CONSIDERATION; CLOSING..................................................................... 2

1.1   Definitions................................................................................... 2
1.2   Purchase Price ............................................................................. 4
1.3   Good Faith Deposit ...................................................................... 5
1.4   Closing Date................................................................................. 5
1.5   Items to be Delivered by Seller Parties at Closing ............................ 5
1.6   Items to be Delivered by Purchaser at Closing................................. 7
1.7   Transfer of Seller Assets .............................................................. 8
1.8   Excluded Assets ......................................................................... 11
1.9   Assumed Obligations .................................................................. 13
1.10  Excluded Liabilities .................................................................... 14
1.11  Risk of Loss ............................................................................... 15

ARTICLE 2 REPRESENTATIONS AND WARRANTIES OF SELLER ................................. 17

2.1   Organization; Good Standing ...................................................... 17
2.2   Authority; Consents; Validity; No Breach...................................... 17
2.3   The Assets .................................................................................. 17
2.4   Financial Statements ................................................................... 18
2.5   Absence of Undisclosed Liabilities ............................................... 18
2.6   No Adverse Changes.................................................................... 18
2.7   Real Property ............................................................................. 19
2.8   Title to and Condition of Personal Property; Personal Property Leases; and
Equipment. .......................................................................... 25
2.9   Intellectual Property.................................................................... 26
2.10  Contracts .................................................................................... 26
2.11  Purchased Inventory.................................................................... 26
2.12  Employees, Employee Relations and Benefits Plans.......................... 27
2.13  Taxes .......................................................................................... 29
2.14  Litigation or Claims .................................................................... 30
2.15  Insurance .................................................................................... 30
2.16  Licenses and Permits................................................................... 30
2.17  Medical Staff.............................................................................. 31
2.18  Compliance with Law .................................................................. 32
2.19  Brokers ...................................................................................... 34
2.20  Accounts Receivable................................................................... 34
2.21  Business and Transactions with Affiliates...................................... 34
2.22  Suppliers and Providers of Services ............................................. 34
2.23  U.S. Persons............................................................................... 35
2.24  Cost Reports, Third Party Receivables and Conditions of Participation............. 35

i

2.25   Compliance Program ................................................................................ 35
2.26   Regulatory Compliance ............................................................................ 36
2.27   Meaningful Use of Certified EHR Technology ................................................ 37
2.28   Full Disclosure ....................................................................................... 38
2.29   Seller's Knowledge .................................................................................. 38

ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF PURCHASER ....................... 38

3.1   Authorization ......................................................................................... 38
3.2   Binding Agreement .................................................................................. 38
3.3   Organization and Good Standing ................................................................ 38
3.4   No Violation........................................................................................... 39
3.5   Brokers and Finders ................................................................................ 39
3.6   Representations of Seller .......................................................................... 39
3.7   Legal Proceedings ................................................................................... 39
3.8   Ability to Perform ................................................................................... 39
3.9   Solvency................................................................................................ 39
3.10   Purchaser's Knowledge ........................................................................... 40

ARTICLE 4 COVENANTS OF SELLER.................................................................. 40

4.1   Access and Information; Inspections ........................................................... 40
4.2   Conduct of Business ................................................................................ 41
4.3   Negative Covenants ................................................................................. 41
4.4   Bankruptcy Court Order ........................................................................... 42
4.5   Cure of Defaults...................................................................................... 45
4.6   Cooperation............................................................................................ 45
4.7   Additional Financial Information ................................................................ 46
4.8   Intentionally Omitted ............................................................................... 46
4.9   Seller's Efforts to Close ............................................................................ 46
4.10   Title Matters.......................................................................................... 46
4.11   Termination of Hospital Employees ........................................................... 46
4.12   Termination Cost Reports ......................................................................... 47
4.13   FTC Notification ..................................................................................... 47
4.14   Required Governmental Approvals ............................................................. 47

ARTICLE 5 COVENANTS OF PURCHASER ........................................................... 48

5.1   Purchaser's Efforts to Close....................................................................... 48
5.2   Required Governmental Approvals .............................................................. 48
5.3   Certain Employee Matters ......................................................................... 48
5.4   Excluded Assets ...................................................................................... 50
5.5   Capital Commitments ............................................................................... 50
5.6   Medical Staff .......................................................................................... 50
5.7   FTC Notification ...................................................................................... 50
5.8   Local Governing Board............................................................................. 50
5.9   Maintenance of Services ........................................................................... 51
5.10   Ethical and Religious Directives................................................................ 51

5.11    Trademark License.................................................................................. 51
5.12    Religious Articles and Artifacts............................................................... 51
5.13    Cooperation............................................................................................. 51
5.14    Assignment of Contracts and Rights........................................................ 52

ARTICLE 6 CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER ....................... 52

6.1    Signing and Delivery of Instruments ....................................................... 52
6.2    No Restraints............................................................................................ 52
6.3    Performance of Covenants........................................................................ 52
6.4    Representations and Warranties................................................................ 53
6.5    Governmental Authorizations .................................................................. 53
6.6    Church Approval....................................................................................... 53
6.7    Release of Security Interests..................................................................... 53
6.8    Satisfaction and Release of NJHCFFA Obligations ................................ 53
6.9    Bankruptcy Court Approval...................................................................... 54

ARTICLE 7 CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER ............... 54

7.1    Governmental Authorizations .................................................................. 54
7.2    Signing and Delivery of Instruments ....................................................... 54
7.3    Performance of Covenants........................................................................ 54
7.4    No Restraints............................................................................................ 54
7.5    Representations and Warranties................................................................ 55
7.6    Title Insurance Policy .............................................................................. 55
7.7    Pre-Closing Confirmations ...................................................................... 55
7.8    Required Consents .................................................................................... 55
7.9    Intentionally Omitted ............................................................................... 56
7.10    Economic Development Incentives .......................................................... 56
7.11    No Material Adverse Change.................................................................... 56
7.12    Bankruptcy Court Approval...................................................................... 56

ARTICLE 8 TERMINATION ....................................................................................... 56

8.1    Termination .............................................................................................. 56
8.2    Consequences of Termination................................................................... 58

ARTICLE 9 POST-CLOSING MATTERS....................................................................... 58

9.1    Excluded Assets and Excluded Liabilities ............................................... 58
9.2    Seller's Receipt of Misdirected Payments and Possession of Assets ................. 59
9.3    Preservation and Access to Records After the Closing ...................... 59
9.4    Post-Closing Real Property Subdivision .................................................. 61

ARTICLE 10 SURVIVAL AND INDEMNFICATION ...................................................... 63

10.1    Survival .................................................................................................... 63
10.2    Indemnification of Purchaser by Seller.................................................... 63
10.3    Indemnification of Seller by Purchaser.................................................... 65

54020/0001-11968411v10

10.4    Method of Asserting Claims. ........................................................................... 66
10.5    Exclusive Remedy ......................................................................................... 69
10.6    Specific Performance .................................................................................... 70

ARTICLE 11 TAX AND COST REPORT MATTERS ............................................................. 70

11.1    Tax Matters; Allocation of Purchase Price ................................................... 70
11.2    Cost Report Matters ...................................................................................... 71

ARTICLE 12 MISCELLANEOUS PROVISIONS ................................................................. 71

12.1    Further Assurances and Cooperation ............................................................ 71
12.2    Successors and Assigns .................................................................................. 71
12.3    Governing Law; Venue .................................................................................. 71
12.4    Amendments .................................................................................................. 72
12.5    Exhibits, Schedules and Disclosure Schedule ................................................ 72
12.6    Publicity ........................................................................................................ 72
12.7    Notices .......................................................................................................... 72
12.8    Headings ........................................................................................................ 73
12.9    Fair Meaning ................................................................................................. 73
12.10   Gender and Number; Construction ................................................................ 73
12.11   Third Party Beneficiary ................................................................................. 73
12.12   Expenses and Attorneys' Fees ....................................................................... 73
12.13   Counterparts .................................................................................................. 74
12.14   Entire Agreement .......................................................................................... 74
12.15   No Waiver ..................................................................................................... 74
12.16   Severability ................................................................................................... 74
12.17   Time is of the Essence ................................................................................... 74
12.18   Late Payments ............................................................................................... 74

# LIST OF SCHEDULES

| SCHEDULE | DESCRIPTION |
|---|---|

Those disclosures provided in the Disclosure Schedule; and

| SCHEDULE | DESCRIPTION |
|---|---|
| A-1 | Other Businesses |
| 1.7(a) | Owned Real Property |
| 1.7(b) | Leased Real Property |
| 1.7(c) | Personal Property |
| 1.7(i) | Licenses and Medicare Provider Numbers |
| 1.7(t) | Joint Ventures |
| 1.7(y) | URL and Domain Names |
| 1.7(aa) | Names and Symbols of Hospital |
| 1.8(d) | Excluded Real Property |
| 1.8(g) | Excluded Contracts |
| 1.8(h) | Excluded Leases |
| 1.8(t) | Other Excluded Assets |
| 1.9(j) | Other Obligations and Liabilities |
| 2.3 | Other Excluded Assets |
| 2.4 | Financial Statements |
| 2.5 | Absence of Undisclosed Liablities |
| 2.6 | Adverse Changes |
| 2.7(a)(i) | Owned Real Property |
| 2.7(a)(ii) | Options and Rights of First Refusal |
| 2.7(b) | Real Property Noncompliance |
| 2.7(c) | Real Estate Leases |
| 2.7(d) | Real Property Enforceability Exceptions |
| 2.7(e) | Options and Rights of Purchase |
| 2.7(e)(ii) | Lease Terminations |
| 2.7(e)(iv) | Rent Exceptions |
| 2.7(e)(vi) | Defenses or Offsets to Rent |
| 2.7(h) | Required Capital Expenditures |
| 2.7(i) | Unpaid Property Taxes |
| 2.7(j) | Environmental Surveys |
| 2.8(a)(i) | Personal Property |
| 2.8(a)(ii) | Personal Property Encumbrances |
| 2.8(b)(i) | Personal Property Leases |
| 2.8(b)(ii) | Personal Property Exceptions |
| 2.9 | Intellectual Property |
| 2.10(a) | Other Contracts |
| 2.10(b) | Contract Disclosures |
| 2.11 | Purchased Inventory Exclusions |
| 2.12(a)(1) | Seller Employees |
| 2.12(a)(2) | Employment Agreements |
| 2.12(b) | Employee Benefit Plans |

| 2.12(c) | Employee Terminations |
| 2.12(e) | ERISA |
| 2.12(g) | Invalid Form I-9s |
| 2.12(h) | Employee Issues |
| 2.13(a)(1) | Exempt Seller's Parties |
| 2.13(a)(2) | Tax Return Extensions |
| 2.14 | Pending Litigation |
| 2.15 | Insurance Policies |
| 2.16 | Licenses and Permits |
| 2.16(a) | Accreditation and Certification |
| 2.16(c) | Uncorrected Deficiencies |
| 2.16(d) | Certificate of Need Filings |
| 2.17(b) | Disputes, Disciplinary Actions or Appeals |
| 2.17(c) | Medical Staff |
| 2.17(d) | Medical Staff Terminations |
| 2.18 | Compliance with Laws |
| 2.21 | Transactions with Affiliates |
| 2.22(a) | Suppliers |
| 2.24(a) | Cost Report Periods |
| 2.24(a)(ii) | Notices of Reopening |
| 2.24(a)(iii) | Medicare or Medicaid Recoupments |
| 2.24(b) | Bad Debt |
| 2.25 | Compliance Program |
| 2.26 | Regulatory Compliance Matters |
| 2.27 | HITECH Attestations |
| 2.29 | Seller's Knowledge Persons |
| 3.4 | Violations |
| 3.7 | Legal Proceedings |
| 3.10 | Purchaser's Knowledge Persons |
| 4.3(a) | Employee Compensation and Bonuses |
| 4.3(b) | Employment or Severance Agreements |
| 4.3(c) | Management Compensation and Bonuses |
| 4.5(a) | Cure Amounts |
| 5.5 | Description of ER Project |
| 5.11 | Primary and Secondary Service Areas |
| 5.12 | Religious Articles and Artifacts |
| 7.6 | Permitted Exceptions |
| 7.8 | Required Consents |
| 9.4 | Post-Closing Real Property Subdivision |
| 10.2 | Pending Governmental Investigations |
| 11(b) | Purchase Price Allocation |

54020/0001-11968411v10

# LIST OF EXHIBITS

| EXHIBIT | DESCRIPTION |
|---|---|
| 1.2 | Net Working Calculation Methodology |
| 1.3 | Good Faith Deposit Agreement |
| 1.5(a) | Deeds |
| 1.5(b) | Bills of Sale |
| 1.5(c) | Assignment and Assumption Agreements |
| 1.5(d) | FIRPTA Certificates |
| 1.5(e) | Powers of Attorney |
| 1.5(j) | Transition Services Agreement |
| 1.5(k) | Deposit Account Transfer Agreement |
| 1.5(m) | Trademark License Agreement |
| 1.5(n) | Trinity Guarantee of Performance |
| 1.6(n) | Prime Guarantee of Performance |
| 4.4A | Bidding Procedures |
| 4.4B | Procedures Order |
| 9.4 | Lot 44 Excluded Real Property Deed |

54020/0001-11968411v10

# FIRST AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

This First Amended and Restated Asset Purchase Agreement (the "*Agreement*") is made and entered into as of this 10TH day of August, 2015 (the "*Effective Date*") by and among **PRIME HEALTHCARE SERVICES – SAINT MICHAEL'S, LLC**, a Delaware limited liability company ("*Purchaser*"), and **SAINT MICHAEL'S MEDICAL CENTER, INC.**, a New Jersey nonprofit corporation ("*SMMC*"), **SAINT JAMES CARE, INC.**, a New Jersey nonprofit corporation ("*SJC*"), **COLUMBUS ACQUISITION CORP.**, a New Jersey nonprofit corporation ("*COLUMBUS*"), and **UNIVERSITY HEIGHTS PROPERTY COMPANY, INC.**, a New Jersey nonprofit corporation ("*UHPC*").  SMMC, SJC, COLUMBUS, and UHPC are also sometimes referred to individually as a "*Seller Party*" and, collectively, the "*Seller*." Purchaser, SMMC, SJC, COLUMBUS, and UHPC are also sometimes referred to individually as a "*Party*" and, collectively, as the "*Parties*."

## R E C I T A L S

**A.**    Seller (1) engages in the business of delivering healthcare services to the public through the operation of an acute care hospital known as Saint Michael's Medical Center located at 111 Central Avenue, Newark, New Jersey 07102 (the "*Acute Care Hospital*"), and (2) owns and operates the outpatient, ancillary and other healthcare businesses incident to the operation of the Acute Care Hospital as specifically identified on Schedule A-1 (the "*Other Businesses*") (the Acute Care Hospital and the Other Businesses are referred to in this Agreement collectively as the "*Hospital*").

**B.**    Each Seller Party has commenced a case (each, a "*Case*" and together, the "*Cases*") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. Sections 101 et seq. (the "*Bankruptcy Code*") on August 10, 2015 (the "*Petition Date*") by filing a voluntary petition with the United States Bankruptcy Court for the District of New Jersey (the "*Bankruptcy Court*");

**C.**    Seller wishes to sell to Purchaser substantially all of the assets of the Seller as specified herein, and Purchaser wishes to purchase such assets and to assume those liabilities relating to the operations of the Hospital and the Other Businesses, on and subject to the terms and conditions set forth in this Agreement and pursuant to Sections 105, 363 and 365 of the Bankruptcy Code (the "*Transactions*");

**D.**    Seller and Purchaser have determined that it is in their respective best interests to consummate the Transactions and in furtherance thereof, have approved this Agreement and the transactions contemplated hereby;

**E.**    The Parties previously entered into an Asset Purchase Agreement dated as of February 8, 2013, as amended (the "*Original Asset Purchase Agreement*"), which amendments included extensions of the due diligence period and a reduction in the Purchase Price to reflect the extinguishment of the Purchaser's due diligence rights regarding the results of an environmental survey, and extensions of the Termination Date; and

**F.**    The Parties wish to amend and restate the Original Asset Purchase Agreement, as set forth herein.

**NOW, THEREFORE,** in consideration of the foregoing premises and the mutual promises and covenants contained in this Agreement, and for their mutual reliance and incorporating into this Agreement the above recitals, the parties hereto agree as follows:

## ARTICLE 1

### DEFINITIONS; SALE AND TRANSFER OF ASSETS; CONSIDERATION; CLOSING

1.1    <u>Definitions</u>.  The terms listed below are defined elsewhere in this Agreement and, for ease of reference, the section containing the definition of each such term is set forth opposite such term.

| Term | Section |
| --- | --- |
| Accounts Receivable | 1.7(e) |
| Acute Care Hospital | Recitals |
| Affiliate | 2.18(e) |
| Aggregate Damage | 1.11(a) |
| Agreement | Preamble |
| Alternate Transaction | 4.4(h) |
| Approval Order | 6.9 |
| Assets | 1.7 |
| Assumed Contracts | 1.7() |
| Assumed Leases | 1.7(j) |
| Assumed Obligations | 1.9 |
| Auction | 4.4(a)(v) |
| Audit Periods | 2.7(d) |
| Avoidance Actions | 1.8(u) |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bidding Procedures | 4.4(a) |
| Bidding Procedures Motion | 4.4(a) |
| Bills of Sale | 1.10 |
| Break-Up Fee | 4.4(a)(vi) |
| Business Day | 1.4 |
| Cases | Recitals |
| Cash Purchase Price | 1.2 |
| Casualty Termination Notice | 1.11(a) |
| Claims | 1.8(u) |
| Casualty Termination Notice Period | 1.11(a) |
| Claim Notice | 10.4(a) |
| Closing Balance Sheet | 1.2 |
| Closing | 1.4 |

| Term | Section |
|------|---------|
| Closing Date | 1.4 |
| COBRA Coverage | 5.3(d) |
| Code | 5.3(d) |
| Consequential Damages | 10.2(c)(vi) |
| Cure Amounts | 4.4(e) |
| Current Assets | 1.2 |
| Current Liabilities | 1.2 |
| Damages | 10.2(a) |
| DIP Credit Facility | 4.3(e) |
| DSH Payments | 1.7(p) |
| Effective Date | Preamble |
| Effective Time | 1.4 |
| Environmental Laws | 2.7(j)(i) |
| Excluded Assets | 1.7 |
| Excluded Bond Trustee Funds | 1.8(e) |
| Excluded Contracts | 1.8(g) |
| Excluded Leases | 1.8(h) |
| Excluded Liabilities | 1.10 |
| Expense Reimbursement | 4.4(a)(vii) |
| Financial Statements | 2.4 |
| Good Faith Deposit | 1.3 |
| Governmental Entity | 4.4(h) |
| Hired Employees | 5.3(a) |
| Hospital | Recitals |
| Indemnified Party | 10.4 |
| Indemnifying Party | 10.4(a) |
| Indemnity Notice | 10.4(b) |
| Interim Financials | 2.9 |
| Inventory | 1.7(n) |
| Joint Commission | 2.16(a) |
| June 30, 2015 Balance Sheet | 2.4 |
| Leased Real Property | 1.7(b) |
| Liens | 1.7 |
| Licenses | 1.6(h) |
| Loss Consultant | 1.11(a) |
| Net Revenue | 1.2 |
| Networking Capital | 1.2 |
| Notice Period | 10.4(a) |
| Order | 4.4(h) |
| Original Closing Date | 1.11(a) |
| Other Businesses | Recitals |
| Owned Real Property | 1.5(a) |
| Owner's Title Policy | 4.8 |
| Permitted Exceptions | 7.7 |
| Person | 4.4(h) |

3

| Term | Section |
|------|---------|

Personal Property ........................................................ 1.7(c)
Petition Date ……………………………………… Recitals
Powers of Attorney ..................................................... 1.5(e)
Pre-Closing E&O Matters............................................ 10.2(a)
Prepaids...................................................................... 1.7(m)
Procedures Order………………………………….. 4.4(a)
Purchase Price ............................................................ 1.2
Purchaser.................................................................... Preamble
Purchaser Indemnified Parties .................................... 10.2(a)
Qualified Bid .............................................................. 4.4(a)
Real Estate Lease ........................................................ 2.7(c)
Real Property .............................................................. 1.7(b)
Receivable Records..................................................... 1.7(f)
Sale Motion................................................................. 4.4(c)
Seller .......................................................................... Preamble
Seller Cost Reports ..................................................... 11.2(a)
Seller Plans................................................................. 4.9
Seller Tax Claims........................................................ 10.2(a)
Termination Date ........................................................ 8.1(h)
Third Party Claim ....................................................... 10.4(a)
Title Commitment ....................................................... 4.8
Title Company ............................................................ 4.8
Title Instruments ......................................................... 4.8
Title Policy.................................................................. 4.8
Trinity………………………………………….... 1.2
Trademark License...................................................... 5.12
Transactions ............................................................... Recitals

1.2    <u>Purchase Price</u>.  Subject to the terms and conditions of this Agreement, the aggregate purchase price to be paid by Purchaser to Seller for the purchase of the Assets shall be (a) Forty-Nine Million One Hundred Fifty Thousand Dollars ($49,150,000) (the "*Purchase Price*"),  *minus* (b) any  negative difference between an amount equal to Seller's Net Working Capital at Closing and an amount equal to ten percent (10%) of Seller's "*Net Revenue*" (*i.e.*, Seller's total unrestricted revenue, gains and other support) for the 2014 fiscal year, *plus* or *minus* (c) the positive or negative difference, as the case may be, between the amount of cash and cash equivalents and short term investments included among the Assets and Thirteen Million Dollars ($13,000,000) (the sum of (a), (b) and (c) being referred to for the purposes of this Agreement as the "*Cash Purchase Price*.")

For purposes of this Agreement, the term "*Net Working Capital*," as of any date shall be defined as an amount equal to the difference between (i) all current assets of Seller other than the Excluded Assets (the "*Current Assets*"), and (ii) the current liabilities of Seller, which for the purposes of this Agreement shall only include accounts payable, accrued expenses, and other current liabilities reflected on the unaudited consolidated balance sheet of the Seller as of the Closing (the "*Closing Balance Sheet*"), (A) excluding the Excluded Liabilities, any current

54020/0001-11968411v10

portion of long-term debt, any amounts due from Seller to Trinity Health Corporation ("*Trinity*") in connection with the Trinity cash management program, any amounts due for third party payor settlements, and any current liabilities not reflected on the Closing Balance Sheet and (B) including the current portion of Seller's liabilities under Assumed Contracts and Assumed Leases (excluding only contracts and leases that do not comply with applicable law or impose material obligations not reflected on Seller's Financial Statements) (the "*Current Liabilities*"). The calculation of Seller's Net Working Capital at the Closing and the dispute mechanism shall be determined in accordance with the methodology set forth at Exhibit 1.2.

     1.3    Good Faith Deposit.  Purchaser has delivered to First American Title Insurance Company (the "*Title Company*"), by wire transfer of immediately available funds, for earnest money, Two Million Dollars ($2,000,000) (the "*Good Faith Deposit*").  The Title Company shall hold the Good Faith Deposit pursuant to the terms of the Good Faith Deposit Agreement attached as Exhibit 1.3 which Seller, Purchaser, and the Title Company have executed.  The Good Faith Deposit is non-refundable regardless of the termination of this Agreement pursuant to Section 8.1, except that Purchaser shall be entitled to return of the Good Faith Deposit in the event Purchaser terminates this Agreement pursuant to the terms set forth in Sections 8.1(c), 8.1(d), 8.1(h) or 8.1(i) (but exclusive of a Purchaser termination pursuant to Section 7.10), if Seller terminates under 8.1(e) (if such termination is for failure of the condition in Section 6.9), or either Seller or Purchaser terminates under Sections 8.1(f), 8.1(g) or 8.1(j).  In the event the Closing occurs, the Good Faith Deposit shall be applied as a credit against the Purchase Price, payable at Closing pursuant to Section 1.6(a).

     1.4    Closing Date.  The consummation of the transactions contemplated by this Agreement (the "*Closing*") shall take place at 9:00 a.m. local time on a date agreed upon by the Parties which is not more than five (5) Business Days after all conditions precedent to Closing have been satisfied or waived in accordance with this Agreement and all other matters required to be completed as of the Closing Date have been so completed, at the offices of Cole Schotz P.C., Court Plaza North, 25 Main Street, Hackensack, NJ 07601, or such other date, time and place as the Parties shall mutually agree ("*Closing Date*").  The Closing shall be deemed to have occurred and be effective as between the Parties as of 12:00:01 a.m. Eastern time the next day after the Closing Date (the "*Effective Time*").  Seller will own, control the management of and operate the Hospital until immediately prior to the Effective Time.  For purposes of this Agreement, the term "*Business Day*" shall mean day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in New Jersey.

     1.5    Items to be Delivered by Seller Parties at Closing.  At or before the Closing, Seller shall execute and deliver or cause to be delivered to Purchaser directly or through the Title Company the following, duly executed by each Seller Party where appropriate:

     (a)    Deed(s) executed by each applicable Seller Party, as applicable, in the form of Exhibit 1.5(a) conveying to Purchaser fee simple title to the Owned Real Property, free and clear of all Liens other than the Permitted Exceptions (the "*Deeds*"), and valid Certificates of Occupancy for the Owned Real Property;

     (b)    Bills of Sale and Assignments in the form of Exhibit 1.5(b), executed by each Seller Party, as applicable, conveying to Purchaser good and valid title to the Assets (other

5

than the Real Property), free and clear of all Liens other than the Permitted Exceptions (the "*Bills of Sale*");

(c)     Assignment and Assumption Agreements in the form of Exhibit 1.5(c), executed by each Seller Party conveying to Purchaser all of Seller's rights and interests in the Assumed Contracts and Assumed Leases to which the applicable Seller Party is a party ("*Assignment and Assumption Agreements*");

(d)     Certificates in the form of Exhibit 1.5(d), executed by each applicable Seller Party, stating, under the penalty of perjury, that as of the Closing Date, it is not a "*foreign person*" for the purposes of Section 1445 of the Code, and that as of the Closing Date withholding of tax will not be required in connection with the contemplated transfer of the Real Property by the applicable Seller Party to Purchaser;

(e)     Limited Powers of Attorney for use of DEA and Other Registration Numbers, and DEA Order Forms, in the form of Exhibit 1.5(e) attached hereto executed by SMMC (the "*Powers of Attorney*");

(f)     Copies of resolutions duly adopted by the board of directors of each Seller Party authorizing and approving the execution and delivery of this Agreement, and the consummation of the transactions contemplated by this Agreement, certified as true and in full force and effect as of the Closing Date by the appropriate officer of each Seller Party;

(g)     Certificate of a duly authorized officer of each Seller Party certifying that each representation and warranty of the Seller Party is true and correct as of the Closing Date, and that each and all of the terms, covenants and agreements to be complied with or performed by the Seller Party on or before the Closing Date have been complied with and performed or waived;

(h)     Certificate of incumbency for the respective officers of each Seller Party executing the Agreement and the other closing documents, dated as of the Closing Date;

(i)     Good standing certificates for each Seller Party from the Office of the Division of Revenue of the State of New Jersey dated not more than ten (10) days prior to the Closing Date;

(j)     An agreement whereby Trinity has agreed to provide certain transition services to Purchaser after the Closing which shall contain the operative provisions described on Exhibit 1.5(j) (the "*Transition Services Agreement*") duly executed by Trinity;

(k)     A deposit account transfer agreement in the form of Exhibit 1.5(k) covering disposition of accounts receivable of third-party government payors to Purchaser (the "*Deposit Account Transfer Agreement*"), duly executed by Trinity;

(l)     Evidence of approvals, if any, required for the transactions contemplated by this Agreement in a form reasonably acceptable to Purchaser;

(m)     The Trademark License Agreement in the form of Exhibit 1.5(m) and referenced in Section 5.11, duly executed by Seller;

(n)     A guarantee of performance in the form of Exhibit 1.5(n) whereby Trinity has agreed to provide a guaranty of the performance of certain of the Seller's covenants, indemnification responsibilities or other obligations pursuant to this Agreement;

(o)     A certified copy of the Approval Order; and

(p)     Such other instruments, certificates, consents or other documents which are reasonably necessary to carry out the transactions contemplated by this Agreement and to comply with the terms hereof.

1.6     Items to be Delivered by Purchaser at Closing.  At or before the Closing, Purchaser shall execute and deliver or cause to be delivered to Seller directly or through the Title Company the following, duly executed by Purchaser where appropriate:

(a)     Payment to Seller of the Cash Purchase Price calculated in accordance with Section 1.2 by wire transfer of immediately available funds to the account(s) specified by Seller to Purchaser in writing;

(b)     The Bills of Sale executed by Purchaser;

(c)     The Assignment and Assumption Agreements executed by Purchaser;

(d)     The Powers of Attorney executed by Purchaser;

(e)     Copies of resolutions duly adopted by the board of directors of Purchaser authorizing and approving the execution and delivery of this Agreement, and the consummation of the transactions contemplated by this Agreement, certified as true and in full force and effect as of the Closing Date by the appropriate officer of Purchaser;

(f)     Certificate of a duly authorized officer of Purchaser certifying that each representation and warranty of Purchaser is true and correct as of the Closing Date, and that each and all of the terms, covenants and agreements to be complied with or performed by Purchaser on or before the Closing Date have been complied with and performed or waived;

(g)     Certificate of incumbency for the respective officers of Purchaser executing the Agreement and the other closing documents, dated as of the Closing Date;

(h)     Good standing, status and/or tax certificates for Purchaser from the Office of the Division of Revenue of the State of New Jersey dated not more than ten (10) days prior to the Closing Date;

(i)     Good standing, status and/or tax certificates for Purchaser from the Office of the Secretary of State of Delaware dated not more than ten (10) days prior to the Closing Date;

7

(j)       Evidence of approvals, if any, required for the transactions contemplated by this Agreement in a form reasonably acceptable to Purchaser;

(k)       The Transition Services Agreement duly executed by Purchaser;

(l)       The Deposit Account Transfer Agreement duly executed by Purchaser;

(m)       The Trademark License Agreement duly executed by Purchaser;

(n)       A guarantee of performance in the form of <u>Exhibit 1.6(n)</u> whereby Prime Healthcare Services, Inc. has agreed to provide a guaranty of the performance of certain of the Purchaser's covenants, indemnification responsibilities or other obligations pursuant to this Agreement; and

(o)       Such other instruments, certificates, consents or other documents which are reasonably necessary to carry out the transactions contemplated by this Agreement and to comply with the terms hereof.

1.7    <u>Transfer of Seller Assets</u>.  On the Closing Date and subject to the terms and conditions of this Agreement and subject to the approval of the Bankruptcy Court pursuant to <u>Section 105</u>, <u>363</u> and <u>365</u> of the Bankruptcy Code, Seller shall sell, assign, transfer, convey and deliver to Purchaser, free and clear of all Claims, liens, charges and encumbrances of any kind or nature ("*Liens*"), other than the Permitted Exceptions, and Purchaser shall acquire, all of Seller's right, title and interest in and to all of Seller's assets existing on the Closing Date, to the extent not included among the Excluded Assets, such transfer being deemed to be effective at the Effective Time (collectively, the "*Assets*") including, without limitation, the following:

(a)       except for the Excluded Real Property, all of the real property that is owned by any Seller Party, including, without limitation, the real property that is used with respect to the operation of the Hospital and the real property that is described in <u>Schedule 1.7(a)</u>, together with all buildings, improvements and fixtures located thereupon, including, without limitation, all buildings and other improvements then under construction (collectively, the "*Owned Real Property*");

(b)       all of Seller's interest, to the extent assignable or transferable by Order of the Bankruptcy Court or otherwise in real property that is leased by a Seller Party including, without limitation, the leased real property described in <u>Schedule 1.7(b)</u> (the "*Leased Real Property*") (the Owned Real Property and the Leased Real Property are collectively referred to in this Agreement as the "*Real Property*");

(c)       all of the tangible personal property owned by Seller including equipment, furniture, fixtures, machinery, vehicles, office furnishings, and leasehold improvements (the "*Personal Property*"), including, without limitation, the Personal Property described in <u>Schedule 1.7(c)</u>;

(d)       all cash, cash equivalents and short-term investments held in any account in the name of or for the benefit of any Seller Party, if any;

(e)    all accounts owed to, notes, interest payable under the foregoing and other receivables of Seller, including accounts, notes or other amounts receivable from physicians or medical groups, and all claims, rights, interests and proceeds related thereto, including all accounts and other receivables, disproportionate share payments and cost report settlements related thereto, in each case arising from the rendering of services or provision of goods, products or supplies to inpatients and outpatients at the Hospital, billed and unbilled, recorded and unrecorded, for services, goods, products and supplies provided by Seller prior to the Effective Time whether payable by Medicare, Medicaid, TRICARE, medically indigent assistance programs, Blue Cross, Blue Shield or any other payor (including, without limitation, any insurance company, health care service plan, self-funded health plan), including any monies allocated to the Hospital pursuant to any charity program in New Jersey (such as the Hospital Care Payment Assistance Program and the Health Care Stabilization Fund), or any health care provider or network (such as a health maintenance organization, preferred provider organization or any other managed care program) or any fiscal intermediary of the foregoing, private pay patients, private insurance or by any other source ("*Accounts Receivable*");

(f)    all documents, records, correspondence, work papers and other documents other than patient records, relating to the Accounts Receivable (the "*Receivable Records*");

(g)    intentionally omitted;

(h)    intentionally omitted;

(i)    all of Seller's rights, to the extent assignable or transferable, to all licenses, provider numbers, permits, approvals, certificates of need, certificates of exemption, franchises, accreditations and registrations and other governmental licenses, permits or approvals issued to any Seller Party for use in the operation of the Hospital (the "*Licenses*"), including, without limitation, the Licenses, Provider Agreement(s), and Provider Number(s) assigned to Seller by the Medicare, Medicaid and TRICARE programs, all as described in Schedule 1.7(i), subject to the government's approval of the assignment and assumption by Purchaser of any Seller Party's current and valid Provider Agreement;

(j)    all of Seller's interest, to the extent assignable or transferable, in and to all real property and personal property leases with respect to the operation of the Hospital herein except for the Excluded Leases (the "*Assumed Leases*");

(k)    all of Seller's interest, to the extent assignable or transferable, in and to all contracts and agreements (including, but not limited to, purchase orders) with respect to the operation of the Hospital, except for the Excluded Contracts (the "*Assumed Contracts*");

(l)    all of those advance payments, prepayments, prepaid expenses, deposits and the like which exist as of the Closing Date, (the "*Prepaids*");

(m)    except as excluded by Section 1.8(i), all inventories of supplies, drugs, food, janitorial and office supplies and other disposables and consumables (the "*Inventory*");

(n)    all rights to settlements and retroactive adjustments, if any, whether arising under a cost report of any Seller Party or otherwise, for any reporting periods ending on

or prior to the Effective Time, whether open or closed, arising from or against the United States government under the terms of the Medicare or Medicaid programs or TRICARE (formerly the Civilian Health and Medical Program of the Uniformed Services ("*CHAMPUS*"));

(o)      all Medicare or Medicaid disproportionate share replacement payments (the "*DSH Payments*") received on and after the Effective Time regardless of the State fiscal year for which the DSH Payments are made in reference to and regardless of the State fiscal year for which the data was derived to calculate eligibility for such payments.  The parties acknowledge and agree that DSH Payments are determined for a particular fiscal year based on data reported for a previous State fiscal year(s).  Notwithstanding the foregoing, the parties hereby confirm that it is the express intent of the parties that Purchaser shall receive the benefit of all DSH Payments received on and after the Effective Time regardless of whether the payments are made in reference to a State fiscal year prior to the Effective Time and regardless of whether the DSH Payments were calculated based on data reported for a State fiscal year prior to the Effective Time;

(p)      all rights, if any, to meaningful use payments or recoveries;

(q)      all rights to receive HITECH Payments under the Medicare EHR Incentive Program or under the New Jersey Medicaid EHR Incentive Program (including all rights to pursue such payment and/or appeal any decision regarding such payments) for any applicable fiscal year (for purposes of this Agreement, "HITECH Payments" means Medicare and Medicaid incentive payments and rights to receive such payments based on attestations submitted or to be submitted with respect to "meaningful use" of certified electronic health record technology ("*EHR Technology*") (as those terms are defined under the Health Information Technology for Economic and Clinical Health Act (the "*HITECH Act*"), pursuant to the requirements of the implementing regulations under the HITECH Act);

(r)      all documents, records, operating manuals, files and computer software with respect to the operation of the Hospital, except for any of the above that are proprietary to Seller or Seller's sole corporate member, Trinity Health Corporation, an Indiana nonprofit corporation, including, without limitation, all patient records, medical records, employee records, financial records with respect to the operation of the Hospital, equipment records, construction plans and specifications, and medical and administrative libraries;

(s)      the electronic funds transfer accounts of the Facilities (the "*EFT Accounts*"), all other bank accounts into which accounts receivable pertaining to the Hospital are deposited, and all information necessary to access the EFT Accounts and such other accounts, but excluding any cash, cash equivalents or short-term investments held in the EFT Accounts or such other accounts as of the Closing Date;

(t)      all of Seller's interests in those joint ventures, partnerships, corporations and limited liability companies listed on Schedule 1.7(t);

(u)      to the extent specifically set forth in Section 1.11, benefits, proceeds or any other amounts payable under any policy of insurance maintained by Seller with respect to the physical condition of the Assets;

(v)    the interest of Seller in computer software, programs, systems,  healthcare information systems and related documentation, including any and all electronic health record systems and technology owned by Seller and used in connection with Seller's operations and attestations of "meaningful use," in connection with the operation of the Hospital;

(w)    to the extent assignable, all rights of Seller in all warranties of any manufacturer or vendor in connection with the Personal Property;

(x)    all goodwill of the Hospital evidenced by the Assets;

(y)    any interest of Seller in the URL or domain name utilized for the Hospital, together with certain content therein as described on Schedule 1.7(y);

(z)    the telephone and facsimile numbers used with respect to the operation of the Hospital;

(aa)    the names and symbols of the Hospital set forth on Schedule 1.7(aa), subject to Section 5.11;

(bb)    all claims, rights, interests and proceeds (whether received in cash or by credit to amounts otherwise due to a third party) with respect to amounts overpaid by Seller to any third party with respect to periods prior to the Effective Time (e.g., such overpaid amounts may be determined by billing audits undertaken by Purchaser or Purchaser's consultants), provided, however, that any such amounts will be offset against amounts determined to have been underpaid by Seller to any third party with respect to periods prior to the Effective Time; and

(cc)    any other assets owned by Seller (which are not otherwise specifically described above in Section 1.7) and which are used in the operation of the Hospital and are not otherwise identified as an Excluded Asset in Section 1.8.

1.8    Excluded Assets.  Notwithstanding anything to the contrary in Section 1.7, Seller shall retain the following assets (collectively, the "*Excluded Assets*"):

(a)    all assets associated with any pension plan or other Benefits Plans, including without limitation, any asset which would revert to the employer upon the termination of any Benefits Plan, including assets representing a surplus or overfunding of any Benefits Plan;

(b)    all of Seller's rights and interests in Chestnut Risk Services, Ltd.;

(c)    all of Seller's rights and interests in Saint Michael's Foundation, Inc. and all assets owned by the Saint Michael's Foundation, Inc.;

(d)    the real property and improvements described on Schedule 1.8(d) (the "*Excluded Real Property*");

(e)    intentionally omitted;

11

(f)      all religious articles and artifacts, which shall remain on site at the Hospital subject to Section 5.12;

(g)      all contracts that:  (i) are made available to Seller by virtue of Seller's relationships with Trinity or its Affiliates; (ii) relate to Excluded Assets, including without limitation, contracts related to any pension plan or other Benefits Plan; (iii) impose material financial obligations on Seller that are not reflected on Seller's financial statements; or (iv) are listed on Schedule 1.8(g) (collectively, the "*Excluded Contracts*");

(h)      all leases that:  (i) are made available to Seller by virtue of Seller's relationships with Trinity or its Affiliates ; (ii) relate to Excluded Assets; (iii) impose material financial obligations on Seller that are not reflected on Seller's financial statements; (iv) certain lease agreement dated as of November 2008, as amended, between Seller and Columbus MedRealty, LLC, (v) that certain lease agreement dated as of November 2008, as amended, between Seller and Saint James MedRealty, LLC (provided that Purchaser will sublease from Seller, or reimburse Seller for its lease payment obligations, through the later of August, 2013 or the date Purchaser stops using the space for the space that comprises the behavioral health business operations if this transaction closes prior to such date), or (vi) are listed on Schedule 1.8(h) (collectively, the "*Excluded Leases*");

(i)      the portions of Inventory, Prepaids and other Assets disposed of, expended or canceled, as the case may be, by Seller after the Effective Date and prior to the Effective Time in the ordinary course of business;

(j)      assets owned and provided by vendors of services or goods to the Hospital;

(k)      all claims, rights, interests and proceeds with respect to state or local tax refunds (including but not limited to property tax) resulting from periods prior to the Effective Time, and the right to pursue appeals of same;

(l)      all of Seller's organizational or corporate record books, minute books and tax records;

(m)      all insurance policies and programs, all related premiums and refunds, records relative thereto, and proceeds arising in connection with the operation of the Assets or the Hospital prior to the Closing Date not specifically assigned to Purchaser pursuant to Section 1.7;

(n)      all unclaimed property in the possession of Seller and belonging to any third party as of the Effective Time, including, without limitation, property which is subject to applicable escheat laws;

(o)      all documents, records, operating manuals and film pertaining to the Hospital (a) which are proprietary to Seller, or (b) which the parties agree that Seller is required by law to retain;

(p)      the rights of Seller and its Affiliates under this Agreement, agreements, ancillary to this Agreement, instruments and certificates referenced herein, including the proceeds of the transaction contemplated by this Agreement;

(q)      all donor restricted assets, and all past, present and future rights to bequests, devises, donor restricted gifts and the like, that name a Seller Party as beneficiary or recipient other than interests in the Real Property or any tangible assets utilized in the Seller's business at the time of Closing;

(r)      all rights, title and interest of the Seller to use of the names "*Saint Michael's," "Saint James*" and "*Columbus*" as well as all derivations or abbreviations thereof, subject to Section 5.11;

(s)      all trademarks, service marks, trade names, trade dress, copyrights and registrations and renewals of the foregoing that include the name "*Trinity*" or "*Catholic Health Ministries*" (as well as derivations and abbreviations thereof),

(t)      any assets identified in Schedule 1.8(t); and

(u)      all rights, demands, claims, actions and causes of action (collectively, the "*Claims*") that any Party may have against any third party, including any Governmental Entity, under Chapter 5 of the Bankruptcy Code (collectively, the "*Avoidance Actions*").

1.9      Assumed Obligations.  On the Closing Date, Seller shall assign, and Purchaser shall assume and agrees to discharge, perform and satisfy fully, on and after the Effective Time, the following liabilities and obligations of Seller and only the following liabilities and obligations (collectively, the "*Assumed Obligations*"):

(a)      the Assumed Contracts and all liabilities of Seller under the Assumed Contracts with respect to events or periods on and after the Closing Date;

(b)      the Current Liabilities of Seller;

(c)      all current and valid provider contracts of any Seller Party with the Medicare, Medicaid and TRICARE programs, including, without limitation, the Provider Agreement, subject to the government's approval of Seller's assignment and Purchaser's assumption thereof;

(d)      the Assumed Leases and all liabilities of Seller under the Assumed Leases with respect to events or periods on and after the Closing Date;

(e)      all liabilities arising out of or relating to any act, omission, event or occurrence connected with the use, ownership or operation by Purchaser of the Hospital or any of the Assets on or after the Effective Time, whether accrued, fixed, contingent, liquidated, unliquidated, recorded, unrecorded, known, unknown or otherwise;

(f)      the Accrued Payroll and Accrued Paid Time Off of Seller's employees as of the Closing Date;

13

(g)    all unpaid real and personal property taxes;

(h)    all expenses associated with utility services being furnished to the Assets;

(i)    any documentary, sales and transfer tax liabilities of Seller incurred as a result of the consummation of the transaction contemplated by this Agreement; and

(j)    any other obligations and liabilities identified in <u>Schedule 1.9(j)</u>.

1.10    <u>Excluded Liabilities</u>.  Notwithstanding anything to the contrary in <u>Section 1.9</u>, Purchaser shall not assume or become responsible for any of Seller's duties, obligations or liabilities that are not expressly assumed by Purchaser pursuant to the terms of this Agreement, the Bills of Sale or the Assignment and Assumption Agreements (the "*Excluded Liabilities*"), and Seller shall remain fully and solely responsible for all of Seller's debts, liabilities, contract obligations, expenses, obligations and claims of any nature whatsoever related to the Assets or the Hospital unless assumed by Purchaser under this Agreement, in the Bill of Sale or in the Assignment and Assumption Agreements.  The Excluded Liabilities shall include, without limitation:

(a)    all liabilities of Seller arising out of or relating to any professional liability claims arising out of the operations of the Hospital prior to the Effective Time ("*Pre-Closing E & O Claims*");

(b)    those liabilities of Seller that are not among the Current Liabilities or otherwise referenced among the Assumed Liabilities, including, without limitation, any long-term debt (including the current portion of any such indebtedness), any amounts due from Seller to Trinity in connection with the Trinity cash management program, any liabilities associated with any pension plan or other Benefits Plans, and any amounts due for third party payor settlements;

(c)    all liabilities of Seller for violations of any law, regulation or rule to the extent arising from acts or omissions of Seller prior to the Effective Time, including, without limitation, any such liabilities associated with any government reimbursement program;

(d)    all liabilities of Seller under the Excluded Contracts and under any contract that is among the Excluded Assets, except as otherwise set forth in <u>Section 1.9(j)</u>;

(e)    all liabilities of Seller under the Excluded Leases and under any contract that is among the Excluded Assets, except as otherwise set forth in <u>Section 1.9(j)</u>;

(f)    all liabilities of Seller for commissions or fees owed to any finder or broker in connection with the transactions contemplated hereunder including, without limitation, any amounts due to B of A Merrill Lynch; and

(g)    all liabilities of Seller that are not Assumed Obligations or which are not reflected in the Closing Balance Sheet.

1.11    Risk of Loss.  The risk of loss or damage to any of the Assets, Personal Property, Owned Real Property, the Hospital and all other property, transfer of which is contemplated by this Agreement, shall remain with Seller until the Effective Time and Seller shall maintain such insurance policies of Seller as are in effect at the Effective Date, or comparable policies of insurance or self-insurance covering the Assets, the Hospital and all other property through the Effective Time.

(a)    With respect to the Real Property, if prior to the Closing, all or any part of the Real Property is destroyed or damaged by fire or the elements or by any other cause where such damage or destruction is in the aggregate (the "*Aggregate Damage*") less than or equal to ten percent (10%) of the Purchase Price, the parties' duties and obligations under this Agreement shall not be affected and the Closing shall proceed as scheduled; provided, however, that Seller shall retain any and all insurance proceeds and other or similar third party recompense on accounts of such damage or destruction and the Aggregate Damages (up to ten percent (10%) of the Purchase Price) shall be deducted from the Purchase Price.  If prior to the Closing, all or any part of the Real Property is destroyed or damaged by fire or the elements or by any other cause where the Aggregate Damage exceeds ten percent (10%)  of the Purchase Price, then either of Seller or Purchaser, in the exercise of its sole discretion, may elect to terminate this Agreement by written notice to the other (the "*Casualty Termination Notice*") delivered after the date which is fifteen (15) calendar days after the occurrence of such damage or destruction but no later than the date which is thirty (30) calendar days after the occurrence of such damage or destruction (the "*Casualty Termination Notice Period*"); provided, however, that in no event shall the Casualty Termination Notice be provided if Seller and Purchaser are unable to agree prior to the inception of the Casualty Termination Notice Period that the amount of the Aggregate Damage exceeds ten percent (10%)  of the Purchase Price. If Purchaser and Seller are unable to agree upon the amount of the Aggregate Damage by the earlier to occur of (a) the originally scheduled Closing Date (the "Original Closing Date"), or (b) the inception of the Casualty Termination Notice Period, the amount of the Aggregate Damage shall be determined by Centex Rodgers, Inc. (the "*Loss Consultant*") pursuant to Section 1.11(d).  If this Agreement is not terminated by Casualty Termination Notice pursuant to this Section 1.11(a), then the Aggregate Damage either as agreed by the parties or as established pursuant to Section 1.11(d) shall be deducted from the Purchase Price and Seller shall retain any and all insurance proceeds and other similar third party recompense.  If Purchaser and Seller are unable to agree on the amount of the Aggregate Damage by the earlier to occur of (x) the Original Closing Date, or (y) the inception of the Casualty Termination Notice, the amount of the Aggregate Damage shall be determined by the Loss Consultant pursuant to Section 1.11(d).

(b)    With respect to any Assets other than Real Property which are destroyed or damaged by fire or the elements or by any other cause prior to the Closing, Seller will deduct from the Purchase Price the cost to repair, restore and/or replace the Assets other than the Real Property (using the lesser of cost of repair, restore or replace as applicable), and Seller will be entitled to any and all insurance proceeds and other or similar third party recompense for such destruction or damage.  Notwithstanding anything in this Agreement to the contrary, if the damage to the Assets other than the Real Property is greater than ten percent (10%) of the Purchase Price, then either of Seller or Purchaser, in the exercise of its sole discretion, may elect to terminate this Agreement by written notice to the other.

(c)      If prior to the Closing, all or any part of a parcel of the Real Property is made subject to an eminent domain proceeding which would in Purchaser's reasonable judgment materially adversely impair access to the Real Property or be materially adverse to the operation of the Hospital, Purchaser may elect to (i) purchase such affected Owned Real Property, or take assignment of such Leased Real Property, and the Closing shall proceed as scheduled (provided, however, that at the Closing Seller shall assign, transfer and set over to Purchaser all of Seller's right, title and interest in and to any award in such eminent domain proceeding), or (ii) elect to terminate this Agreement by written notice to Seller.  If Purchaser and Seller are unable to agree upon the amount of the adjustment described in subsection (i) of the preceding sentence by the Original Closing Date, the adjustment shall be resolved by the Loss Consultant pursuant to Section 1.11(d).

(d)      If pursuant to either Section 1.11(a) or 1.11(c), the amount of the Aggregate Damage (and any applicable Purchase Price adjustment) is to be determined by the Loss Consultant, within five (5) calendar days after the earlier to occur of the Original Closing Date or the inception of the Casualty Termination Notice Period (the "*Submittal Date*"), each party shall submit to the other party and to the Loss Consultant its proposed Aggregate Damage (and any applicable Purchase Price adjustment) as a result of the event(s) contemplated by either Section 1.11(a) or 1.11(c), along with a detailed description of the basis for such amount and any applicable adjustment.  Within ten (10) calendar days after the Submittal Date (the "Decision Date"), the Loss Consultant, acting as an expert and not as an arbitrator, shall select either the Aggregate Damage (and any applicable Purchase Price adjustment) proposal of Seller or the Aggregate Damage (and any applicable Purchase Price adjustment) proposal of Purchaser as the definitive amount of the Aggregate Damage (and any applicable adjustment to the Purchase Price) and Purchaser or Seller shall thereafter have the right to provide a Casualty Termination Notice provided that the Aggregate Damage exceeds ten percent (10%) of the Purchase Price. If either Purchaser or Seller fails to timely provide their proposed Aggregate Damage (and any applicable Purchase Price adjustment) to the Loss Consultant, the Aggregate Damage (and any applicable Purchase Price adjustment) shall be the amount proposed by the submitting party, and Purchaser or Seller shall thereafter have the right to provide a Casualty Termination Notice provided that the Aggregate Damage exceeds ten percent (10%) of the Purchase Price.  If neither party submits its proposed Aggregate Damage (and any applicable Purchase Price adjustment) to the Loss Consultant, no adjustment to the Purchase Price shall be made and neither Purchaser nor Seller shall have the right to provide a Casualty Termination Notice.  The decision of the Loss Consultant shall be conclusive and binding as between Purchaser and Seller, and the costs of such review shall be borne by the party whose proposed Aggregate Damage (and any applicable Purchase Price adjustment) is not selected by the Loss Consultant.  Upon any such determination of the adjustment to the Purchase Price in accordance with this Section 1.11, the parties shall, subject to the terms and conditions of this Agreement, consummate the transactions contemplated by this Agreement at a mutually agreeable time and place, in accordance with the provisions of this Agreement. If pursuant to either Section 1.11(a) or 1.11(c), the amount of the Aggregate Damage (and any applicable Purchase Price adjustment) is to be determined by the Loss Consultant and either the Submittal Date or the Decision Date falls on a day which is on or after the Termination Date, then the Termination Date shall be extended to the date which is ten (10) calendar days after the Decision Date.

# ARTICLE 2

## REPRESENTATIONS AND WARRANTIES OF SELLER

As an inducement to Purchaser to enter into this Agreement and to consummate the transactions contemplated by this Agreement, each Seller Party hereby represents, warrants and covenants to Purchaser as to the following matters, except as disclosed in the disclosure schedule as of the Effective Date, as may be amended pursuant to the terms of this Agreement (the "*Disclosure Schedule*") hereby delivered by Seller to Purchaser:

2.1     <u>Organization; Good Standing</u>.  Each Seller Party is a nonprofit corporation duly organized, validly existing and in good standing under the laws of the State of New Jersey, each with requisite power and authority to carry on its respective businesses as they are presently being conducted.

2.2     <u>Authority; Consents; Validity; No Breach</u>.

(a)     Subject to the entry of the Approval Order, each Seller Party has the requisite power and authority to execute, deliver and carry out the terms of this Agreement and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance of this Agreement has been duly authorized and approved by all necessary actions of each Seller Party and do not require any further authorization or consent of any Seller Party.

(b)     The execution, delivery and performance by Seller of this Agreement and the consummation by Seller of the transactions contemplated by this Agreement:

(i)     do not conflict with the articles of incorporation or bylaws of any Seller Party, and have been duly authorized by all appropriate corporate or member action of each Seller Party;

(ii)     assuming the receipt of all consents discussed in this Agreement and the entry of the Approval Order, will not result in the breach, default, acceleration, loss of benefit or violation of any material contract to which any Seller Party is a party or by which any Seller Party is bound; and

(iii)     will not result in any breach or contravention of, or permit the acceleration of the maturity of, any debts, obligations or liabilities of any Seller Party (other than Excluded Liabilities) and do not create or permit the creation of any encumbrance on or affecting any of the Assets.

2.3     <u>The Assets</u>.  The Assets (other than Assets leased pursuant to contracts) are legally and beneficially owned by a Seller Party and, as of the Closing Date, and subject to the entry of the Approval Order, will be free and clear of Liens (other than the Permitted Exceptions), and a Seller Party has a valid leasehold interest in the Assets leased by such entity. The Assets (other than Assets leased pursuant to contracts) are owned free and clear of any Liens (other than Permitted Exceptions).  Except as set forth on <u>Schedule 2.3</u>, the Assets include all of the Real Property, Personal Property and other assets of every kind and nature whatsoever owned by Seller and used for the operation of the Hospital as currently conducted and as conducted.

17

Except as set forth on Schedule 2.3, the Assets constitute all of the assets that are reasonably necessary for the operation of the Hospital as conducted by Seller as of the Effective Date and as of the Closing.

2.4     Financial Statements.  Attached hereto as Schedule 2.4 are true and complete copies of the:  (a) audited balance sheets of Seller with respect to the Assets as of December 31, 2013 and December 31, 2014 (the "*December 31, 2014 Balance Sheet*") and the related statements of operations for each fiscal year then ended (the "*Prior Years Statements*"), and (b) unaudited balance sheet of Seller with respect to the Assets as of June 30, 2015 (the "*June 30, 2015 Balance Sheet*").  The Prior Years Statements and the June 30, 2015 Balance Sheet, and the Monthly Statements (as hereinafter defined) are collectively referred to as the "*Financial Statements*."  The Financial Statements have been prepared from, and are in accordance with, the books and records of Seller (on a consolidated basis) and fairly present the financial condition and results of operations of Seller (on a consolidated basis) in all material respects, as of the respective dates thereof and for the periods therein referred to, all in accordance with GAAP, subject, in the case of the June 30, 2015 Balance Sheet, and the Monthly Statements, to normal year-end adjustments and the absence of financial statement notes.

2.5     Absence of Undisclosed Liabilities.  Except as set forth on Schedule 2.5, to the extent accrued or disclosed in the Financial Statements and other than liabilities and obligations incurred in the ordinary course of business, since the date of the June 30, 2015 Balance Sheet, Seller does not have any other liabilities or obligations of any nature whatsoever with respect to the Acute Care Hospital, the Other Businesses or the Assets, whether due, accrued, absolute, contingent or otherwise.

2.6     No Adverse Changes.  Since the date of the June 30, 2015 Balance Sheet, other than as contemplated or permitted by this Agreement, Seller has operated the Acute Care Hospital and the Other Businesses only in the Ordinary Course of Business and, except as shown on Schedule 2.6, none of the following have occurred:

(a)     Any material amendment of, or termination of, any material contract by Seller;

(b)     Any material condemnation, casualty, physical damage, destruction or physical loss respecting, or material change in the physical condition of, any of the Asset;

(c)     No sale, transfer or disposition of any Asset included in the June 30, 2015 Balance Sheet having a net book value in excess of $50,000, unless such asset is replaced with an equivalent asset of equal value;

(d)     Any change in the method of accounting or accounting principle, practice or policy that affects the Financial Statements;

(e)     Any material amendment (other than general amendments which the carrier makes for a category of policy) or termination of any insurance policy or failure to renew any insurance policy covering or relating to any of the Acute Care Hospital, the Other Businesses or the Assets;

18

(f)      Any material default or breach by Seller or the Other Businesses under any contract that would have been a contract included in the definition of Assets herein as of the date of the June 30, 2015 Balance Sheet;

(g)      Any incurrence of indebtedness with respect to the Acute Care Hospital, any of the Other Businesses or the Assets outside the ordinary course of business;

(h)      Any encumbrances other than Permitted Exceptions on any of the Assets; or

(i)      Any (i) adoption of, or amendment to (except as required by law), any employee benefits plan, (ii) except in the ordinary course of business, increase the compensation levels or benefits of any officer of the Seller, or (iii) except in the ordinary course of business general increase in the compensation levels or benefits of Seller's other employees.

2.7      <u>Real Property</u>.

(a)      <u>Schedule 2.7(a)(i)</u> sets forth a legal description and the address of all Owned Real Property.  Each Seller now owns good, indefeasible, fee simple title to all of the Owned Real Property which, as of the Closing Date, will be free and clear of any and all encumbrances other than the Permitted Exceptions and good leasehold interest in all of the Leased Real Property, subject to the Permitted Exceptions, the entry of the Approval Order and the payment of all Cure Amounts required with respect to the assumption of such Real Estate Lease.  Except as set forth on <u>Schedule 2.7(a)(ii)</u>, there are no purchase contracts, options, rights of first refusal, restrictions on transfer, easements or other agreements of any kind whereby any person or entity will have acquired or will have any basis to assert any right, title or interest in, or right to the possession, use, enjoyment or proceeds of any part or all of the Owned Real Property, except for the Permitted Exceptions and the Real Estate Leases (as hereinafter defined).

(b)      Except as on <u>Schedule 2.7(b)</u>, <u>(i)</u> none of the improvements on the Real Property (or portion thereof), or the current use or operation of the Acute Care Hospital and any of the Other Businesses and such improvements, is in violation of any applicable laws affecting the Real Property; (ii) certificates of occupancy have been issued for all such improvements permitting such improvements to be used and occupied for the uses for which they are currently being used or such improvements were constructed at a time when certificates of occupancy were not required, and there are no facts that would prevent Seller from receiving certificates of occupancy upon completion of construction of those improvements Seller is in the process of constructing, if any; and (iii) Seller has not received any written notice and there are no proceedings or actions pending to change the zoning of, or other land use (including parking) restrictions affecting, such Real Property.  There is no proceeding or pending, and there is no study or investigation pending or threatened or any proceeding threatened by or before any Governmental Authority relating to the Real Property, Acute Care Hospital, any of the Other Businesses, or the continued use of the Acute Care Hospital as a general acute-care hospital or the composition of its licensed beds.

(c)      <u>Schedule 2.7(c)</u> sets forth an accurate and complete list of all real property leases, subleases, licenses and occupancy agreements, options or commitments, oral or written,

pursuant to which Seller is a licensor, licensee, lessor, lessee, sublessor, or sublessee, including, without limitation, all retail and office space leases, specifying the interest of Seller, but excluding any real property lease consummated as part of the transactions contemplated herein (collectively referred to as the "*Real Estate Leases*").  Seller has provided Purchaser with complete and correct copies of all Real Estate Leases, together with all amendments and modifications.  Except for the Real Estate Leases listed in Schedule 2.7(c), there are no other leases, subleases, licenses or other occupancy rights or agreements with respect to space within the Real Property.

(d)     With respect to each Real Estate Lease, except as disclosed in Schedule 2.7(d):

(i)     Each Real Estate Lease is a legal, valid, binding, obligation of Seller, enforceable against Seller in accordance with its terms.  To the Knowledge of Seller, each Real Estate Lease is the legal, valid and binding obligation of the other party thereto, enforceable against such other party in accordance with its terms, subject to the Enforceability Exceptions, and each Real Estate Lease is in full force and effect;

(ii)     Subject to obtaining necessary consents, if any, and the entry of the Approval Order and the payment of all Cure Amounts with respect to each assumed Real Estate Lease (1) the transactions contemplated by this Agreement will not result in a breach of or default under any Real Estate Lease, and (2) will not otherwise cause any Real Estate Lease to cease to be legal, valid, binding, enforceable and in full force and effect on identical terms following the Effective Time;

(iii)     The possession and quiet enjoyment of the real property by Seller, subject to any Real Estate Lease, has not been disturbed and there are no disputes with respect to any Real Estate Lease and none of Seller has not received any written notice of default from the other party under any Real Estate Lease;

(iv)     With respect to all material fees or commissions specified in any Real Estate Lease that are the responsibility of Seller, all material allowances, work-letters, commissions, fees and other amounts payable by Seller under or in connection with the Real Estate Lease and the transactions contemplated thereby have, to the extent due, been paid in full;

(v)     Subject to (1) any delinquent rent disclosed on Schedule 2.7(d), and (2) obtaining all of the necessary consents, no event or condition has occurred that with the passage of time or the giving of notice (or both) would constitute a material default or breach of the terms of any Real Estate Lease;

(vi)     Seller has not assigned any Real Estate Lease covering, any portion of the Real Property; and

(vii)     With respect to each Real Estate Lease: (1) the lessee has been in peaceable possession of the premises covered by the Real Estate Lease; (2) the

20

lessee is the sole present holder of all of the lessee's interest in the Real Estate Lease; (3) the Real Estate Lease is a complete statement of the agreement of the parties with respect to the leasing of the premises described therein by the lessor to the lessee and the Real Estate Lease is the only agreement in effect under which the lessor has leased the premises described therein; and (4) the lessee has not been granted any concessions not set forth in the Real Estate Lease.

(e)    Except as otherwise disclosed on Schedule 2.7(e), with respect to any Real Estate Lease under which Seller is licensor, lessor or sublessor and a party is granted the right to use and occupy a portion of the Real Property:

(i)    No tenant under any Real Estate Lease has an option or other right to purchase all or any part of the Real Property covered thereby;

(ii)    Except as set forth on Schedule 2.7(e)(ii), each tenant is in possession of the office or suite described in its lease and has not delivered written notice to Seller, as applicable, that such tenant intends to cancel, terminate or not renew its lease;

(iii)    No tenant is entitled to any rebate, concession, allowance or other benefits;

(iv)    Except as disclosed on Schedule 2.7(e)(iv), all rents due and payable have been paid in full by the tenants and no rent has been paid in advance except for the current month;

(v)    No matured claim exists for any security or other deposit;

(vi)    Except as set forth on Schedule 2.7(e)(vi), no tenant has any defense or offset to rent;

(vii)    All improvements, including, without limitation, tenant finish improvements, required to be constructed by the "lessor" or "landlord" have been completed and paid for in full;

(viii)    All leasing commissions, fees and similar compensation due and payable in connection with such Real Estate Leases have been paid in full; and

(ix)    Seller is entitled to the ownership and possession of all tenant improvements upon the expiration of their respective Real Estate Lease terms without payment of any consideration therefor to any tenant.

(f)    Neither the whole nor any portion of the Owned Real Property (or the Leased Real Property) has been condemned, requisitioned or otherwise taken by any public authority (a "*Public Taking*"), and no written notice of any Public Taking has been received by Seller with regard to the Owned Real Property or the Leased Real Property.  No such Public Taking is threatened or contemplated with respect to the Real Property.  No public improvements have been ordered to be made that have not heretofore been assessed, and no special, general or

21

other assessments are pending or have been threatened against or will affect the Owned Real Property.

(g)    All essential utilities (including water, sewer, gas, electricity and telephone service) (the "*Utilities*") are available in adequate supply to the Real Property for  use and operation of the Acute Care Hospital and the Other Businesses.

(h)    Except as disclosed on Schedule 2.7(h), Seller has not received any written notice or has knowledge of any unsatisfied requests for repairs, restorations, or improvements to the Real Property from any Governmental Authority or insurance company or provider.  Except as disclosed on Schedule 2.7(h), there are no material capital expenditures required to be made by Seller in connection with the Real Property in order to comply with all applicable Laws or to continue operation of the Acute Care Hospital.

(i)    There have been no special assessments for public improvements which affect the Real Property. Except as set forth on Schedule 2.7(i), there are no unpaid property Taxes, levies or special assessments, including, without limitation, those for construction of sewers, water and other utility lines, streets, sidewalks and curbs, and there are no pending Liens on account thereof.

(j)    Seller has provided Purchaser copies of all surveys or reports in the possession of Seller which relate to the environmental condition of the Acute Care Hospital (including the Real Property) (together with any environmental surveys obtained by Seller with respect to the Acute Care Hospital, the "*Environmental Surveys*").  Except as disclosed in the Environmental Surveys, Purchaser's Phase I report, and on Schedule 2.7(j), to the Knowledge of Seller:

(i)    The operations of the Acute Care Hospital or the Other Businesses are not in violation of any applicable limitations, restrictions, conditions, standards, prohibitions, requirements and obligations of "Environmental Laws" and related orders of any court or other Governmental Authority (as used herein, "*Environmental Laws*" shall include, but not be limited to the following statutes and the regulations promulgated thereunder: the Clean Air Act, 42 U.S.C. § 7401 et seq., the Clean Water Act, 33 U.S.C. § 1251 et seq., the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq., the Superfund Amendments and Reauthorization Act, 42 U.S.C. § 11011 et seq., the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq., the Water Pollution Control Act, 33 U.S.C. § 1251 et seq., the Safe Drinking Water Act, 42 U.S.C. § 300f et seq., CERCLA, OSHA, the Hazardous Materials Transportation Act, 49 U.S.C. § 1801 et seq., the Industrial Site Recovery Act, N.J.S.A. § 13:1K-6 et seq. ("*ISRA*"), the Spill Compensation and Control Act, N.J.S.A. § 58:10-23.11 et seq. (the "*Spill Act*"), and any other state, county, or local regulations similar thereto);

(ii)    There are not any existing, pending or, threatened actions, suits, claims, investigations, inquiries or proceedings by or before any court or any other Governmental Authority directed against Seller that pertain or relate to (A) any past, current and/or anticipated remedial obligations under any applicable

22

Environmental Law, (B) unresolved violations by Seller of any Environmental Law, (C) personal injury or property damage claims relating to a Release of or exposure to Hazardous Materials, or (D) response, removal, or remedial costs under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq., ("*CERCLA*"), ISRA, the Spill Act, or any other similar state law;

(iii)     Seller has not received any written, verbal notice of any claim, citation, summons, order, complaint, notice of violation, lawsuit, penalty, general or special notice letter, potentially responsible party letter, CERCLA Section 104(e) request or investigation related to: (A) any actual or alleged violation by Seller of any Licenses and Permits required under any Environmental Laws; (B) any actual or alleged failure of Seller to have or comply with any Licenses or Permits required under any Environmental Laws; (C) the release or the treatment, storage, disposal or arrangement for disposal of any Hazardous Materials by Seller; and (D) any "*Environmental Liability*" (as used herein, as "*Environmental Liability*" means (1) any liability of a Person that arises in connection with any proceeding, claim, lawsuit, complaint, citation, inquiry, demand, notice or action which was, is or could be brought or issued (I) by any Governmental Authority, or (II) by a third party, in either case, pursuant to or under any Environmental Law or by virtue of the presence or release of any Hazardous Material, or (2) any liability or cost incurred by a Person that arises in connection with any investigatory or remedial activities by virtue of the presence or release of any Hazardous Material in order (II) to comply with any Environmental Law, or (II) to minimize any potential liability to a third party in connection with the presence or release of any Hazardous Material), any of which either: (x) is unresolved, or (y) was received since January 1, 2012;

(iv)     With respect to Permits and Licenses required under any Environmental Laws, (A) all material licenses, permits, consents, or other approvals required under Environmental Laws that are necessary to the operations of the Acute Care Hospital have been obtained and are in full force and effect, and Seller has not received any written notice from any Governmental Authority referencing any basis for revocation or suspension of any such licenses, permits, consents or other approvals exists; (B) none of the operations of the Acute Care Hospital have violated in any material respect the conditions set forth in the approved permits for the Acute Care Hospital; and (C) the operations of the Acute Care Hospital are not in current violation in any material respect with any such approved permits, licenses, consents, or approvals, or the production levels or emission levels specified in such permits, licenses, consents, or approvals;

(v)     There are no current and were no former underground storage tanks on the Real Property, and any underground storage tanks described in Schedule 2.7(j) have been properly removed or abandoned in accordance with all applicable Environmental Laws;

(vi)    No Hazardous Materials generated by Seller have been released, transported, stored, treated or disposed in violation of any applicable Environmental Laws;

(vii)    No Person has disposed or Released any Hazardous Materials on, at, or under the Real Property, except which would not have a material impact on Seller or the Hospital;

(viii)    Except as would not result in material liability, Seller has not sent, arranged for disposal or treatment, arranged with a transporter for transport for disposal or treatment, transported, or accepted for transport any Hazardous Materials to a facility, site or location, which, pursuant to CERCLA, (1) has been placed, or is proposed to be placed, on the national priorities list or its state equivalent or, (2) is subject to a past, current and/or anticipated claim, administrative order or other request to effect removal or take remedial action; and

(k)    Purchaser acknowledges that a material term of this transaction for Seller is that Purchaser hereby agrees to purchase and accept the Real Property and the Personal Property (collectively, the "*Property*") on the Closing Date "as is" in its present condition, in reliance upon Seller's representations, warranties, covenants and indemnities contained in this Agreement and/or in the documents conveying the Property at Closing and Purchaser's own due diligence review and inspection of the physical and environmental condition of the Property.  In furtherance of the foregoing, other than Seller's representations, warranties, covenants and indemnities contained in this Agreement and/or in the Real Property conveyance documents, the Real Property will be sold and transferred by Seller to the Purchaser "AS IS, WHERE IS" WITH NO WARRANTY OF HABITABILITY OF FITNESS FOR HABITATION, and with respect to the physical condition of the Real Property, Personal Property, and Inventory, WITH NO WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, and Sellers hereby disclaim ANY WARRANTY OF HABITABILITY OF FITNESS FOR HABITATION AND ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.  Accordingly, Purchaser represents, warrants and agrees that:

(i)    Except for the representations, warranties, covenants and indemnities expressly set forth in this Agreement and/or in the documents conveying the Property at Closing, neither Seller nor any of the employees, agents or attorneys of the Seller have made any verbal or written representations, warranties, promises or guaranties whatsoever to Purchaser, whether express or implied, relating to the physical or environmental condition or operation of the Property, the actual or projected revenue and expenses of the Property, the compliance by the Property with applicable zoning, building, environmental or other laws, regulations and rules, the quantity, quality or condition of the articles of personal property and fixtures included in the transactions contemplated hereby, or the use or occupancy of the Property;

(ii)    Except for the representations, warranties, covenants and indemnities expressly set forth in this Agreement and/or in the documents

conveying the Property at Closing, Purchaser has not relied upon any representations, warranties, promises or guaranties or upon any statements made in any informational brochure with respect to the Property and have entered into this Agreement after having made their own independent investigation, inspection, analysis, appraisal, examination and evaluation of the facts and circumstances relating thereto.  Purchaser acknowledges that, in addition to the benefit of the representations, warranties, covenants and indemnities expressly set forth in this Agreement and/or in the documents conveying the Property at Closing, it has satisfied itself in all material respects concerning the physical condition and other matters pertaining to the Property, based upon such due diligence;

(iii)     Subject to Seller's representations, warranties, covenants and indemnities expressly set forth in this Agreement and/or contained in this Agreement and the documents conveying the Property at Closing, Purchaser agrees to accept the Property "as is" in its present condition, subject to reasonable use, wear and tear of the Property between the date hereof and the Closing Date; and

(iv)     Purchaser hereby releases and waives any present or future claim against Seller related to the condition of the Property, except for any claim based on the representations, warranties, covenants and indemnities expressly set forth in this Agreement.

2.8     Title to and Condition of Personal Property; Personal Property Leases; and Equipment.

(a)     On the Closing Date and subject to entry of the Approval Order, Seller will have, good and valid title to and ownership of their respective Personal Property (other than Personal Property leased pursuant to Contracts for which Seller has a valid leasehold interest), including, without limitation, the Personal Property described in Schedule 2.8(a)(i).  Except as set forth on Schedule 2.8(a)(ii) and subject to any Personal Property Leases, none of the Personal Property is subject to, any encumbrances except for the Permitted Exceptions, and shall not be subject to any encumbrances on the Closing Date.

(b)     Schedule 2.8(b)(i) sets forth an accurate and complete list of all leases of personal property to which Seller is a party (the "*Personal Property Leases*").  Seller has provided Purchaser with complete and correct copies of all Personal Property Leases.  To the Knowledge of Seller, except as set forth in Schedule 2.8(b)(ii), (i) the Personal Property Leases, are legally valid, binding and enforceable in accordance with their respective terms, subject to the Enforceability Exceptions, and are in full force and effect; (ii) there are no defaults by Seller or any other party to the Personal Property Leases; (iii) Seller has not received written notice of any default, offset or breach under any Personal Property Leases; and (iv) subject to obtaining all necessary consents, no condition or event has occurred that with the passage of time or the giving of notice or both would constitute a default or breach by Seller of the terms of any Personal Property Leases.

(c)     To the Knowledge of Seller, all material items of equipment constituting part of the Personal Property are usable for their intended purpose in the ordinary course of business and are in good working condition, subject to reasonable wear and tear and maintenance requirements given each such items of equipment's relative age.

2.9     <u>Intellectual Property</u>.  A true and complete list of all business names, logos, patents, trademarks, service marks, trade names and copyrights used in the conduct of the Acute Care Hospital, as currently being conducted and as conducted over the past twenty-four (24) months is set forth in <u>Schedule 2.9</u> along with, all other proprietary or intellectual property rights of Seller, if any, used in the conduct of the Acute Care Hospital (the "*Intellectual Property*"). Except as set forth on <u>Schedule 2.9</u>, Seller owns or is licensed to use, the Intellectual Property, and no rights thereto have been granted to others by Seller.  No patents, trademarks, service marks, trade names or copyrights are necessary to conduct or to continue the Acute Care Hospital business as heretofore conducted, except the Intellectual Property.  Seller's use of the Intellectual Property does not infringe upon or otherwise violate the rights of others, and none of the Intellectual Property is being infringed upon by others.  Seller has not received any written notice of infringement upon or conflict with the asserted rights of others in such manner that the infringement or cessation of rights would materially affect the operations of the Acute Care Hospital.  None of the Intellectual Property owned by the Seller is registered with the United States Patent and Trademark Office or the United States Copyright Office.  No director, officer, or, employee of Seller or any predecessor has any interest in any of the foregoing rights.

2.10    <u>Contracts</u>.

(a)     Excluding Real Estate Leases and Personal Property Leases, the contracts that either (i) have annual payments in excess of Fifty Thousand Dollars ($50,000), (ii) are not terminable by Seller upon notice of not more than ninety (90) days without penalty, or (iii) are with a referral source, are set forth on <u>Schedule 2.10(a)</u>.  Seller has provided or will provide Purchaser with complete and correct copies of all contracts, which constitutes the entire agreement by and between the parties thereto.

(b)     Except as set forth on <u>Schedule 2.10(b)</u>, (i) all of the contracts are valid, legally binding and enforceable in accordance with their respective terms (subject to the Enforceability Exceptions) and are in full force and effect without amendment or modification; (ii) there are no defaults by Seller, or to the Knowledge of Seller, any other person or entity under any contract; (iii) Seller has not received written notice of any default, offset or defense under any contract; (iv) Seller has not waived any material right under the contracts; (v) Seller has not received written notice that any person or entity intends to cancel or terminate any Contract; and (vi) subject to obtaining all necessary consents and the payment of any Cure Amounts, no condition or event has occurred which with the passage of time or the giving of notice or both would constitute a default or breach by Seller of the terms of any contract.

2.11    <u>Purchased Inventory</u>.  Except as provided in <u>Schedule 2.11</u>, all inventory included among the Assets (the "*Purchased Inventory*") is valued on Seller's books at the lower of cost or market on a first-in, first-out basis.  The quantities of Purchased Inventory, taken as a whole, are reasonable and justifiable under the normal operations of the Acute Care Hospital and the Other Businesses.

2.12    Employees, Employee Relations and Benefits Plans.

(a)    Schedule 2.12(a)(1) contains a correct and complete list of all current employees of Seller as of the date set forth therein including (and indicating the status of) those employees who are on leave of absence or layoff status (the "*Seller Employees*"), including their job title, hire date, accrued vacation and current hourly wage, monthly salary, target or actual bonuses, and other compensation of such employees as of the date set forth therein.  Except as designated on or provided in Schedule 2.12 (a)(2), (i) Seller does not have any employment, severance, or similar agreement or arrangement with or covering any Seller Employees, and (ii) all Seller Employees are employed pursuant to an "at-will" policy and do not regularly perform any of their duties in the office of any independent physician referring patients to the Acute Care Hospital.  No individual has been engaged by Seller as or in the capacity of an independent contractor who does not qualify for such status under the Code and ERISA.

(b)    Schedule 2.12(b) sets forth a listing of "Employee Benefit Plans" sponsored, maintained or contributed to by Seller or with respect to which Seller has any obligations or liability or through which an individual who is a Seller Employee (or any beneficiary or dependent of such individual) (collectively, the "Benefits Plans").  With respect to each Employee Benefit Plan that is sponsored, maintained or contributed to by Seller or by any other entity or business that, together with Seller, would be treated as a single employer under Section 414 of the Code:  (1) no withdrawal liability under Section 4201 of ERISA or any liability to the PBGC has been incurred by Seller or any such other entity or business and not satisfied; (2) all contributions (including installments) to each such plan required by Section 302 of ERISA and Section 412 of the Code have been timely made; and (3), in all material respects, each such plan has been funded, maintained and operated in compliance with all Laws applicable thereto and the requirements of such plan's governing documents.  Further, Seller shall designate those Benefit Plans applicable exclusively to certain senior management Seller Employees ("*Executive Benefit Plans*").

(i)    True and complete copies of all Benefits Plans, including Executive Benefit Plans, have been furnished to Purchaser.

(ii)    Seller has made available to Purchaser the most recent summary plan description, governing plan document, or other documentation necessary to determine the amount and terms and conditions of benefits provided to Seller Employees, and has made available to Purchaser the most recent IRS determination letter (or opinion letter if applicable) with respect to each Other Businesses Plan and Benefits Plan that is intended to be tax-qualified.

(iii)    Each Benefit Plan intended to be "qualified" within the meaning of Section 401(a) of the Code has received a favorable determination letter from the IRS (or opinion letter, if applicable) and to the Knowledge of Seller, nothing has occurred since the issuance of such letter that could adversely affect such ruling.

(c)    Except as set forth on Schedule 2.12(c), no hospital executive of Seller nor any group of Seller Employees has given written notice of intent to terminate his, her or its employment with Seller, as applicable, as of the Effective Date.

(d)　　To the Knowledge of Seller, Seller has materially complied with and is currently complying in all material respects with, and Seller has not received any written notice of noncompliance with, any and all applicable Laws relating to the employment of personnel including, without limitation, any Laws relating to wages, hours, equal employment, occupational safety and health, workers' compensation, unemployment insurance, collective bargaining, affirmative action and the payment and withholding of social security and other taxes.  Seller has withheld all amounts required by Law or agreement to be withheld from the wages or salaries of Seller Employees and Seller is not liable for any arrears of any Tax or penalties for failure to comply with the foregoing.  Seller has, as of the Effective Date, made all filings required under the foregoing Laws with respect to Seller Employees.

(e)　　Except as set forth on Schedule 2.12(e), neither Seller, nor any other Affiliate of Seller (determined under Section 414(b) or (c) of the Code) (i) maintains or has any liability, direct or indirect, contingent or otherwise, under or with respect to an "employee pension plan" (within the meaning of Section 3(2) of ERISA) that is covered by Title IV of ERISA or Section 302 of ERISA or Section 412 of the Code, or (ii) has ever contributed to or participated in a multi-employer pension plan as defined in Section 3(37) of ERISA.

(f)　　No event or circumstance has been identified or claim asserted under which Seller have incurred or may incur any liability (direct or indirect) under Section 4980B of the Code, or that could result in the imposition of an Encumbrance upon any of the Assets.

(g)　　To the Knowledge of Seller, Seller is in compliance with the terms and provisions of the Immigration Reform and Control Act of 1986.  Seller has reviewed each Seller Employee's Form I-9 at the Acute Care Hospital, as applicable, and, except as set forth on Schedule 2.12(g), each such Form I-9 is valid.  Seller has not been cited, fined, served with a Notice of Intent to Fine or with a Cease and Desist Order (as such terms are defined in such Act), nor has any proceeding been initiated or threatened against Seller or the Other Businesses by reason of any actual or alleged failure to comply with such Act.

(h)　　Except as disclosed on Schedule 2.12(h), the following statements are true and correct as of the date hereof and the Closing Date:

(i)　　Each Seller is not a party to any agreement, and is not obligated to bargain, with any union or other labor organization with respect to its employees;

(ii)　　To the Knowledge of Seller, no Seller Employee has made written demand for recognition by a union or other labor organization in the last five (5) years;

(iii)　　To the Knowledge of Seller, no union organizing activities (including, without limitation, any campaigns being conducted to solicit cards to authorize representation by any labor organization) by or with respect to any Seller Employee are taking place or have taken place in the last five (5) years;

(iv)　　There are currently no work stoppages, strikes, labor disputes, grievances in respect of labor organizing activities, or unfair labor practice

28

pending or threatened involving Seller Employees and none have taken place in the last five (5) years;

(v)     Seller has not suffered any strikes (including wildcat strikes), slowdowns, walkouts, boycotts or lockouts or other material interruptions or disruptions of operations as a result of labor disputes with respect to Seller Employees in the last five (5) years;

(vi)     Payment in full and/or accrual on Seller's books and records has been made with respect to all Seller Employees of all wages, salaries, commissions, bonuses, benefits and other compensation currently due to such individuals;

(vii)     No facility of Seller has been closed, there have not been implementations of any early retirement, separation or window program within the past three (3) years with respect to Seller, nor are there any plans or announcements of any such action or program for the future; and

(viii)     Seller currently is in compliance with its obligations with respect to the WARN Act and has not involuntarily terminated, reduced by more than fifty percent (50%) the hours of, or laid off any Seller Employees in the one hundred eighty (180) days prior to the Closing Date.

2.13    Taxes.

(a)     The Seller Parties referenced on Schedule 2.13(a)(1) are exempt from federal income taxation pursuant to Section 501(a) of the Code as an organization described in Section 501(c)(3) of the Code.  All Tax Returns (including unclaimed property returns) required to be filed by or on behalf of, or with respect to Seller have been duly and timely filed, except for any Tax Returns for which a Seller Party is currently the beneficiary of an extension of time.  All such Tax Returns were correct and complete in all material respects.  All Taxes due and payable by Seller (whether or not shown on any Tax Return) have been paid.  Except as set forth on Schedule 2.13(a)(2), Seller is not currently the beneficiary of any extension of time within which to file any Tax Return.  There are no Tax Liens on any of the Assets subject to any Liens for current taxes not yet due and payable and no basis exists for the imposition of any such Liens. No claim has ever been made by an authority in a jurisdiction where Seller does not file Tax Returns that it is or may be subject to taxation by that jurisdiction.  The accrual for Taxes reflected in the Financial Statements is in the aggregate adequate to cover any and all federal, state, local or foreign Tax liabilities (whether or not disputed) of Seller for the period ended on the date thereof and all prior periods.  Seller has not had, and do not currently have, any dispute with any taxing authority as to Taxes of any nature that affects the subject matter of this Agreement.  Seller is not currently the subject of an audit or have been subject to an audit by the IRS or other taxing authority.

(b)     Seller has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, creditor, or other third party.

(c)     Seller has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(d)     Seller (i) has not ever been a member of an affiliated group filing a consolidated federal income Tax Return, (ii) has no liability for the Taxes of any entity under Treas. Reg. § 1.1502-6 (or any similar provision of state, local, or foreign Law), as a transferee or successor, by contract, or otherwise, (iii) is not a party to or bound by, and has no obligation under, any Tax allocation or Tax sharing agreement, Tax indemnity agreement, or similar written agreement or arrangement, and (iv) is not a party to or bound by, and has no obligation under, any agreement, ruling or compromise entered into with any Governmental Authority regarding the assessment or payment of Taxes.

2.14    Litigation or Claims.  Except as set forth in Schedule 2.14 (said matters set forth in Schedule 2.14 being collectively referred to herein as "*Pending Litigation*"), there are no actions, suits, claims, Proceedings, or enforcement actions pending, or threatened against, affecting or relating to Seller, the Acute Care Hospital, any of the Assets, or any employee of any of the foregoing as an agent of any of the foregoing, whether at law or in equity, or before or by any Governmental Authority.  Except as otherwise specified in Schedule 2.14, to the Knowledge of Seller, all Pending Litigation relating to general and professional liability is covered by Seller's insurance.  None of the Pending Litigation has created an encumbrance against the Assets.

2.15    Insurance.  Schedule 2.15 sets forth a list of all material insurance policies and any self-insurance trusts currently held by Seller, or in which Seller participates, and which are effective with respect to the Assets and the operation of the Acute Care Hospital (the "*Insurance Policies*").  The properties, Assets and operations of Seller that are of an insurable nature and are of a character usually insured by similar businesses, have been continuously insured by Seller, with the types and amounts of insurance that the Seller reasonably believe are adequate to protect such properties and operations, either through the purchase of insurance from a third party insurance company or through a self-insurance trust established by Seller.  Seller is not delinquent with respect to any premium payments thereon nor is Seller in default or breach with respect to any material provision contained in the Insurance Policies.  Seller has not received any written notice or request from any insurance company identifying any defects in the Assets that would have a material adverse effect on the insurability of the Assets.  Since June 30, 2013, Seller has not been refused any insurance, nor has any of their Insurance Policies been limited by an insurance carrier to which they have applied for insurance.

2.16    Licenses and Permits.  The Acute Care Hospital is duly licensed as a general, acute care hospital pursuant to the applicable laws of the State of New Jersey.  The pharmacies, laboratories, equipment, programs, and all other ancillary departments located at the Acute Care Hospital or operated for the benefit of the Hospital which are required to be separately licensed, registered or certified, are duly licensed, registered or certified by the New Jersey Department of Health or other appropriate licensing agency, including without limitation the Division of Medical Assistance and Health Services, the New Jersey Board of Pharmacy, and the New Jersey Department of Environmental Protection (collectively, the "*State Health Agency*").  Schedule 2.16 sets forth a list of all material Licenses and Permits (including Medicare and Medicaid provider and supplier numbers and associated national provider identifier numbers) issued to or

applied for by Seller and the Acute Care Hospital in connection with and required for the conduct of the Acute Care Hospital, including the expiration dates thereof, if any.

(a)     Seller possesses all material Licenses and Permits necessary for the operation of the Acute Care Hospital at the location and in the manner presently operated, and for the completion of all capital projects of Seller in process as of the Effective Date.  Except as otherwise disclosed on Schedule 2.16(a), the Acute Care Hospital:  (i) is fully accredited by the Joint Commission without contingency; (ii) is certified for participation in the Medicare program; (iii) is party to valid participation agreements for payment by third party payors, Medicare and Medicaid, which are in full force and effect; and (iv) is in compliance with the conditions of participation in each such program, and is in compliance with the material terms and conditions of each such contract or agreement, including the participation agreements, related thereto.

(b)     Seller has complied in all material respects with the terms and conditions of its Licenses and Permits, and all such Licenses and Permits are unconditionally in full force and effect, and there has occurred no event nor is any event, action, investigation or proceeding pending or threatened which could cause or permit revocation or suspension of or otherwise adversely affect the maintenance of any such Licenses and Permits.

(c)     Seller has previously delivered to Purchaser true and complete copies of: (i) the most recent Joint Commission accreditation survey report and deficiency list for Seller, if any; (ii) the most recent state licensing report and list of deficiencies, if any; (iii) the most recent Medicare and Medicaid certification reports and lists of deficiencies, if any; and (iv) the two most recent fire marshal's survey and deficiency list, if any.  Seller also previously has delivered to Purchaser the most recent plans of correction relating to each of the deficiency lists referred to in subparts (c)(i) through (c)(iv) above, and all correspondence relating to such reports, surveys, deficiencies, and/or plans of correction.  Seller has taken or is in the process of taking all reasonable steps to correct all material deficiencies noted in such reports, surveys and deficiency lists and a description of any material uncorrected deficiency is listed in Schedule 2.16(c).

(d)     Except as set forth on Schedule 2.16(d) and except as required to consummate this transaction, no application for any Certificate of Need, Exemption Certificate or declaratory ruling has been made by Seller with the State Health Agency or other applicable agency which is currently pending or open before such agency.  Except as set forth on Schedule 2.16(d), Seller has not prepared, filed, supported or presented opposition to any applications with the State Health Agency or other applicable agency (referred to herein as "Applications") filed by another hospital or health agency within the past three (3) years.

2.17    Medical Staff.

(a)     Seller has previously delivered to Purchaser, with respect to the Acute Care Hospital:

(i)     All current medical staff bylaws, rules and regulations and amendments thereto respecting the Acute Care Hospital; and

(ii)     All contracts with physicians, physician groups, or other members of the medical staff of the Acute Care Hospital.

(b)     Except as set forth on Schedule 2.17(b) in a summary fashion without identifying any medical staff member by name or other identifying information, there are no disputes, disciplinary actions or appeals therefrom pending between SMMC and any medical staff members of the Acute Care Hospital, or applicants thereto, or threatened.  All appeal periods in respect of any medical staff member against whom an adverse action has been taken by SMMC have expired.  No member of the medical staff of the Acute Care Hospital has been excluded from participation in any state or federal Medicare or Medicaid programs.

(c)     Schedule 2.17(c) sets forth a complete and accurate list of the name and specialty, if any, of each member of the medical staff of the Acute Care Hospital as of the date shown thereon.

(d)     Schedule 2.17(d) sets forth a complete and accurate list of each member of the medical staff in a summary fashion without identifying any medical staff member by name or other identifying information, that has resigned or had their privileges revoked since January 1, 2015.

2.18    Compliance with Law.

Except as set forth on Schedule 2.18,

(a)     Seller has not used funds or other assets, or made any promise or undertaking in such regard, for (i) illegal contributions, gifts, entertainment or other expenses relating to political activity; (ii) illegal payments to or for the benefit of any governmental official or government employee, whether domestic or foreign; or (iii) the establishment or maintenance of a secret or unrecorded fund; and there have been no fictitious entries made in the books or records of Seller.

(b)     Seller, with respect to the operation of the Acute Care Hospital and the Assets, is in compliance with all applicable Health Care Laws, and in compliance in all material respects with all other applicable Laws.  No Governmental Authority has provided written or verbal notice to Seller or the Other Businesses of its intention to conduct, nor, to the Knowledge of Seller, is there threatened or pending any investigation or review by any Governmental Authority with respect to Seller or the Acute Care Hospital.

(c)     No Governmental Authority has indicated to Seller an intention to conduct, nor, to the Knowledge of Seller, is there threatened or pending any investigation or review by any Governmental Authority of the Seller.

(d)     No action is pending or threatened or recommended by any Governmental Authority to terminate or decertify any participation of the Acute Care Hospital, or Seller in the Medicare, Medicaid or any other third party payor programs nor has there been any decision not to renew any provider agreement related to the Acute Care Hospital.  With the exception of deficiencies that are currently the subject of waiver and those of which are the subject of a plan of correction (each set forth on Schedule 2.18), there are no outstanding written notices of

32

deficiencies or written notices of work orders of a material nature of any Governmental
Authority having jurisdiction over the Acute Care Hospital requiring conformity to any
applicable Law pertaining to the Acute Care Hospital, including the Medicare and Medicaid
programs.

(e)    All billing practices of Seller with respect to all third party payors,
including the Medicare, Medicaid and TRICARE programs and private insurance companies,
have been in compliance in all material respects with all applicable laws, regulations and policies
of such third party payors and the Medicare, Medicaid and TRICARE programs, and to the
Knowledge of Seller, Seller has not billed or received any payment or reimbursement in excess
in any material respect of amounts allowed by law or agreement.  Seller has not retained and is
not retaining any overpayment in violation of Section 6402(a) of the Patient Protection and
Affordable Care Act.  Seller has not been excluded from participation in the Medicare or
Medicaid programs nor has any such exclusion been threatened.  No employee or independent
contractor of Seller or any Seller Affiliate (whether an individual or entity) has been excluded
from participating in any federal health care program (as defined in 42 U.S.C. §1320a-7b(f)).
Based upon and in reliance upon Seller's review of (i) the "*list of Excluded Individuals/Entities*"
on the website of the United States Health and Human Services ("*HHS*") Office of Inspector
General (http://oig.hhs.gov/exclusions/), and (ii) the "List of Parties Excluded From Federal
Procurement and Nonprocurement Programs" on the website of the United States General
Services Administration (https://www.epls.gov/), none of the officers, directors or managing
employees (as such term is defined in the Medicare Program Integrity Manual) of Seller has been
excluded from participation in the Medicare or Medicaid programs or been subject to sanction
pursuant to 42 U.S.C. §1320a-7a or 1320a-8 or been convicted of a crime described at 42 U.S.C.
§1320a-7b.  Seller has not received any written or oral notice from any of the Medicare or
Medicaid programs, or any other third party payor programs of any pending or threatened
investigations or surveys, and Seller has no reason to believe that any such investigations or
surveys are pending, threatened, or imminent.  For purposes of this Agreement, the term
"*Affiliate*" shall mean any Person directly or indirectly controlling, controlled by or under
common control with a second Person.  The term "control" (including the terms "controlled by"
and "under common control with") means the possession, direct or indirect, of the power to
direct or cause the direction of the management and policies of a Person, whether through the
ownership of voting securities, by contract or otherwise.  A "Person" shall mean any natural
person, partnership, corporation, limited liability company, association, trust or other legal entity.

(f)    Since January 1, 2013, Seller is in full compliance in all material respects
with all applicable statutes, rules, regulations, policies, guidance and requirements of the
Government Entities having jurisdiction over Seller, the Hospital, the Assets and the operations
of the Acute Care Hospital or its related ancillary services.  As used herein, "*Government Entity*"
or "*Government Entities*" means any government or any agency, bureau, board, directorate,
commission, court, department, official, political subdivision, tribunal or other instrumentality of
any government, whether federal, state or local. Seller has timely filed all material reports, data,
and other information required to be filed with the Government Entities.  Seller and its
employees and independent contractors are, and have been since January 1, 2009 in full
compliance in all material respects with all applicable health care laws, rules and regulations,
including those relating to Medicare and Medicaid reimbursement and to the payment or receipt
of illegal remuneration, including 42 U.S.C. § 1320a-7b(b) (the Medicare/Medicaid anti-

kickback statute), 42 U.S.C. 1395nn (the Stark Statute), 42 U.S.C. § 1320a-7a, 42 U.S.C. § 1320a-7b(a), 42 U.S.C. § 1320a-7b(c) and any analogous state laws) (collectively, the "*Health Care Laws*").  Seller is, and has been since January 1, 2009, in full compliance in all material respects with the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act, enacted as Title XIII of the American Recovery and Reinvestment Act of 2009 ("*HIPAA*"), including the electronic data interchange regulations, the health care security regulations and the health care privacy regulations, as of the applicable effective dates for such requirements.  Seller has at all times taken the necessary steps (including, without limitation, implementing reasonable and appropriate technical, physical and administrative safeguards, and monitoring compliance therewith) to (i) protect personally identifiable information, including protected health information ("*PHI*") (as defined under HIPAA) (collectively, "*Personally Identifiable Information*"), against unauthorized access, use, transfer, modification, disclosure, misuse, destruction, loss, or anticipated threats or hazards, and (ii) ensure the availability, integrity and confidentiality of any such PHI in compliance with applicable laws.  Seller has not suffered any actual or threatened breach, unauthorized disclosure, or misuse of any Personally Identifiable Information and Seller and the Hospital have not been the subject of any claim, proceeding or investigation relating thereto.

2.19    <u>Brokers</u>.  Except for its arrangement with BofA Merrill Lynch, Seller has not entered into any contracts, agreements, arrangements or understandings with any Person that could give rise to any claim for a broker's, finder's or agent's fee or commission or any similar payment in connection with the negotiations leading to this Agreement or the consummation of the transactions contemplated by this Agreement.  Seller shall be responsible for any costs related to the services of BofA Merrill Lynch.

2.20    <u>Accounts Receivable</u>.  All outstanding Accounts Receivable, to the extent not collected, are valid and existing and represent monies due for goods sold and delivered or for services performed in bona fide commercial transactions.  Except as reflected or reserved for on the June 30, 2015 Balance Sheet, such Accounts Receivable are not subject to counterclaim or set-off and are collectible in full, except to the extent that reserves for doubtful accounts have been established by Seller and which reserves have been adequately reflected on, and are consistent with presentation in, the Financial Statements.  No Accounts Receivable have been sold.  Since June 30, 2015, Seller has not sold or assigned any Accounts Receivable (other than pursuant to the terms of this Agreement.

2.21    <u>Business and Transactions with Affiliates</u>.  Since January 1, 2012, Seller has not purchased, acquired or leased any property or services from, or sold, transferred or leased any property or services to, or lent or advanced any money to, or borrowed any money from, or acquired any capital stock, obligations or securities of, or made any management consulting or similar fee agreement with any officer, director or trustee of Seller except as set forth on <u>Schedule 2.21</u>.

2.22    <u>Suppliers and Providers of Services</u>.

(a)    <u>Schedule 2.22(a)</u> lists all suppliers of goods to, and providers of services to the Acute Care Hospital (collectively, "Suppliers") to which Seller made payments during the

34

fiscal year ended December 31, 2014, in excess in the case of each Supplier of Five Hundred Thousand Dollars ($500,000).

(b)        To the Knowledge of Seller, none of the Suppliers intends to cease selling or rendering services to, or dealing with, the Acute Care Hospital, nor, to the Knowledge of Seller, does any such Supplier intend to alter in any respect the amount of sales or service or the extent of dealings with Purchaser or would alter in any respect its sales or service or dealings in the event of the consummation of the transactions contemplated hereby.

2.23    U.S. Persons.  No Seller Party is a "foreign person" for purposes of Section 1445 of the Code or any other Laws requiring withholding of amounts paid to foreign persons or entities.

2.24    Cost Reports, Third Party Receivables and Conditions of Participation

(a)        Notices of program reimbursement or similar notices of settlement have been issued with respect to the Cost Reports filed by the Seller for Medicare and Medicaid through the periods set forth in Schedule 2.24(a).  Except as disclosed on Schedule 2.24(a):

(i)        All Cost Reports required to be filed by Seller were filed when due;

(ii)        Seller has not received notice of any dispute by the applicable third party payor regarding such Cost Reports for the periods subsequent to the period specified in Schedule 2.24(a), expressly excluding any notices of reopening of cost reports in the ordinary course of business, which notices of reopening, if any, are specified in Schedule 2.24(a)(ii); and

(iii)        There are no pending or threatened claims (including potential penalties) by either Medicare or Medicaid against Seller expressly excluding Medicare and Medicaid recoupments for inpatient services denied on medically necessity grounds in the ordinary course of business, which recoupments, if any, are specified in Schedule 2.24(a)(iii).

(b)        Schedule 2.24(b) contains a description of the policies and procedures of Seller for reporting bad debts to Medicare and each other third party payor.  Seller does not routinely waive co-payments and deductibles for beneficiaries of Medicare or any other third party payor, except for Medicare Part A deductibles as provided for under participation agreements with a Medicare supplemental insurer.

2.25    Compliance Program.

(a)        Seller has provided to Purchaser an accurate and complete copy of Seller's current compliance program materials.  At all times since January 1, 2012, Seller has maintained in respect of the operations of its business a compliance program designed to promote compliance with applicable Laws and ethical standards, to improve the quality and performance of operations, and to detect, prevent, and address violations of legal or ethical standards applicable to the operations of their business (the "Compliance Program").  Seller has conducted

35

their operations materially in accordance with such applicable Compliance Program.  Except as set forth on Schedule 2.25, Seller (i) is not a party to a Corporate Integrity Agreement with the OIG; (ii) does not have reporting obligations pursuant to any settlement agreement entered into with any Governmental Authority; (iii) has not been the subject of any Government Program investigation conducted by any federal or state enforcement agency; (iv) has not been a defendant in any qui tam/False Claims Act litigation (other than by reason of a sealed complaint of which Seller or the Other Businesses has no knowledge); and (v) has not been served with or received any search warrant, subpoena, civil investigation demand, contact letter, or telephone or personal contact by or from any federal or state enforcement agency (except in connection with medical services provided to third-parties who may be defendants or the subject of investigation into conduct unrelated to Seller or the Other Businesses).

(b)     Seller has used commercially reasonable efforts to search the Office of Inspector General's List of Excluded Individuals/Entities to confirm, to the extent practicable, that their employees, independent contractors and consultants and other Persons providing any services under any of the contracts is not currently excluded, debarred or otherwise ineligible to participate in the Medicare, Medicaid or TRICARE programs.  Seller has no written notice that (i) any Person providing services under the Contracts; or (ii) any employee or contractor, in either case of (i) or (ii), is charged with or has been convicted of a criminal offense related to the Medicare, Medicaid or TRICARE programs, or the provision of health care items or services but has not yet been excluded, debarred or otherwise declared ineligible to participate in such programs or is proposed for exclusion therefrom.

2.26    Regulatory Compliance.

(a)     Except as set forth on Schedule 2.26, Seller, nor any of its officers, directors or employees, have been convicted of, charged with or investigated for, or have engaged in conduct that would constitute, a Medicare or other Federal Health Care Program (as defined in 42 U.S.C. § 1320a-7(b)(f)) related offense or convicted of, charged with or, except as set forth on Schedule 2.26, investigated for, or engaged in conduct that would constitute a violation of any Law related to fraud, theft, embezzlement, breach of fiduciary duty, kickbacks, bribes, other financial misconduct, obstruction of an investigation or controlled substances. Seller, nor any officer, director, employee or independent contractor of Seller (whether an individual or entity), has been excluded from participating in any Government Program, subject to sanction pursuant to 42 U.S.C. § 1320a-7a or § 1320a-8 or been convicted of a crime described at 42 U.S.C. § 1320a-7b, nor are any such exclusions, sanctions or charges threatened or pending.

(b)     Seller has been and is presently in compliance in all material respects with all applicable Law, including, but not limited to, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395hhh (the Medicare statute), including specifically, the Ethics in Patient Referrals Act, as amended, or "Stark Law," 42 U.S.C. § 1395nn; Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v (the Medicaid statute); the Federal Health Care Program Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b); the False Claims Act, as amended, 31 U.S.C. §§ 3729-3733; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; the Anti-Kickback Act of 1986, 41 U.S.C. §§ 51-58; the Civil Monetary Penalties Law, 42 U.S.C. §§ 1320a-7a and 1320a-7b; the Exclusion Laws, 42 U.S.C. § 1320a-7; HIPAA and all applicable implementing

36

regulations, rules, ordinances and Orders; and any similar state and local statutes, regulations, rules, ordinances and Orders, and any corresponding State of New Jersey statutes and applicable implementing regulations that address the subject matter of the foregoing.

(c)      Seller has not received any communication from a Governmental Authority, commercial payor or patient that alleges that Seller is not in compliance with any Laws, other than statements of deficiencies from a Governmental Authority received in the ordinary course of business.  Seller has timely filed all material reports, data, and other information required to be filed with such commissions, boards, bureaus, and agencies regarding the Assets.

(d)      All of  Seller's Contracts with physicians, other health care providers, or immediate family members of any physicians or other health care providers, or entities in which physicians, other health care providers, or immediate family members of any physicians or other health care providers are equity owners, involving services, supplies, payments, or any other type of remuneration, and all of Seller's leases of personal or real property with such physicians, health care providers, immediate family members or entities are in writing, are signed by the appropriate parties, set forth the services to be provided, provide for a fair market value compensation in exchange for such services, space, or goods and comply with all applicable Laws in all material respects.

(e)      Except in compliance with applicable Law, neither Seller, nor any of its officers, directors or employees is a party to any contract, lease agreement or other arrangement (including any joint venture or consulting agreement) related to Seller, or the Assets with any physician, physical or occupational therapist, health care facility, hospital, nursing facility, home health agency or other Person or entity that is in a position to make or influence referrals to or otherwise generate business for Seller with respect to the Assets, to provide services, lease space, lease equipment or engage in any other venture or activity.

(f)      Neither Seller nor any of its officers, directors or employees, has engaged in activities that are prohibited under 42 U.S.C. §§ 1320a-7 et seq., or the regulations promulgated thereunder, or other federal or state statutes or regulations, or which are prohibited by applicable rules of professional conduct.

2.27    <u>Meaningful Use of Certified EHR Technology</u>.  Seller: (a) is eligible to receive HITECH Payments under the Medicare EHR Incentive Program, (b) are eligible to receive HITECH Payments under the New Jersey Medicaid EHR Incentive Program, (c) has adopted, implemented or upgraded a certified EHR Technology, (d) has demonstrated or are capable of demonstrating "meaningful use" of such EHR Technology, in accordance with the Stage 1 and Stage 2 Criteria of the Medicare EHR Incentive Program, (e) has demonstrated or is capable of demonstrating "meaningful use" of such EHR Technology, in accordance with the requirements of the New Jersey Medicaid Incentive Program.  Seller has submitted attestations dated with the dates for the reporting periods covering federal fiscal years set forth on <u>Schedule 2.27</u>, copies of which attestations are attached as <u>Schedule 2.27</u> in order to receive HITECH Payments, or are entitled to submit attestations for such reporting periods in order to receive HITECH Payments.

2.28    Full Disclosure.  The respective written representations and warranties of Seller contained in this Agreement and the Schedules do not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made therein, in the light of the circumstances under which they were made, not misleading.

2.29    Seller's Knowledge.  When used herein, the phrases "*to the Knowledge of Seller*" and "*known*" and similar references to Seller's knowledge shall mean (a) the actual knowledge of those individuals set forth on Schedule 2.29, including that such individuals shall be responsible for all facts which such individuals reasonably should have known, (b) information in such individuals' files and in all written or electronic communications to or from them, and (c) and information set forth in the minutes of the board of directors and any standing committees thereof of Seller.

# ARTICLE 3

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

As an inducement to Seller to enter into this Agreement and to consummate the transactions contemplated by this Agreement, Purchaser hereby represents, warrants and covenants to Seller as to the following matters as of the Effective Date and, except as otherwise provided herein, shall be deemed to remake all of the following representations, warranties and covenants as of the Closing Date:

3.1    Authorization.  Purchaser has full power and authority to enter into this Agreement and has full power and authority to perform its obligations hereunder and to carry out the transactions contemplated hereby.  The execution, delivery and performance of this Agreement has been duly authorized and approved by all necessary actions of Purchaser and do not require any further authorization or consent of Purchaser.

3.2    Binding Agreement.  All legal and other actions required to be taken by Purchaser to authorize the execution, delivery and performance of this Agreement, all documents executed by Purchaser which are necessary to give effect to this Agreement, and all transactions contemplated hereby, have been duly and properly taken or obtained by Purchaser; *provided*, *however*, that as of the Effective Date, Purchaser does not have a license or any of the necessary state or federal certificates, approvals or agreements to own and operate the Hospital or participate in any state or federal healthcare programs.  Except as otherwise provided above, no other legal or other action on the part of Purchaser is necessary to authorize the execution, delivery and performance of this Agreement, all documents necessary to give effect to this Agreement and all transactions contemplated hereby.  This Agreement has been duly and validly executed and delivered by Purchaser and, assuming due and valid execution by Seller, this Agreement constitutes a valid and binding obligation of Purchaser enforceable in accordance with its terms subject to (a) applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect, and (b) limitations on the enforcement of equitable remedies.

3.3    Organization and Good Standing.  Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware, is or

will be duly authorized to transact business in the State of New Jersey, and has full power and authority to own, operate and lease its properties and to carry on its business as now conducted.

3.4     No Violation.  Except as set forth in Schedule 3.4, neither the execution and delivery by Purchaser of this Agreement nor the consummation of the transactions contemplated hereby nor compliance with any of the material provisions hereof by Purchaser will (a) violate, conflict with or result in a breach of any material provision of the Articles of Incorporation, Bylaws or other organizational documents of Purchaser or any contract, lease or other instrument by which Purchaser is bound; (b) require any approval or consent of, or filing with, any governmental agency or authority, (c) violate any law, rule, regulation, or ordinance to which Purchaser is or may be subject, (d) violate any judgment, order or decree of any court or other governmental agency or authority to which Purchaser is subject.

3.5     Brokers and Finders.  Neither Purchaser nor any Affiliate thereof nor any officer or director thereof has engaged any finder or broker in connection with the transactions contemplated hereunder.

3.6     Representations of Seller.  Purchaser acknowledges that it is not relying on any representation or warranty (expressed or implied, oral or otherwise) made on behalf of Seller other than as expressly set forth in this Agreement.  Purchaser further acknowledges that Seller is not making any representations or warranties herein relating to the operation of the Hospital or the condition of the Assets on and after the Effective Time.

3.7     Legal Proceedings.  Except as described on Schedule 3.7, there are no claims, proceedings or investigations pending or, to the knowledge of Purchaser, threatened relating to or affecting Purchaser or any Affiliate of Purchaser before any court or governmental body (whether judicial, executive or administrative) in which an adverse determination would materially adversely affect the properties, business condition (financial or otherwise) of Purchaser or any Affiliate of Purchaser or which would adversely affect or has adversely affected Purchaser's ability to consummate the transactions contemplated hereby.  Neither Purchaser nor any Affiliate of Purchaser is subject to and is not reasonably likely to become subject to any judgment, order, decree or other governmental restriction specifically (as distinct from generically) applicable to Purchaser or any Affiliate of Purchaser which materially adversely affects the condition (financial or otherwise), operations or business of Purchaser or any Affiliate of Purchaser or which would adversely affect Purchaser's ability to consummate the transactions contemplated hereby.

3.8     Ability to Perform.  Purchaser has the ability to obtain funds in cash in amounts equal to the Purchase Price by means of credit facilities or otherwise and will at the Closing have immediately available funds in cash, which are sufficient to pay the Purchase Price and to pay any other amounts payable pursuant to this Agreement and to consummate the transactions contemplated by this Agreement.

3.9     Solvency.  Purchaser is solvent and will not be rendered insolvent as a result of any of the transactions contemplated by this Agreement.  For purposes hereof, the term "solvency" means that: (a) the fair salable value of Purchaser's tangible assets is in excess of the total amount of its liabilities (including for purposes of this definition all liabilities, whether or

not reflected on a balance sheet prepared in accordance with generally accepted accounting principles, and whether direct or indirect, fixed or contingent, secured or unsecured, and disputed or undisputed); (b) Purchaser is able to pay its debts or obligations in the ordinary course as they mature; and (c) Purchaser has capital sufficient to carry on its businesses and all businesses which it is about to engage.

3.10    Purchaser's Knowledge.  When used herein, the phrases "*to the Knowledge of Purchaser*" and "*known*" and similar references to Purchaser's knowledge shall mean (a) the actual knowledge of those individuals set forth on Schedule 3.10, including that such individuals shall be responsible for all facts which such individuals reasonably should have known, (b) information in such individuals' files and in all written or electronic communications to or from them, and (c) information set forth in the minutes of the board of directors and any standing committees thereof of Purchaser.

## ARTICLE 4

## COVENANTS OF SELLER

4.1    Access and Information; Inspections.  From the Effective Date through the date that is three (3) days before the Closing Date, (a) Seller shall afford to the officers and agents of Purchaser (which shall include accountants, attorneys, bankers and other consultants and authorized agents of Purchaser) reasonably full and complete access during normal business hours to and the right to inspect the plants, properties, books, accounts, records and all other relevant documents and information with respect to the assets, liabilities and business of the Hospital and (b) Seller shall furnish Purchaser with such additional financial and operating data and other information in Seller's possession as to businesses and properties of the Hospital as Purchaser or its representatives may from time to time reasonably request, without regard to where such information may be located;  *provided*, *however*, that all disclosures of information shall be consistent with the confidentiality, agreements and any other non-disclosure agreements entered into (or to be entered into) among Purchaser, its representatives and Seller.  Purchaser's right of access and inspection shall be exercised on twenty-four (24) hours' notice Monday through Friday and in such a manner as not to interfere unreasonably with the operations of the Hospital.  Such access may include consultations with the personnel of Seller; *provided*, *however*, that Purchaser shall not consult with or contact in any manner any employee at the Hospital without Seller's prior written consent (which consent may only be given by David Ricci or another designee).  Further, Purchaser may undertake commercially reasonable environmental, mechanical and structural surveys of the Hospital, provided however, that Purchaser may not conduct invasive environmental, health or safety inspections of the Real Property or Assets, including any sampling or testing of soils, surface water, groundwater, ambient air, or improvements at, or under the Real Property or Assets, without the Seller's specific written consent which will not be unreasonably withheld.  Purchaser agrees that it will repair any and all damage caused by its investigations and inspections and restore the condition of the Real Property and Assets to what it was prior to each such investigation and inspection.  All access and inspection activities contemplated by this Section 4.1 shall be subject to twenty-four (24) hours' notice Monday through Friday and the prior reasonable approval of Seller (which approval may only be granted by David Ricci or another designee) and all disclosures of information shall be consistent with the confidentiality agreements and any other non-disclosure

agreements entered into (or to be entered into) among Purchaser, its representatives and Seller (including Affiliates of Seller).

4.2     <u>Conduct of Business</u>.  Except as required pursuant to an Order of the Bankruptcy Court, on and after the Effective Date and prior to the Effective Time, and except as otherwise consented to or approved by an authorized officer of Purchaser, required by this Agreement, Seller shall, with respect to the operation of the Hospital:

(a)     carry on its businesses with respect to the operation of the Hospital in substantially the same manner as presently conducted and not make any material adverse change in operations, finance, accounting policies (unless Seller is required to adopt such changes under generally accepted accounting principles), or real or personal property;

(b)     maintain the Hospital and all parts thereof and all other Assets in operating condition in a manner consistent with past practices, ordinary wear and tear excepted, inclusive of substitutions and retirements in the ordinary course of business;

(c)     perform all of its material obligations under the Assumed Contracts and Assumed Leases;

(d)     keep in full force and effect present insurance policies or other comparable self-insurance; and

(e)     use its commercially reasonable efforts to maintain and preserve its respective business organizations and its respective relationships with physicians, suppliers, customers and others having business relationships with the Hospital;

4.3     <u>Negative Covenants</u>.  From the Effective Date until the Effective Time, with respect to the operation of the Hospital, Seller shall not, without the prior written consent of Purchaser:

(a)     except as provided in <u>Schedule 4.3(a)</u>, increase compensation payable or to become payable or make any bonus payment to or otherwise enter into one or more bonus agreements with any employee, except in the ordinary course of business in accordance with Seller's customary personnel policies;

(b)     except as provided in <u>Schedule 4.3(b)</u>, enter into any employment or severance agreement with any employee;

(c)     except as provided in <u>Schedule 4.3(c)</u>, increase compensation payable or to become payable or otherwise enter into any bonus agreement with any member of Seller's management team;

(d)     amend or terminate any of the Assumed Contracts and Assumed Leases, or enter into any new contract or lease that either (i) exceed Fifty Thousand Dollars ($50,000) in value, or (ii) is not cancellable without cause or penalty upon ninety (90) days written notice;

41

(e)     create, assume or permit to exist any new debt, mortgage, deed of trust, pledge or other Lien upon any of the Assets, except Liens arising under any Bankruptcy Court orders relating to the use of cash collateral (as defined in the Bankruptcy Code), Liens arising pursuant to any debtor-in-possession financing of the Seller (a "*DIP Credit Facility*"), which Liens shall include a first priority mortgage Lien of $5,300,000 on certain property of Seller as described it the Seller's motion to approve the DIP Credit Facility, and Liens that will be discharged and removed and not be enforceable against any Asset following the Closing in accordance with the Approval Order;

(f)     acquire (whether by purchase or lease) or sell, assign, lease, or otherwise transfer or dispose of any property, plant or equipment, except in the ordinary course of business consistent with historical practices;

(g)     except with respect to previously budgeted expenditures, purchase capital assets or incur costs in respect of material construction in progress;

(h)     take any action outside the ordinary course of business that would have a material adverse effect on the Assets or the Hospital; or

(i)     materially reduce Inventory except in the ordinary course of business.

For purposes of this Section 4.3, Seller shall be deemed to have obtained Purchaser's prior written consent to undertake the actions otherwise prohibited by this Section 4.3 if Seller gives Purchaser written notice of a proposed action and Seller does not receive from Purchaser a written notice of objection to such action within five (5) business days after Purchaser receives Seller's written notice.  Notwithstanding any provision to the contrary contained in this Agreement, neither Section 4.2 nor this Section 4.3 shall be construed to prohibit Seller from engaging in any act which Seller reasonably believes is necessary to preserve and protect the condition or continued operations of the Hospital, its contractual obligations or the requirements of governmental or regulatory authorities.  Seller shall give Purchaser prompt written notice subsequent to taking any act described in the immediately preceding sentence.

4.4     Bankruptcy Court Order.

(a)     Within three (3) days of the Petition Date, Seller shall file a motion with the Bankruptcy Court (the "*Bidding Procedures Motion*") seeking to approve the Bidding Procedures attached hereto as Exhibit 4.4A, with such changes that are mutually acceptable to the Purchaser and Seller (the "*Bidding Procedures*"), which shall govern the terms and conditions of Qualified Bids (as such term is defined in the Bidding Procedures) and of the sale and the Auction (as such term is defined in the Bidding Procedures).  Seller shall use commercially reasonable efforts to obtain within ten (10) days of the Petition Date the entry of an Order in the form set forth in Exhibit 4.4B, with such changes that are mutually acceptable to the Purchaser and Seller (the "*Procedures Order*") granting such Bidding Procedures Motion, including the Bidding Procedures appended thereto, shall be (as may be amended or extended from time to time).  The Bidding Procedures and the Procedures Order shall provide for, among other things:

42

(i)      That Qualified Bids shall include cash consideration of not less than the Purchase Price plus:

(A)      a break-up fee of two and one-half percent (2.5%) of the Purchase Price (the "*Break-Up Fee*");

(B)      subject to court approval as to reasonableness, an expense reimbursement of Purchaser's documented out-of-pocket costs, fees and other expenses (including professional fees and expenses, the negotiation of this Agreement, drafting, review and comments on drafts, attendance at hearings and due diligence) (collectively, the "*Expenses*"), up to a maximum aggregate amount of Two Hundred Thousand Dollars ($200,000.00) (the "*Expense Reimbursement*");

(C)      an initial overbid of $500,000, and

(D)      the assumption of the Assumed Obligations;

(ii)      That any successive overbids shall be made in increments not less than $500,000 of cash consideration in excess of the last submitted, highest Qualified Bid for the Assets;

(iii)      that a Qualified Bid contains terms and conditions as they relate to the Seller that are higher and better than the terms and conditions set forth in this Agreement;

(iv)      for any Person submitting a Qualified Bid to provide an earnest money cash deposit in accordance with the Bidding Procedures of $2,000,000;

(v)      subject to the terms of Section 8.2, that the Break-Up Fee and Expense Reimbursement shall be payable by Seller to Purchaser, as provided in Section 4.4(a)(vi) and (vii);

(vi)      subject to the terms of Section 8.2, in the event of an Alternate Transaction, the Expense Reimbursement shall be paid to Buyer from the first cash proceeds of such Alternate Transaction received upon the closing of such Alternate Transaction.  In addition, Seller's obligation to pay the Expense Reimbursement shall be allowed as an administrative expense with priority under Sections 503(b) and 507(a)(2) of the Bankruptcy Code;

(vii)      Subject to the terms of Section 8.2, in the event of an Alternate Transaction, the Break-Up Fee shall be paid to Buyer from the first cash proceeds of such Alternate Transaction received upon the closing of such Alternate Transaction.  In addition, Seller's obligation to pay the Break-Up Fee shall be allowed as an administrative expense with priority under Sections 503(b) and 507(a)(2) of the Bankruptcy Code; and

(viii)    That each of Buyer or Seller, as the case may be, shall be entitled to payment of the Deposit Escrow as provided in this Agreement.

(b)    Each of the parties hereto agrees to file this Agreement with the Bankruptcy Court promptly following execution by the parties.

(c)    Seller shall use commercially reasonable efforts to obtain, through the filing with the Bankruptcy Court of appropriate applications or motions (the "*Sale Motion*"), entry of the Approval Order, not later than three (3) Business Days after conclusion of the Auction.

(d)    Seller shall give notice under the Bankruptcy Code of the request for the relief specified in the Bidding Procedures Motion and Sale Motion to all creditors and parties in interest entitled to notice pursuant to the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the local rules of the Bankruptcy Court, and orders of the Bankruptcy Court, including all Persons that have asserted Liens in the Purchased Assets, and all non-debtor parties to the Assumed Contracts and the Assumed Leases, and other appropriate notice, including such additional notice as the Bankruptcy Court shall direct or as the Buyer may reasonably request, and provide appropriate opportunity for hearing, to all parties entitled thereto, of all motions, orders, hearings, or other Proceedings in the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby.

(e)    Within ten (10) days following entry of the Procedures Order, the Seller will serve a cure notice (the "*Cure Notice*") by first class mail, overnight or electronic mail on all non-debtor counterparties to Contracts and Real Property Leases.  The Cure Notice will inform each recipient that its respective Contract or Real Property Lease may be either assumed or rejected, and the timing and procedures relating to such assumption or rejection, and, to the extent applicable (i) the title of the Contract or Real Property Lease, (ii) the name of the counterparty to the Contract or Real Property Lease, (iii) the Sellers' good faith estimates as to each Assumed Contract and Assumed Lease of all Cure Amounts to assume and assign such Assumed Contract and Assumed Leases, (iv) the identity of Purchaser, (v) the deadline by which any such Contract or Real Property Lease counterparty may file an objection to the proposed assumption and assignment and/or Cure Amount, and the procedures relating thereto, and (vi) that such Contract or Real Property Lease counterparty's failure to object timely to the proposed assumption or Cure Amount will be deemed to be consent to such assumption and to the Seller's scheduled Cure Amount.  For purposes of this Agreement, "*Cure Amount*" means all amounts payable to Section 365(b)(1)(A) or (B) of the Bankruptcy Code in order to effectuate, pursuant to the Bankruptcy Code, the assumption of Sellers and assignment to Buyer of Assumed Contracts and Assumed Leases under the Approval Order or other Order of the Bankruptcy Court.

(f)    Seller and Buyer shall consult with one another regarding pleadings which any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect the Bankruptcy Court's approval of, as applicable, the Procedures Order and the Approval Order, (ii) all such filings shall be in form and substance acceptable to the Purchaser, and (iii) the Sellers shall provide Buyer with a copy of such documents at least three (3) Business Days prior to the filing thereof.

44

(g)     If the Procedures Order, the Approval Order, or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Procedures Order, the Approval Order, or other such order), subject to rights, otherwise arising from this Agreement, the Seller shall use its commercially reasonable efforts to prosecute such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion.

(h)     For purposes of this Agreement:

(1)     "*Alternate Transaction*" means a transaction or transactions pursuant to which Seller, in one or a series of transactions, sells, transfers, leases or otherwise disposes, directly or indirectly, of all or substantially all of the Seller's assets, including any transaction pursuant to a Qualified Bid or through any other asset sale, stock sale, debt-for-equity swap, joint venture, financing, organization or recapitalization, confirmation of a plan of reorganization or a plan of liquidation in the Cases, or any similar transaction, in each case to a Person other than Purchaser, as the highest or best offer in accordance with the Procedures Order or otherwise.

(2)     "*Order*" shall mean any award, decision, injunction, judgment, order, ruling, subpoena or verdict entered, issued, made, or rendered by any court, administrative agency, or other Governmental Entity or by any arbitrator.

(3)     "*Person*" shall mean any natural person, partnership, corporation, limited liability company, association, trust or other legal entity.

4.5     Cure of Defaults.  Schedule 4.5(a) sets forth the estimated amount of Cure Amounts of each Real Property Lease and Contract.  On entry of the Approval Order or such other Orders entered by the Bankruptcy Court from time to time (each, an "*Assignment Order*") approving the assumption and assignment to Purchaser of any Real Property Leases and Contracts (each, an "*Assumed Agreement*," and together the "*Assumed Agreements*"), Purchaser shall pay within ten (10) Business Days of the Closing Date all Cure Amounts to be paid pursuant to such Approval Order or Assignment Order, as applicable.  Upon payment by the Purchaser of the Cure Amounts with respect to any Assumed Agreements, all defaults under such Assumed Agreements (monetary or otherwise) shall be deemed cured, including but not limited to any tax, rental obligation, common area maintenance, percentage rent, base rent or utility payments, whether or not such obligation became due, or accrued, after the effective date of the assignment of such Assumed Agreements, and Purchaser shall have no further liability thereunder relating to Cure Amounts.

4.6     Cooperation.  Seller shall reasonably and promptly cooperate with Purchaser and its authorized representatives and attorneys:  (a) in Purchaser's efforts to obtain all consents, approvals, authorizations, clearances and licenses required to carry out the transactions contemplated by this Agreement (including, without limitation, those of governmental and

regulatory authorities) or which Purchaser reasonably deems necessary or appropriate, (b) in the preparation of any document or other material which may be required by any governmental agency as a predicate to or result of the transactions contemplated in this Agreement, and (c) in Purchaser's efforts to effectuate the assignment of Assumed Contracts and Assumed Leases to Purchaser as of the Closing Date; *provided*, *however*, that except as otherwise set forth in this Agreement it shall be Purchaser's responsibility to obtain all permits, certificates, clearances and licenses required to carry out the transactions contemplated by this Agreement.  To the extent Purchaser needs certain information and data which is in the possession of Seller in order for Purchaser to complete Purchaser's license and permit approval applications, Purchaser shall receive, upon request, reasonable assistance from Seller in connection with the provision of such information.

4.7     Additional Financial Information.  Within thirty (30) calendar days following the end of each calendar month prior to Closing, Seller shall deliver to Purchaser complete copies of the unaudited balance sheet and related unaudited statements of income relating to Seller with respect to the operation of the Hospital for each month then ended, together with corresponding year-to-date amounts, which presentation shall be consistent with the provisions of Section 2.4 which are applicable to the Financial Statements.

4.8     Intentionally Omitted.

4.9     Seller's Efforts to Close.  Seller shall use its commercially reasonable efforts to satisfy all of the conditions precedent set forth in Article 6 and Article 7 to its or Purchaser's obligations under this Agreement to the extent that Seller's action or inaction can control or influence the satisfaction of such conditions.

4.10    Title Matters.  No later than thirty (30) days prior to the Closing Date, Purchaser shall obtain (a) a preliminary binder or title commitment(s) (the "*Title Commitment*") sufficient for the issuance of an ALTA Extended Coverage Owner's Title Insurance Policy with respect to the Owned Real Property (the "*Owner's Title Policy*") issued by First American Title Insurance Company (the "*Title Company*"), together with true, correct and legible (or, if not legible, the best available) copies of all instruments referred to therein as conditions or exceptions to title (the "*Title Instruments*"), and (b) an ALTA survey or surveys of the Owned Real Property complying with the Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys for the Owned Real Property in a form reasonably acceptable to Purchaser and the Title Company (the "*Surveys*").  Section 12.12 shall govern which party or parties hereto shall bear the costs and expenses of the Title Commitment, the Title Policy and the Surveys.  At the Closing, each Seller Party that is transferring Real Property to Purchaser shall deliver to the Title Company an owner's affidavit of title (the "*Owner's Affidavit*") in a form reasonably acceptable to Purchaser and the Title Company.

4.11    Termination of Hospital Employees.  Upon the Effective Time, the Seller's Employees shall cease to be employees of Seller, and shall be removed from such entities' respective payrolls.  Seller shall terminate effective as of the Effective Time the active participation of all of the Hospital Employees in all of the Seller Plans.  After the Effective Time, Seller shall timely make or cause to be made by Seller's Affiliates appropriate distributions to, or for the benefit of, all of the Hospital Employees in respect of the Seller Plans which are in force

46

and effect with respect to the Hospital Employees at the Hospital immediately prior to the Effective Time in accordance with ERISA, the Code, and the terms and conditions of the Seller Plans; *provided*, *however*, no such distribution shall be required to the extent it is among the Assumed Obligations.

4.12    Termination Cost Reports.  Seller shall file all Medicare, Medicaid, TRICARE, Blue Cross and any other termination cost reports required to be filed as a result of the consummation of (a) the transfer of the Assets to Purchaser and (b) the transactions contemplated by this Agreement.  Purchaser shall permit Seller access to all Hospital books and records to prepare such reports and shall assist Seller in the process of preparing, filing, and reviewing the termination cost reports.  All such termination cost reports shall be filed by Seller in a manner that is consistent with current laws, rules and regulations.  Seller shall be responsible for filing governmental cost reports for the periods prior to the Closing Date.  Purchaser shall be responsible for its own cost report filings relating to the Hospital beginning on the day immediately following the Closing Date.

4.13    FTC Notification.  Seller shall, if and to the extent required by law, file all reports or other documents required or requested by the Federal Trade Commission ("*FTC*") or the United States Department of Justice ("*Justice Department*") under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("*HSR Act*"), and all regulations promulgated thereunder, concerning the transactions contemplated hereby, and comply promptly with any requests by the FTC or Justice Department for additional information concerning such transactions, so that the waiting period specified in the HSR Act will expire as soon as reasonably possible after the execution and delivery of this Agreement.  Seller agrees to furnish to Purchaser such information concerning Seller as Purchaser needs to perform its obligations under Section 5.7.

4.14    Required Governmental Approvals.  Seller shall promptly file all filings, notices, reports and applications required to be made by Seller pursuant to any applicable state or federal laws, as a result of the transactions contemplated by this Agreement including, but not limited to the necessary filings, notices and applications in connection with approvals required under the New Jersey Community Health Care Assets Protection Act ("*CHAPA*").  All such notices, filings applications and reports to be filed or submitted by Seller as a result of the transactions contemplated by this Agreement including, but not limited to approvals required under CHAPA process shall be in a form approved by Purchaser, which approval may not be unreasonably withheld.  Seller shall further reasonably cooperate with Purchaser in the prompt preparation of any filings required by Purchaser under such laws.  Seller shall be responsible for its own expenses and filing fees incurred in connection with filings required or reasonably necessary under CHAPA.  If the New Jersey Attorney General challenges, objects to, prohibits, enjoins or fails to provide any consents or approvals required for the sale of the Assets, or any portion thereof, by Seller to Purchaser, then both Purchaser and Seller may appeal such objection, prohibition or injunction.  In that event, but subject to the provisions of Section 8.1(g), the Closing Date shall be extended to such time as all appeals that may be taken have been successfully completed.  In the event both Seller and Purchaser elect not to appeal such injunction or other governmental objection or prohibition, then this Agreement may be terminated by mutual agreement of the Parties, and both Parties shall thereupon be released from any and all obligations and liability related to this Agreement, except as may otherwise be specifically provided for herein.  Seller and Purchaser will reasonably cooperate with one

47

another in efforts to obtain such consents, approvals (or exemptions therefrom) and authorizations from governmental and regulatory authorities as are necessary to enable Purchaser to operate the Hospital after the Effective Time, and Seller will provide such information and communications to governmental and regulatory authorities as Purchaser or such authorities may reasonably request.

# ARTICLE 5

## COVENANTS OF PURCHASER

5.1     <u>Purchaser's Efforts to Close</u>.  Purchaser shall use its commercially reasonable efforts to satisfy all of the conditions precedent set forth in <u>Article 6</u> and <u>Article 7</u> to its or Seller's obligations under this Agreement to the extent that Purchaser's action or inaction can control or influence the satisfaction of such conditions.

5.2     <u>Required Governmental Approvals</u>.  Purchaser (a) shall use its reasonable commercial efforts to apply for and secure, as promptly as practicable after the Effective Date, all consents, approvals (or exemptions therefrom), authorizations, clearances and licenses required to be obtained from governmental and regulatory authorities in order to carry out the transactions contemplated by this Agreement and to cause all of its covenants and agreements to be performed, satisfied and fulfilled, and (b) will provide such other information and communications to governmental and regulatory authorities as Seller or such authorities may reasonably request.  Except as otherwise set forth in this Agreement, Purchaser is responsible for all filings with and requests to governmental authorities necessary to enable Purchaser to operate the Hospital at and after the Effective Time.  Purchaser shall, as promptly as practicable after the Effective Date, file all applications, licensing packages and other similar documents with all applicable governmental and regulatory authorities which are a prerequisite to obtaining the material licenses, permits, authorizations and provider numbers.  Purchaser shall be entitled, but not obligated, to obtain the Contract and Lease Consents.  Except as otherwise provided in this Agreement, Purchaser's failure to obtain any or all of the Contract and Lease Consents or estoppel certificates as of the Closing Date shall not be a condition precedent to either party's obligation to close the transactions contemplated by this Agreement.

5.3     <u>Certain Employee Matters</u>.

(a)     As of the Effective Time, Seller shall terminate and Purchaser shall offer to hire substantially all of Seller's active employees.  For purpose of this Agreement, any person on short-term disability, vacation or leave of absence with a definite date of return shall be considered an active employee for purposes of this <u>Section 5.3(a)</u> and, subject in all respects to applicable law governing protected forms of leave from employment, any person on long-term disability, layoff or leave of absence with no prior agreement or understand to return to employment with the Seller at the end of such disability, layoff or leave shall not be considered an active employee.  Subject to the terms of any collective bargaining agreements, Purchaser shall have the right to determine all terms and conditions of employment to be afforded to such employees so long as such terms and conditions are substantially similar to those offered by Purchaser's Affiliates to similarly situated employees.  The offer to hire shall include substantially the same base salaries or wages provided by Seller before Closing (subject to

48

employee background checks to the extent required by law).  All employees who accept an offer of employment by Purchaser shall be referred to collectively in this Agreement as the "*Hired Employees*."  The Parties agree that Purchaser's employment of the Hired Employees shall be on an "at will" basis, subject to the terms of any collective bargaining agreements and with regard to any employees covered by employment-related agreements that are included in the Assumed Contracts.

(b)     Purchaser shall give all Hired Employees full credit for all paid time off pay to such employees as of the Closing Date, either by (i) crediting such employees the time off reflected in the employment records of Seller and/or any of its Affiliates immediately prior to the Effective Time or (ii) by making full payments to such employees of the amounts which such employees would have received had they taken such paid time off.

(c)     On and after the Effective Time, Hired Employees shall be eligible for a medical and hospital plan sponsored by Purchaser.  Hired Employees shall be given credit for periods of employment with Seller, as applicable, prior to the Effective Time for purposes of determining eligibility to participate and amount of benefits (including without limitation vesting of benefits), and preexisting condition limitations will be waived with respect to Hired Employees and their covered dependents unless such preexisting condition limitations were applicable prior to the Effective Time.  In addition, if prior to the Effective Time a Hired Employee or his or her covered dependents paid any amounts towards a deductible or out-of-pocket maximum in Seller's medical and health plan's current fiscal year, such amounts shall be applied toward satisfaction of the deductible or out-of-pocket maximum in the current fiscal year of Purchaser's medical and health plan that covers Hired Employees on and after the Effective Time.

(d)     Seller shall be responsible to provide continuation coverage pursuant to the requirements of Code section 4980B and Part 6 of Title I of ERISA ("COBRA Coverage") with respect to the Hospital Employees (and their dependents) whose qualifying event occurred prior to the Closing Date.  Purchaser shall be responsible to provide COBRA Coverage with respect to each of the Hired Employees (and their dependents) whose qualifying event occurs on or after the Closing Date.  After the Closing Date, Seller shall not be liable and responsible for, and Purchaser shall incur liability or responsibility with respect to, any "Continuation Coverage" (as that term is defined by COBRA <u>Section 4980B</u> of the Internal Revenue Code of 1986, as amended (the "Code") and <u>Section 601</u>, et seq. of ERISA) for any Hired Employee terminated after the Closing Date.  Purchaser shall take no action, which, in any manner, might encourage Hired Employees to assert any COBRA rights against Seller.  Purchaser acknowledges and agrees that it is the intent of this provision that Purchaser shall be required to provide continued health coverage under ERISA or <u>Section 4980B</u> of the Code to any of such Hired Employees or to any qualified beneficiary (as defined for purposes of <u>Section 4980B</u> of the Code) with respect to any such Hired Employees.

(e)     After the Closing Date, Purchaser's human resources department will give reasonable assistance to Seller's human resources departments and Seller's agents with respect to Seller's post-Closing administration of Seller's and Seller's Affiliates' pre-Closing wage and benefit obligations, and employee pension benefit plans and employee health or welfare benefit plans for the former Hospital Employees.  Within five (5) days after the Closing Date, Purchaser

49

shall provide to Seller lists of all the Hospital employees who were either offered employment by Purchaser but refused such employment or were not offered employment by Purchaser.

5.4    Excluded Assets.  Subject to Section 5.12, as soon as practicable after the Closing Date, Purchaser shall deliver to Seller or Seller's designee any Excluded Assets found at the Hospital on and after the Effective Time, without imposing any charge on Seller for Purchaser's storage or holding of same on and after the Effective Time.

5.5    Capital Commitments.  Within five (5) years following the Closing Date, Purchaser will either spend or commit to spend at least Twenty-Five Million Dollars ($25,000,000) in capital expenditures (over and above routine maintenance capital) at the Acute Care Hospital.  As used in this Section 5.5, "capital expenditures" shall mean expenditures for capital improvements, equipment, information technology, equipment replacement, facility renovations, new facilities, information systems, and other infrastructure improvements at the Acute Care Hospital.  In addition, any remaining funds held by the Bond Trustee at the time of Closing designated for use in the completion of the ER Project and included in the Assets shall be used to complete the ER Project at the Acute Care Hospital as described on Schedule 5.5.

5.6    Medical Staff.  To ensure continuity of care in the community, Purchaser agrees that the Hospital's medical staff members in good standing as of the Effective Time shall maintain medical staff privileges at the Hospital as of the Effective Time.  On and after the Effective Time, the medical staff will be subject to the Hospital's Medical Staff Bylaws then in effect.

5.7    FTC Notification.  Purchaser shall, if and to the extent required by law, file all reports or other documents required or requested by the FTC or the Justice Department under the HSR Act, and all regulations promulgated thereunder, concerning the transactions contemplated hereby, and comply promptly with any requests by the FTC or Justice Department for additional information concerning such transactions, so that the waiting period specified in the HSR Act will expire as soon as reasonably possible after the execution and delivery of this Agreement.  Purchaser agrees to furnish to Seller such information concerning Purchaser as Seller needs to perform its obligations under Section 4.11.

5.8    Local Governing Board.

(a)    Immediately after the Effective Time, Purchaser shall form a local governing board at the Acute Care Hospital in accordance with the terms of this Section 5.8. Such local governing board shall be an advisory committee to the board of directors of Purchaser comprised of medical staff members, community leaders and the Acute Care Hospital's Chief Executive Officer.  The local governing board shall be subject to the authority of Purchaser's board of directors and the terms of Purchaser's Articles of Incorporation, Bylaws and other organizational documents.  The individuals on the local governing board will (i) represent the Acute Care Hospital in the community and represent the views of the community to the local governing board in its deliberations, (ii) participate in Purchaser's community outreach programs, and (iii) supervise the Hospital's charity care policies and practices.

(b)     The local governing board of the Hospital shall have responsibilities that are consistent with similar local governing boards at other hospitals, or in other markets, respectively, which are owned directly or indirectly by Affiliates of Purchaser.

5.9     Maintenance of Services.  Purchaser agrees that following the Closing, Purchaser will keep open and operate the Acute Care Hospital as a licensed acute care hospital with an open and accessible emergency department for no less than five (5) years after the Effective Time.  Purchaser will continue to provide charity care based upon policies that are similar to those that are currently being provided at the Acute Care Hospital; *provided* that the maintenance of such policies will be subject to occurrences, facts or circumstances resulting from or attributable to (a) changes in law, or (b) the implementation of health care reform, and/or (c) intervening reimbursement coverage changes.

5.10     Ethical and Religious Directives.  Purchaser agrees that at all times following the Closing, Purchaser will operate the Hospital in a manner consistent with the Ethical and Religious Directives for Catholic Health Care Services, as promulgated and amended from time to time by the United States Conference of Catholic Bishops, all as interpreted by the local ordinary of the Catholic Church.

5.11     Trademark License.   Purchaser agrees that at the Closing they will execute a perpetual, royalty-free, non-transferable license (“*Trademark License*”) to use the trademarks “*Saint Michael's*”, “*Saint James*” and “*Columbus*” only at the current sites of the Acute Care Hospital and Other Businesses and only for so long as Purchaser abides by the covenant set forth in Section 5.10; *provided*, *however*, that notwithstanding any other provision in this Agreement or the Trademark License, neither the Seller or any of its Affiliates shall be restricted from using the names “*Saint Michael's*”, “*Saint James*” and “*Columbus*” in any geographic location outside the Seller's primary and secondary service areas as described on the attached Schedule 5.11.

5.12     Religious Articles and Artifacts.  The Parties agree that all religious articles and artifacts located at the Hospital and identified on Schedule 5.12 are Excluded Assets owned by Seller, notwithstanding the fact that the Parties have agreed that they remain on the Property after the execution of this Agreement.  The Parties acknowledge that the presence of such religious articles and artifacts on site at the Hospital is important to the local community and the Catholic tradition of the Seller.  Notwithstanding any other provision of this Agreement, at any time after the Closing Date, upon not less than thirty (30) days, prior written notice to Purchaser, Seller, its successors or assigns shall have the right to have any or all of the religious articles and artifacts removed from the Property at any time and for any reason, including without limitation, any violation of Seller's covenant set forth in Section 5.10.

5.13     Cooperation.  Purchaser shall reasonably and promptly cooperate with Seller and its authorized representatives and attorneys:  (a) in Seller's efforts to obtain all consents, approvals, authorizations, clearances and licenses required to carry out the transactions contemplated by this Agreement (including, without limitation, those of governmental and regulatory authorities) or which Seller reasonably deems necessary or appropriate, (b) in the preparation of any document or other material which may be required by any governmental agency as a predicate to or result of the transactions contemplated in this Agreement, and (c) in Seller's efforts to effectuate the assignment of Assumed Contracts and Assumed Leases to

Purchaser as of the Closing Date; *provided*, *however*, that except as otherwise set forth in this Agreement it shall be Purchaser's responsibility to obtain all permits, certificates, clearances and licenses required to carry out the transactions contemplated by this Agreement.

5.14    <u>Assignment of Contracts and Rights</u>.  To the maximum extent permitted by the Bankruptcy Code, the Assets shall be assumed and assigned to Purchaser pursuant to <u>Section 365</u> of the Bankruptcy Code as of the Closing Date or such other date as specified in the Approved Order or this Agreement, as applicable.  Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any asset or any right thereunder if an attempted assignment without the consent of a third party would constitute a breach or in any way adversely affect the rights of Purchaser or Seller thereunder.  If such consent is not obtained or such assignment is not attainable pursuant to <u>Sections 105</u>, <u>363</u> or <u>365</u> of the Bankruptcy Code other than as a result of the failure to pay Cure Amounts, then Seller and Purchaser will cooperate in a mutually agreeable arrangement, to the extent feasible and at no cost or expense to Seller, under which Purchaser would obtain the benefits and assume the obligations (to the extent otherwise constituting Assumed Obligations hereunder) thereunder in accordance with this Agreement, including subcontracting, sublicensing or subleasing to Purchaser, or under which Seller would enforce for the benefit of, and at the direction of, Purchaser, with Purchaser assuming all of Seller's obligations (to the extent constituting Assumed Obligations hereunder), and any and all rights of Seller thereunder.

# ARTICLE 6

## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

Seller's obligation to sell the Assets and to close the transactions as contemplated by this Agreement shall be subject to the satisfaction of each of the following conditions on or prior to the Closing Date unless specifically waived in writing by Seller in whole or in part at or prior to the Closing:

6.1    <u>Signing and Delivery of Instruments</u>.  Purchaser shall have executed and delivered all documents, instruments and certificates required to be executed and delivered pursuant to the provisions of this Agreement.

6.2    <u>No Restraints</u>.  No temporary restraining order, preliminary or permanent injunction or other order preventing the consummation of the transactions contemplated in this Agreement shall have been issued by any court of competent jurisdiction or any other governmental body and shall remain in effect on the Closing Date, and further, no Governmental Entity shall have commenced any action or suit before any court of competent jurisdiction or other governmental authority that seeks to restrain or prohibit the consummation of the transactions contemplated hereby.

6.3    <u>Performance of Covenants</u>.  Purchaser shall have in all respects performed or complied with each and all of the obligations, covenants, agreements and conditions required to be performed or complied with by it on or prior to the Closing Date.

6.4     Representations and Warranties.  The representations and warranties of Purchaser contained in this Agreement will be true and correct in all material respects on and as of the date hereof and as of the Closing Date, except to the extent such representations and warranties that speak only as of an earlier date (in which case they shall be true and correct in all material respects as of such date).

6.5     Governmental Authorizations.  All material approvals, permits and authorizations from governmental agencies or governmental bodies (including approvals required under CHAPA) that are necessary or required for completion of the transactions contemplated by this Agreement shall have been obtained, without the imposition of any material and adverse condition upon Seller or its Affiliates, including reasonable assurances that any material approvals, licenses, permits and authorizations requested or applied for but not actually issued as of the Closing will be issued following Closing (which may include oral assurances from appropriate governmental agencies or bodies).  Seller shall have obtained all such approvals, waivers and authorizations of the New Jersey Attorney General (including, but not limited to those approvals in connection with CHAPA), all Government Entities, the State Health Agency and other third parties necessary (i) for the valid execution, delivery and performance of this Agreement and (ii) for the Acute Care Hospital to be transferred to Purchaser and operated by the Certificate of Application in connection with the transaction contemplated by this Agreement).  Any conditions imposed by the New Jersey Attorney General or the State Health Agency upon Seller or its Affiliates in connection with the New Jersey Attorney General's or the State Health Agency's approval of the consummation of the transactions contemplated by this Agreement shall be acceptable to Seller, as determined in Seller's reasonable discretion.

6.6     Church Approval.  Seller shall have obtained all those approvals required to complete the transactions contemplated by this Agreement under the Canon Law of the Roman Catholic Church.

6.7     Release of Security Interests.  Seller shall have received such written releases and other authorizations as it deems necessary or desirable from the State of New Jersey, the New Jersey Health Care Facilities Financing Authority, the Bankruptcy Court and other governmental agencies and third parties confirming that Seller has the requisite ability and is authorized to transfer the Assets to Purchaser free and clear of the security interests granted in such Assets in connection with the New Jersey Health Care Facilities Financing Authority 2008A Contract Bonds (Hospital Asset Transformation Program).  To evidence the foregoing, Seller shall have received such approving legal opinions and release documents as are satisfactory to Seller in its sole discretion.

6.8     Satisfaction and Release of NJHCFFA Obligations.  Seller shall have received such written releases and other confirmations as it deems necessary or desirable from the State of New Jersey, the New Jersey Health Care Facilities Financing Authority, and other governmental agencies confirming that all of Seller's obligations and liabilities of every kind and nature, regardless of when arising or maturing, financial or otherwise, under that certain loan agreement dated as of July 1, 2008, by and between Seller and New Jersey Health Care Facilities Financing Authority, and all other agreements, instruments, notes, certificates and other commitments between such parties, will, concurrent with or prior to the Closing, be fully and finally released

and deemed satisfied in full without further action, liability or obligation on the part of Seller or its Affiliates.

6.9     Bankruptcy Court Approval.  The Bankruptcy Court shall have entered the Procedures Order and an Order or Orders in the form and substance mutually acceptable to Purchaser and Seller approving this Agreement and the Transactions hereunder (the "*Approval Order")*, which shall be in full force and effect as of the Closing.

# ARTICLE 7

# CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER

Purchaser's obligation to purchase the Assets and to close the transactions contemplated by this Agreement shall be subject to the satisfaction of each of the following conditions on or prior to the Closing Date unless specifically waived in writing by Purchaser in whole or in part at or prior to the Closing.

7.1     Governmental Authorizations.  Purchaser shall have obtained licenses, permits and authorizations from governmental agencies or governmental bodies that are required for operation of the Acute Care Hospital or shall have received reasonable assurances from governmental agencies or governmental bodies that the licenses, permits and authorizations required for operation of the Acute Care Hospital will be issued after the Effective Time, except in such case where failure to obtain such license, permit or authorizations from a governmental agency or governmental body does not have a material adverse effect.

7.2     Signing and Delivery of Instruments.  Each Seller Party shall have executed and delivered all documents, instruments and certificates required to be executed and delivered pursuant to all of the provisions of this Agreement.

7.3     Performance of Covenants.  Each Seller Party shall have in all material respects performed or complied with each and all of the obligations, covenants, agreements and conditions required to be performed or complied with by each Seller Party on or prior to the Closing Date; *provided*, *however*, that this condition will be deemed to be satisfied unless (a) Seller was given written notice of such failure to perform or comply and did not or could not cure such failure to perform or comply within fifteen (15) business days after receipt of such notice, and (b) the respects in which such obligations, covenants, agreements and conditions have not been performed have had or would more likely than not result in a material adverse effect on the Assets or the business of the Hospital.

7.4     No Restraints.  No temporary restraining order, preliminary or permanent injunction or other order preventing the consummation of the transactions contemplated in this Agreement shall have been issued by any court of competent jurisdiction or any governmental body and shall remain in effect on the Closing Date, and further, no Governmental Entity shall have commenced any action or suit before any court of competent jurisdiction or other governmental authority that seeks to restrain or prohibit the consummation of the transactions contemplated hereby.

7.5    <u>Representations and Warranties</u>.  The representations and warranties of each Seller Party contained in this Agreement and the Disclosure Schedule will be true and correct in all material respects on and as of the date hereof and as of the Closing Date, except to the extent such representations and warranties that speak only as of an earlier date (in which case they shall be true and correct in all material respects as of such date).

7.6    <u>Title Insurance Policy</u>.  The Title Company shall have irrevocably committed to issue the Title Policy to Purchaser covering the Owned Real Property in the amount of the full insurable value of the Owned Real Property.  Such Title Policy shall show fee simple title to the Owned Real Property vested in Purchaser, subject only to: (a) current real estate taxes and assessments not yet due and payable; (b) mechanic's, repairmen's, warehousemen's, carrier's Liens, or other similar or statutory Liens arising in the ordinary course of business of the Seller Parties, and (c) the permitted title exceptions, such as easements and rights of way, as listed in <u>Schedule 7.6</u> (the "*Permitted Exceptions*").  The failure to obtain the Title Policy in a form required by Purchaser shall not be a breach of any obligation of Seller under this Agreement.

7.7    <u>Pre-Closing Confirmations</u>.  Purchaser shall have obtained documentation or other evidence reasonably satisfactory to Purchaser that:

(a)    Purchaser has been provided all consents, licenses, approvals, permits, waivers and authorizations of the New Jersey Attorney General (including, but not limited to those approvals in connection with CHAPA), all Government Entities, the State Health Agency and other third parties necessary (i) for the valid execution, delivery and performance of this Agreement and (ii) for the Acute Care Hospital to be transferred to Purchaser and operated by Purchaser as currently being operated (which includes, but shall not be limited to, the approval of the Certificate of Application in connection with the transaction contemplated by this Agreement).  Any conditions imposed by the New Jersey Attorney General or the State Health Agency upon Purchaser or its Affiliates in connection with the New Jersey Attorney General's or the State Health Agency's approval of the consummation of the transactions contemplated by this Agreement shall be acceptable to Purchaser, as determined in Purchaser's reasonable discretion;

(b)    Purchaser shall not have received information that Medicare and Medicaid certification of the Acute Care Hospital (or certification in other applicable government programs) for their operation by Purchaser would not be effective as of the Closing and that Purchaser would not be able to participate in and receive reimbursement from such programs effective as of the Closing in the same manner in which Seller was certified or participated in any such government programs immediately prior to the Closing; and

7.8    <u>Required Consents</u>.  All consents, waivers, and estoppels of third parties which are listed on <u>Schedule 7.8</u> (the "*Required Consents*") shall have been obtained and shall be in form and substance reasonably satisfactory to Purchaser, *provided* that a contract that is included on <u>Schedule 7.8</u> either must require total payments in excess of Two Hundred Thousand Dollars ($200,000) during the twelve (12) month period following the Closing Date, or be determined, in Purchaser's reasonable discretion, to be material to the continued operation of a service or program offered by the Acute Care Hospital.

7.9     Intentionally Omitted.

7.10     Economic Development Incentives.  Purchaser shall have received reasonable assurances of the availability of economic development incentives, tax abatements and/or other tax related relief or benefits from the State of New Jersey, the City of Newark and/or from other state, county, or local municipalities or governmental agencies (collectively, the "*Incentives*"), as Purchaser may deem to be reasonably necessary in order to operate the Acute Care Hospital and the Other Businesses in a financially feasible manner following the Closing, and Seller acknowledges that the availability of the Incentives is material to Purchaser's decision to consummate the transactions contemplated in this Agreement, *provided* that this condition precedent shall expire ten (10) business days following the approval of the New Jersey Attorney General to the consummation of the transaction described in this Agreement in connection with the CHAPA application.

7.11     No Material Adverse Change.  There shall have been no material adverse change or material adverse effect, individually or in the aggregate, on the business, financial condition, operations, results of operations, or assets, of the Hospital, taken as a whole, subsequent to the Effective Date; *provided*, *however*, that any adverse effect arising out of, resulting from or attributable to any of the following shall not constitute or be deemed to contribute to a material adverse effect, and otherwise shall not be taken into account in determining whether a material adverse effect has occurred unless such event is reasonably expected to have a disproportionate impact (as compared to other health care services providers) on the business, operations, property, financial condition or results of operations of the Hospital:  (i) a fact, circumstance, event, change, effect, condition or occurrence, or series of such items, to the extent affecting global or national or regional economic, business, regulatory, market or political conditions, including those attributable to acts of war, terrorism, or the outbreak of hostilities, or national or global financial markets, including changes in interest or exchange rates, (ii) the negotiation, execution or the announcement of, or the performance of obligations under, this Agreement, the Schedules or the other documents contemplated by this Agreement or the consummation of the transactions contemplated hereby (including any change in the financial and operating performance of the Seller as a result thereof), (iii) any changes or any proposed changes in GAAP effective or adopted after the date of this Agreement, (iv) any actions taken or not taken at the request or otherwise with the consent of Purchaser, or (v) the commencement of the Cases and the subsequent conduct of the Acute Care Hospital and the Other Businesses in accordance with this Agreement, the Bankruptcy Code and one or more Orders of the Bankruptcy Court.

7.12     Bankruptcy Court Approval.  The Bankruptcy Court shall have entered the Approval Order, with such changes as may be mutually acceptable to Purchaser and Seller, which shall be in full force and effect as of the Closing.

## ARTICLE 8

## TERMINATION

8.1     Termination.  This Agreement may be terminated at any time prior to Closing:

      (a)     by the mutual written consent of the Parties;

(b)      by Seller if a material breach of this Agreement has been committed by Purchaser and such breach has not been (i) waived in writing by Seller or (ii) cured by Purchaser to the reasonable satisfaction of Seller within fifteen (15) business days after service by Seller upon Purchaser of a written notice which describes the nature of such breach; provided, however, Seller shall not be permitted to terminate this Agreement pursuant to this <u>Section 8.1(b)</u> if such material breach was caused by Seller or if Seller is also in material breach of this Agreement;

(c)      by Purchaser if a material breach of this Agreement has been committed by Seller and such breach has not been (i) waived in writing by Purchaser or (ii) cured by Seller to the reasonable satisfaction of Purchaser within fifteen (15) business days after service by Purchaser upon Seller of a written notice which describes the nature of such breach; provided, however, that Purchaser shall not be permitted to terminate this Agreement pursuant to this <u>Section 8.1(c)</u> if such material breach was caused by Purchaser or if Purchaser is also in material breach of this Agreement;

(d)      by Purchaser if any of the conditions in Article 7 have not been satisfied as of the Termination Date, or if satisfaction of any condition in Article 7 is or becomes impossible and Purchaser has not waived such condition in writing on or before the Termination Date (provided that the failure to satisfy the applicable condition or conditions has occurred by reason other than (i) through the failure of Purchaser to comply with its obligations under this Agreement, or (ii) Seller's failure to provide its closing deliveries on or before the Termination Date as a result of Purchaser not being ready, willing and able to close the transaction on or before the Termination Date);

(e)      by Seller if any of the conditions in Article 6 have not been satisfied as of the Termination Date, or if satisfaction of any such condition in Article 6 is or becomes impossible and Seller has not waived such condition in writing on or before the Termination Date (provided that the failure to satisfy the applicable condition or conditions has occurred by reason other than (i)  through the failure of Seller to comply with their obligations under this Agreement, or (ii) Purchaser's failure to provide its closing deliveries on or before the Termination Date as a result of Seller not being ready, willing and able to close the transaction on  or before the Termination Date);

(f)      by Purchaser or Seller, upon the delivery of a Casualty Termination Notice in accordance with <u>Section 1.11</u>;

(g)      by either Purchaser or Seller if the Closing has not occurred (other than as a result of a failure of the Party seeking to terminate this Agreement to comply fully with its obligations under this Agreement) on or before the date that is one hundred twenty (120) days after the Petition Date (the "Termination Date"); or

(h)      by Purchaser at any time after ten (10) days after the Petition Date, if (A) the Bankruptcy Court shall not have entered the Procedures Order, or (B) after its entry, the Procedures Order shall fail to be in full force and effect or shall have been stayed, reversed, modified or amended in any respect without the prior written consent of Purchaser;

54020/0001-11968411v10

(i)      by Purchaser at any time after one hundred (100) days after the Petition Date, if (A) the Bankruptcy Court shall not have entered the Approval Order, or (B) after its entry, the Approval Order shall fail to be in full force and effect or shall have been stayed, reversed, modified or amended in any respect without the prior written consent of Buyer; or

(j)      by Purchaser or Seller upon entry of an Order of the Bankruptcy Court or other court of competent jurisdiction approving any Alternate Transaction, unless the Purchaser is designated at the Auction as the "backup bidder," in which case Purchaser may terminate this Agreement upon the closing of an Alternate Transaction.

8.2      Consequences of Termination .  If this Agreement is terminated under Section 8.1, written notice thereof will forthwith be given to the other Party and this Agreement will thereafter become void and have no further force and effect and all further obligations of Seller and Purchaser to each other under this Agreement will terminate without further obligation or liability of Seller or Purchaser to the other, except that:

(a)      each Party will return or destroy all documents, workpapers and other material of any other party relating to the Transactions contemplated by this Agreement, whether so obtained before or after the execution of this Agreement, to the Party furnishing the same;

(b)      the Good Faith Deposit shall be disbursed in accordance with Section 1.3;

(c)      if this Agreement is terminated by Purchaser pursuant to Sections 8.1(c) 8.1(d), 8.1(f), 8.1(g) (other than as a result of Purchaser failing to fully comply with its obligations hereunder), 8.1(i) or 8.1(j) or by Sellers pursuant to Section or 8.1(e) (other than as a result of Purchaser failing to comply with its obligations hereunder) or 8.1(g) , then Purchaser upon the closing of an Alternate Transaction shall be entitled to payment of the Expense Reimbursement.

(d)      In addition to the payment of the Expense Reimbursement pursuant to Section 8.2(c), if this Agreement is terminated by Purchaser or Seller pursuant to Section 8.1(j), then Purchaser upon the closing of an Alternate Transaction shall be entitled to payment of the Break-Up Fee.

(e)      Notwithstanding the foregoing provisions of this Section 8.2, this Section 8.2 and the obligations in Sections 12.3, 12.6, and 12.12 shall survive, (ii) each party shall pay the costs and expenses incurred by it in connection with this Agreement, except as provided in Section 12.12 and for the payment of the Expense Reimbursement to Purchaser under Section 8.2(c), and (iii) the Parties shall remain bound by the terms of that certain Confidentiality Agreement dated as of February 6, 2012 ("*Confidentiality Agreement*").

## ARTICLE 9

## POST-CLOSING MATTERS

9.1      Excluded Assets and Excluded Liabilities.  Subject to Section 9.2, any asset or any liability, all other remittances and all mail and other communications that is an Excluded Asset or an Excluded Liability (a) pursuant to the terms of this Agreement, (b) as otherwise

determined by the parties' mutual written agreement or (c) absent such agreement, as determined by adjudication by a court or similar tribunal, and which comes into the possession, custody or control of Purchaser (or its respective successors-in-interest, assigns or Affiliates) shall within five (5) business days following receipt be transferred, assigned or conveyed by Purchaser (and its respective successors-in-interest, assigns and Affiliates) to Seller at Seller's cost.  Until such transfer, assignment and conveyance, Purchaser (and its respective successors-in-interest, assigns and Affiliates) shall not have any right, title or interest in or obligation or responsibility with respect to such asset or liability except that Purchaser shall hold such asset in trust for the benefit of Seller.  Purchaser (and its respective successors-in-interest, assigns and Affiliates) shall have neither the right to offset amounts payable to Seller under this Section 9.1 against, nor the right to contest its obligation to transfer, assign and convey to Seller because of, outstanding claims, liabilities or obligations asserted by Purchaser against Seller or the indemnification provisions of Section 10.2.  If Purchaser does not remit any monies included in the Excluded Assets to Seller in accordance with the first sentence of this Section 9.1, such withheld funds shall bear interest at the Prime Rate in effect on the calendar day upon which such payment was required to be made to Seller (the "*Excluded Asset Due Date*") plus five percent (5%) (or the maximum rate allowed by law, whichever is less), such interest accruing on each calendar day after the Excluded Asset Due Date until payment of the Excluded Assets and all interest thereon is made to Seller.  The terms of this Article 9 shall not be subject to the time limitations contained in Section 10.1 of this Agreement.

9.2     Seller's Receipt of Misdirected Payments and Possession of Assets.

(a)     To the extent there are any funds forwarded to Seller (or any of its Affiliates) by any third parties, which funds are paid in respect of the performance of services by or on behalf of the Hospital, Seller shall remit such misdirected funds to Purchaser within five (5) business days after receipt thereof, to an account designated by Purchaser.

(b)     To the extent Seller is in possession of any of the Assets after the Effective Time, Seller shall deliver such Assets to Purchaser within five (5) business days after Seller determines that it is improperly in its possession.

9.3     Preservation and Access to Records After the Closing.

(a)     From the Closing Date until ten (10) years after the Closing Date or such longer period as required by law (the "Document Retention Period"), Purchaser shall keep and preserve all medical records, patient records, medical staff records and other books and records which are among the Assets as of the Effective Time, but excluding any records which are among the Excluded Assets.  Purchaser will afford to the representatives of Seller, including its counsel and accountants, full and complete access to, and copies (including, without limitation, color laser copies) of, such records with respect to time periods prior to the Effective Time (including, without limitation, access to records of patients treated at the Hospital prior to the Effective Time) during normal business hours after the Effective Time, to the extent reasonably needed by Seller for business purposes.  Purchaser acknowledges that, as a result of entering into this Agreement and operating the Hospital, it will gain access to patient records and other information which are subject to rules and regulations concerning confidentiality.  Purchaser shall abide by any such rules and regulations relating to the confidential information it acquires,

and shall maintain privacy practices which are equal to or better than the privacy practices of Seller.  Purchaser shall maintain the patient and medical staff records in accordance with applicable law and the requirements of relevant insurance carriers.  After the expiration of the Document Retention Period, if Purchaser intends to destroy or otherwise dispose of any of the documents described in this <u>Section 9.3(a)</u>, Purchaser shall provide written notice to Seller of Purchaser's intention no later than forty-five (45) calendar days prior to the date of such intended destruction or disposal.  Seller shall have the right, at its sole cost, to take possession of such documents during such forty-five (45) calendar day period.  If Seller does not take possession of such documents during such forty-five (45) calendar day period, Purchaser shall be free to destroy or otherwise dispose of such documentation upon the expiration of such forty-five (45) calendar day period.

(b)    Purchaser shall give full cooperation to Seller and its insurance carriers in respect of the defense of claims by third parties against Seller.  Such cooperation shall include, without limitation, making the Hired Employees available for interviews, depositions, hearings and trials.  Such cooperation shall also include making all of its employees available to assist in the securing and giving of evidence and in obtaining the presence and cooperation of witnesses (all of which shall be done without payment of any fees or expenses to Purchaser or to such employees).  In addition, Seller shall be entitled to remove from the Acute Care Hospital originals of any such records, but only for purposes of pending litigation involving the persons to whom such records refer, as certified in writing prior to removal by counsel retained by Seller in connection with such litigation.  Any records so removed from the Acute Care Hospital shall be promptly returned to Purchaser following Seller's use of such records.

(c)    Purchaser and its representatives shall be given access by Seller during normal business hours to the extent reasonably needed by Purchaser for business purposes to all documents, records, correspondence, work papers and other documents retained by Seller pertaining to any of the Assets or with respect to the operation of the Hospital prior to the Effective Time, all in such manner as to not interfere unreasonably with Seller's business.  Such documents and other materials shall be, at Seller's option, either (i) copied by Seller for Purchaser at Purchaser's expense, or (ii) removed by Purchaser from the premises, copied by Purchaser and promptly returned to Seller.

(d)    Purchaser shall comply with, and be solely responsible for, all obligations under the Standards for Privacy of Individually Identifiable Health Information (45 CFR Parts 160 and 164) promulgated pursuant to the Health Insurance Portability and Accountability Act of 1996 with respect to the operation of the Hospital on and after the Effective Time.

(e)    Purchaser shall cooperate with Seller, on a timely basis and as reasonably requested by Seller, in connection with the provision of all data of the Hospital and other information required by Seller for reporting to Joint Commission for the pre-Closing portion of the quarterly period in which the Closing has occurred.

(f)    Seller shall submit all quality data required under ORYX to The Joint Commission, for any calendar quarter with reporting deadlines between the Effective Date and the Closing Date.  If a calendar quarter ends prior to the Closing Date, but the reporting deadline for such quarter ends after the Closing Date, Seller shall prepare and submit the quality data for

60

the Facilities required under ORYX in accordance with applicable filing deadlines and in the form and manner required by The Joint Commission, or, at the sole option of Purchaser, Seller shall transmit such quality data to Purchaser in a form mutually agreeable to Purchaser and Seller or allow Purchaser access to such data, to enable Purchaser to submit quality data for the Acute Care Hospital required under ORYX for such quarter.  If the Closing Date falls between the first and last day of a calendar quarter, Seller shall cooperate with Purchaser to ensure that all quality data required to be submitted for the Acute Care Hospital under ORYX for the portion of the quarter during which Seller owned the Acute Care Hospital can be aggregated with the quality data for the portion of the quarter during which Purchaser owned the Acute Care Hospital, to enable Purchaser and/or Seller to submit the quality data for the Acute Care Hospital required under ORYX in accordance with applicable filing deadlines and in the form and manner required by The Joint Commission

(g)     After the Closing Date, Seller will cooperate with Purchaser in all reasonable respects in providing pre-Closing documents or data then in Seller's possession that Purchaser reasonably believes are necessary or appropriate to file with respect to HITECH Payments for any federal fiscal year, including (i) making available to Purchaser all information and records necessary for the preparation of HITECH attestations or other filings, (ii) providing the services of Seller's employees as required to assist Purchaser in preparing such reports, (iii) coordinating with Purchaser in regards to applicable Medicare and Medicaid conferences or meetings, (iv) providing to appropriate parties, as determined to be reasonably necessary by Purchaser, a letter acknowledging that, as between Seller and Purchaser, Purchaser holds all rights to the HITECH Payments for all federal fiscal years, that Seller agrees that Purchaser has the right to pursue such HITECH Payments, either on Purchaser's behalf or, to the extent required by law, as Seller's representative, and that Purchaser has the right to submit all attestations with respect to such HITECH Payments for any such period, either on Purchaser's behalf or, to the extent required by law, as Seller's representative.  Seller shall forward to Purchaser any and all correspondence relating to HITECH Payments for any federal fiscal year within five (5) business days after receipt by Seller.

(h)     To the extent required by New Jersey law, Seller will notify its applicable patients of the change of ownership of the Hospital, including patients in any of its applicable inpatient or outpatient healthcare service programs.

(i)     To the maximum extent permitted by law, if any Person requests or demands from Purchaser, by subpoena or otherwise, any documents relating to the Excluded Liabilities or Excluded Assets, including without limitation, documents relating to the operations of any of the Hospital or any of the Hospital's committees prior to the Effective Time, prior to any disclosure of such documents, Purchaser shall notify Seller and shall provide Seller with the opportunity to object to, and otherwise coordinate with respect to, such request or demand.

9.4     <u>Post-Closing Real Property Subdivision</u>.  The Parties acknowledge that included in the Excluded Real Property is a portion, but not all, of Block 42, Lot 44, in the City of Newark, New Jersey.  Such portion of the Excluded Real Property is more particularly described on <u>Schedule 9.4</u> attached hereto and is referred to herein as the "*Lot 44 Excluded Real Property*".  The Parties acknowledge and agree  that (i) Seller cannot retain the Lot 44 Excluded Real Property without successful completion of a minor subdivision proceeding (or other appropriate

action) with the Planning Board of the City of Newark to subdivide into a separate lot number the Lot 44 Excluded Real Property (the "*Subdivision*"), (ii)  the Deeds to be delivered to Purchaser at the Closing shall include the Lot 44 Excluded Real Property in its entirety, and (iii) Purchaser shall file and prosecute the Subdivision as expeditiously as commercially practicable after the Closing.  Within five (5) business days after the later of the effective date of the Subdivision or the date when all rights of appeal with respect to the Subdivision have lapsed and no appeal has been taken, Purchaser shall transfer and convey to Seller or Seller's designee the Lot 44 Excluded Real Property free and clear of all Liens and encumbrances other than Permitted Exceptions.  In connection with the Subdivision and the conveyance of the Lot 44 Excluded Real Property to Seller or Seller's designee, the following shall apply:

(a)    The deed conveying the Lot 44 Excluded Real Property to Seller or Seller's designee shall be in the form of Exhibit 9.4 attached hereto and Seller or Seller's designee shall accept the Lot 44 Excluded Real Property in its then "AS IS" condition.

(b)    Purchaser shall have no obligation to improve, repair, or otherwise maintain the Lot 44 Excluded Real Property or any improvements thereon.  At Seller's request, Purchaser shall allow Seller access to the Lot 44 Excluded Real Property from the Closing to the day preceding the date on which the Lot 44 Excluded Real Property is conveyed to Seller or Seller's designee so long as Seller provides Purchaser with such liability insurance as Purchaser may reasonably request in connection with any such access.

(c)    From the Closing to the day preceding the date on which the Lot 44 Excluded Real Property is conveyed to Seller, Purchaser shall maintain insurance coverage on the Lot 44 Excluded Real Property in such amounts and limits as Purchaser maintains on the Real Property after the Closing and shall provide security services for the benefit of the Lot 44 Excluded Real Property as is consistent with that provided by Purchaser for the benefit of the Real Property after the Closing.

(d)    Recordation and title insurance charges for conveyance of the Lot 44 Excluded Real Property to Seller or Seller's designee shall be at Seller's expense and title insurance shall not be a condition to the conveyance of the Lot 44 Excluded Real Property to Seller or Seller's designee.

(e)    A civil engineer experienced with the City of Newark process ("Civil Engineer") shall be retained by Purchaser to process the Subdivision (including, by way of example, preparing any required survey, filing the application, and similar items).

(f)    Prior to the Closing, Seller and Purchaser shall agree upon, and then implement upon the conveyance of the Lot 44 Excluded Real Property to Seller or Seller's designee, covenants, easements and similar instruments needed to operate the Lot 44 Excluded Real Property and the adjacent property owned by Purchaser.  By way of example only, such covenants, easements and similar instruments may include easements for ingress and egress, utilities, and lateral support.

(g)    Purchaser and Seller agree to cooperate in connection with the ongoing redevelopment of the area surrounding the Lot 44 Excluded Real Property as may be required from time to time after Closing.

(h)    All costs and expenses relating to the Subdivision (including the fees and costs of the Civil Engineer) shall be paid by Purchaser.  Seller shall reimburse Purchaser for one-half of such costs and expenses with reimbursement made with ten (10) business days after Purchaser's written request which request will be accompanied by supporting invoices, billings or similar evidence of costs and expenses incurred.

## ARTICLE 10

## SURVIVAL AND INDEMNFICATION

10.1    <u>Survival</u>.  Except as expressly set forth in this Agreement to the contrary, all representations, warranties, covenants, agreements and indemnifications of Purchaser and Seller, respectively, contained in this Agreement or in any document delivered pursuant hereto shall continue to be fully effective and enforceable following the Closing Date for eighteen (18) months and shall thereafter be of no further force and effect.  Notwithstanding the foregoing, the indemnifications contained in <u>Section 10.2(a)(vi)</u> shall continue to be fully effective and enforceable following the Closing Date for the applicable statute of limitations period, plus thirty (30) days, and the indemnifications contained in <u>Sections 10.2(a)(iii)</u>, <u>10.2(a)(iv)</u>, <u>10.2(a)(v)</u>, <u>10.2(a)(vii)</u>, and <u>10.3(a)(iii)-10.3(a)(x)</u> shall continue to be fully effective and enforceable following the Closing Date without any time limitation; *provided*, *however*, that if there is an outstanding notice of a claim at the end of any such applicable period in compliance with the terms of <u>Section 10.4</u>, such applicable period shall not end in respect of such claim until such claim is resolved.

10.2    <u>Indemnification of Purchaser by Seller.</u>

(a)    <u>Indemnification</u>.  Seller shall keep and save Purchaser, and its directors, officers, employees, agents and other representatives (the "*Purchaser Indemnified Parties*"), forever harmless from and shall indemnify and defend the Purchaser Indemnified Parties from and against any and all obligations, judgments, liabilities, penalties, violations, fees, fines, claims, losses, costs, demands, damages, liens, encumbrances and expenses including reasonable attorneys' fees (collectively, "*Damages*"), to the extent connected with or arising or resulting from (i) any breach of any representation or warranty of Seller under this Agreement, (ii) any breach or default by Seller of any covenant or agreement of Seller under this Agreement, (iii) the Excluded Liabilities, (iv) the Excluded Assets, (v) all federal, state and local income taxes relating to Seller ("*Seller Tax Claims*"), (vi) any Pre-Closing E&O Matters, and (vii) any of those certain pending governmental investigations which are described on <u>Schedule 10.2</u>.  No provision in this Agreement shall prevent Seller from pursuing any of its legal rights or remedies that may be granted to Seller by law against any person or legal entity other than Purchaser. Nothing in this <u>Article 10</u> shall prevent Seller as debtor from reorganizing, liquidating, or dissolving, and distributing its assets under federal or state law, including federal bankruptcy law.

(b)    <u>Indemnification Limitations</u>.    Notwithstanding any provision to the contrary contained in this Agreement, Seller shall be under no liability to indemnify Purchaser under <u>Section 10.2(a)</u> and no claim under <u>Section 10.2(a)</u> of this Agreement shall:

(A)    be made unless notice thereof shall have been given by or on behalf of Purchaser to Seller in the manner provided in <u>Section 10.4</u>, unless failure to provide such notice in a timely manner does not materially impair Seller's ability to defend its rights, mitigate damages, seek indemnification from a third party or otherwise protect its interests;

(B)    be made to the extent that such claim relates to a liability arising out of or relating to any act, omission, event or occurrence connected with:

(A)    the use, ownership or operation of the Hospital, or

(B)    the use, ownership or operation of any of the Assets,

on and after the Effective Time (without regard to whether such use, ownership or operation is consistent with Seller's policies, procedures and/or practices prior to the Effective Time);

(C)    be made to the extent such claim relates to an obligation or liability for which Purchaser has agreed to indemnify Seller pursuant to <u>Section 10.3</u>;

(D)    be made to the extent that such claim would not have arisen but for a voluntary act, omission or transaction carried out by Purchaser or its Affiliates after the Effective Date;

(E)    be made to the extent such claim relates to Seller's failure to comply with or the Assets' failure to be in compliance with the Americans with Disabilities Act; *provided*, *however*, that this <u>Section 10.2(b)(v)</u> shall not apply to the extent that such claim arises as a result of a claim brought by a non-governmental third party who has suffered personal injury prior to the Effective Time;

(F)    be made to the extent such claim seeks Damages which are consequential in nature (as opposed to direct), including, without limitation, loss of future revenue or income or loss of business reputation or opportunity (collectively, "*Consequential Damages*"); *provided*, *however*, that the limitation contained in this <u>Section 10.2(b)(vi)</u> shall not apply to the extent (1) of any payments which Purchaser is required to make to a third party (other than any third party which is an Affiliate of, investor of or lender to Purchaser) which are in the nature of Consequential Damages, and (2) such third party's claim is unrelated to the failure to obtain any or all of the Contract and Lease Consents; and

(c)    If Purchaser is entitled to recover any sum (whether by payment, discount, credit or otherwise) from any third party in respect of any matter for which a claim of indemnity could be made against Seller hereunder, Purchaser shall use its reasonable efforts to recover the full amount of such sum from such third party prior to making a claim hereunder and any sum

64

recovered will reduce the amount of the claim.  If Seller pays to Purchaser an amount in respect of a claim, and Purchaser subsequently recovers from a third party a sum which is referable to that claim, Purchaser shall forthwith repay to Seller so much of the amount paid by it as does not exceed the sum recovered from the third party less all reasonable costs, charges and expenses incurred by Purchaser in obtaining payment in respect of that claim and in recovering that sum from the third party.

10.3    Indemnification of Seller by Purchaser.

(a)    Indemnification.    Purchaser shall keep and save Seller, and Seller's respective directors, officers, employees, agents and other representatives, forever harmless from and shall indemnify and defend Seller and Seller's respective directors, officers, employees, agents and other representatives against any and all matters and Damages, to the extent connected with or arising or resulting from (i) any breach of any representation or warranty of Purchaser under this Agreement, (ii) any breach or default by Purchaser under any covenant or agreement of Purchaser under this Agreement, (iii) cost reports (and all claims with respect thereto) relating to Purchaser with respect to Medicare, Medicaid, TRICARE or Blue Cross programs or any other third-party payor for all periods beginning on and after the Effective Time, (iv) the Assumed Obligations, (v) any professional liability claim arising out of the business operations of the Hospital on and after the Effective Time, (vi) any other obligation or liability specifically assumed by Purchaser in this Agreement, (vii) liabilities to the Hired Employees arising out of actions of Purchaser based wholly or in part upon the contents of the personnel records of such employees, (viii) any act, conduct or omission of Purchaser that has accrued, arisen, occurred or come into existence at any time, (ix) any non-compliance with any "bulk transfer laws", and (x) any and all loss, liability, cost, damage or expense (including, without limitation, attorneys' fees, accountants' fees, consultants' fees, court costs and interest) related to Purchaser's inspections and assessments of the Assets prior to the Effective Time.  No provision in this Agreement shall prevent Purchaser from pursuing any of its legal rights or remedies that may be granted to Purchaser by law against any person or legal entity other than Seller or any Affiliate of Seller.

(b)    Indemnification Limitations.    Notwithstanding any provision to the contrary contained in this Agreement, Purchaser shall be under no liability to indemnify Seller under Section 10.3(a) and no claim under Section 10.3(a) of this Agreement shall:

(A)    be made unless notice thereof shall have been given by or on behalf of Seller to Purchaser in the manner provided in Section 10.4, unless failure to provide such notice in a timely manner does not materially impair Purchaser's ability to defend its rights, mitigate damages, seek indemnification from a third party or otherwise protect its interests;

(B)    be made to the extent that such claim relates to a liability of Seller arising out of or relating to any act, omission, event or occurrence connected with:

(A)    the use, ownership or operation of the Hospital, or

(B)    the use, operation or ownership of any of the Assets,

prior to the Effective Time;

        (C)    be made to the extent such claim relates to an obligation or liability for which Seller has agreed to indemnify Purchaser pursuant to Section 10.2;

        (D)    be made to the extent such claim seeks Consequential Damages; *provided*, *however*, the limitation contained in this Section 10.3(b)(iv) shall not apply to the extent of any payments which Seller or any Affiliate of Seller is required to make to a third party which are in the nature of Consequential Damages; and

        (c)    If Seller is entitled to recover any sum (whether by payment, discount, credit or otherwise) from any third party in respect of any matter for which a claim of indemnity could be made against Purchaser hereunder, Seller shall use its reasonable endeavors to recover such sum from such third party and any sum recovered will reduce the amount of the claim.  If Purchaser pays to Seller an amount in respect of a claim, and Seller subsequently recovers from a third party a sum which is referable to that claim, Seller shall forthwith repay to Purchaser so much of the amount paid by it as does not exceed the sum recovered from the third party less all reasonable costs, charges and expenses incurred by Seller in obtaining payment in respect of that claim and in recovering that sum from the third party.

    10.4    Method of Asserting Claims.  All claims for indemnification by any person entitled to indemnification (the "*Indemnified Party*") under this Article 10 will be asserted and resolved as follows:

        (a)    In the event any claim or demand, for which a party hereto (an "*Indemnifying Party*") would be liable for the Damages to an Indemnified Party, is asserted against or sought to be collected from such Indemnified Party by a person other than Seller, Purchaser or their Affiliates (a "*Third Party Claim*"), the Indemnified Party shall deliver a notice of its claim (a "*Claim Notice*") to the Indemnifying Party within thirty (30) calendar days after the Indemnified Party receives written notice of such Third Party Claim; *provided*, *however*, that notice shall be provided to the Indemnifying Party within ten (10) calendar days after receipt of a complaint, petition or institution of other formal legal action by the Indemnified Party.  If the Indemnified Party fails to provide the Claim Notice within such applicable time period after the Indemnified Party receives written notice of such Third Party Claim and thereby materially impairs the Indemnifying Party's ability to protect its interests, the Indemnifying Party will not be obligated to indemnify the Indemnified Party with respect to such Third Party Claim.  The Indemnifying Party will notify the Indemnified Party within thirty (30) calendar days after receipt of the Claim Notice (the "*Notice Period*") whether the Indemnifying Party desires, at the sole cost and expense of the Indemnifying Party, to defend the Indemnified Party against such Third Party Claim.

        (A)    If the Indemnifying Party notifies the Indemnified Party within the Notice Period that the Indemnifying Party desires to defend the Indemnified Party with respect to the Third Party Claim pursuant to this Section 10.4(a)(i), then the Indemnifying Party will have the right to defend, at its sole cost and expense, such Third Party Claim by all appropriate proceedings, which proceedings will be prosecuted by the Indemnifying Party to a final conclusion or will be settled at the discretion of the

Indemnifying Party.  The Indemnifying Party will have full control of such defense and proceedings, including any compromise or settlement thereof.  Notwithstanding the foregoing, the Indemnified Party may, at its sole cost and expense, file during the Notice Period any motion, answer or other pleadings that the Indemnified Party may deem necessary or appropriate to protect its interests or those of the Indemnifying Party and which is not prejudicial, in the reasonable judgment of the Indemnifying Party, to the Indemnifying Party.  Except as provided in Section 10.4(a)(i), if an Indemnified Party takes any such action that is prejudicial and causes a final adjudication that is adverse to the Indemnifying Party, the Indemnifying Party will be relieved of its obligations hereunder with respect to the portion of such Third Party Claim prejudiced by the Indemnified Party's action.  If requested by the Indemnifying Party, the Indemnified Party agrees, at the sole cost and expense of the Indemnifying Party, to cooperate with the Indemnifying Party and its counsel in contesting any Third Party Claim that the Indemnifying Party elects to contest, or, if appropriate and related to the Third Party Claim in question, in making any counterclaim against the person asserting the Third Party Claim, or any cross-complaint against any person (other than the Indemnified Party or any of its Affiliates).  The Indemnified Party may participate in, but not control, any defense or settlement of any Third Party Claim controlled by the Indemnifying Party pursuant to this Section 10.4(a)(i), and except as specifically provided in this Section 10.4(a)(i), the Indemnified Party will bear its own costs and expenses with respect to such participation.

(B)     If the Indemnifying Party fails to notify the Indemnified Party within the Notice Period that the Indemnifying Party desires to defend the Indemnified Party pursuant to this Section 10.4(a), or if the Indemnifying Party gives such notice but fails to prosecute diligently or settle the Third Party Claim, or if the Indemnifying Party fails to give any notice whatsoever within the Notice Period, then the Indemnified Party will have the right to defend, at the sole cost and expense of the Indemnifying Party, the Third Party Claim by all appropriate proceedings, which proceedings will be promptly and reasonably prosecuted by the Indemnified Party to a final conclusion or will be settled at the discretion of the Indemnified Party.  The Indemnified Party will have full control of such defense and proceedings, including any compromise or settlement thereof; *provided, however,* that if requested by the Indemnified Party, the Indemnifying Party agrees, at the sole cost and expense of the Indemnifying Party, to cooperate with the Indemnified Party and its counsel in contesting any Third Party Claim which the Indemnified Party is contesting, or, if appropriate and related to the Third Party Claim in question, in making any counterclaim against the person asserting the Third Party Claim, or any cross-complaint against any person (other than the Indemnifying Party or any of its Affiliates).  Notwithstanding the foregoing provisions of this Section 10.4(a)(ii), if the Indemnifying Party has notified the Indemnified Party with reasonable promptness that the Indemnifying Party disputes its liability to the Indemnified Party with respect to such Third Party Claim and if such dispute is resolved in favor of the Indemnifying Party, the Indemnifying Party will not be required to bear the costs and expenses of the Indemnified Party's defense pursuant to this Section 10.4(a)(ii) or of the Indemnifying Party's participation therein at the Indemnified Party's request, and the Indemnified Party will reimburse the Indemnifying Party in full for all reasonable costs and expenses incurred by the Indemnifying Party in connection with such litigation.  Subject to the above terms

67

of this Section 10.4(a)(ii), the Indemnifying Party may participate in, but not control, any defense or settlement controlled by the Indemnified Party pursuant to this Section 10.4(a)(ii), and the Indemnifying Party will bear its own costs and expenses with respect to such participation.  The Indemnified Party shall give sufficient prior notice to the Indemnifying Party of the initiation of any discussions relating to the settlement of a Third Party Claim to allow the Indemnifying Party to participate therein.

(b)    In the event any Indemnified Party should have a claim against any Indemnifying Party hereunder that either (i) does not involve a Third Party Claim being asserted against or sought to be collected from the Indemnified Party, or (ii) is a Seller Tax Claim, the Indemnified Party shall deliver an Indemnity Notice (as hereinafter defined) to the Indemnifying Party.  The term "*Indemnity Notice*" shall mean written notification of a claim for indemnity under Article 10 (which claim does not involve a Third Party Claim or is a Seller Tax Claim) by an Indemnified Party to an Indemnifying Party pursuant to this Section 10.4, specifying the nature of and specific basis for such claim and the amount or the estimated amount of such claim.)  The failure by any Indemnified Party to give the Indemnity Notice shall not impair such party's rights hereunder except to the extent that an Indemnifying Party demonstrates that it has been prejudiced thereby.

(c)    If the Indemnifying Party does not notify the Indemnified Party within thirty (30) calendar days following its receipt of a Claim Notice or an Indemnity Notice that the Indemnifying Party disputes its liability to the Indemnified Party hereunder, such claim specified by the Indemnified Party will be conclusively deemed a liability of the Indemnifying Party hereunder and the Indemnifying Party shall pay the amount of such liability to the Indemnified Party on demand, or on such later date (i) in the case of a Third Party Claim, as the Indemnified Party suffers the Damages in respect of such Third Party Claim, (ii) in the case of an Indemnity Notice in which the amount of the claim is estimated, when the amount of such claim becomes finally determined or (iii) in the case of a Seller Tax Claim, upon the earlier of when a lien attaches, or within fifteen (15) calendar days following final determination of the item giving rise to the claim for indemnity.  If the Indemnifying Party has timely disputed its liability with respect to such claim, as provided above, the Indemnifying Party and the Indemnified Party agree to proceed in good faith to negotiate a resolution of such dispute, and if not resolved through negotiations, such dispute will be resolved by adjudication by a court or similar tribunal.

(d)    The Indemnified Party agrees to give the Indemnifying Party reasonable access to the books and records and employees of the Indemnified Party in connection with the matters for which indemnification is sought hereunder, to the extent the Indemnifying Party reasonably deems necessary in connection with its rights and obligations hereunder.

(e)    The Indemnified Party shall assist and cooperate with the Indemnifying Party in the conduct of litigation, the making of settlements and the enforcement of any right of contribution to which the Indemnified Party may be entitled from any person or entity in connection with the subject matter of any litigation subject to indemnification hereunder.  In addition, the Indemnified Party shall, upon request by the Indemnifying Party or counsel selected by the Indemnifying Party (without payment of any fees or expenses to the Indemnified Party or an employee thereof), attend hearings and trials, assist in the securing and giving of evidence, assist in obtaining the presence or cooperation of witnesses, and make available its own

68

personnel; and shall do whatever else is necessary and appropriate in connection with such litigation.  The Indemnified Party shall not make any demand upon the Indemnifying Party or counsel for the Indemnifying Party in connection with any litigation subject to indemnification hereunder, except a general demand for indemnification as provided hereunder.   If the Indemnified Party shall fail to perform such obligations as Indemnified Party hereunder or to cooperate fully with the Indemnifying Party in Indemnifying Party's defense of any suit or proceeding, such cooperation to include, without limitation, attendance at all depositions and the provision of all documents relevant to the defense of any claim, then, except where such failure does not have an adverse effect on the Indemnifying Party's defense of such claims, the Indemnifying Party shall be released from all of its obligations under this Agreement with respect to that suit or proceeding and any other claims which had been raised in such suit or proceeding.

(f)     Following indemnification as provided for hereunder, the Indemnifying Party shall be subrogated to all rights of the Indemnified Party with respect to all persons or entities relating to the matter for which indemnification has been made; *provided*, *however*, that the Indemnifying Party shall have no subrogation rights to seek reimbursement through or from the Indemnified Party's insurance policies, programs, coverage, carriers or beneficiaries.

10.5    <u>Exclusive Remedy</u>.  Other than claims for fraud or equitable relief (which equitable relief claims are nevertheless subject to <u>Section 10.1</u>), any claim arising under this Agreement or in connection with or as a result of the transactions contemplated by this Agreement or any Damages or injury alleged to be suffered by any party as a result of the actions or failure to act by any other party shall, unless otherwise specifically stated in this Agreement, be governed solely and exclusively by the provisions of this <u>Article 10</u>.  If Seller and Purchaser cannot resolve such claim by mutual agreement, such claim shall be determined by adjudication by a court or similar tribunal subject to the provisions of this <u>Article 10</u>.

Limitations On Any Indemnification Claim.  The ability of the Parties to seek indemnification pursuant to this <u>Article 10</u> shall be limited in the following manner:The maximum aggregate liability of the Seller for indemnification under <u>Sections 10.2(a)(i)</u> shall be limited to twenty percent (20%) of the Cash Purchase Price (the "*Indemnification Cap*").  Seller's indemnification obligations under <u>Section 10.2(a)(iii-vii)</u> shall not be subject to the Indemnification Cap.

(b)     Seller will have no obligation to indemnify the Purchaser pursuant to <u>Section 10.2(a)(i)</u> in respect of damages arising from the breach of, or inaccuracy in, any representation or warranty described therein unless the aggregate amount of all such damages incurred or suffered by the Purchaser exceeds Five Hundred Thousand Dollars ($500,000) (and at such time as the Five Hundred Thousand Dollars ($500,000) threshold amount is reached, indemnification shall apply from first dollar).

(c)     The maximum aggregate liability of Purchaser for indemnification under <u>Sections 10.3(a)(i)</u> shall be limited to the Indemnification Cap.

(d)     Purchaser will have no obligation to indemnify Seller pursuant to Section 10.3(a)(i) in respect of damages arising from the breach of, or inaccuracy in, any representation or warranty described therein unless the aggregate amount of all such damages incurred or

69

suffered by the Purchaser exceeds Five Hundred Thousand Dollars ($500,000) (and at such time as the Five Hundred Thousand Dollars ($500,000) threshold amount is reached, indemnification shall apply from first dollar).

10.6    Specific Performance.

(a)    The Parties acknowledge and agree that irreparable injury would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached and that such injury would not be adequately compensable in damages because of the difficulty of ascertaining the amount of damages that will be suffered in the event that this Agreement is breached.  Accordingly, each Party agrees that, in the event of any breach or threatened breach by any other Party of any covenant or obligation contained in this Agreement, in addition to any other remedy to which it is entitled at law or in equity, the non-breaching Party, shall be entitled to seek and obtain, without actual proof of damages, (i) a decree or other order of specific performance to enforce the observance or performance of such covenant or obligation, and (ii) an injunction restraining such breach or threatened breach.

(b)    Each Party acknowledges and agrees that (i) it will not oppose any equitable relief or equitable remedy referred to in this Section 10.7 on the grounds that any other remedy is available at law or in equity, and (ii) no Party hereto will be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any equitable relief or equitable remedy referred to in this Section 10.7 (and it hereby irrevocably waives any right it may have to require the obtaining, furnishing or posting of any such bond or similar instrument).


# ARTICLE 11

# TAX AND COST REPORT MATTERS

11.1    Tax Matters; Allocation of Purchase Price.

(a)    After the Closing Date, the Parties shall cooperate fully with each other and shall make available to each other, as reasonably requested, all information, records or documents relating to tax liabilities or potential tax liabilities attributable to Seller with respect to the operation of the Hospital for all periods prior to the Effective Time and shall preserve all such information, records and documents at least until the expiration of any applicable statute of limitations or extensions thereof.  The Parties shall also make available to each other to the extent reasonably required, and at the reasonable cost of the requesting party (for out-of-pocket costs and expenses only), personnel responsible for preparing or maintaining information, records and documents in connection with tax matters and as Seller reasonably may request in connection with the completion of its post-Closing audits of the Hospital.

(b)    The Purchase Price shall be allocated among each category of the Assets of the Hospital and among the Seller in accordance with Schedule 11.1(b).  Seller and Purchaser hereby agree to allocate the Purchase Price in accordance with Schedule 11.1(b), to be bound by such allocations, to account for and report the purchase and sale of the Assets contemplated

hereby for federal and state tax purposes in accordance with such allocations, and not to take any position (whether in tax returns, tax audits, or other tax proceedings), which is inconsistent with such allocations without the prior written consent of the other parties.

11.2    <u>Cost Report Matters</u>.

(a)    Consistent with <u>Section 4.11</u>, Seller shall prepare and timely file all cost reports relating to the periods ending prior to the Effective Time or required as a result of the consummation of the transactions described in this Agreement, including, without limitation, those relating to Medicare, Medicaid, Blue Cross and other third party payors which settle on a cost report basis (the "*Seller Cost Reports*").

(b)    Upon reasonable notice and during normal business office hours, Purchaser will cooperate reasonably with Seller in regard to Seller's preparation, filing, handling, and appeals of the Seller Cost Reports.  Upon reasonable notice and during normal business office hours, Purchaser will cooperate with Seller in connection with any cost report disputes and/or other claim adjudication matters relative to governmental program reimbursement.  Such cooperation shall include, at no cost to Seller, obtaining access to files at the Hospital and Purchaser's provision to Seller of data and statistics, and the coordination with Seller pursuant to reasonable notice of Medicare and Medicaid exit conferences or meetings.

# ARTICLE 12

## MISCELLANEOUS PROVISIONS

12.1    <u>Further Assurances and Cooperation</u>.  Seller shall execute, acknowledge and deliver to Purchaser any and all other assignments, consents, approvals, conveyances, assurances, documents and instruments reasonably requested by Purchaser at any time and shall take any and all other actions reasonably requested by Purchaser at any time for the purpose of more effectively assigning, transferring, granting, conveying and confirming to Purchaser, the Assets.  After consummation of the transaction contemplated in this Agreement, the parties agree to cooperate with each other and take such further actions as may be necessary or appropriate to effectuate, carry out and comply with all of the terms of this Agreement, the documents referred to in this Agreement and the transactions contemplated hereby.

12.2    <u>Successors and Assigns</u>.  All of the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto; *provided*, *however,* that no party hereto may assign any of its rights or delegate any of its duties under this Agreement without the prior written consent of the other Parties.

12.3    <u>Governing Law; Venue</u>.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New Jersey as applied to contracts made and performed within the State of New Jersey.  The Parties hereby waive their right to claim in any proceeding involving this Agreement that the law of any jurisdiction other than the State of New Jersey shall apply to such dispute; and the parties hereby covenant that they shall assert no such claim in any dispute arising under this Agreement.  Any proceeding which arises out of or relates

in any way to the subject matter of this Agreement shall be brought in the federal courts located in the State of New Jersey.  The parties hereby consent to the jurisdiction of such court and waive their right to challenge any proceeding involving or relating to this Agreement on the basis of lack of jurisdiction over the person or *forum non conveniens*.

12.4    <u>Amendments</u>.  This Agreement may not be amended other than by written instrument signed by the parties hereto.

12.5    <u>Exhibits, Schedules and Disclosure Schedule</u>.  The Disclosure Schedule and all exhibits and schedules referred to in this Agreement shall be attached hereto and are incorporated by reference herein.  From the Effective Date until the Closing, the Parties agree that the Disclosure Schedule, exhibits and schedules may be updated by any Party as necessary upon written notice to the other Parties, which update shall be acceptable in the reasonable discretion of the reviewing Party.  Notwithstanding the foregoing, should any exhibit or schedule not be completed and attached hereto as of the Effective Date, Seller and Purchaser shall promptly negotiate in good faith any such exhibit or schedule, which exhibit or schedule must be acceptable to each of Seller and Purchaser in their reasonable discretion prior to being attached hereto.  In the event that Seller and Purchaser are unable to reach agreement on any updates to the Disclosure Schedule or any new exhibit or schedule, or the update to an existing exhibit or schedule, or if a new exhibit or schedule materially and adversely changes the terms of the transactions contemplated by this Agreement, either Seller or Purchaser may terminate this Agreement.  Any matter disclosed in this Agreement or in the Disclosure Schedule with reference to any Section of this Agreement shall be deemed a disclosure in respect of all sections to which such disclosure may apply.

12.6    <u>Publicity</u>.  Seller and Purchaser shall consult with each other as to the form and substance of any press release or other public disclosure materially related to this Agreement or the transactions contemplated hereby and each shall have the right to review and comment on the other's press releases prior to issuance; provided, however, that nothing in this <u>Section 12.6</u> shall be deemed to prohibit either Seller or Purchaser from making any disclosure it deems necessary to comply with its legal obligations, its obligations under this Agreement, and/or its ability to satisfy the closing conditions.

12.7    <u>Notices</u>.  Any notice, demand or communication required, permitted, or desired to be given hereunder shall be deemed effectively given when personally delivered, when received by telegraphic or other electronic means (including facsimile) or overnight courier, or five (5) calendar days after being deposited in the United States mail, with postage prepaid thereon, certified or registered mail, return receipt requested, addressed as follows:

|                        |                                         |
|------------------------|-----------------------------------------|
| If to Seller Parties:  | Saint Michael's Medical Center, Inc.    |
|                        | 111 Central Avenue                      |
|                        | Newark, New Jersey 07102                |
|                        | Attention:  David C. Ricci, President and CEO |
|                        |                                         |
| With copy to:          |                                         |
| (which copy shall not  |                                         |

72

|                         |                                                         |
|-------------------------|---------------------------------------------------------|
| constitute notice):     | Cole Schotz P.C.                                        |
|                         | 25 Main Street, Court Plaza North                      |
|                         | Hackensack, NJ 07601                                   |
|                         | Attention: Michael Sirota, Esq.                        |
|                         | Facsimile No.: (201) 678-6262                          |
|                         |                                                         |
| If to Purchaser:        | Prime Healthcare Services – Saint Michael's, LLC       |
|                         | 3300 E. Guasti Road, 3rd Floor                    |
|                         | Ontario, California 91761                              |
|                         | Attention: Chief Executive Officer                     |
|                         | Facsimile No.: (909) 235-4419                          |
|                         |                                                         |
| With a copy to:         | Prime Healthcare Management, Inc.                      |
| (which copy shall       | 3300 East Guasti Road, 3rd Floor                  |
| not constitute notice)  | Ontario, California 91761                              |
|                         | Attention: General Counsel                             |
|                         | Facsimile No.: (909) 235-4419                          |

or at such other address as one party may designate by notice hereunder to the other parties.

12.8    Headings.  The section and other headings contained in this Agreement and in the Disclosure Schedule, exhibits and schedules to this Agreement are included for the purpose of convenient reference only and shall not restrict, amplify, modify or otherwise affect in any way the meaning or interpretation of this Agreement or the Disclosure Schedule, exhibits and schedules hereto.

12.9    Fair Meaning.  This Agreement shall be construed according to its fair meaning and as if prepared by all Parties hereto.

12.10    Gender and Number; Construction.  All references to the neuter gender shall include the feminine or masculine gender and vice versa, where applicable, and all references to the singular shall include the plural and vice versa, where applicable.  Unless otherwise expressly provided, the word "including" followed by a listing does not limit the preceding words or terms and shall mean "including, without limitation."

12.11    Third Party Beneficiary.  None of the provisions contained in this Agreement are intended by the Parties, nor shall they be deemed, to confer any benefit on any person not a party to this Agreement.

12.12    Expenses and Attorneys' Fees.  Except as otherwise provided in this Agreement, each party shall bear and pay its own costs and expenses relating to the preparation of this Agreement and to the transactions contemplated by, or the performance of or compliance with any condition or covenant set forth in, this Agreement, including without limitation, the disbursements and fees of their respective attorneys, accountants, advisors, agents and other representatives, incidental to the preparation and carrying out of this Agreement, whether or not the transactions contemplated hereby are consummated.  The Parties expressly agree that (a) all sales, transfer, documentary transfer and similar taxes, fees, surcharges and the like in

connection with the sale of the Assets shall be borne by Seller; (b) all costs of the Title Commitment and the Title Policy shall be borne by Seller; (c) all costs associated with endorsements to the Title Policy shall be borne by Purchaser; (d) all recording fees or similar charges in connection with the sale of the Assets shall borne one-half by Seller and one-half by Purchaser; (e) all costs of the Environmental Survey and all costs of the Surveys shall be borne by Purchaser; and (f) Seller shall pay the HSR Act filing fees required in connection with Section 4.11 and Purchaser shall pay the HSR Act filing fees required in connection with Section 5.7.  If any action is brought by any Party to enforce any provision of this Agreement, the prevailing party shall be entitled to recover its court costs and reasonable attorneys' fees.

12.13  Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement, binding on all of the Parties hereto.  The Parties agree that facsimile and electronically scanned or pdf copies of signatures shall be deemed originals for all purposes hereof and that a party may produce such copies, without the need to produce original signatures, to prove the existence of this Agreement in any proceeding brought hereunder.

12.14  Entire Agreement.  This Agreement, the Disclosure Schedule, the Confidentiality Agreement, the exhibits and schedules, and the documents referred to in this Agreement contain the entire understanding between the Parties with respect to the transactions contemplated hereby and supersede all prior or contemporaneous agreements, understandings, representations and statements, oral or written, between the parties on the subject matter hereof (the "*Superseded Agreements*"), which Superseded Agreements shall be of no further force or effect.

12.15  No Waiver.  Any term, covenant or condition of this Agreement may be waived at any time by the party which is entitled to the benefit thereof but only by a written notice signed by the party expressly waiving such term or condition.  The subsequent acceptance of performance hereunder by a party shall not be deemed to be a waiver of any preceding breach by any other party of any term, covenant or condition of this Agreement, other than the failure of such other party to perform the particular duties so accepted, regardless of the accepting party's knowledge of such preceding breach at the time of acceptance of such performance.  The waiver of any term, covenant or condition shall not be construed as a waiver of any other term, covenant or condition of this Agreement.

12.16  Severability.  If any term, provision, condition or covenant of this Agreement or the application thereof to any party or circumstance shall be held to be invalid or unenforceable to any extent in any jurisdiction, then the remainder of this Agreement and the application of such term, provision, condition or covenant in any other jurisdiction or to persons or circumstances other than those as to whom or which it is held to be invalid or unenforceable, shall not be affected thereby, and each term, provision, condition and covenant of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

12.17  Time is of the Essence.  Time is of the essence for all dates and time periods set forth in this Agreement and each performance called for in this Agreement.

12.18  Late Payments.  If any Party shall fail to make any payment to the other on the date due, then the Party failing to receive such amount to which it is entitled shall have the right

to receive interest on the unpaid amount at a per annum rate equal to five percent (5%) from such defaulting Party, such interest accruing beginning on the calendar day after the applicable due date until payment of such amount and all interest thereon is made.

*[REMAINDER OF THIS PAGE IS BLANK]*

75

**IN WITNESS WHEREOF,** this Agreement has been entered into as of the day and year first above written.

**PURCHASER:**

Prime Healthcare Services – Saint Michael's, LLC, a Delaware limited liability company

By: _____

Name:  Michael A. Heather

Title:    Chief Financial Officer

**SELLER:**

Saint Michael's Medical Center, Inc., a New Jersey nonprofit corporation

By: _____

Name: David A. Ricci

Its: President and CEO

Saint James Care, Inc., a New Jersey nonprofit corporation

By: _____

Name: David A. Ricci

Its: President and CEO

Columbus Acquisition Corp., a New Jersey nonprofit corporation

By: _____

Name: David A. Ricci

Its: President and CEO

University Heights Property Company, a New Jersey nonprofit corporation

By: _____

Name: David A. Ricci

Its: President and CEO

**IN WITNESS WHEREOF,** this Agreement has been entered into as of the day and year first above written.

**PURCHASER:**

Prime Healthcare Services -- Saint Michael's, LLC, a Delaware limited liability company

By:_____
Name:  Prem Reddy, M.D.
Title:   Chairman, President & CEO

**SELLER:**

Saint Michael's Medical Center, Inc., a New Jersey nonprofit corporation

By: _____
Name: David A. Ricci
Its: President and CEO

Saint James Care, Inc., a New Jersey nonprofit corporation

By: _____
Name: David A. Ricci
Its: President and CEO

Columbus Acquisition Corp., a New Jersey nonprofit corporation

By:_____
Name: David A. Ricci
Its: President and CEO

University Heights Property Company, a New Jersey nonprofit corporation

By:_____
Name: David A. Ricci
Its: President and CEO

## EXHIBIT 1.2

### Net Working Capital Calculation and Dispute Mechanism

At least five (5) business days but no more than ten (10) business days prior to the Closing Date, Seller shall prepare and deliver to Purchaser the Closing Balance Sheet of Seller as of the end of the month immediately preceding the month in which the Closing Date occurs. The Closing Balance Sheet shall include a calculation of Net Working Capital, of Seller's Net Revenues, and of the current balance of Board Designated Funds. The Closing Balance Sheet shall be attached hereto as **Schedule 1.2-a.** The amounts set forth in the Closing Balance Sheet shall be subject to adjustment as provided below.

Within one hundred twenty (120) calendar days after the Closing Date, the final unaudited balance sheet of Seller as of the Effective Time (the "*Final Balance Sheet*"), which shall include a calculation of Net Working Capital as of the Effective Time, the amount of Seller's Net Revenues as of the Effective Time, and the current balance of Board Designated Funds as of the Effective Time shall be prepared by Seller and delivered to Purchaser. The Closing Balance Sheet and the Final Balance Sheet shall be prepared in a manner consistent with the terms of Section 2.4 of the Agreement. If Purchaser disputes any entry on the Final Balance Sheet that affects the calculation of Net Working Capital, Seller's Net Revenues, and/or the balance of Board Designated Funds, Purchaser shall notify Seller in writing (which writing shall contain Purchaser's determination of the amount of the disputed entry) within sixty (60) calendar days after Purchaser's receipt of the Final Balance Sheet from Seller. If Purchaser and Seller cannot resolve such dispute within thirty (30) calendar days after Purchaser notifies Seller in writing of such dispute, then an independent certified public accounting firm selected by Seller and Purchaser (the "*Independent Auditor*"), shall review the matter in dispute and, solely as to disputes relating to accounting issues and acting as an expert and not as an arbitrator, shall promptly decide the proper amounts of such disputed entries (which decision shall also include a final recalculation of the Cash Purchase Price). In the event that all or a portion of the dispute at issue involves a legal issue or an interpretation of the Agreement, such legal or interpretative dispute shall first be subject to adjudication by a court or similar tribunal, with any necessary review by the Independent Auditor occurring following the resolution of such legal dispute. Such decision of the Independent Auditor shall be conclusive and binding as between Purchaser and Seller, and the costs of such review shall be borne one-half by Seller, on the one hand, and one-half by Purchaser, on the other hand.

Within sixty (60) calendar days after Purchaser's receipt of the Final Balance Sheet from Seller or, if disputed by Purchaser, within five (5) business days after the earlier of (a) the date Purchaser and Seller finally resolve such dispute and recalculate the Cash Purchase Price accordingly, or (b) the date of receipt of a final decision from the Independent Auditor (the "*Post-Closing Adjustment Date*"), either (i) Seller shall pay Purchaser in cash or in other immediately available funds the amount of any decrease in the Cash Purchase Price, or (ii) Purchaser shall pay Seller in cash or in other immediately available funds the amount of any increase in the Cash Purchase Price (as applicable, the "*Post-Closing Adjustment Date Payment Amount*"), plus interest as described in the immediately following sentence. The Post-Closing Adjustment Date Payment Amount paid by Seller to Purchaser, or by Purchaser to Seller, as the case may be, shall be increased by interest at a per annum rate equal to the prime rate reported by the Wall Street Journal under

"Money Rates" (the "*Prime Rate*") on the Closing Date, plus two percent (2%) (or the maximum rate allowed by Law, whichever is less) accruing on the Post-Closing Adjustment Date Payment Amount from the date the Post-Closing Adjustment Date Payment Amount is due until the date the Post-Closing Adjustment Date Payment Amount is paid to Seller or Purchaser, as the case may be.

**EXHIBIT 1.3**

# GOOD FAITH DEPOSIT AGREEMENT

This Good Faith Deposit Agreement (the "*Agreement*") is made and entered into as of the 20th day of December, 2013 by and among Prime Healthcare Services – Saint Michael's, LLC, a Delaware limited liability company ("*Purchaser*"), Saint Michael's Medical Center, Inc., a New Jersey nonprofit corporation ("*SMMC*"), Saint James Care, Inc., a New Jersey nonprofit corporation ("*SJC*"), Columbus Acquisition Corp., a New Jersey nonprofit corporation ("*Columbus*"), University Heights Property Company, Inc., a New Jersey nonprofit corporation ("*UHPC*", and collectively with SMMC, SJC and Columbus, "*Seller*") and First American Title Insurance Company, a Delaware corporation ("*Title Company*").

## R E C I T A L S

**A.**    Seller and Purchaser have entered into that certain Asset Purchase Agreement dated February 8, 2013, as amended (the "*Purchase Agreement*") pursuant to which Seller has agreed to sell substantially all of the assets of Seller pursuant to the terms set forth in the Purchase Agreement.

**B.**    Under the terms of the Purchase Agreement, Purchaser is obligated to deposit with Title Company the sum of Two Million Dollars ($2,000,000) (the "*Good Faith Deposit*").  This Agreement is entered into in accordance with the Purchase Agreement, and Title Company, Purchaser and Seller shall take such actions and at such times as are specifically set forth herein.

**NOW, THEREFORE,** in consideration of the foregoing and the mutual covenants set forth below, and for their mutual reliance, Purchaser, Seller and Title Company agree as follows:

1.    Good Faith Deposit.

    (a)    Deposit with Title Company.  Prior to or concurrent with the execution of this Agreement, Purchaser shall cause to be delivered to Title Company the Good Faith Deposit, paid to Title Company by wire transfer or by certified or cashiers check.  Title Company shall immediately notify Seller and Purchaser by facsimile upon receipt of the Good Faith Deposit.

    (b)    Investment of Funds.  Unless otherwise advised in writing by Purchaser, Title Company shall invest the Good Faith Deposit as soon as practicable on or after the date hereof in an interest bearing account of a federally insured bank or savings and loan association reasonably acceptable to Seller and Purchaser, provided Purchaser has deposited with Title Company a complete and duly executed Form W-9 and Title Company's standard form of Investment Instructions.  The Good Faith Deposit plus all accrued interest thereon (collectively, the "*Good Faith Deposit Funds*") shall remain the sole, exclusive property of Purchaser, subject to the provisions of this Agreement.

2.     <u>Obligations of Seller, Purchaser and Title Company</u>.

(a)     Title Company shall disburse the Good Faith Deposit Funds as follows:

(i)     if (A) the Purchase Agreement is terminated by Purchaser pursuant to Section 8.1(c) or Section 8.1(d) thereof (exclusive of a Purchaser termination pursuant to either Section 7.9 or Section 7.10 thereof), (B) Purchaser delivers a written notice to Seller and Title Company setting forth that the Purchase Agreement was terminated as contemplated in Section 2(a)(i)(A) above (the "*Purchaser Disbursement Notice*") and (C) Seller does not deliver a written notice to Purchaser and Title Company within seven (7) business days after receipt of the Purchaser Disbursement Notice that Seller objects to Purchaser's statements set forth in the Purchaser Disbursement Notice (the "*Seller Dispute Notice*"), Title Company shall disburse the Good Faith Deposit Funds to Purchaser on the date which is ten (10) business days after Title Company's receipt of the Purchaser Disbursement Notice; or

(ii)     if Seller delivers to Purchaser and Title Company a Seller Dispute Notice, Title Company shall not disburse the Good Faith Deposit Funds, and unless Title Company is otherwise jointly instructed by Seller and Purchaser in writing, such dispute shall be handled, and Title Company shall proceed in accordance with, Sections 6 and 7 of this Agreement; or

(iii)     if (A) the Purchase Agreement is terminated for any reason other than as set forth in Section 2(a)(i)(A) above, (B) Seller delivers a written notice to Purchaser and Title Company setting forth that the Purchase Agreement has been terminated for any reason other than as set forth in Section 2(a)(i)(A) above (the "*Seller Disbursement Notice*"), and (C) Purchaser does not deliver a written notice to Seller and Title Company within seven (7) business days after receipt of the Seller Disbursement Notice that Purchaser objects to Seller's statements set forth in the Seller Disbursement Notice (the "*Purchaser Dispute Notice*"), Title Company shall disburse the Good Faith Deposit Funds to Seller no later than the date which is ten (10) business days after Title Company's receipt of the Seller Disbursement Notice; or

(iv)     if Purchaser delivers to Seller and Title Company a Purchaser Dispute Notice, Title Company shall not disburse the Good Faith Deposit Funds, and unless Title Company is otherwise jointly instructed by Seller and Purchaser in writing, such dispute shall be handled, and Title Company shall proceed in accordance with, Sections 6 and 7 of this Agreement; or

(v)     if the transaction contemplated by the Purchase Agreement closes, the Title Company shall promptly disburse the Good Faith Deposit Funds to Seller in accordance with written instructions delivered to Title Company by Seller and Purchaser.

(b)     Without limiting the respective obligations of Purchaser and Seller to deliver a Disbursement Notice, if any, to the other, if Title Company receives a Purchaser Disbursement Notice, it shall provide Seller a copy of such notice within two (2) business days after its receipt of such Purchaser Disbursement Notice, and if Title Company receives a Seller Disbursement Notice, it shall provide Purchaser a copy of such notice within two (2) business days after its receipt of such Seller Disbursement Notice.

(c)     Title Company shall be fully authorized to rely upon the procedure set forth in Section 2(a) above in disbursing the Good Faith Deposit Funds, and shall have no obligation to inquire further into the accuracy of any matters stated therein.

3.     Conditions.

(a)     Title Company, by reason of its consent to and execution of this Agreement, hereby agrees to accept the foregoing Agreement and instructions, and for the fees herein specified shall be bound by said Agreement in the performance of its duties hereunder.  Title Company shall not, however, assume any responsibility or liability for any transaction between Seller and Purchaser.  The duties and responsibilities of Title Company to Seller and Purchaser are limited to those expressly set forth herein.  Title Company shall not be personally liable for any act taken or omitted hereunder or taken by it in good faith and in the exercise of its own best judgment.

(b)     Title Company shall be under no responsibility in respect of the Good Faith Deposit Funds other than faithfully to follow the instructions contained herein. Title Company may consult with counsel of its own choosing and shall be fully protected in any action taken in good faith, in accordance with such consultation.  Title Company shall not be required to defend any legal proceedings that may be instituted unless requested so to do by Purchaser and Seller, and shall be indemnified by Purchaser and Seller, jointly and severally to its satisfaction against the cost and expense of such defense. Title Company shall have no responsibility for the genuineness or validity of any document or other item deposited with Title Company, and it shall be fully protected in acting in accordance with written instructions to it hereunder and believed by Title Company to have been signed by the proper parties.

(c)     Purchaser and Seller shall jointly and severally indemnify, protect and save Title Company harmless from any claims, liabilities, judgments, reasonable attorneys' fees, and other expenses of any kind and nature that may be incurred by Title Company by reason of its acceptance of, and its good faith performance under, this Agreement; provided, however, this indemnification shall not extend to any grossly negligent or reckless acts or omissions of Title Company, its officers, employees or agents. All of the terms and conditions in connection with Title Company's duties and responsibilities, and the rights of the parties or any third party, are contained in this Agreement.  Title Company is not required to be familiar with the provisions of any other instrument or agreement and shall not be charged with any responsibility or liability in connection with the observance or nonobservance by any person having duties or obligations under any such instrument or agreement.

4.    <u>Termination</u>. Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall terminate upon disbursement in full of the Good Faith Deposit Funds, by Title Company in accordance with the terms of this Agreement.

5.    <u>Fees and Other Charges</u>. The fees and other charges for services rendered by Title Company for ordinary services as contemplated by this Agreement shall be as set forth on **Exhibit A** attached hereto, which fees and other charges shall be borne equally by Seller and Purchaser. If Title Company renders any service not provided for in this Agreement or if there is an assignment of any interest in the subject matter of this Agreement or if controversy arises in connection with this Agreement, Title Company shall be reasonably compensated for any extraordinary services required of it, and shall be reimbursed, equally by Purchaser and Seller for all reasonable costs, attorneys' fees and expenses occasioned by any such controversy or litigation.

6.    <u>Compliance with Orders of Court</u>. Title Company is hereby expressly instructed by Seller and Purchaser to comply with and obey all orders, judgments or decrees of any court with jurisdiction and in case Title Company complies with any such order, judgment or decree, Title Company shall not be liable to Purchaser or Seller or to any other person or entity by reason of compliance. In complying with the foregoing, if Title Company becomes or is made a party to any court proceeding which affects this Agreement, Title Company shall promptly give notice thereof to Purchaser and Seller. To the extent possible in any such proceeding, Title Company shall interplead Purchaser and Seller. If Title Company receives any such order from any court, to the extent possible and consistent with the language of such order, Title Company shall delay compliance until Purchaser and Seller have had an opportunity to advise Title Company of the respective position of each of Seller and Purchaser with regard to compliance.

7.    <u>Disputes</u>. If a dispute arises as to the duties of any party under the terms of this Agreement, Title Company may file an interpleader or concursus procedure for the purpose of having the respective rights of the Title Company, Purchaser, and Seller adjudicated and deposit the Good Faith Deposit Funds then in its hands with the clerk of the appropriate court. Upon such deposit of the Good Faith Deposit Funds and upon filing its complaint in the interpleader or concursus proceeding, Title Company shall be relieved from all liability under the provisions of this Agreement as to the Good Faith Deposit Funds so deposited.

8.    <u>Notices</u>. Notices required and authorized to be given under this Agreement shall be in writing and shall be deemed effective (a) upon personal delivery, or (b) three (3) business days after deposit (or three business (3) days following receipt with respect to notices sent to Title Company) in the United States mail if mailed by certified or registered mail, return receipt requested, postage prepaid, or (c) one business day after deposit with a nationally recognized courier such as Federal Express for overnight delivery, or (d) one business day after transmission by facsimile to the facsimile number of the respective party indicated below. Any notice required, or permitted, to be given to Title Company hereunder shall not be effective unless the party which is providing notice also provides a copy of such notice to the other parties hereto pursuant to the terms of this Section 8. Seller, Purchaser and Title Company may, by written notice given by each to the other,

designate any address or addresses to which notices, certificates, or other communications shall be sent when required as contemplated by this Agreement.  Unless otherwise provided by the parties, all notices, certificates and communications to each of them shall be addressed as follows:

> If to Seller:  Saint Michael's Medical Center, Inc.
> c/o Catholic Health East
> c/o Catholic Health East Newtown Square,
> Pennsylvania  19073
> Attention:  Michael C. Hemsley, Esquire
> Executive Vice President and General Counsel
> Facsimile No.: (610) 355-2171

> With a copy to:  Buchanan Ingersoll & Rooney PC
> 401 E. Jackson Street, Suite 2500
> Tampa, FL  33602
> Attention: Dale S. Webber, Esquire
> Facsimile No.:  (813) 222-8189

> If to Purchaser:  Prime Healthcare Services – Saint Michael's, LLC
> 3300 E. Guasti Road, 3rd Floor
> Ontario, California 91761
> Attention: Chief Executive Officer
> Facsimile No.: (909) 235-4419

> With a copy to:  Prime Healthcare Management, Inc.
> 3300 East Guasti Road, 3rd Floor
> Ontario, California 91761
> Attention: General Counsel
> Facsimile No.:  (909) 235-4419

> If to Title Company:  First American Title Insurance Company
> 3281 East Guasti Road, Suite 440
> Ontario, California  91761
> Attention:  Janette Delap
> Facsimile No.:  (877) 461-2088

9.    General.    The rights and obligations of this Agreement shall be binding upon, and inure to the benefit of, the successors, assigns and legal representatives of the parties hereto.  This Agreement may not be modified except by a writing signed by Title Company, Purchaser and Seller.  This Agreement may be executed in one or more counterparts, each of which shall be considered as the original.

10.    Governing Law; Venue.    This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New Jersey as applied to contracts made and performed within the State of New Jersey. The parties hereby waive their right to claim in any proceeding involving this Agreement that the law of any

jurisdiction other than the State of New Jersey shall apply to such dispute; and the parties hereby covenant that they shall assert no such claim in any dispute arising under this Agreement. Any proceeding which arises out of or relates in any way to the subject matter of this Agreement shall be brought in the federal courts located in the state of New Jersey. The parties hereby consent to the jurisdiction of such court and waive their right to challenge any proceeding involving or relating to this Agreement on the basis of lack of jurisdiction over the person or *forum non conveniens*.

[REMAINDER OF PAGE IS BLANK]

**IN WITNESS WHEREOF,** Purchaser and Seller through their duly authorized representatives hereby execute this Agreement effective as of the date first written above.

**PURCHASER:**

Prime Healthcare Services – Saint Michael's LLC, a Delaware limited liability company

By: _____

Name:  Prem Reddy, M.D.

Its:  Chairman, President & CEO

**SELLER:**

Saint Michael's Medical Center, Inc., a New Jersey nonprofit corporation

By:_____

Name: _____

Its: _____

Saint James Care, Inc., a New Jersey nonprofit corporation

By:_____

Name: _____

Its: _____

Columbus Acquisition Corp., a New Jersey nonprofit corporation

By:_____

Name: _____

Its: _____

University Heights Property Company, a New Jersey nonprofit corporation

By:_____

Name: _____

Its: _____

**[SIGNATURE PAGE TO GOOD FAITH DEPOSIT AGREEMENT]**

**IN WITNESS WHEREOF,** Purchaser and Seller through their duly authorized representatives hereby execute this Agreement effective as of the date first written above.

**PURCHASER:**

Prime Healthcare Services – Saint Michael's LLC, a Delaware limited liability company

By: _____
Name:  Prem Reddy, M.D.
Its:  Chairman, President & CEO

**SELLER:**

Saint Michael's Medical Center, Inc., a New Jersey nonprofit corporation

By: _____
Name:  DAVID A. RICCI
Its:   PRESIDENT & CEO

Saint James Care, Inc., a New Jersey nonprofit corporation

By: _____
Name:  DAVID A RICCI
Its:   PRESIDENT & CEO

Columbus Acquisition Corp., a New Jersey nonprofit corporation

By: _____
Name:  DAVID A RICCI
Its:   PRESIDENT & CEO

University Heights Property Company, a New Jersey nonprofit corporation

By: _____
Name:  DAVID A RICCI
Its:   PRESIDENT & CEO

**[SIGNATURE PAGE TO GOOD FAITH DEPOSIT AGREEMENT]**

## CONSENT TO GOOD FAITH DEPOSIT AGREEMENT & INSTRUCTIONS

The undersigned Title Company does hereby agree and consent to the terms and conditions of this Good Faith Deposit Agreement and the instructions contained herein.

**TITLE COMPANY:**

First American Title Insurance Company

By:_____

Name:_____

Its:_____

# EXHIBIT A

Title Company Fees

1.      Funds Holding Fee  =  $500.00

# EXHIBIT 1.5(a)

To be prepared and agreed upon prior to Closing

Exhibit 1.5(b)

## GENERAL ASSIGNMENT AND BILL OF SALE

Saint Michael's Medical Center, Inc., Saint James Care, Inc., Columbus Acquisition Corp., and University Heights Property Company, Inc., as Assignor

to

Prime Healthcare Services – Saint Michael's, LLC, as Assignee

1.      Pursuant to and in accordance with the provisions and conditions of that certain Asset Purchase Agreement dated as of July __, 2015 (the "Agreement") by and among Saint Michael's Medical Center, Inc., a New Jersey nonprofit corporation ("SMMC"), Saint James Care, Inc., a New Jersey nonprofit corporation ("SJC"), Columbus Acquisition Corp., a New Jersey nonprofit corporation ("Columbus"), and University Heights Property Company, Inc., a New Jersey nonprofit corporation ("UHPC," with SMMC, SJC and Columbus, collectively "Assignor") and Prime Healthcare Services – Saint Michael's, LLC, a Delaware limited liability company ("Assignee"), Assignor hereby sells, assigns, transfers, conveys and delivers to Assignee for valuable consideration, free and clear of all encumbrances other than the Permitted Exceptions, all of Assignor's right and interest in and to the Assets, with such transfer being deemed to be effective as of the Effective Time. Any capitalized terms used but not otherwise defined herein shall have the meanings specified in the Agreement.

2.      Notwithstanding anything to the contrary in Section 1 above, Assignor shall retain the Excluded Assets and Excluded Liabilities.

3.      Assignor hereby constitutes and appoints Assignee and its successors and assigns as Assignor's true and lawful attorney, with full power of substitution, in Assignor's name and stead, but on behalf and for the benefit of Assignee and its successors and assigns, (a) to demand and receive any and all of the Assets, (b) to give receipts and releases for them respecting the same, and any part thereof, and (c) from time to time to institute and prosecute in Assignor's name, or otherwise, at the expense and for the benefit of Assignee and its successors and assigns, any and all proceedings at law or in equity or otherwise which Assignee or its successors and assigns, thinks proper for the collection or reduction to possession of any of the Assets or for the collection and enforcement of any claim or right of any kind hereby sold, conveyed, transferred and assigned, or intended so to be sold, conveyed, transferred or assigned, and (d) to do all acts and things in relation to the Assets which Assignee or its successors or assigns shall deem desirable, Assignor hereby declaring that the foregoing powers are coupled with an interest and are and shall be irrevocable by Assignor or by its dissolution or in any manner or for any reason whatsoever.

4.      Nothing contained in this Bill of Sale will be deemed to supersede, limit, amend, supplement, modify, vary or enlarge any of the rights, obligations, covenants, agreements, representations or warranties of Assignor or Assignee under the Agreement, this Bill of Sale being intended only to effect the transfer of Assignor's right, title and interest in and to the Assets to Assignee, as contemplated in the Agreement.

5.      Assignor covenants and agrees that it will at any time and from time to time do, execute, acknowledge and deliver any and all other acts, deeds, assignments, transfers,

conveyances, powers of attorney and other instruments that Assignee reasonably requests to carry out the assignment and conveyance intended to be made hereunder.

6.     This Bill of Sale shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

7.     This Bill of Sale shall be governed by and construed and enforced in accordance with the laws of the State of New Jersey.

8.     This Bill of Sale may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, binding on all of the parties hereto.  Signatures sent by facsimile or electronic transmission shall be deemed to be originals for all purposes of this Bill of Sale.

[Remainder of page intentionally left blank]

2

IN WITNESS WHEREOF, each of the undersigned has caused this Bill of Sale to be executed and delivered by their duly authorized representatives as of the Effective Time.


ASSIGNOR:                                           ASSIGNEE:

Saint Michael's Medical Center, Inc.,               Prime Healthcare Services –
a New Jersey nonprofit corporation                  Saint Michael's, LLC,
                                                    a Delaware limited liability company

By: _____                     By: _____
Print:_____                     Print:_____
Title:_____                     Title:_____



Saint James Care, Inc.,
a New Jersey nonprofit corporation


By: _____
Print:_____
Title:_____



Columbus Acquisition Corp.,
a New Jersey nonprofit corporation


By: _____
Print:_____
Title:_____



University Heights Property Company, Inc.,
a New Jersey nonprofit corporation


By: _____
Print:_____
Title:_____

54020/0001-12054496v2

Exhibit 1.5(c)

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (the "Agreement") is made and entered into effective as of the _____, 2015, by and among Saint Michael's Medical Center, Inc., a New Jersey nonprofit corporation ("SMMC"), Saint James Care, Inc., a New Jersey nonprofit corporation ("SJC"), Columbus Acquisition Corp., a New Jersey nonprofit corporation ("Columbus"), and University Heights Property Company, Inc., a New Jersey nonprofit corporation ("UHPC," with SMMC, SJC and Columbus, collectively the "Assignor") and Prime Healthcare Services – Saint Michael's, LLC, a Delaware limited liability company ("Assignee"). Any capitalized terms used but not otherwise defined herein shall have the meanings specified on the Asset Purchase Agreement (as defined below).

WITNESSETH

WHEREAS, Assignor and Assignee, among other parties, have entered into an Asset Purchase Agreement dated as of July __, 2015 (the "Asset Purchase Agreement") to sell to Assignee certain assets and obligations of Assignor; and

WHEREAS, Assignor desires to assign and transfer all of Assignor's rights and interests in the Assumed Contracts and Assumed Leases as set forth on Exhibit A attached hereto and Assumed Obligations, and Assignee desires to assume and accept the Assumed Contracts, Assumed Leases and Assumed Obligations from Assignor, in accordance with the terms and conditions contained in this Agreement.

NOW, THEREFORE, in consideration of the above recitals, the terms and conditions hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.    Assignment and Transfer; Acceptance.  Assignor does hereby convey, assign and transfer all of Assignor's rights, title and interest in, to and under the Assumed Contracts, Assumed Leases and Assumed Obligations to Assignee as of the Effective Time, and Assignee hereby accepts the assignment and transfer of the Assumed Contracts, Assumed Leases and Assumed Obligations from Assignor from and after the Effective Time.

2.    Effective Time of Agreement.  This Agreement shall take effect at 12:00:01 a.m. Eastern Time the next day after the Closing Date (the "Effective Time").

3.    Indemnification.

(a)    Assignee.  Assignee shall indemnify and hold harmless Assignor, its successors and assigns, from and against any and all claims, losses, expenses, liabilities and damages, including reasonable attorneys' fees, that Assignor shall incur or suffer in connection with the Assumed Contracts, Assumed Leases and Assumed Obligations arising on or after the Effective Time, other than claims, losses, expenses, liabilities and damages caused by the actions or omissions of Assignor.

(b)    Assignor.  Assignor shall indemnify and hold harmless Assignee, its successors and assigns, from and against any and all claims, losses, expenses, liabilities and

damages, including reasonable attorneys' fees, that Assignee shall incur or suffer in connection with the Assumed Contracts, Assumed Leases and Assumed Obligations on or prior to the Effective Time, other than claims, losses, expenses, liabilities and damages caused by the actions or omissions of Assignee.

4.    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of New Jersey.

5.    <u>Counterparts</u>.  This Agreement may be executed in two counterparts and together shall constitute a single document.  Signatures sent by facsimile or electronic transmission shall be deemed to be originals for all purposes of this Agreement.

6.    <u>Confidentiality</u>.  Neither party shall disclose this Agreement or the terms thereof to a third party, except as provided herein or as otherwise required by law, without the prior written consent of the other party.

7.    <u>Additional Documents</u>.  Each of the parties hereto agrees to execute any document or documents that may be requested from time to time by the other party to implement or complete such party's obligations pursuant to this Agreement.

[Remainder of page intentionally left blank]

54020/0001-12054530v2

IN WITNESS WHEREOF, each of the undersigned has caused this Bill of Sale to be executed and delivered by their duly authorized representatives as of the Effective Time.


ASSIGNOR:

Saint Michael's Medical Center, Inc.,
a New Jersey nonprofit corporation


By: _____
Print:_____
Title:_____


ASSIGNEE:

Prime Healthcare Services –
Saint Michael's, LLC,
a Delaware limited liability company

By: _____
Print:_____
Title:_____


Saint James Care, Inc.,
a New Jersey nonprofit corporation


By: _____
Print:_____
Title:_____


Columbus Acquisition Corp.,
a New Jersey nonprofit corporation


By: _____
Print:_____
Title:_____


University Heights Property Company, Inc.,
a New Jersey nonprofit corporation


By: _____
Print:_____
Title:_____


3

**EXHIBIT A**

**LIST OF ASSUMED CONTRACTS AND ASSUMED LEASES**

See attached.

4

**Exhibit 1.5(d)**

## Certification of Non-Foreign Status by Entity

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person.  For U.S. tax purposes (including Section 1445), the owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity.  To inform Prime Healthcare Services – Saint Michael's, LLC, a Delaware Limited Liability Company ("Purchaser") and First American Title Insurance Company that withholding of tax is not required upon the disposition of a U.S. real property interest, the undersigned hereby certifies the following on behalf of Saint Michael's Medical Center, Inc., a New Jersey nonprofit corporation ("Seller"):

1.      Seller is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

2.      Seller is not a disregarded entity as defined in §1.1445-2(b)(2)(iii) of the Internal Revenue Code;

3.      The U.S. employer identification number for Seller is: _____; and

4.      The office address of Seller is 111 Central Avenue, Newark, New Jersey 07102.

The Seller understands that this certification may be disclosed to the Internal Revenue Service by Purchaser and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct, and complete, and I further declare that I have authority to sign this document on behalf of Seller.

By:  Saint Michael's Medical Center, Inc., a New Jersey nonprofit corporation

By:_____
Name:_____
Its:_____

Dated: _____, 2015

54020/0001-12054306v2

**<u>Certification of Non-Foreign Status by Entity</u>**

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person.  For U.S. tax purposes (including Section 1445), the owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity.  To inform Prime Healthcare Services – Saint Michael's, LLC, a Delaware Limited Liability Company ("Purchaser") and First American Title Insurance Company that withholding of tax is not required upon the disposition of a U.S. real property interest, the undersigned hereby certifies the following on behalf of Saint Michael's Medical Center, Inc., a New Jersey nonprofit corporation ("Seller"):

1.      Seller is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

2.      Seller is not a disregarded entity as defined in §1.1445-2(b)(2)(iii) of the Internal Revenue Code;

3.      The U.S. employer identification number for Seller is: _____; and

4.      The office address of Seller is 111 Central Avenue, Newark, New Jersey 07102.

The Seller understands that this certification may be disclosed to the Internal Revenue Service by Purchaser and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct, and complete, and I further declare that I have authority to sign this document on behalf of Seller.

By: University Heights Property Company, Inc., a New Jersey nonprofit corporation

By:_____
Name:_____
Its:_____

Dated: _____, 2015

Exhibit 1.5(e)

## LIMITED POWER OF ATTORNEY FOR USE OF DEA
## REGISTRATION NUMBERS AND DEA ORDER FORMS

Saint Michael's Medical Center, Inc., a New Jersey nonprofit corporation (the "Registrant"), which owns and operates an acute care hospital known as Saint Michael's Medical Center located at 111 Central Avenue, Newark, New Jersey 07102, DEA registration number BS2291300, institutional pharmacy license number 28RS00438900 and controlled dangerous substances registration number D05200500, is authorized to sign the current applications for registration and licensure as the registrant under the Controlled Substances Act (21 U.S.C. 801 et seq.) or Controlled Substances Import and Export Act of the United States (21 USC 951 et seq.). Effective _____, 2015 (the "Effective Time"), the Registrant has made, constituted and appointed, and by these presents does make, constitute, and appoint, Prime Healthcare Services – Saint Michael's LLC, a Delaware limited liability company (the "New Registrant") and _____ (the "Pharmacist"), as the Registrant's agent and attorney-in-fact for the limited purpose of utilizing the Registrant's DEA registration and any other registrations required under the laws of the State of New Jersey at the pharmacy located at the address set forth above (hereinafter the "Pharmacy"). The New Registrant and the Pharmacist shall use Registrant's DEA registration number (and any other registrations required under the laws of the State of New Jersey) and DEA order forms until such time as New Registrant obtains a DEA registration and other such registrations for the Pharmacy, but in no event shall this limited power of attorney continue for more than one hundred twenty (120) days (unless otherwise extended by the parties) after the Closing under that certain Asset Purchase Agreement dated as of July __, 2015, by and among the Registrant, Saint James Care, Inc., Columbus Acquisition Corp., University Heights Property Company, Inc., on the one hand, and New Registrant on the other hand (the "Agreement"). Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

The Registrant further grants this limited power of attorney to the New Registrant and the Pharmacist to act as the true and lawful agent and attorney-in-fact of the Registrant, and to act in the name, place, and stead of the Registrant, to execute applications for books of official order forms and to sign such order forms in requisition for Schedules I, II, III, IV and V controlled substances, in accordance with Section 828 of the Controlled Substances Act (21 U.S.C. § 828) and part 1305 of Title 21 of the Code of Federal Regulations, as is necessary for the treatment of the Hospital's patients.

Registrant recognizes that it is legally responsible for the DEA and other registrations and all activities undertaken with its DEA registration by New Registrant until such time as New Registrant obtains its own DEA and other registrations. The Registrant grants this limited power of attorney based upon the following covenants and warranties of the New Registrant and the Pharmacist: (a) at all times that this limited power of attorney is in effect, the New Registrant and the Pharmacist shall operate the Pharmacy and utilize the DEA registration in compliance with all applicable federal, state and local laws, rules, statutes, regulations and ordinances, and (b) the New Registrant shall make timely application for, diligently pursue and use its best efforts to obtain a new DEA and other registrations as soon as practicable after the Effective Time.

[SIGNATURES ON FOLLOWING PAGE; REMAINDER OF PAGE IS BLANK]

IN WITNESS WHEREOF, the Registrant, on the one hand, and the New Registrant and the Pharmacist, on the other hand, have executed this Limited Power of Attorney for Use of DEA Registration Numbers and DEA Order Forms as of _____, 2015.

REGISTRANT:
Saint Michael's Medical Center, Inc.,
a New Jersey nonprofit corporation


By: _____
Name: _____
Its: _____


NEW REGISTRANT:
Prime Healthcare Services – Saint Michael's LLC,
a Delaware limited liability company


By: _____
Name: _____
Its: _____


PHARMACIST:

_____

By:_____
Name: _____


Witnesses:

1._____

2._____

2

Exhibit 1.5(j)

## TRANSITION SERVICES AGREEMENT

THIS TRANSITION SERVICES AGREEMENT (this "Agreement") is made and entered into effective as of _____, 2013, by and among **Trinity Health Corporation** ("Trinity"), and **Prime Healthcare Services - Saint Michael's, LLC**, a Delaware limited liability company ("Prime" and together with Trinity, the "Parties," and each individually, a "Party").

## R E C I T A L S

**WHEREAS**, pursuant to the terms and conditions of that certain Asset Purchase Agreement (the "Purchase Agreement") dated as of July ___, 2015, by and among Prime and Saint Michael's Medical Center, Inc., a New Jersey nonprofit corporation ("SMMC"), Saint James Care, Inc., a New Jersey nonprofit corporation ("SJC"), Columbus Acquisition Corp., a New Jersey nonprofit corporation ("Columbus"), and University Heights Property Company, Inc., a New Jersey nonprofit corporation ("UHPC" and SMMC, SJC, Columbus and UHPC are referred to individually as a "Seller Party" and collectively as the "Seller"), Prime will purchase from Seller, and Seller will sell to Prime, the Assets (the "Acquisition"), which Assets include operating assets related to the Acute Care Hospital and Other Businesses, formerly owned and operated by Seller (all capitalized terms used in this Agreement shall have the meanings set forth in this Agreement or, if not defined in this Agreement, in the Purchase Agreement); and

**WHEREAS**, in connection with the Acquisition, Prime desires to procure from Trinity, and Trinity is willing to perform for Prime, certain transition services (as more fully described herein) for a period of time following the Closing Date, on the terms and subject to the conditions hereof.

**NOW, THEREFORE**, in consideration of the foregoing and the respective representations, warranties, covenants, agreements and conditions set forth herein and in the Purchase Agreement, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

## ARTICLE I
## SERVICES TO BE PERFORMED

Section 1.1    Services.

(a)    In accordance with the terms and provisions of this Agreement, Trinity shall provide, or shall cause its Affiliates to use commercially reasonable efforts to provide, to Prime the services described on Exhibit A (collectively, the "Services"). In furtherance of the Acquisition, Prime may direct any of the Services to be performed on behalf of any of its subsidiaries that may be conducting the business at the Acute Care Hospital and Other Businesses (collectively, the "Business"). Except as otherwise expressly provided for herein), the Services shall be provided to Prime in no less than the same quality, quantity and type as such Services were provided for the benefit of the Assets prior to the Effective Time, and may be modified by Trinity in the ordinary course of performance to the extent Trinity makes such modifications to the services it provides generally. In delivering the Services, Trinity shall have

the specific right, within its sole discretion, to use third-party contractors for all or any portion of the Services.

(b)      Services shall expressly exclude those services referenced as Excluded Services on Exhibit B and shall also not include:  (i) supplies, electricity, personnel and other tangible assets that were provided to or maintained for the benefit of the Assets prior to the Closing, all of which Prime shall provide during the term of this Agreement, or (ii) services other than those provided prior to the Effective Time, including any services necessary because of Prime's changes in the operation of the Assets following the Closing or due to Prime's failure to cooperate with Trinity.

(c)      Prime shall be solely responsible for the operations and control of all aspects of the Assets.

Section 1.2    Terms of Services.

(a)      The Services shall be provided in good faith in a manner reasonably consistent with Trinity's past practices with respect to the Business in the one (1) year period immediately preceding the Closing Date.

(b)      The Parties acknowledge that the employees of Trinity (or its Affiliates) involved in the provision of the Services shall remain employees of Trinity (or its Affiliate), and Trinity (or its Affiliate) shall be solely responsible for the payment and provision of all wages, bonuses, commissions, employee benefits and workers' compensation and the withholding and payment of applicable taxes relating to such employment.  Neither Trinity nor Prime shall be considered a joint employer or co-employer of the employees of the other Party.

(c)      The Parties recognize that Trinity may utilize certain technology support license/services provided by third-party vendors under specific third-party agreements ("Third-Party Agreements").  The Parties further recognize that the Third-Party Agreements may have been entered into by Trinity and that Trinity's obligation to provide services is expressly contingent on receiving permission from third party vendors to allow Trinity to permit Prime to receive technology software or services from Trinity as a result of the Third-Party Agreements.  Prime and Trinity shall use commercially reasonable efforts to cause the third-party vendors to continue to provide the technology software or support to the other under the terms of the Third-Party Agreements in effect as of the date hereof.  If the parties have not, as of the Effective Time, obtained all consents necessary for Trinity to provide Services with respect to any software for which consent is required, Trinity may without penalty suspend Services relating to such software, and Prime shall not be required to pay any Services Charge for such suspended Services relating to such software, until such consent is obtained.

(d)      Each Party shall be responsible for its own compliance with any and all laws applicable to its performance under this Agreement.

Section 1.3    Additional Services.  After the date hereof, if Prime identifies a service that (a) Trinity or one of its Affiliates provided to the Business during the one (1) year period immediately preceding the Closing Date that Prime reasonably needs in order for the Business to continue to operate in substantially the same manner in which the Business operated during the

2

one (1) year period immediately preceding the Closing Date, and such service was not included in Exhibit A (other than because the Parties agreed such services shall not be provided), then Trinity and Prime shall negotiate in good faith regarding the provision of such requested services (such additional services, the "Additional Services").  In the event that the Parties reach an agreement with respect to providing such Additional Services, the Parties shall amend Exhibit A in writing to include such Additional Services (including the Service Charges and Expiration Dates with respect to such Additional Services) and such Additional Services shall be deemed Services hereunder, and accordingly, Trinity shall provide such Additional Services, or cause such Additional Services to be provided, in accordance with the terms and subject to the conditions set forth in this Agreement.  Nothing contained in this Section 1.3 shall require the Parties to reach any agreement with respect to the provision of Additional Services.

      Section 1.4    <u>Cooperation</u>.

      (a)    Prime shall, in a timely manner, take all such actions as may be reasonably necessary or desirable in order to enable or assist Trinity in the provision of the Services, including (a) providing necessary information, and (b) using reasonable efforts to obtain any consents, licenses, sublicenses or approvals necessary to permit Trinity to perform its obligations hereunder.

      (b)    Upon the termination of the provision of any or all of the Services, Prime shall have one (1) year to provide Trinity with a request ("Data Transfer Request") to electronically transfer Prime data in Trinity's possession in such a manner and in such a format as is specified in the notice in reasonable detail, to Prime ("Data Transfer"). Prime agrees to reimburse Trinity's actual, documented and reasonable internal costs to provide such Data Transfer, as well as any actual, documented and reasonable third party costs incurred by Trinity to assist with such.

      (c)    Trinity makes no warranties with respect to the accuracy or completeness of Prime data, and Trinity expressly disclaims any warranties of fitness for particular purpose, merchantability, accuracy or completeness of Prime data.  In the event Prime fails to submit a Data Transfer Request within one (1) year after the termination of the provision of the applicable Services, Trinity shall have no further liability to Prime whatsoever with respect to the storage of any data belonging to Prime, Trinity may proceed, without liability to Prime, to delete or destroy any or all such data or extend any applicable protections to such data in accordance with the HIPAA Business Associate Agreement attached to this Agreement as Exhibit C and incorporated by reference to this Agreement.

ARTICLE II
TERM AND TERMINATION

      Section 2.1    <u>Term</u>. The term of this Agreement shall be [two (2) years] from the date first written above ("Term"), provided that Article III and Article IV shall survive termination of this Agreement.  In the event of any termination of this Agreement in its entirety, this Agreement (other than Article III and Article IV, and all provisions that limit Trinity's liability) shall be of no further force or effect, provided that, subject to the terms of this Agreement, no such termination shall relieve any Party from liability for any breach of this Agreement prior to

3

termination thereof, or, subject to the terms of such other agreements, from any liability for breach under any other agreements between the Parties.

Section 2.2   Termination.

(a)   Notwithstanding any provision herein to the contrary, Prime may discontinue any particular Service or Services prior to the end of the Term upon at least sixty (60) days' prior written notice to Trinity of its intent to terminate this Agreement as to that particular Service or Services.  The parties acknowledge and agree that to the extent Trinity is unable to unbundle a particular Service, Prime will either continue such Service as part of this Agreement or discontinue the applicable bundle of Services.  Prime shall no longer be obligated to pay to Trinity the Service Charge attributable to such terminated Service(s) following the effective date of termination of such Service(s); provided, however, that Prime shall pay to Trinity the Service Charge attributable to any terminated Service(s) up to the effective date of termination.  Such early termination as to any particular Services or Services shall have no effect on any other Service(s).

(b)   Notwithstanding any provision herein to the contrary, if either Party materially breaches any of its obligations under this Agreement, and does not cure such breach within thirty (30) days after receiving written notice thereof from the non-breaching party, then the non-breaching party may, at its option, terminate any Service affected by such material breach or this Agreement in its entirety by providing written notice of termination to the other Party, which termination shall be effective immediately.  Notwithstanding the foregoing, Prime shall remain liable to Trinity for all outstanding amounts due and payable hereunder on account of Services provided through the date of termination.

(c)   Notwithstanding anything contained herein to the contrary, Prime expressly agrees that at any time during the term of this Agreement, Trinity may terminate all or part of the Services and/or this Agreement to the extent Trinity ceases to provide any such Services to its affiliates generally, upon sixty (60) days' prior written notice to Prime.  Prime shall no longer be obligated to pay to Trinity the Service Charge attributable to such terminated Service(s) following the effective date of termination of such Service(s)

(d)   Termination for Default. In the event: (i) Prime shall become or be adjudicated insolvent and/or bankrupt, or (ii) a receiver or trustee shall be appointed for Prime or its property or (iii) a petition for reorganization or arrangement of Prime under any bankruptcy or insolvency law shall be approved, or (iv) an assignment shall be made for the benefit of creditors of Prime, or Prime shall file a voluntary petition in bankruptcy or shall consent to the appointment of a receiver or trustee, Trinity shall have the right, at its sole discretion, to immediately terminate its participation under this Agreement. Notwithstanding the foregoing however, Prime shall remain liable to Trinity for all outstanding amounts due and payable hereunder on account of Services provided through the date of termination.

(e)   Notwithstanding anything to the contrary contained herein, this Agreement may be terminated, in whole or in part, at any time by the mutual written consent of Trinity and Prime.

4

## ARTICLE III
## PAYMENT

Section 3.1    Payment for Services.  In consideration for the Services, Prime shall pay to Trinity the service fee set forth next to each Service on Exhibit A (the "Service Charge"), which the Parties agree shall be based on the same methodology used by Trinity to charge for the same Services provided to its affiliates in 2013 or 2014, as applicable.  Prime shall pay its own costs and shall pay the cost of any third party retained by Prime, or by Trinity with Prime's consent, to assist with data migration or any other Services provided hereunder.

Section 3.2    Payment.  Prime shall pay Trinity on a monthly basis, in advance,  for the Service Charge due to Trinity under this Agreement, on the first business day of each month during the Term, adjusted on a pro rata basis for any partial month during the Term.

## ARTICLE IV
## MISCELLANEOUS

Section 4.1    Confidentiality.  Each Party shall keep confidential this Agreement (including the Exhibits) and all information received from another Party (the "Providing Party") regarding the Services, including any information received with respect to Trinity or Prime, and to use such information only for the purposes set forth in this Agreement unless otherwise agreed to in writing by the Providing Party.  In the event a Party is required by any court or legislative or administrative body (by oral questions, interrogatories, requests for information or documents, subpoena, civil investigation demand or similar process) to disclose any confidential information provided pursuant to this Agreement, such Party shall provide the Providing Party with prompt notice of such requirement in order to afford the Providing Party an opportunity to seek an appropriate protective order or other remedy.  However, if the Providing Party is unable to obtain or does not seek such protective order and the Party required to disclose the confidential information is, in the opinion of its counsel, legally compelled to disclose such confidential information, disclosure of such information may be made without liability under this Agreement.  The covenants in this Section 4.1 shall survive any termination of this Agreement for a period of two (2) years from the date such termination becomes effective.

Section 4.2    Indemnification; Limitations on Liability.

(a)    Prime shall indemnify and hold harmless Trinity and its Affiliates (each, a "Trinity Indemnified Party") from and against any Damages, and reimburse each relevant Trinity Indemnified Party for all reasonable expenses as they are incurred, whether or not in connection with pending litigation and whether or not any Trinity Indemnified Party is a party, to the extent caused by, resulting from or in connection with any of the Services rendered or to be rendered by or on behalf of such Trinity Indemnified Party pursuant to this Agreement or the transactions contemplated by this Agreement; provided that Prime and its Affiliates shall not be responsible for any Damages of such Trinity Indemnified Party (i) to the extent that such Damage is caused by, results from, or arises out of or in connection with a Trinity Indemnified Party's willful breach, gross negligence or willful misconduct, or (ii) for which Trinity is required to indemnify a Prime Indemnified Party pursuant to Section 10.2 of the Purchase Agreement.

5

(b)     Trinity and its Affiliates rendering the Services hereunder shall indemnify and hold harmless Prime and its Affiliates (each, a "Prime Indemnified Party") from and against any Damages, and reimburse each Prime Indemnified Party for all reasonable expenses as they are incurred, whether or not in connection with pending litigation and whether or not any Prime Indemnified Party is a party, to the extent caused by, resulting from, or arising out of or in connection with (i) the willful breach, negligence or willful misconduct of Trinity or its Affiliates in providing any of the Services the pursuant to this Agreement, or (ii) any violation of applicable law by Trinity or its Affiliates.

(c)     Any indemnification claims made hereunder shall be made in accordance with the procedures set forth in, and be subject to the limitations contained in, Section 10 of the Purchase Agreement.

(d)     Notwithstanding any other provision of this Agreement, Trinity's maximum liability to, and the sole remedy of Prime for breach of this Agreement by Trinity or otherwise, is a refund in whole or in pertinent part of the Service Charges paid for the particular Service or, at the option of Trinity, a correction or cure of the breach, including without limitation, through redelivery (or delivery) of the Service, unless the breach arises out of the gross negligence or intentional misconduct of Trinity.  In any event, Trinity's maximum liability to Prime hereunder under any legal theory whatsoever shall be the total amount paid by Prime to Trinity in connection with this Agreement during the twelve (12) months immediately prior to the act giving rise to the liability.

Section 4.3     Force Majeure.

(a)     No Party or any of its Affiliates shall be liable for a failure or delay in the performance of any of its obligations (other than payment obligations) under this Agreement where such failure or delay is the result of fire, flood, earthquake, hurricane, tornado, storm or other natural disaster, act of God, war or terrorism, embargo, riot, labor dispute, unavailability of raw materials or the intervention of any government authority, provided that the Party failing in or delaying its performance promptly notifies the other Party promptly in writing of its inability to perform and states the reason for such inability.

(b)     During the period of a force majeure, Prime shall be entitled to seek an alternative service provider with respect to such Service(s) and shall be entitled to permanently terminate such Service(s) (and shall be relieved of the obligation to pay Service Charges for such Services(s) throughout the duration of such force majeure) if a force majeure shall continue to exist for more than fifteen (15) consecutive days, it being understood that Prime shall not be required to provide any advanced notice of such termination to Trinity.

Section 4.4     No Partnership or Agent Created.  The relationship of Trinity, on the one hand, and Prime, on the other hand, shall be that of independent contractors only.  Nothing in this Agreement shall be construed as ranking one Party an agent or legal representative of the other or otherwise as having the power or authority to bind the other in any manner.

6

Section 4.5    <u>Miscellaneous</u>.

    (a)    <u>Notices</u>.  All notices and other communications hereunder will be in writing (including facsimile or similar writing) and will be sent, delivered or mailed, addressed or faxed:

|  |  |
|---|---|
| If to Prime, to: | Prime Healthcare Services – Saint Michael's, LLC 3300 E. Guasti Road, 3rd Floor Ontario, California  91761 Attention: Chief Executive Officer Facsimile No.: (909) 235-4419 |
| with a copy to: | Prime Healthcare Management, Inc. 3300 East Guasti Road, 3rd Floor Ontario, California  91761 Attention: General Counsel Facsimile No.: (909) 235-4419 |
| If to Trinity, to: | Saint Michael's Medical Center, Inc. c/o Catholic Health East 3805 West Chester Pike Newtown Square, Pennsylvania  19073 Attention:  Michael C. Hemsley, Esquire Executive Vice President and General Counsel Facsimile No.: (610) 355-2171 |
| with a copy to: | Buchanan Ingersoll & Rooney PC 401 E. Jackson Street, Suite 2500 Tampa, Florida  33602 Attention: Dale S. Webber, Esquire Facsimile No.: (813) 222-8189 |

Each such notice or other communication will be given (i) by hand delivery, (ii) by nationally recognized overnight courier service, or (iii) by facsimile, receipt confirmed.  Each such notice or communication will be effective (x) if delivered by hand, when delivered at the address specified in this Section 4.5(a) (or in accordance with the latest unrevoked direction from such Party), (y) if delivered by nationally recognized overnight courier service, on the first business day following the date of dispatch, and (z) if given by facsimile, when such facsimile is transmitted to the facsimile number specified in this Section 4.5(a) (or in accordance with the latest unrevoked direction from such Party), and confirmation is received.

    (b)    <u>Severability</u>.  Any term or provision of this Agreement that is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms

54020/0001-12054840v2

and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction.

(c)     Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same agreement, it being understood that all of the parties need not sign the same counterpart.  The facsimile signature of any Party to this Agreement or any document delivered in connection with the consummation of the transactions described herein or a PDF copy of the signature of any Party to this Agreement or any document delivered in connection with the consummation of the transactions described herein delivered by electronic mail for purposes of execution or otherwise, is to be considered to have the same binding effect as the delivery of an original signature on an original contract.

(d)     Entire Agreement; No Third Party Beneficiaries.  This Agreement (i) constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof, and (ii) is not intended to confer upon any Person other than the Parties and their successors and permitted assigns any rights or remedies hereunder.

(e)     Governing Law; Waiver of Jury Trial.  THIS AGREEMENT, THE LEGAL RELATIONS BETWEEN THE PARTIES AND THE ADJUDICATION AND THE ENFORCEMENT THEREOF, SHALL BE GOVERNED BY AND INTERPRETED AND CONSTRUED IN ACCORDANCE WITH THE SUBSTANTIVE LAWS OF THE STATE OF NEW JERSEY APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED WHOLLY WITHIN THAT JURISDICTION.  THE PARTIES HEREBY EXPRESSLY WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BROUGHT BY OR AGAINST ANY OF THEM RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

(f)     Consent to Jurisdiction.  Each Party, by its execution hereof, hereby:

(i)     irrevocably submits to the exclusive jurisdiction of any court located in the State of New Jersey, for the purposes of any and all actions, suits or proceedings arising in whole or in part out of, related to, based upon or in connection with this Agreement or the subject matter hereof;

(ii)     waives to the extent not prohibited by applicable law, and agrees not to assert, by way of motion, as a defense or otherwise, in any such action, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that any such action brought in one of the above-named courts should be dismissed on grounds of forum non conveniens, should be transferred to any court other than one of the above-named courts, or should be stayed by reason of the pendency of some other proceeding in any other court other than one of the above-named courts, or that this Agreement or the subject matter hereof may not be enforced in or by such court; and

(iii)     agrees not to commence any such action other than before one of the above-named courts nor to make any motion or take any other action seeking or intending to

8

cause the transfer or removal of any such action to any court other than one of the above-named courts whether on the grounds of forum non conveniens or otherwise.

(g)     Assignment.  Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by any of the Parties without the prior written consent of the other Parties and any purported assignment or other transfer without such consent shall be void and unenforceable.  Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of and be enforceable by the Parties and their respective successors and assigns.

(h)     Construction and Interpretation of Certain Terms and Phrases.  Unless the context of this Agreement otherwise requires, (a) words of any gender include each other gender; (b) words using the singular or plural number also include the plural or singular number, respectively; (c) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement; (d) the terms "Article" or "Section" refer to the specified Article or Section of this Agreement; and (e) the phrases "ordinary course of business" and "ordinary course of business consistent with past practice" refer to the business and practice of Sellers in connection with the Purchased Assets.  Whenever this Agreement refers to a number of days, such number refers to calendar days unless business days are specified.  The headings contained in this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement.  For purposes of any indemnification provision in this Agreement, the word "expenses" means out-of-pocket expenses, and does not include any allocations of internal salaries and other expenses.  Whenever the words "included," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation."

(i)     No Waiver.  Any term, covenant or condition of this Agreement may be waived at any time by the Party that is entitled to the benefit thereof but only by a written notice signed by the Party expressly waiving such term or condition.  The waiver of any term, covenant or condition shall not be construed as a waiver of any other term, covenant or condition of this Agreement.

(j)     Amendments.  This Agreement may not be amended other than by written instrument signed by both Parties.

(k)     Expenses and Attorneys' Fees.  Except as otherwise provided in this Agreement, each Party shall bear and pay its own costs and expenses relating to the preparation of this Agreement and to the transactions contemplated by, or the performance of or compliance with any condition or covenant set forth in, this Agreement.  If any action is brought by any Party to enforce any provision of this Agreement, the prevailing Party shall be entitled to recover its reasonable attorneys' fees after receipt of a final, non-appealable judgment.

Section 4.6    Business Associate Agreement.  Trinity and Prime agree that Trinity shall perform its obligations under this Agreement in compliance with the HIPAA Business Associate Addendum, attached to this Agreement as Exhibit C and incorporated by reference into this Agreement. To the extent required by current or future final regulations adopted pursuant to Health Insurance Portability and Accountability Act of 1996 and any regulations promulgated

9

thereunder, the Parties agree to revise this Agreement as necessary to conform to these requirements.

Section 4.7    No Warranties.  With the exception of any express warranties provided for herein, Trinity makes no other warranties, express or implied, and disclaims any all other warranties of any kind, including but not limited to warranties of merchantability, title, fitness or particular purpose, non-infringement, or that the Services will be provided uninterrupted or error-free.  In no event shall CHE be liable to Prime for any lost profits, loss of goodwill, or consequential, incidental or special damages suffered by Prime arising out of this Agreement, under theories of contract, tort, equity or otherwise and whether resulting from the negligence of Trinity or otherwise.

IN WITNESS WHEREOF, the undersigned have executed this Agreement through their duly authorized officers effective as of the date first above written.

**TRINITY HEALTH CORPORATION:**

By:_____
Name:_____
Title:_____


**PRIME:**

**PRIME HEALTHCARE SERVICES-SAINT MICHAEL'S, LLC**


By:_____
Name:_____
Title:_____

10

# EXHIBIT A

## SERVICES

| Service | Description | Term | Service Charge |
|---|---|---|---|
| _____ | These services include:<br>● <br>● <br>● <br>● | ___ months | $_____/Cost |
| _____ | These services include:<br>● <br>● <br>● | ___ months | $_____/Cost |
| _____ | These services include:<br>● <br>● <br>● | ___ months | $_____/Cost |
| _____ | These services include:<br>● <br>● <br>● | ___ months | $_____/Cost |
| _____ | These services include:<br>● <br>● <br>● | ___ months | $_____/Cost |
| _____ | These services include:<br>● <br>● <br>● | ___ months | $_____/Cost |

**[SEE ATTACHED DESCRIPTION OF SERVICES]**

A-1

**EXHIBIT B**

**EXCLUDED SERVICES**

[To be determined]

54020/0001-12054840v2

# EXHIBIT C

## HIPAA BUSINESS ASSOCIATE ADDENDUM

# HIPAA BUSINESS ASSOCIATE ADDENDUM

This Addendum is entered into this _____ day of _____, 2013, between **Prime Healthcare Services - Saint Michael's, LLC**, a Delaware limited liability company, on behalf of itself and its affiliates ("Covered Entity"), and **Trinity Health Corporation** ("Business Associate") (each a "Party" and collectively the "Parties").  The Parties intend to use this Addendum to satisfy the Business Associate contract requirements in the regulations at 45 CFR 164.314, 164.502(e) and 164.504(e), issued under the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Reinvestment Act ("HITECH") (collectively, "HIPAA").

This Addendum shall supplement and/or amend the Transition Services Agreement only with respect to Business Associate's receipt, use and creation of PHI under the Transition Services Agreement to allow Covered Entity to comply with section §164.502(e) of the Privacy Rule and §164.314 of the Security Rule.  Except as so supplemented and/or amended, the terms of the Transition Services Agreement continue unchanged and shall apply with full force and effect to govern the matters addressed in this Addendum and in Transition Services Agreement.

1.    Definitions

Unless otherwise defined in this Addendum, all capitalized terms used in this Addendum have the meanings ascribed in the Privacy Rule, Security Rule and HITECH, provided, however, that "PHI" shall mean Protected Health Information, as defined in 45 C.F.R. § 164.501, limited to the information Business Associate received from or created or received on behalf of Covered Entity as Covered Entity's Business Associate.

2.    Obligations and Activities of Business Associate

(a)    Business Associate agrees to not use or further disclose Protected Health Information ("PHI") other than as permitted or required by Section 3.0 of this Addendum, or as Required by Law.

(b)    Business Associate agrees to implement administrative, physical, and technological safeguards that reasonably and appropriately protect the confidentiality integrity and availability of all PHI, which shall include Electronic PHI ("EPHI") that Business Associate creates, receives, maintains or transmits on behalf of Covered Entity.

(c)    Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Addendum.

(d)    Business Associate agrees to promptly report to Covered Entity, no later than within five (5) business days of becoming aware, any security incident involving EPHI, any breach or any use or disclosure of the PHI not provided for by the Addendum. For purposes of this paragraph, "security incident" shall mean the attempted or successful unauthorized access, use, disclosure, modification or destruction of information or interference with systems operations in an information system. "Breach" shall mean the unauthorized acquisition, access, use or disclosure of PHI that compromises the security or privacy of such PHI.  Business

C-2

Associate agrees to reimburse Covered Entity for all costs, expenses and damages (including reasonable attorneys' fees) associated with any notification process that may be required under HITECH with respect to any breach of unsecured PHI.

(e)     Business Associate agrees to ensure that any agent, including a subcontractor, to whom it provides Protected Health Information received from, or created or received by Business Associate on behalf of, Covered Entity agrees to essentially the same restrictions and conditions that apply through this Addendum to Business Associate with respect to such information.

(f)     Business Associate shall ensure that any agent, including a subcontractor, to whom it provides EPHI, agrees to implement reasonable and appropriate safeguards to protect such EPHI.

(g)     Business Associate agrees to provide access, within seven (7) business days of a request of Covered Entity or an Individual, and in a reasonable manner consistent with the HIPAA regulations, to Protected Health Information in a Designated Record Set, to the Covered Entity in order to meet the requirements under 45 CFR 164.524.

(h)     Business Associate agrees to make any Amendment(s) to Protected Health Information in a Designated Record Set that the Covered Entity or an Individual directs or agrees to pursuant to 45 CFR 164.526 within seven (7) business days of a request of Covered Entity or an Individual, and in a reasonable manner consistent with the HIPAA regulations.

(i)     Business Associate agrees to make its internal practices, books, and records, including policies and procedures and Protected Health Information, relating to the use and disclosure of Protected Health Information received from, or created or received by Business Associate on behalf of the Covered Entity, to the Secretary in a reasonable time and manner, for purposes of the Secretary determining Covered Entity's compliance with the Privacy Rule.  In addition, upon Covered Entity's request, Business Associate shall make its internal practices, books and records relating to compliance with HITECH available to Covered Entity for purposes of determining the Business Associate's compliance with HITECH.  Without limiting the generality of the foregoing, Business Associate acknowledges and agrees that it shall have policies and procedures that are sufficient to comply with the applicable requirements of HITECH.

(j)     Business Associate agrees to document disclosures of Protected Health Information and information related to such disclosures as would be required for Covered Entity to respond to a request by an Individual for an accounting of disclosures of Protected Health Information in accordance with 45 CFR 164.528.

(k)     Business Associate agrees to provide to Covered Entity an accounting of disclosures of Protected Health Information in accordance with 45 CFR 164.528, in a reasonable manner consistent with the HIPAA regulations and within seven (7) business days of receiving a request for an accounting of disclosures of PHI from the Covered Entity.

(l)     When using or disclosing PHI or when requesting PHI from Covered Entity, in all cases, in accordance with the terms of this Addendum, Business Associate agrees to

C-3

make reasonable efforts to limit the Minimum Necessary type and amount of PHI required to perform its services and will comply with 45 CFR 164.502(b) and 514(d).

3.    <u>Permitted or Required Uses and Disclosures by Business Associate</u>

(a)    <u>General Use and Disclosure</u>.  Except as otherwise limited in this Addendum, Business Associate may use or disclose Protected Health Information to perform functions, activities, or services for, or on behalf of, Covered Entity as specified in the Contract and in this Addendum, provided that such use or disclosure of Protected Health Information would not violate the Privacy Rule, including the Minimum Necessary requirement, if done by Covered Entity.

(b)    <u>Additional use and disclosure</u>.

(i)    Except as otherwise limited in this Addendum, Business Associate may use Protected Health Information for the proper management and administration of the Business Associate or to carry out the legal responsibilities of the Business Associate.

(ii)    Except as otherwise limited in this Addendum, Business Associate may disclose Protected Health Information for the proper management and administration of the Business Associate, provided that such disclosures are required by law, or Business Associate obtains reasonable assurances from the person to whom the information is disclosed that it will remain confidential and be used or further disclosed only as required by law or for the purpose for which it was disclosed to the person, and the person notifies the Business Associate of any instances of which it is aware in which the confidentiality of the information has been breached.

(iii)    Except as otherwise limited in this Addendum, Business Associate may use Protected Health Information to provide Data Aggregation services to Covered Entity as permitted by 45 CFR 164.504(e)(2)(i)(B).

(iv)    Business Associate may use Protected Health Information to report violations of law to appropriate Federal and State authorities, consistent with 45 CFR 164.502(j)(1)

(v)    Business Associate may de-identify any and all PHI obtained by Business Associate under this Addendum at any location, and use such de-identified data, all in accordance with the de-identification requirements of the Privacy Rule.

4.    <u>Obligations of Covered Entity to Inform Business Associate of Covered Entity's Privacy Practices, and any Authorization or Restrictions</u>.

(a)    Covered Entity shall provide Business Associate with the notice of privacy practices that Covered Entity produces in accordance with 45 CFR 164.520, as well as any changes to such notice.

(b)    Covered Entity shall provide Business Associate with any changes in, or revocation of, Authorization by Individual or his or her personal representative to use or disclose

C-4

Protected Health Information, if such changes affect Business Associate's uses or disclosures of Protected Health Information.

(c)    Covered Entity shall notify Business Associate of any restriction to the use or disclosure of Protected Health Information that Covered Entity has agreed to in accordance with 45 CFR 164.522, if such changes affect Business Associate's uses or disclosures of Protected Health Information.

5.    Permissible Requests by Covered Entity.

Covered Entity shall not request Business Associate to use or disclose Protected Health Information or Electronic Protected Health Information in any manner that would not be permissible under the Privacy or Security Rules if done by Covered Entity.

6.    Term and Termination

(a)    Term. The Term of this Addendum shall be effective as of _____, 2013, and shall terminate when all of the Protected Health Information provided by Covered Entity to Business Associate, or created or received by Business Associate on behalf of Covered Entity, is destroyed or returned to Covered Entity, or, if it is infeasible to return or destroy Protected Health Information, protections are extended to such information, in accordance with the termination provisions in this Section.

(b)    Termination for Cause. Without limiting the termination rights of the Parties pursuant to the Transition Services Agreement, and upon Covered Entity's knowledge of a material breach by Business Associate of a provision under this Addendum, Covered Entity shall provide an opportunity for Business Associate to cure the breach or end the violation and terminate the Contract if Business Associate does not cure the breach or end the violation within thirty (30) days written notice by Covered Entity, or immediately terminate the Contract if Business Associate commits a material breach of this Addendum and cure is not possible. If neither termination nor cure is feasible, Covered Entity shall report the violation to the Secretary.

(c)    Effect of Termination. The Parties mutually agree that it is essential for Protected Health Information to be maintained after the expiration of the Transition Services Agreement for regulatory and other business reasons.  The Parties further agree that it would be infeasible for Covered Entity to maintain such records because Covered Entity lacks the necessary system and expertise.  Accordingly, Covered Entity hereby appoints Business Associate as its custodian for the safe keeping of any record-containing Protected Health Information that Business Associate may determine it is appropriate to retain.  Notwithstanding the expiration or termination of the Transition Services Agreement, Business Associate shall extend the protections of this Addendum to such Protected Health Information, and limit further use or disclosure of the Protected Health Information to those purposes that make the return or destruction of the Protected Health Information infeasible.

C-5

7.    <u>Miscellaneous</u>

(a)    <u>Regulatory References</u>.  A reference in this Addendum to a section in the Privacy or Security Rules means the section as in effect or as amended, and for which compliance is required.

(b)    <u>Amendment</u>.  Upon the enactment of any law or regulation affecting the use or disclosure of Protected Health Information, or Electronic Protected Health Information or the publication of any decision of a court of the United States or any state relating to any such law or the publication of any interpretive policy or opinion of any governmental agency charged with the enforcement of any such law or regulation, the Parties agree to negotiate in good faith appropriate amendment(s) to this Addendum to give effect to these revised obligations.

(c)    <u>Survival</u>.  The respective rights and obligations of Business Associate under Section 6.0 of this Addendum shall survive the termination of this Addendum.

(d)    <u>Interpretation</u>.  Any ambiguity in this Addendum shall be resolved in favor of a meaning that permits Covered Entity to comply with the Privacy and Security Rules and HITECH.

(e)    <u>No third party beneficiary</u>.  Nothing expressed or implied in this Addendum or in the Transition Services Agreement is intended to confer, nor shall anything herein confer, upon any person other than the Parties and the respective successors or assignees of the Parties, any rights, remedies, obligations, or liabilities whatsoever.

(f)    <u>Indemnification</u>.  The Business Associate agrees to indemnify, defend and hold harmless the Covered Entity and its respective employees and agents, against any loss, claim, damage or liability that may result from any third party claim if and to the extent proximately caused by any breach of this Addendum by the Business Associate and its respective employees and agents.

(Signatures on Next Page)

IN WITNESS WHEREOF, the undersigned have executed this HIPAA Business Associate Addendum as of the date first above written.

**TRINITY HEALTH CORPORATON:**

By:_____
Name:_____
Title:_____


**PRIME:**

**PRIME HEALTHCARE SERVICES-SAINT MICHAEL'S, LLC**


By:_____
Name:_____
Title:_____

C-7

Exhibit 1.5(k)

## DEPOSIT ACCOUNT TRANSFER AGREEMENT

This Deposit Account Transfer Agreement, dated as of _____, 2015 ("Agreement"), is made and entered into by and among Saint Michael's Medical Center, Inc., a New Jersey nonprofit corporation ("Holder"), Prime Healthcare Services – Saint Michael's, LLC, a Delaware limited liability company ("Purchaser") and _____ ("Bank"). Capitalized terms used but not defined herein are used herein as defined in the Purchase Agreement (as such term is hereinafter defined).

## R E C I T A L S

WHEREAS, pursuant to the Asset Purchase Agreement dated as of July __, 2015, by and among "Sellers" thereunder and Purchaser (the "Purchase Agreement"), Sellers agreed to sell to Purchaser, and Purchaser agreed to purchase from Sellers, substantially all of the assets of the Sellers used in connection with the operation of Saint Michael's Medical Center (the "Acute Care Hospital") and the outpatient, ancillary and other health care businesses incident to the operation of the Acute Care Hospital immediately prior to the date hereof (collectively, the "Hospital"), including the right to Governmental Payments (as such term is hereinafter defined);

WHEREAS, to the extent that only the Holder is permitted to directly receive payments from Medicare, Medicaid and any other similar or successor federal, state or local health care payment programs with or sponsored by Governmental Authorities (as such term is hereinafter defined) ("Governmental Payors") for services provided by the Hospital on or prior to the Closing Date but reimbursed after the Effective Time (the "Governmental Payments"), such Governmental Payments will be deposited into the Holder's bank accounts;

WHEREAS, Holder has established the bank accounts listed on Exhibit A under the exclusive domain and control of the Holder (collectively, the "Holder Accounts"), into which the Governmental Payments may be deposited; and

WHEREAS, pursuant to Section 1.5(k) of the Purchase Agreement, Holder has agreed to certain arrangements regarding the Holder Accounts; and

WHEREAS, the terms of this Agreement, among other things, set forth the obligations of Holder and Bank with respect to the holding and distribution of funds from the Holder Accounts to Purchaser.

NOW, THEREFORE, in consideration of the premises and the agreements, covenants, representations and warranties hereinafter set forth, and for other good and valuable consideration, the receipt, adequacy and legal sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

1.  Control of Holder Accounts; Account Balances.

(a)  The Holder Accounts shall be subject to the signing authority of Holder as set forth in Bank's record of authorized signatures. Holder shall have exclusive domain over, and control of, the Holder Accounts, and Bank shall be subject only to Holder's instructions regarding the Holder Accounts.

(b)      Nothing in this Agreement shall require that any of the Holder Accounts have a positive balance prior to or as of the Effective Time.  Holder shall be entitled to sweep the Holder Accounts for its own benefit prior to the Effective Time with any funds derived therefrom being available to pay such Excluded Liabilities as Holder shall determine.

2.      Daily Sweep.  Holder hereby instructs Bank, automatically and without further direction, unless and until Bank receives written instruction from Holder to the contrary, to book transfer each business day (such wire transfer being referred to herein as the "Daily Sweep") all funds in the Holder Accounts solely to the following bank account of Purchaser ("Purchaser's Account"):

Bank:
ABA No.:
Accounts No.:

3.      Statements.  With respect to the end of each calendar month, Bank will send to Holder its regular statement covering the deposits to and withdrawals from the Holder Accounts during such month and a duplicate of such statement to Purchaser.

4.      Expenses.  All charges, costs and expenses incurred in connection with Bank's performance hereunder, including, without limitation (a) maintaining the Holder Accounts and Bank's services under this Agreement, (b) providing the information required by this Agreement and mailing statements and notices with respect to the Holder Accounts, and (c) transferring funds from the Holder Accounts to Purchaser's Account, shall be charged to the Holder's master system account number _____, and Bank will provide statements to Holder of all such amounts and the date charged to Holder.  Bank shall not offset, charge, deduct or otherwise withdraw funds from the Holder Accounts.

5.      Termination.  Each party may terminate this Agreement by written notice delivered to the other parties at least sixty (60) days prior to the effective date of such termination; provided, however, that Bank shall, for not less than sixty (60) additional days after the effective date of such termination, continue to receive electronic funds transfers, and deposit any checks received, into the Holder Accounts and to wire transfer such funds to Purchaser's Account, in accordance with Section 2 above.  Upon termination, Bank shall close the Holder Accounts and transfer all funds therein and any future instruments deposited in the Holder Accounts to Purchaser's Account, in accordance with Section 2 above.

6.      Notification to Purchaser.  Holder and Bank will immediately notify Purchaser with reasonable detail in the event (a) Holder delivers any instruction to Bank contrary to the instructions contained in Section 2 above, or (b) Holder withdraws or attempts to withdraw any funds from the Holder Accounts.

7.      Representations, Warranties and Covenants of Bank. Bank hereby makes the following representations and warranties and covenants:

(a)      Bank has all requisite corporate power and authority to execute and deliver this Agreement and to perform its obligations hereunder.  All acts or proceedings required to be taken

2

by Bank to authorize the execution and delivery of this Agreement and the performance of Bank's obligations hereunder have been properly taken.

(b)    This Agreement has been duly authorized, executed and delivered by Bank and constitutes the legal, valid and binding obligation of Bank, enforceable against it in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting or relating to creditors' rights generally and general equitable principles.

(c)    The execution and delivery of this Agreement by Bank, and the consummation by it of the transactions contemplated hereby, will not (i) violate any provision of the organizational documents of Bank or (ii) violate any law, statute, ordinance, rule or regulation of any federal, state or local or any foreign government, legislature, governmental entity, regulatory, administrative authority, agency or commission or any court, tribunal, or judicial or arbitral body ("Governmental Authorities") applicable to, binding upon or enforceable against Bank.

(d)    There are no other agreements entered into between Bank and Holder with respect to the Holder Accounts.

(e)    Bank does not know of any liens, claims or encumbrances relating to the Holder Accounts.  If any person asserts any lien, encumbrance or adverse claim (including any writ, garnishment, judgment, warrant of attachment, execution or similar process) against the Holder Accounts, Bank will promptly notify Holder and Purchaser thereof.

(f)    Bank will hold all funds and instruments received by it for deposit in the Holder Accounts as provided in this Agreement.

8.    Representations and Warranties and Covenants of Holder.  Holder hereby makes the following representations and warranties:

(a)    Holder has all requisite corporate power and authority to execute and deliver this Agreement and to perform its obligations hereunder.  All acts or proceedings required to be taken by Holder to authorize the execution and delivery of this Agreement and the performance of Holder's obligations hereunder have been properly taken.

(b)    This Agreement has been duly authorized, executed and delivered by Holder and constitutes the legal, valid and binding obligation of Holder, enforceable against it in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting or relating to creditors' rights generally and general equitable principles.

(c)    The execution and delivery of this Agreement by Holder, and the consummation by it of the transactions contemplated hereby, will not (i) violate any provision of the organizational documents of Holder, or (ii) violate any law, statute, ordinance, rule or regulation of any Governmental Authorities applicable to, binding upon or enforceable against Holder.

(d)    There are no other agreements entered into between Bank and Holder with respect to the Holder Accounts.

(e)      Holder does not know of any liens, claims or encumbrances relating to the Holder Accounts.  If any person asserts any lien, encumbrance or adverse claim (including any writ, garnishment, judgment, warrant of attachment, execution or similar process) against the Holder Accounts, Holder will promptly notify Bank and Purchaser thereof.

9.      Representations and Warranties and Covenants of Purchaser.  Purchaser hereby makes the following representations and warranties:

(a)      Purchaser has all requisite corporate power and authority to execute and deliver this Agreement and to perform its obligations hereunder.  All acts or proceedings required to be taken by Purchaser to authorize the execution and delivery of this Agreement and the performance of Purchaser's obligations hereunder have been properly taken.

(b)      This Agreement has been duly authorized, executed and delivered by Purchaser and constitutes the legal, valid and binding obligation of Purchaser, enforceable against it in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting or relating to creditors' rights generally and general equitable principles.

(c)      The execution and delivery of this Agreement by Purchaser, and the consummation by it of the transactions contemplated hereby, will not (i) violate any provision of the organizational documents of Purchaser, or (ii) violate any law, statute, ordinance, rule or regulation of any Governmental Authorities applicable to, binding upon or enforceable against Purchaser.

10.      Duties of Bank.  Notwithstanding anything to the contrary in this Agreement (a) Bank shall have only the duties and responsibilities with respect to the matters set forth herein as is expressly set forth in writing herein and shall not be deemed to be an agent, bailee or fiduciary for Holder or Purchaser; (b) Bank shall not be liable to Holder or Purchaser for any action or failure to act under or in connection with this Agreement except to the extent such conduct constitutes its own willful misconduct or gross negligence (and to the maximum extent permitted by law, shall under no circumstances be liable for any incidental, indirect, special, consequential or punitive damages); (c) Bank is not charged with knowledge of or any duties or responsibilities in respect of any other agreement or document; (d) Bank shall not be subject to, nor required to comply with any direction or instruction (other than those contained herein or delivered in accordance with this Agreement) from any party hereto or any entity acting on behalf of any party, and (e) Bank shall not be required to, and shall not, expend or risk any of its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder.

11.      Indemnification.  Holder and Purchaser agree to indemnify, defend and hold harmless Bank and its affiliates, directors, officers, employees, agents, successors and assigns (each an "Indemnitee") from and against any and all liabilities, losses, claims, damages, demands, costs and expenses of every kind (including but not limited to costs incurred as a result of items being deposited in the Holder Accounts and being unpaid for any reason, reasonable attorneys' fees and the reasonable charges of Bank's in-house counsel) incurred or sustained by any Indemnitee arising out of Bank's performance of the services contemplated by this Agreement, except to the extent such liabilities, losses, claims, damages, demands, costs and

4

expenses are the direct result of Bank's willful misconduct or gross negligence.  The provisions of this Section 11 shall survive the termination of this Agreement.

12.    Notices.  Any notice, demand or communication required, permitted, or desired to be given hereunder shall be deemed effectively given when (a) in writing, and (b) personally delivered, received by facsimile or overnight courier, or five calendar days after being deposited in the United States mail, with postage prepaid thereon, certified or registered mail, return receipt requested, addressed as follows:

| | |
|---|---|
| If to Holder: | Saint Michael's Medical Center, Inc.<br>c/o Trinity Health Corporation<br>3805 West Chester Pike<br>Newtown Square, Pennsylvania 19073<br>Attention:  Michael C. Hemsley, Esquire<br>Executive Vice President and General Counsel<br>Facsimile No.:  (610) 355-2171 |
| with copies to: | Cole Schotz P.C.<br>25 Main Street<br>Hackensack, New Jersey  07601<br>Attention:  Marc P. Press, Esquire<br>Facsimile No.:  (201) 678-6271 |
| If to Bank: | _____<br>_____<br>_____<br>Attention: _____<br>Facsimile No._____ |
| If to Purchaser: | Prime Healthcare Services – Saint Michael's, LLC<br>3300 E. Guasti Road, 3rd Floor<br>Ontario, California 91761<br>Attention:  Chief Executive Officer<br>Facsimile No.: (909) 235-4419 |
| with copies to: | Prime Healthcare Management, Inc.<br>3300 East Guasti Road, 3rd Floor<br>Ontario, California 91761<br>Attention: General Counsel<br>Facsimile No.: (909) 235-4419 |

or to such other address or facsimile number, and to the attention of such other person, as any party may designate at any time in writing in conformity with this Section 12.

13.    Choice of Law; Forum.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New Jersey.  The parties hereby waive their right to assert in any proceeding involving this Agreement that the law of any other jurisdiction

shall apply to such dispute; and the parties hereby covenant that they shall assert no such claim in any dispute arising under this Agreement.

14.    Assignment.  All of the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto; provided, however, that no party hereto may assign any of its rights or delegate any of its duties under this Agreement without the prior written consent of the other party and any attempted assignment without the required consents shall be void.

15.    Severability.  If any provision of this Agreement is prohibited by law or otherwise determined to be invalid or unenforceable by a court of competent jurisdiction, the provision that would otherwise be prohibited, invalid or unenforceable shall be deemed amended to apply to the broadest extent that it would be valid and enforceable, and the invalidity or unenforceability of such provision shall not affect the validity of the remaining provisions of this Agreement so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter hereof and the prohibited nature, invalidity or unenforceability of the provision(s) in question does not substantially impair the respective expectations or reciprocal obligations of the parties or the practical realization of the benefits that would otherwise be conferred upon the parties.  The parties will endeavor in good faith negotiations to replace the prohibited, invalid or unenforceable provision(s) with a valid provision(s), the effect of which comes as close as possible to that of the prohibited, invalid or unenforceable provision(s).

16.    Entire Agreement; Amendment.  This Agreement supersedes all previous contracts, agreements and understandings and constitutes the entire agreement of whatsoever kind or nature existing between or among the parties representing the within subject matter and no party shall be entitled to benefits other than those specified herein; provided, however, that solely as between Holder and Purchaser, this Agreement is subject in all respects to the terms and conditions of the Purchase Agreement.  This Agreement may be amended or modified and any term of this Agreement may be waived only if such amendment, modification or waiver is in writing and signed by all parties.

17.    Binding Effect.  This Agreement shall inure to the benefit of, and be binding upon, the respective successors and assigns of the parties hereto.

18.    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, binding on all of the parties hereto.  Signatures sent by facsimile or electronic transmission shall be deemed to be originals for all purposes of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their duly authorized representatives as of the Effective Time.

BANK:

_____

By: _____
Print:_____
Title:_____

HOLDER:

Saint Michael's Medical Center, Inc., a New Jersey nonprofit corporation

By: _____
Print:_____
Title:_____

PURCHASER:

Prime Healthcare Services –
Saint Michael's, LLC,
a Delaware limited liability company

By: _____
Print:_____
Title:_____

7

**EXHIBIT A**

**HOLDER ACCOUNTS**

To be provided.

54020/0001-12054491v2

Exhibit 1.5(m)

## TRADEMARK LICENSE AGREEMENT

THIS TRADEMARK LICENSE AGREEMENT (this "Agreement") is made and entered into effective as of _____, 2015 (the "Effective Date"), by and between SAINT MICHAEL'S MEDICAL CENTER, INC., a New Jersey nonprofit corporation ("Licensor"), and PRIME HEALTHCARE SERVICES - SAINT MICHAEL'S, LLC, a Delaware limited liability company ("Licensee").

## R E C I T A L S

WHEREAS, Licensor is engaged in the business of delivering healthcare services to the public through the operation of an acute care hospital known as Saint Michael's Medical Center located at 111 Central Avenue, Newark, New Jersey 07102 (the "Acute Care Hospital") and other locations including primary care facilities located in Newark's East Ward (the "Saint James Campus") and Newark's North Ward (the "Columbus Campus"); and

WHEREAS, Licensor is the owner of all right, title and interest in and to the SAINT MICHAEL'S MEDICAL CENTER, SAINT JAMES and COLUMBUS service marks in connection with hospital and healthcare services (collectively, the "Mark"); and

WHEREAS, Licensee is acquiring from Licensor all of Licensor's assets, including the operation of the Acute Care Hospital and primary care facilities from Licensor, pursuant to that certain Asset Purchase Agreement dated July __, 2015 (the "Purchase Agreement"); and

WHEREAS, Licensor and Licensee have agreed to enter into this Agreement pursuant to Section 5.11 of the Purchase Agreement.

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements set forth herein, and other good and valuable consideration, the receipt and legal sufficiency of which are acknowledged, and intending to be legally bound hereby, the parties covenant and agree as follows:

1.    **LICENSE**

(a)    Licensor hereby grants to Licensee a perpetual, royalty-free, non-transferrable, exclusive (which exclusivity is limited to the primary and secondary service areas of the Acute Care Hospital and primary care facilities as described on Exhibit A) license to use the Mark solely in connection with the operation of the Acute Care Hospital and primary care facilities, and in the provision of hospital and healthcare services at the Acute Care Hospital and primary care facilities (the "Services"), subject to the restrictions, terms and conditions of this Agreement.

(b)    Licensor retains all right, title, and interest in and to the Mark including any goodwill associated therewith, and is free to continue to use and license the Mark as it sees fit outside of the primary and secondary service areas of the Acute Care Hospital and primary care facilities as described on Exhibit A attached hereto.  Any use of the Mark by Licensee shall inure to the benefit of Licensor, and Licensee shall take no action that is inconsistent with Licensor's ownership thereof.

2.    **QUALITY CONTROL**

(a)    Licensee agrees that the Services provided while using the Mark will be rendered in a manner consistent with the Ethical and Religious Directives for Catholic Health Care Services, as promulgated and amended from time to time by the United States Conference of Catholic Bishops, all as interpreted by the local ordinary of the Catholic Church (the "Ethical and Religious Directives").

(b)    Except for the restrictions contained in this Agreement related to the use of the Mark, Licensee shall have sole discretion over the manner in which Licensee's business is operated and the Services are actually provided.

3.    **TERM AND TERMINATION**

(a)    Unless sooner terminated pursuant to this Section 3, the term of this Agreement and the license granted hereby shall remain in force commencing on the Effective Date for so long as Licensee renders the Services using the Mark in a manner consistent with the Ethical and Religious Directives.

(b)    Licensor may terminate this Agreement if Licensee materially breaches any obligation hereunder, which breach is not remedied within thirty (30) days following written notice to Licensee of such breach.

(c)    Licensee may terminate this Agreement if Licensor materially breaches Licensor's obligations hereunder, which breach is not remedied within thirty (30) days following written notice to Licensor of such breach.  Licensee may also terminate this Agreement at any time upon thirty (30) days' written notice to Licensor, such termination to become effective at the conclusion of such thirty (30) day period.

(d)    Upon the termination of this Agreement, Licensee shall immediately cease all use of the Mark.  At that same time, Licensee shall send a written statement to Licensor confirming that all such use has ceased.  Licensee shall indemnify and hold harmless Licensor from and against any and all losses arising from use of the Mark by Licensee during the term of this Agreement and thereafter, but excluding losses for which Licensor is obligated to indemnify Licensee in accordance with Section 10.2 of the Purchase Agreement.

4.    **PUBLICITY**

No press release or other public announcement concerning this Agreement or the transactions contemplated hereby shall be made without advance written approval thereof by Licensor and Licensee, except as required by law.

5.    **ENTIRE AGREEMENT**

This Agreement, together with the Asset Purchase Agreement, constitutes the entire agreement of the parties with respect to the subject matter hereof.

54020/0001-12054381v2

6.    **NOTICES**

Wherever in this Agreement it shall be required or permitted that notice or demand be given or served by a party to this Agreement to or on the other party, such notice or demand shall be deemed to have been duly given or served if in writing and either personally served or forwarded by registered or certified mail, postage prepaid, and addressed as follows:

To Licensor:

> Saint Michael's Medical Center, Inc.
> c/o Trinity Health Corporation
> 3805 West Chester Pike
> Newtown Square, Pennsylvania  19073
> Attention:  Michael C. Hemsley, Esquire
> Executive Vice President and General Counsel
> Facsimile No.:  (610) 355-2171

With copy to:

> Cole Schotz P.C.
> 25 Main Street
> Hackensack, NJ  07601
> Attention:  Marc P. Press, Esquire
> Facsimile No.:  (201) 678-6271

To Licensee:

> Prime Healthcare Services - Saint Michael's, LLC
> 3300 E. Guasti Road, 3rd Floor
> Ontario, California  91761
> Attention:  Chief Executive Officer
> Facsimile No.:  (909) 235-4419

With copy to:

> Prime Healthcare Management, Inc.
> 3300 E. Guasti Road, 3rd Floor
> Ontario, California  91761
> Attention:  General Counsel
> Facsimile No.:  (909) 235-4419

Each such mailed notice shall be deemed to have been effectively given to or served upon the party to which addressed on the date the same is personally served upon such party, when received by facsimile of other electronic means or deposited in the United States registered or certified mail, postage prepaid, and properly addressed in the manner provided above.  Any party may change its address to which said notice shall be delivered or mailed by giving written notice of such change to the other Party, as provided in this Section 6.

3

7.     **WAIVERS AND AMENDMENTS**

This Agreement may be amended, superseded, canceled, renewed, or extended and the terms hereof may be waived only by a written instrument signed by both parties hereto or, in the case of a waiver, by the party waiving compliance.

8.     **CHOICE OF LAW; JURY WAIVER**

(a)     THIS AGREEMENT SHALL BE GOVERNED IN ALL RESPECTS, INCLUDING AS TO VALIDITY, INTERPRETATION AND EFFECT, BY THE LAWS OF THE STATE OF NEW JERSEY, WITHOUT GIVING EFFECT TO ITS PRINCIPLES OR RULES OF CONFLICT OF LAWS, TO THE EXTENT SUCH PRINCIPLES OR RULES ARE NOT MANDATORILY APPLICABLE BY STATUTE AND WOULD PERMIT OR REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.  Licensor and Licensee hereby irrevocably submit to the jurisdiction of the courts of the State of New Jersey and the federal courts of the United States of America located where Newark, New Jersey is situated solely in respect of the interpretation and enforcement of the provisions of this Agreement and in respect of the transactions contemplated hereby.  Each of Licensor and Licensee irrevocably agrees that all claims in respect of the interpretation and enforcement of the provisions of this Agreement and in respect of the transactions contemplated hereby, or with respect to any such action or proceeding, shall be heard and determined in such a court, and that such jurisdiction of such courts with respect thereto shall be exclusive, except solely to the extent that all such courts shall lawfully decline to exercise such jurisdiction.  Each of Licensor and Licensee hereby waives, and agrees not to assert, as a defense in any action, suit or proceeding for the interpretation or enforcement hereof or in respect of any such transaction, that it is not subject to such jurisdiction.  Each of Licensor and Licensee hereby waives, and agrees not to assert, to the maximum extent permitted by law, as a defense in any action, suit or proceeding for the interpretation or enforcement hereof or in respect of any such transaction, that such action, suit or proceeding may not be brought or is not maintainable in such courts or that the venue thereof may not be appropriate or that this Agreement may not be enforced in or by such courts.  Licensor and Licensee hereby consent to and grant any such court jurisdiction over the person of such Parties and over the subject matter of any such dispute and agree that mailing of process or other papers in connection with any such action or proceeding in the manner provided in this Section 8 or in such other manner as may be permitted by law, shall be valid and sufficient service thereof.

(b)     EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

9.     **COUNTERPARTS**

This Agreement may be executed in counterparts (delivery of which may occur via facsimile), each of which shall be binding as of the date first written above, and, when delivered, all of which shall constitute one and the same instrument.  A facsimile signature or electronically scanned copy of a signature shall constitute and shall be deemed to be sufficient evidence of a

4

party's execution of this Agreement, without necessity of further proof.  Each such copy shall be deemed an original, and it shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart.

**10.    NEGOTIATED AGREEMENT**

The parties hereby acknowledge that the terms and language of this Agreement were the result of negotiations between the parties and, as a result, there shall be no presumption that any ambiguities in this Agreement shall be resolved against any particular party.  Any controversy over construction of this Agreement shall be decided without regard to events of authorship or negotiation.

**11.    BUSINESS DAYS**

Whenever the last day for the exercise of any privilege or the discharge of any duty hereunder shall fall upon any day which is not a business day, party having such privilege or duty may exercise such privilege or discharge such duty on the next succeeding business day.

**12.    ASSIGNMENT**

This Agreement shall be binding upon, and inure to the benefit of, the parties and their respective successors and permitted assigns.  Neither this Agreement nor any rights or obligations hereunder shall be assignable by Licensee without the prior written consent of Licensor.

**13.    EXPENSES**

Each of Licensee and Licensor shall bear all of its own expenses in connection with the execution, delivery, and performance of this Agreement and the transactions contemplated hereby, including without limitation all fees and expenses of its agents, representatives, counsel, and accountants.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

54020/0001-12054381v2

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first above written.

SAINT MICHAEL'S MEDICAL CENTER, INC.

By:_____

Name: _____

Title: _____


PRIME HEALTHCARE SERVICES-
SAINT MICHAEL'S, LLC

By:_____

Name: _____

Title: _____

6

**EXHIBIT A**

Primary and Secondary Service Areas

To be added

7

Exhibit 1.5(n)

### GUARANTY OF PERFORMANCE

For valuable consideration, the undersigned, TRINITY HEALTH CORPORATION ("Guarantor"), hereby unconditionally and irrevocably guarantees in favor of "Purchaser" (as defined below) the due, prompt and complete performance (including, without limitation, payment) by SAINT MICHAEL'S MEDICAL CENTER, INC., a New Jersey nonprofit corporation ("SMMC"), SAINT JAMES CARE, INC., a New Jersey nonprofit corporation ("SJC"), COLUMBUS ACQUISITION CORP., a New Jersey nonprofit corporation ("Columbus"), and UNIVERSITY HEIGHTS PROPERTY COMPANY, INC., a New Jersey nonprofit corporation ("UHPC" and SMMC, SJC, Columbus and UHPC are referred to individually as a "Seller Party" and collectively as the "Seller"), of each and every obligation of Seller under that certain Asset Purchase Agreement dated as of July __, 2015 (the "Agreement") by and among Seller and PRIME HEALTHCARE SERVICES - SAINT MICHAEL'S, LLC, a Delaware limited liability company ("Purchaser"), (collectively, the "Obligations").

Notwithstanding any provision to the contrary contained in this Guaranty, Guarantor shall have no liability to Purchaser hereunder and no claim shall be made against Guarantor hereunder unless:

(i)        notice thereof shall have been given by or on behalf of Purchaser to Guarantor in the manner provided in Section 10.4 of the Agreement for notice to Seller as an Indemnifying Party (as defined in the Agreement), unless failure to provide such notice in a timely manner does not materially impair Guarantor's ability to defend its rights, mitigate damages, seek indemnification from a third party or otherwise protect its interests;

(ii)       Purchaser shall have accorded Guarantor the same rights and remedies that Seller would have as an Indemnifying Party under Article 10 of the Agreement; and

(iii)      Purchaser shall have complied with the requirements of Section 10.4 of the Agreement for asserting and resolving claims against Seller.

Guarantor authorizes Purchaser without notice to or demand upon Guarantor (except as shall be required by applicable statute which requirement cannot be waived), and without affecting or impairing Guarantor's liability hereunder, from time to time to renew, compromise, extend, increase, change the time for payment of, or otherwise amend, waive or change the terms of, the Obligations or any part thereof, and to release any of the Seller Parties from any or all of the Obligations.  Subject to the provisions of the immediately preceding paragraph, Guarantor hereby waives:  (a) any right to require Purchaser to proceed against Seller or to pursue any other remedy in Purchaser's power whatsoever; (b) any defense arising by reason of any disability or other defense of Seller, or any lack of validity or enforceability of any documents evidencing any of the Obligations; (c) all presentments, demands for performance, notices of nonperformance, notices of protest, notices of dishonor and notices of acceptance of this Guaranty, and (d) and any other act or thing, or omission or delay to do any other act or thing, which in any manner or to any extent might vary the risk of Guarantor or which otherwise might operate to discharge Guarantor from its obligations hereunder.

Guarantor hereby expressly covenants and agrees for the benefit of Purchaser that all existing and future indebtedness, interest thereon, obligations and liabilities of any Seller Party to Guarantor, whether fixed or contingent, matured or unmatured, liquidated or unliquidated and of whatever description (collectively, the "Junior Claims") shall be subordinate and junior in right of payment to the payment and performance of all Obligations, and Guarantor shall not accept any direct or indirect payment (in cash, property or securities, by setoff or otherwise) from any Seller Party on account of or in any manner in respect of any Junior Claim until all of the Obligations have been performed or paid in full.

Notices.  Any notice, demand or communication required, permitted, or desired to be given hereunder shall be deemed effectively given when personally delivered, when received by telegraphic or other electronic means (including facsimile) or overnight courier, or five (5) calendar days after being deposited in the United States mail, with postage prepaid thereon, certified or registered mail, return receipt requested, addressed as follows:

| | |
|---|---|
| If to Guarantor: | Trinity Health Corporation<br>3805 West Chester Pike<br>Newtown Square, Pennsylvania  19073<br>Attention:  Michael C. Hemsley, Esquire<br>Executive Vice President and General Counsel<br>Facsimile No.: (610) 355-2171 |
| With copy to:<br>(which copies shall<br>not constitute notice) | Cole Schotz P.C.<br>25 Main Street<br>Hackensack, New Jersey  07601<br>Attention:  Marc P. Press, Esquire<br>Facsimile No.: (201) 678-6271 |
| If to Purchaser: | Prime Healthcare Services - Saint Michael's, LLC<br>3300 E. Guasti Road, 3rd Floor<br>Ontario, California 91761<br>Attention: Chief Executive Officer<br>Facsimile No.: (909) 235-4419 |
| With a copy to:<br>(which copy shall<br>not constitute notice) | Prime Healthcare Management, Inc.<br>3300 East Guasti Road, 3rd Floor<br>Ontario, California 91761<br>Attention: General Counsel<br>Facsimile No.: (909) 235-4419 |

or at such other address as one party may designate by notice hereunder to the other parties.

If any provision of this Guaranty is held invalid or unenforceable, the remainder of this Guaranty shall not be affected thereby, the provisions of this Guaranty being severable in any such instance.  This Guaranty shall be governed by and construed and enforced in accordance with the laws of the State of New Jersey as applied to contracts made and performed within the State of New Jersey.

2

This Guaranty shall not be assigned or delegated by Guarantor in whole or in part and any attempted assignment or delegation of this Guaranty by Guarantor shall be null and void and of no force and effect.  Subject to the terms of the Agreement, this Guaranty shall be binding upon Guarantor and shall inure to the benefit of Purchaser, and, in each case, their permissible and respective successors and assigns.

No modification, limitation or discharge of the obligations herein guaranteed, arising out of or by virtue of any bankruptcy, reorganization or similar proceeding for relief of debtors under federal or state law, or any other voluntary or involuntary dissolution, liquidation, or winding up of the affairs of any Seller Party, will in any way affect, modify, limit or discharge the liability of Guarantor under this Guaranty.

This Guaranty may only be amended, waived, modified discharged, or otherwise changed by a written instrument signed by Guarantor and Purchaser.  No delay or forbearance by Purchaser in exercising any right under the Agreement, any agreement ancillary thereto or under this Guaranty, and no express or implied waiver by Purchaser of any default under the Agreement, any agreement ancillary thereto or under this Guaranty, shall constitute a waiver of any subsequent default under the Agreement, any agreement ancillary thereto, or under this Guaranty.

Guarantor hereby represents and warrants to Purchaser that:  (a) it is a nonprofit corporation that is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has the power and authority to conduct the business in which it is currently engaged; (b) Guarantor has the full corporate power and authority to execute and deliver, and to perform its obligations under, this Guaranty and has taken all necessary action to authorize its execution, delivery and performance of this Guaranty; and (c) this Guaranty constitutes a legal, valid and binding obligation of Guarantor enforceable in accordance with its terms, except as affected by bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting the enforcement of creditors' rights generally, general equitable principles and an implied covenant of good faith and fair dealing.

GUARANTOR UNCONDITIONALLY WAIVES ITS RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF, DIRECTLY OR INDIRECTLY, THIS GUARANTY AND THE OBLIGATIONS GUARANTEED HEREBY.

Dated: _____, 2015          TRINITY HEALTH CORPORATION


By:_____
Name:_____
Title:_____

3

54020/0001-12054463v2

<b>Exhibit 1.6(n)</b>

### GUARANTY OF PERFORMANCE

For valuable consideration, the undersigned, PRIME HEALTHCARE SERVICES, INC. ("Guarantor"), hereby unconditionally and irrevocably guarantees in favor of "Seller" (as defined below) the due, prompt and complete performance (including, without limitation, payment) by PRIME HEALTHCARE SERVICES – SAINT MICHAEL'S, LLC, a Delaware limited liability company ("Purchaser") of each and every obligation of Purchaser under that certain Asset Purchase Agreement dated as of July __, 2015 (the "Agreement") by and among SAINT MICHAEL'S MEDICAL CENTER, INC., a New Jersey nonprofit corporation ("SMMC"), SAINT JAMES CARE, INC., a New Jersey nonprofit corporation ("SJC"), COLUMBUS ACQUISITION CORP., a New Jersey nonprofit corporation ("Columbus"), and UNIVERSITY HEIGHTS PROPERTY COMPANY, INC., a New Jersey nonprofit corporation ("UHPC") (SMMC, SJC, Columbus and UHPC are referred to individually as a "Seller Party" and collectively as the "Seller") and Purchaser (collectively, the "Obligations").

Notwithstanding any provision to the contrary contained in this Guaranty, Guarantor shall have no liability to Seller hereunder and no claim shall be made against Guarantor hereunder unless:

(i)    notice thereof shall have been given by or on behalf of Seller to Guarantor in the manner provided in Section 10.4 of the Agreement for notice to Purchaser as an Indemnifying Party (as defined in the Agreement), unless failure to provide such notice in a timely manner does not materially impair Guarantor's ability to defend its rights, mitigate damages, seek indemnification from a third party or otherwise protect its interests;

(ii)    Seller shall have accorded Guarantor the same rights and remedies that Purchaser would have as an Indemnifying Party under Article 10 of the Agreement; and

(iii)    Seller shall have complied with the requirements of Section 10.4 of the Agreement for asserting and resolving claims against Purchaser.

Guarantor authorizes Seller without notice to or demand upon Guarantor (except as shall be required by applicable statute which requirement cannot be waived), and without affecting or impairing Guarantor's liability hereunder, from time to time to renew, compromise, extend, increase, change the time for payment of, or otherwise amend, waive or change the terms of, the Obligations or any part thereof, and to release Purchaser from any or all of the Obligations. Subject to the provisions of the immediately preceding paragraph, Guarantor hereby waives: (a) any right to require Seller to proceed against Purchaser or to pursue any other remedy in Seller's power whatsoever; (b) any defense arising by reason of any disability or other defense of Purchaser, or any lack of validity or enforceability of any documents evidencing any of the Obligations; (c) all presentments, demands for performance, notices of nonperformance, notices of protest, notices of dishonor and notices of acceptance of this Guaranty, and (d) and any other act or thing, or omission or delay to do any other act or thing, which in any manner or to any extent might vary the risk of Guarantor or which otherwise might operate to discharge Guarantor from its obligations hereunder.

Guarantor hereby expressly covenants and agrees for the benefit of Seller that all existing and future indebtedness, interest thereon, obligations and liabilities of Purchaser to Guarantor, whether fixed or contingent, matured or unmatured, liquidated or unliquidated and of whatever description (collectively, the "Junior Claims") shall be subordinate and junior in right of payment to the payment and performance of all Obligations, and Guarantor shall not accept any direct or indirect payment (in cash, property or securities, by setoff or otherwise) from Purchaser on account of or in any manner in respect of any Junior Claim until all of the Obligations have been performed or paid in full.

Notices.  Any notice, demand or communication required, permitted, or desired to be given hereunder shall be deemed effectively given when personally delivered, when received by telegraphic or other electronic means (including facsimile) or overnight courier, or five (5) calendar days after being deposited in the United States mail, with postage prepaid thereon, certified or registered mail, return receipt requested, addressed as follows:

| | |
|---|---|
| If to Seller: | Saint Michael's Medical Center, Inc.<br>c/o Trinity Health Corporation<br>3805 West Chester Pike<br>Newtown Square, Pennsylvania  19073<br>Attention:  Michael C. Hemsley, Esquire<br>Executive Vice President and General Counsel<br>Facsimile No.: (610) 355-2171 |
| With copy to (which copies shall not constitute notice) | Cole Schotz P.C.<br>25 Main Street<br>Hackensack, NJ  07601<br>Attention:  Marc P. Press, Esquire<br>Facsimile No.: (201) 678-6271 |
| If to Guarantor: | Prime Healthcare Services, Inc.<br>3300 E. Guasti Road, 3rd Floor<br>Ontario, California 91761<br>Attention: Chief Executive Officer<br>Facsimile No.: (909) 235-4419 |
| With a copy to: (which copy shall not constitute notice) | Prime Healthcare Management, Inc.<br>3300 East Guasti Road, 3rd Floor<br>Ontario, California 91761<br>Attention: General Counsel<br>Facsimile No.: (909) 235-4419 |

or at such other address as one party may designate by notice hereunder to the other parties.

If any provision of this Guaranty is held invalid or unenforceable, the remainder of this Guaranty shall not be affected thereby, the provisions of this Guaranty being severable in any such instance.  This Guaranty shall be governed by and construed and enforced in accordance

2

with the laws of the State of New Jersey as applied to contracts made and performed within the State of New Jersey.

This Guaranty shall not be assigned or delegated by Guarantor in whole or in part and any attempted assignment or delegation of this Guaranty by Guarantor shall be null and void and of no force and effect.  Subject to the terms of the Agreement, this Guaranty shall be binding upon Guarantor and shall inure to the benefit of Seller, and, in each case, their permissible and respective successors and assigns.

No modification, limitation or discharge of the obligations herein guaranteed, arising out of or by virtue of any bankruptcy, reorganization or similar proceeding for relief of debtors under federal or state law, or any other voluntary or involuntary dissolution, liquidation, or winding up of the affairs of Purchaser, will in any way affect, modify, limit or discharge the liability of Guarantor under this Guaranty.

This Guaranty may only be amended, waived, modified discharged, or otherwise changed by a written instrument signed by Guarantor and Seller.  No delay or forbearance by Seller in exercising any right under the Agreement, any agreement ancillary thereto or under this Guaranty, and no express or implied waiver by Seller of any default under the Agreement, any agreement ancillary thereto or under this Guaranty, shall constitute a waiver of any subsequent default under the Agreement, any agreement ancillary thereto, or under this Guaranty.

Guarantor hereby represents and warrants to Seller that:  (a) it is a corporation that is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has the power and authority to conduct the business in which it is currently engaged; (b) Guarantor has the full corporate power and authority to execute and deliver, and to perform its obligations under, this Guaranty and has taken all necessary action to authorize its execution, delivery and performance of this Guaranty; and (c) this Guaranty constitutes a legal, valid and binding obligation of Guarantor enforceable in accordance with its terms, except as affected by bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting the enforcement of creditors' rights generally, general equitable principles and an implied covenant of good faith and fair dealing.

GUARANTOR UNCONDITIONALLY WAIVES ITS RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF, DIRECTLY OR INDIRECTLY, THIS GUARANTY AND THE OBLIGATIONS GUARANTEED HEREBY.

Dated: _____ 2015              PRIME HEALTHCARE SERVICES, INC.

                                          By:_____
                                          Name:_____
                                          Title:_____

3

**EXHIBIT 4.4A**

**Exhibit 1**

**BIDDING PROCEDURES**

Set forth below are the bidding procedures (the "Bidding Procedures") to be employed in connection with the sale of certain tangible and intangible assets (the "Assets") of Saint Michael's Medical Center, Inc. ("Parent") and certain of its direct and indirect subsidiaries (collectively, the "Debtors" or the "Sellers") in connection with the jointly administered chapter 11 cases pending in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") under case number 15-_____ (____). The transaction contemplated herein is subject to approval by the Bankruptcy Court pursuant to sections 363 and 365 of title 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code").

The Debtors have agreed to the terms of an asset purchase agreement between the Debtors and Prime Healthcare Services – Saint Michael's, LLC (the "Prime"), pursuant to which Prime shall acquire the Assets on the terms and conditions specified therein (together with the schedules and related documents thereto, the "Stalking Horse Agreement"). The sale transaction pursuant to the Stalking Horse Agreement is subject to competitive bidding as set forth herein. Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Stalking Horse Agreement.

The Bidding Procedures set forth herein describe, among other things, the assets available for sale, the manner in which bidders and bids become Potential Bidders, Qualified Bidders and Qualified Bids (each as defined herein), respectively, the receipt and negotiation of bids received, the Conduct of any Auction (as defined herein), the ultimate selection of the Successful Bidder, and the Bankruptcy Court's approval thereof (collectively, the "Bidding Process"). The Debtors intend to consult with, among others, the official committee of unsecured creditors (the "Committee") throughout the bidding process. In the event that the Debtors and any party disagree as to the interpretation or application of these Bidding Procedures, the Bankruptcy Court shall have jurisdiction to hear and resolve such dispute.

**I.    ASSETS TO BE SOLD**

The Debtors seek to complete a sale of all or substantially all of the Assets (the "Sale"). The Assets comprise, among other things:

>    (a)    except for the Excluded Real Property, all of the real property that is owned by the Sellers, including, without limitation, the real property that is used with respect to the operation of the hospital and the real property that is described in Schedule 1.7(a) to the Stalking Horse Agreement, together with all buildings, improvements and fixtures located thereupon, including, without limitation, all buildings and other improvements then under construction;

>    (b)    all of the Sellers' interests, to the extent assignable or transferrable in real property that is leased by a Seller Party, including, without limitation, the leased real property described in Schedule 1.7(b) to the Stalking Horse Agreement;

(c)     all of the tangible personal property owned by the Sellers including equipment, furniture, fixtures, machinery, vehicles, office furnishings, and leasehold improvements, including, without limitation, the personal property described in Schedule 1.7(c) to the Stalking Horse Agreement (the "Personal Property");

(d)     all cash, cash equivalents and short-term investments held in any account in the name of or for the benefit of any Seller, if any;

(e)     all accounts owed to, notes, interest payable under the foregoing and other receivables of Seller, including accounts, notes or other amounts receivable from physicians or medical groups, and all claims, rights, interests and proceeds related thereto, including all accounts and other receivables, disproportionate share payments and cost report settlements related thereto, in each case arising from the rendering of services or provision of goods, products or supplies to inpatients and outpatients at the Hospital, billed and unbilled, recorded and unrecorded, for services, goods, products and supplies provided by Seller prior to the Effective Time whether payable by Medicare, Medicaid, TRICARE, medically indigent assistance programs, Blue Cross, Blue Shield or any other payor (including, without limitation any insurance company, health care service plan, self-funded health plan), including any monies allocated to the Hospital pursuant to any charity program in New Jersey (such as the Hospital Care Payment Assistance Program and the Health Care Stabilization Fund), or any health care provider or network (such as a health maintenance organization, preferred provider organization or any other managed care program) or any fiscal intermediary of the foregoing, private pay patients, private insurance or by any other source ("Accounts Receivable");

(f)     all documents, records, correspondence, work papers and other documents other than patient records, relating to the Accounts Receivable;

(g)     all of Seller's rights, to the extent assignable or transferable, to all licenses, provider numbers, permits, approvals, certificates of need, certificates of exemption, franchises, accreditations and registrations and other governmental licenses, permits or approvals issued to any Seller Party for use in the operation of the Hospital (the "Licenses"), including without limitation, the Licenses, Provider Agreement(s), and Provider Number(s) assigned to Seller by the Medicare, Medicaid and TRJCARE programs, all as described in Schedule 1.7(i) to the Stalking Horse Agreement, subject to the government's approval of the assignment and assumption by Purchaser of any Sellers' current and valid Provider Agreement;

(h)     all of Sellers' interest, to the extent assignable or transferable, in and to all real property and personal property leases with respect to the operation of the hospital herein except for the Excluded Leases;

2

(i)      all of Sellers' interest, to the extent assignable or transferable, in and to all contracts and agreements (including, but not limited to, purchase orders) with respect to the operation of the hospital, except for the Excluded Contracts;

(j)      all of those advance payments, prepayments, prepaid expenses, deposits and the like which exist as of the Closing Date;

(k)      except as excluded by Section 1.8(i) of the Stalking Horse Agreement, all inventories of supplies, drugs, food, janitorial and office supplies and other disposables and consumables;

(l)      all rights to settlements and retroactive adjustments, if any, whether arising under a cost report of any Seller Party or otherwise, for any reporting periods ending on or prior to the Effective Time, whether open or closed, arising from or against the United States government under the terms of the Medicare or Medicaid programs or TRICARE (formerly the Civilian Health and Medical Program of the Uniformed Services);

(m)      all Medicare or Medicaid disproportionate share replacement payments (the "DSH Payments") received on and after the Effective Time regardless of the State fiscal year for which the DSH Payments are made in reference to and regardless of the State fiscal year for which the data was derived to calculate eligibility for such payments;

(n)      all rights, if any, to meaningful use payments or recoveries;

(o)      all rights to receive HITECH Payments under the Medicare EHR Incentive Program or under the New Jersey Medicaid EHR Incentive Program (including all rights to pursue such payment and/or appeal any decision regarding such payments) for any applicable fiscal year (for purposes of the Stalking Horse Agreement, "HITECH Payments" means Medicare and Medicaid incentive payments and rights to receive such payments based on attestations submitted or to be submitted with respect to "meaningful use" of certified electronic health record technology ("EHR Technology") (as those terms are defined under the Health Information Technology for Economic and Clinical Health Act (the "HITECH Act"), pursuant to the requirements of the implementing regulations under the HITECH Act);

(p)      all documents, records, operating manuals, files and computer software with respect to the operation of the hospital except for any of the above that are proprietary to Seller or Sellers' sole corporate member, Maxis Health System, a Pennsylvania nonprofit corporation, including, without limitation, all patient records, medical records, employee records, financial records with respect to the operation of the hospital, equipment records, construction plans and specifications, and medical and administrative libraries;

(q)      the electronic funds transfer accounts of the Facilities (the "EFT Accounts"), all other bank accounts into which accounts receivable pertaining to

3

the hospital are deposited, and all information necessary to assess the EFT Accounts and such other accounts, but excluding any cash, cash equivalents or short-term investments held in the EFT Accounts or such other accounts as of the Closing;

(r)     all of Sellers' interests in those joint ventures, partnerships, corporations and limited liability companies listed on Schedule 1.7(t) to the Stalking Horse Agreement;

(s)     to the extent specifically set forth in Section 1.11 of the Stalking Horse Agreement, benefits, proceeds or any other amounts payable under any policy of insurance maintained by Seller with respect to the physical condition of the Assets;

(t)     the interest of Seller in computer software, programs, systems, healthcare information systems and related documentation, including any and all electronic health record systems and technology owned by Seller and used in connection with Seller's operations and attestations of "meaningful use," in connection with the operation of the hospital;

(u)     to the extent assignable, all rights of Seller in all warranties of any manufacturer or vendor in connection with the Personal Property;

(v)     all goodwill of the hospital evidenced by the Assets;

(w)     any interest of Sellers in the URL or domain name utilized for the hospital, together with certain content therein as described on Schedule 1.7(y) to the Stalking Horse Agreement;

(x)     the telephone and facsimile numbers used with respect to the operation of the hospital;

(y)     the names and symbols of the hospital set forth on Schedule 1.7(aa) to the Stalking Horse Agreement;

(z)     all claims, rights, interests and proceeds (whether received in cash or by credit to amounts otherwise due to a third party) with respect to amounts overpaid by Sellers to any third party with respect to periods prior to the Effective Time (e.g., such overpaid amounts may be determined by billing audits undertaken by Purchaser or Purchaser's consultants), provided, however, that any such amounts will be offset against amounts determined to have been underpaid by Sellers to any third party with respect to periods prior to the Effective Time; and

(aa)     any other assets owned by Sellers (which are not otherwise specifically described above) and which are used in the operation of the hospital and are not otherwise identified as an Excluded Asset in Section 1.8 of the Stalking Horse Agreement.

4

The sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtors or their estates except to the extent set forth in the Stalking Horse Agreement or the Successful Bidder's Purchase Agreement (as that term is defined below).

The Assets shall not include the Excluded Assets, which are set forth in Section 1.8 of the Stalking Horse Agreement.

## II.    THE BID PROCEDURES

In order to ensure that the Debtors receive the maximum value for the Assets, the Stalking Horse Agreement is subject to higher and better offers, and, as such, the Stalking Horse Agreement will serve as the "stalking horse" bid for the Assets.

### A.    Documentation Necessary for Qualification as a Potential Bidder

In order to be qualified to receive any confidential information from the Debtors, to submit an Initial Overbid (as defined below), and to participate in an auction with respect to the Assets (the "Auction"), a potential bidder (each, an "Interested Party") must submit each of the following to the Notice Parties (as defined below):

> (1)    An executed confidentiality agreement in a form reasonably satisfactory to the Debtors, which shall inure to the benefit of the Successful Bidder (as defined below); and

> (2)    Sufficient information, including as reasonably requested by the Debtors to allow the Debtors to determine that the Interested Party has or will have the financial wherewithal and any required organizational authorizations to close the applicable transactions, including, but not limited to current audited financial statements (or such other form of financial disclosure and credit quality support or enhancement acceptable to the Debtors) and latest unaudited financial statements of the Interested Party or, if the Interested Party is an entity formed for the purpose of acquiring the Assets, current audited financial statements and latest unaudited financial statements of the equity holders or sponsors of the Interested Party who will guarantee the obligations of the Interested Party, or such other form of financial disclosure and/or credit-quality support or enhancement, if any, that will allow the Debtors to make a reasonable determination as to the Interested Party's financial and other capabilities to consummate the Sale.

An Interested Party that delivers the documents and information described above and that the Debtors, after consultation with the Committee, determine in their reasonable business judgment, after consultation with their advisors, is likely (based on availability of financing, experience and other considerations deemed relevant by the Debtors in consultation with the Committee) (i) to be able to consummate the sale and (ii) is pursuing the transaction in good faith, will be deemed to be a "Potential Bidder."

3449102v.2
August 07, 2015

As promptly as practicable after an Interested Party delivers all of the materials required above, the Debtors will determine, in consultation with the Committee, and will notify the Interested Party and Prime as to whether the Interested Party is deemed to be a Potential Bidder.

**B.      Due Diligence**

The Debtors will afford any Potential Bidder such due diligence access or additional information as the Debtors deem appropriate, in their reasonable discretion, which must include differentiations between the diligence provided to strategic and financial bidders, as appropriate, and contractual obligations to limit access to certain proprietary information.  The Debtors must promptly advise Prime in the event any other Potential Bidder receives diligence Prime has not previously received and shall promptly provide Prime with access to such diligence materials. The due diligence period shall extend through and include the Bid Deadline (as defined below). Additional due diligence will not be provided after the Bid Deadline.

**C.      Provisions Governing Qualifications of Overbids**

A bid submitted will be considered a qualified bid only if the bid is submitted by a Potential Bidder and complies with all of the following (collectively, a "Qualified Bid"):

(1)      includes a proposed purchase agreement, including all exhibits and schedules thereto (the "Competing Purchase Agreement"), duly authorized and executed by the Potential Bidder, that:

(A)      contains, with the exception of the requirements of an increased purchase price, substantially all the terms and conditions contained in the Stalking Horse Agreement, along with a redlined, marked copy showing all changes between the Competing Purchase Agreement and the Stalking Horse Agreement;

(B)      provides for a purchase price expressed in U.S. dollars (the "Competing Purchase Price") that includes cash consideration of not less than (i) the Purchase Price, *plus* (ii) the amount of the Break-Up Fee, *plus* (iii) the amount of Expense Reimbursement, *plus* (iv) an initial $500,000 overbid (such amount, the "Minimum Overbid");

(C)      remains open and irrevocable until the closing of the Sale;

(D)      specifically disclaims any right of the Potential Bidder to receive a fee analogous to a break-up fee or to compensation under Section 503(b) of the Bankruptcy Code for making a substantial contribution;

(E)      identifies with specificity the executory contracts and unexpired leases the Potential Bidder wishes to assume and states that the Potential Bidder will pay all cure costs and such payments will be made within 10 business days of the closing date; and

6

(F)     contains a proposed closing date that is not later than 120 days from the commencement of these cases (the "<u>Petition Date</u>").

(2)     includes a cashier's check made payable to the order of the Debtors equal to $2,000,000 (the "<u>Potential Bidder's Deposit</u>"), which will be retained by the Debtors as a refundable deposit for application against the purchase price at the closing of the transaction, or returned to the Potential Bidder within five business days following conclusion of the Auction, in the event that the Bankruptcy Court does not approve a sale of the Purchased Assets to the Potential Bidder;

(3)     contains sufficient information concerning the Potential Bidder's ability to provide adequate assurance of performance with respect to executory contracts and unexpired leases;

(4)     be accompanied by adequate evidence based upon the Debtors' business judgment establishing that the Potential Bidder has the financial ability to pay the Competing Purchase Price set forth in the Competing Purchase Agreement;

(5)     be accompanied by adequate evidence based upon the Debtors' business judgment establishing that the Potential Bidder has the ability to obtain all of the necessary government approvals set forth in section 4.14 of the Stalking Horse Agreement to consummate the Sale;

(6)     contain terms and conditions that are higher and better than the terms and conditions of the Stalking Horse Agreement as determined by the Debtors using their business judgment, in consultation with the Committee;

(7)     be accompanied by adequate evidence based upon the Debtors' business judgment, in consultation with the Committee, establishing that the Potential Bidder is capable and qualified, financially, legally, and otherwise, of unconditionally performing all obligations under the Competing Purchase Agreement;

(8)     disclose any and all regulatory approvals Potential Bidder must obtain in order to close on the transaction contemplated by the Competing Purchase Agreement;

(9)     is accompanied by an affirmative statement that there are no conditions precedent to the Potential Bidder's ability to enter into a definitive agreement and that all necessary internal, board and shareholder approvals related to the submission, execution, delivery and closing of the Competing Purchase Agreement have been obtained prior to the bid;

(10)     it includes an acknowledgement and representation that the Potential Bidder is solvent and will not be rendered insolvent as a result of any of the transactions contemplated by the Competing Purchase Agreement;

7

(11)    it includes an acknowledgement and representation that the Potential Bidder: (A) has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer; (B) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid; and (C) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of any information provided in connection therewith or with the Auction (defined below), except as expressly stated in the Competing Purchase Agreement;

(12)    it contains such other information reasonably requested by the Debtors in consultation with the Committee; and

(13)    it is received prior to the Bid Deadline.

Prime, and any Potential Bidder that submits a timely, conforming Competing Purchase Agreement and Potential Bidder's Deposit (an "Initial Overbid"), as set forth above and as determined by the Debtors in consultation with the Committee, shall each be deemed a "Qualified Overbidder" and may bid for the Purchased Assets at the Auction.  Any entity that fails to submit a timely, conforming Initial Overbid, as set forth above, other than Prime, shall be disqualified from bidding for the Assets at the Auction.

### D.    Bid Deadline

A Potential Bidder that desires to make an Initial Overbid will deliver written copies of its bid to the following parties (collectively, the "Notice Parties"): (i) counsel to the Debtors: Cole Schotz P.C., 25 Main Street, Hackensack, New Jersey, 07601 (Attn:  Michael D. Sirota, Esq. (msirota@coleschotz.com) and Ryan T. Jareck, Esq. (rjareck@coleschotz.com), and (ii) proposed counsel to the Committee, _____ (_____.com), so as to be received by no later than _____, 2015 at 5:00 p.m. (prevailing Eastern Time) (i.e., [75] days from the entry of the Bid Procedures Order (the "Bid Deadline").

### E.    Evaluation of Competing Bids

A Qualified Bid will be valued based upon several factors including, without limitation, (1) the amount of such bid, (2) the risks and timing associated with consummating such bid, (3) any proposed revisions to the Stalking Horse Agreement, (4) the ability of the Qualified Overbidder to obtain appropriate state and regulatory approvals, (5) whether the Debtors' estates will have to incur and pay the Expense Reimbursement and Breakup Fee (the "Bid Protections"), and (6) any other factors deemed relevant by the Debtors in their reasonable business judgment and in consultation with the Committee.

### F.    No Competing Bid

If no timely, conforming Initial Overbid is submitted, the Debtors shall not conduct an Auction, Prime will be named the Successful Bidder (as defined below) following the Bid Deadline and the Debtors shall request at the Sale Hearing that the Bankruptcy Court approve the Debtors'

entry into the Stalking Horse Agreement, including the Sale of the Purchased Assets, and request that the Sale Order be immediately effective upon entry.

### G.    Auction Procedures

If one or more timely conforming Initial Overbids is received for all or some of the Assets, the Debtors will conduct an auction of the Assets (the "Auction") on _____, 2015 at \_\_:\_\_ \_.m. (prevailing Eastern Time) (i.e., within two (2) business days following the Bid Deadline), at the offices of Cole Schotz P.C., 25 Main Street, Hackensack, New Jersey 07601, or at such other location as shall be identified in a notice filed with the Bankruptcy Court at least 24 hours before the Auction, in which Prime and all other Qualified Overbidders may participate.  The Auction shall be governed by the following procedures:

>    (1)    The Auction will be conducted openly and the actual identity of each Qualified Overbidder will be disclosed on the record at the Auction;

>    (2)    The Committee members, their respective professionals, and the Committee's professionals will be permitted to attend; provided, however, that only Qualified Overbidders may participate in the Auction and all Qualified Overbidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Overbidder attending the Auction in person;

>    (3)    each Qualified Overbidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale;

>    (4)    at least one (1) business day prior to the Auction, each Qualified Overbidder who has timely submitted a Qualified Bid must inform the Debtors and the Committee whether it intends to attend the Auction; provided, however, in the event a Qualified Overbidder elects not to attend the Auction, such Qualified Overbidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Overbidder until the date of the selection of the Successful Bidder at the conclusion of the Auction.  At least one (1) business day prior to the Auction, the Debtors will advise Prime and all other Qualified Overbidders of the Qualified Bid which the Debtors, in consultation with the Committee, believe, in their reasonable discretion, is the highest or otherwise best offer (the "Starting Bid");

>    (5)    bidding will commence at the Starting Bid;

>    (6)    each subsequent bid shall be in increments of no less than $500,000 above such bidder's immediately preceding bid, and the Debtors, in consultation with the Committee, will evaluate each such bid.  After the first round of bidding and between each subsequent round of bidding, the Debtors shall announce the bid that they in consultation with the Committee, believe to be the highest or otherwise better offer (the "Leading Bid").  A round of bidding will conclude after each participating Qualified Overbidder has had the opportunity to submit a subsequent bid with full knowledge of the Leading Bid.  If a Qualified

9

Overbidder fails to make a subsequent bid, it will not be permitted to bid in any subsequent rounds of bidding at the Auction.

(7) for the purpose of evaluating the value of the consideration provided by subsequent bids (including any subsequent bid by Prime), the Debtors, in consultation with the Committee, will give effect to (i) any additional liabilities to be assumed by a Qualified Overbidder; (ii) any additional costs which may be imposed on the Debtors; and (iii) the full value of the Bid Protections as an addition to any subsequent bid by Prime;

(8) the Auction shall be conducted openly and each bidder will be informed of the terms of the previous bid determined by the Debtors, in consultation with the Committee, to have been the highest and otherwise best bid;

(9) each bidder will be permitted a fair, but limited, amount of time to respond to the previous bid at the Auction;

(10) no relative bids will be allowed or considered;

(11) the Auction shall continue until there is only one highest and otherwise best bid in the Debtors' determination, in consultation with the Committee (the "Successful Bidder");

(12) the bidding at the Auction shall be transcribed; and

(13) the Debtors,  in consultation with the Committee, shall have the ability to modify the procedures for the Auction in a manner not inconsistent with the Stalking Horse Agreement and with the provisions set forth in subparagraph (1) through (12) above.

As used herein, the term "Successful Bidder's Purchase Agreement" shall mean, as applicable, the (i) Competing Purchase Agreement of the Successful Bidder, if the Successful Bidder is any Qualified Overbidder other than Prime, or (ii) Stalking Horse Agreement, as it may be modified during the Auction pursuant to the procedures set forth in the immediately preceding paragraph, if Prime is the Successful Bidder.

**H.    Notice of Bidding Procedures**

Notice of the Bidding Procedures, subject to the approval of the Bankruptcy Court, shall be published in *The Star Ledger*.

**I.    Selection of Successful Bidder(s)**

The determination of the Successful Bidder(s) by the Debtors in consultation with the Committee at the conclusion of the Auction shall be final, subject only to approval by the Bankruptcy Court.

Unless otherwise agreed to by the Debtors, in consultation with the Committee and the Successful Bidder(s), within two (2) business days after the conclusion of the Auction, the

10

Successful Bidder(s) shall complete and execute all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which the Successful Bidder's bid was made.  Within two (2) business days after the conclusion of the Auction (if any), the Debtors shall file a notice identifying the Successful Bidder(s) and the second highest or best bid (the "Back-Up Bid" and the Qualified Bidder submitting such Back-Up Bid, the "Back-Up Bidder"), with the Bankruptcy Court and shall serve such notice by fax, email or overnight mail to all counterparties whose contracts are proposed to be assumed and assigned.

The Debtors will sell the Assets, and assume and assign the designated executory contracts and unexpired leases, to the Successful Bidder pursuant to the terms of the Successful Bidder's Purchase Agreement upon the approval of such Successful Bidder's bid by the Bankruptcy Court at the Sale Hearing.  If the sale of the Assets to the Successful Bidder closes, the Successful Bidder's Deposit shall be applied to the purchase price at closing, and the Back-Up-Bidder deposit returned to the Back-Up Bidder.  If the sale of the Assets to the Successful Bidder does not close as a result of the Successful Bidder's breach or default, then, the Successful Bidder's Deposit shall be forfeited to the Debtors' estates.  If the sale of the Assets to the Back-Up Bidder does not close as a result of the Back-Up Bidder's breach or default, then, the Back-Up Bidder's Deposit shall be forfeited to the Debtors' estates.

> **J.**    **Return of Deposits**

All deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder or Back-Up Bidder no later than five (5) business days following the conclusion of the Auction. The Good Faith Deposit of the Back-Up Bidder shall be returned to the Back-Up Bidder no later than 72 hours after the closing of the transaction with the Successful Bidder or such other date as governed by the Stalking Horse Agreement.  If the Successful Bidder timely closes the transaction, its Good Faith Deposit shall be credited towards the purchase price.

## III.    SALE HEARING

The Debtors will seek entry of an order from the Bankruptcy Court at the Sale Hearing, to begin at **10:00 a.m. (prevailing Eastern Time) on the day that is three (3) business days from the conclusion of the Auction**, approving and authorizing the Sale to the Successful Bidder on terms and conditions determined in accordance with the Bidding Procedures.

**EXHIBIT 4.4B**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-2(c)**
**COLE SCHOTZ P.C.**
A Professional Corporation
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, NJ 07602-0800
Michael D. Sirota, Esq.
Gerald H. Gline, Esq.
Ryan T. Jareck, Esq.
(201) 489-3000
(201) 489-1536 Facsimile
*Proposed Attorneys for Saint Michael's*
*Medical Center, Inc., et al., Debtors-in-Possession*

In re:

SAINT MICHAEL'S MEDICAL CENTER, INC., *et al.*[1]

Debtors-in-Possession.

Case No. 15-

Judge: Honorable

Chapter 11
(Joint Administration Pending)

**Hearing Date and Time:**
_____, 2015 at _____ .m.

**ORDER PURSUANT TO 11 U.S.C. §§ 363 AND 365 AND FED. R. BANKR. P. 2002, 6004
AND 6006: (1) APPROVING "STALKING HORSE" ASSET PURCHASE AGREEMENT
FOR THE SALE OF SUBSTANTIALLY ALL THE DEBTORS' ASSETS; (2)
APPROVING BIDDING PROCEDURES AND FORM, MANNER AND SUFFICIENCY
OF NOTICE; (3) SCHEDULING (A) AN AUCTION SALE AND (B) A HEARING TO
CONSIDER APPROVING THE HIGHEST AND BEST OFFER; (4) AUTHORIZING
THE DEBTORS TO SELL SUBSTANTIALLY ALL THEIR ASSETS FREE AND
CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (5)
AUTHORIZING THE DEBTORS TO ASSUME AND ASSIGN CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES; AND
(6) GRANTING OTHER RELATED RELIEF**

The relief set forth on the following pages, numbered two (2) through fourteen (14), is hereby
**ORDERED**.

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal identification number
are:  Saint Michael's Medical Center, Inc. (6046); Columbus Acquisition Corp. (6342); Saint James Care, Inc.
(6230); and University Heights Property Company, Inc.(0162).

(Page 2)

| | |
|---|---|
| Debtors: | SAINT MICHAEL'S MEDICAL CENTER, INC. |
| Case No. | 15- |
| Caption of Order: | ORDER PURSUANT TO 11 U.S.C. §§ 363 AND 365 AND FED. R. BANKR. P. 2002, 6004 AND 6006: (1) APPROVING "STALKING HORSE" ASSET PURCHASE AGREEMENT FOR THE SALE OF SUBSTANTIALLY ALL THE DEBTORS' ASSETS; (2) APPROVING BIDDING PROCEDURES AND FORM, MANNER AND SUFFICIENCY OF NOTICE; (3) SCHEDULING (A) AN AUCTION SALE AND (B) A HEARING TO CONSIDER APPROVING THE HIGHEST AND BEST OFFER; (4) AUTHORIZING THE DEBTORS TO SELL SUBSTANTIALLY ALL THEIR ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (5) AUTHORIZING THE DEBTORS TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (6) GRANTING OTHER RELATED RELIEF |

THIS MATTER having been opened to the Court by Cole Schotz P.C., proposed attorneys to Saint Michael's Medical Center, Inc., *et al.*, the within debtors and debtors-in-possession (the "**Debtors**"), upon motion pursuant to 11 U.S.C. §§ 363 and 365 and Fed. R. Bankr. P. 6004 for an Order: (1) Approving a "Stalking Horse" Asset Purchase Agreement for the Sale of Substantially All the Debtors' Assets; (2) Approving Bidding Procedures and Form, Manner and Sufficiency of Notice Thereof; (3) Scheduling (a) an Auction Sale and (b) a Hearing to Consider Approving the Highest and Best Offer; (4) Authorizing the Debtors to Sell Substantially All of Their Assets Free and Clear of Liens, Claims, Encumbrances, and Interests; (5) Authorizing the Debtors to Assume and Assign Related Executory Contracts and Unexpired Leases; and (6) Granting Other Related Relief(the "**Motion**");[2] and it appearing that good and sufficient notice of the Motion having been provided, as evidenced by the Affidavit of Service filed with the Court; and the Court having considered all the motion papers, and the arguments of

---

[2] All capitalized terms used but not otherwise defined herein shall have the same meanings ascribed to themin the verified application submitted in support ofthe Motion(the "**Application**").

3449087v.2

(Page 3)
Debtors:                    SAINT MICHAEL'S MEDICAL CENTER, INC.
Case No.                    15-
Caption of Order:           ORDER PURSUANT TO 11 U.S.C. §§ 363 AND 365 AND FED. R.
                            BANKR. P. 2002, 6004 AND 6006: (1) APPROVING "STALKING
                            HORSE" ASSET PURCHASE AGREEMENT FOR THE SALE OF
                            SUBSTANTIALLY ALL THE DEBTORS' ASSETS; (2) APPROVING
                            BIDDING PROCEDURES AND FORM, MANNER AND SUFFICIENCY
                            OF NOTICE; (3) SCHEDULING (A) AN AUCTION SALE AND (B) A
                            HEARING TO CONSIDER APPROVING THE HIGHEST AND BEST
                            OFFER; (4) AUTHORIZING THE DEBTORS TO SELL
                            SUBSTANTIALLY ALL THEIR ASSETS FREE AND CLEAR OF
                            LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (5)
                            AUTHORIZING THE DEBTORS TO ASSUME AND ASSIGN CERTAIN
                            EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (6)
                            GRANTING OTHER RELATED RELIEF

counsel; and the Court having determined that the relief requested in the Motion is in the best

interests of the Debtors, their estates and creditors; and other good cause having been shown,

    IT IS ORDERED as follows:

    1.    The form of asset purchase agreement (the "**APA**") attached as Exhibit

"A" to the Application (as further modified or amended) be and hereby is approved to serve as

the basis for the Debtors' solicitation of higher or otherwise better bids for the Assets as

modified herein.  The final form of asset purchase agreement (the "**Final APA**") and the

Debtors' request to consummate the sale transaction pursuant thereto shall be subject to further

approval at the Sale Hearing (defined below).

    2.    The proposed sale of the Assets to Prime Healthcare Services – Saint

Michael's, LLC (the "**Proposed Purchaser**") pursuant to the APA shall be subject to higher and

otherwise better offers.  In connection with the Debtors' solicitation of higher and otherwise

better offers, the Debtors hereby are authorized, subject to further approval at the Sale Hearing,

3

(Page 4)
Debtors:                SAINT MICHAEL'S MEDICAL CENTER, INC.
Case No.               15-
Caption of Order:   ORDER PURSUANT TO 11 U.S.C. §§ 363 AND 365 AND FED. R.
                           BANKR. P. 2002, 6004 AND 6006: (1) APPROVING "STALKING
                           HORSE" ASSET PURCHASE AGREEMENT FOR THE SALE OF
                           SUBSTANTIALLY ALL THE DEBTORS' ASSETS; (2) APPROVING
                           BIDDING PROCEDURES AND FORM, MANNER AND SUFFICIENCY
                           OF NOTICE; (3) SCHEDULING (A) AN AUCTION SALE AND (B) A
                           HEARING TO CONSIDER APPROVING THE HIGHEST AND BEST
                           OFFER; (4) AUTHORIZING THE DEBTORS TO SELL
                           SUBSTANTIALLY ALL THEIR ASSETS FREE AND CLEAR OF
                           LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (5)
                           AUTHORIZING THE DEBTORS TO ASSUME AND ASSIGN CERTAIN
                           EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (6)
                           GRANTING OTHER RELATED RELIEF

to enter into an asset purchase agreement with potential interested purchasers substantially in the

same form as the APA.

3.      Payment of the Break-Up Fee in the amount of 2.5% of the purchase price,

and an expense reimbursement of up to $200,000 (collectively, the "**Bid Protections**") payable

at such times and under the circumstances set forth in and in accordance with the terms of the

APA is hereby approved.  The Bid Protections are an essential inducement and condition relating

to the Proposed Purchaser's entry into the APA, and the Bid Protections: (i) if triggered, shall be

deemed to be an actual and necessary cost and expense of preserving the estates; (ii) are

reasonable and appropriate in light of the size and nature of the proposed sale, the necessity to

quickly consummate the sale and resources that have been and will continue to be expended by

the Proposed Purchaser pending the sale hearing; (iii) has been negotiated by the parties and their

respective advisors at arms'-length and in good faith; and (iv) are necessary to ensure that the

Proposed Purchaser will continue to pursue the closing of the sale.  The terms of the APA shall

3449087v.2

(Page 5)
Debtors:            SAINT MICHAEL'S MEDICAL CENTER, INC.
Case No.            15-
Caption of Order:   ORDER PURSUANT TO 11 U.S.C. §§ 363 AND 365 AND FED. R.
                    BANKR. P. 2002, 6004 AND 6006: (1) APPROVING "STALKING
                    HORSE" ASSET PURCHASE AGREEMENT FOR THE SALE OF
                    SUBSTANTIALLY ALL THE DEBTORS' ASSETS; (2) APPROVING
                    BIDDING PROCEDURES AND FORM, MANNER AND SUFFICIENCY
                    OF NOTICE; (3) SCHEDULING (A) AN AUCTION SALE AND (B) A
                    HEARING TO CONSIDER APPROVING THE HIGHEST AND BEST
                    OFFER; (4) AUTHORIZING THE DEBTORS TO SELL
                    SUBSTANTIALLY ALL THEIR ASSETS FREE AND CLEAR OF
                    LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (5)
                    AUTHORIZING THE DEBTORS TO ASSUME AND ASSIGN CERTAIN
                    EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (6)
                    GRANTING OTHER RELATED RELIEF

---

govern (i) the conditions under which the Purchaser's bid and the APA are terminable, and

(ii) payment or other disposition of the Bid Protections.

      4.     The provisions of this Order respecting the grant of the Bid Protections

shall survive entry of any order which may be entered (i) approving the Sale, or (ii) confirming

any Plan in the Case, or (iii) converting the Chapter 11 case to a case under Chapter 7 of the

Bankruptcy Code, or (iv) dismissing the Chapter 11 case, or (v) withdrawing of the reference of

the Chapter 11 case from this Court, or (vi) providing for abstention from handling or retaining

of jurisdiction of this Chapter 11 case in this Court, and the terms and provisions of this Order as

well as the Bid Protections granted pursuant to this Order and in the APA shall continue in full

force and effect notwithstanding the entry of such order.  To the extent the Debtors' obligation

with respect to the Bid Protections are otherwise still in effect, the obligations to pay such Bid

Protections shall not be discharged by the entry of an order confirming a Plan.  To the extent the

Debtors' obligation respecting the Bid Protections are otherwise still in effect, the Debtors shall

not propose or support any Plan that is not conditioned upon the payment in full in cash of the

3449087v.2

(Page 6)
Debtors:              SAINT MICHAEL'S MEDICAL CENTER, INC.
Case No.              15-
Caption of Order:     ORDER PURSUANT TO 11 U.S.C. §§ 363 AND 365 AND FED. R.
                      BANKR. P. 2002, 6004 AND 6006: (1) APPROVING "STALKING
                      HORSE" ASSET PURCHASE AGREEMENT FOR THE SALE OF
                      SUBSTANTIALLY ALL THE DEBTORS' ASSETS; (2) APPROVING
                      BIDDING PROCEDURES AND FORM, MANNER AND SUFFICIENCY
                      OF NOTICE; (3) SCHEDULING (A) AN AUCTION SALE AND (B) A
                      HEARING TO CONSIDER APPROVING THE HIGHEST AND BEST
                      OFFER; (4) AUTHORIZING THE DEBTORS TO SELL
                      SUBSTANTIALLY ALL THEIR ASSETS FREE AND CLEAR OF
                      LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (5)
                      AUTHORIZING THE DEBTORS TO ASSUME AND ASSIGN CERTAIN
                      EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (6)
                      GRANTING OTHER RELATED RELIEF

---

Bid Protections, on or prior to the earlier of (i) the effective date of such Plan, if the Bid

Protections shall then be due and owing or (ii) the date such Bid Protections shall be due and

owing.

     5.     The procedures governing the solicitation of bids for the sale of the Assets

and the procedures for an auction sale of the Assets (the "**Auction**"), if necessary, attached

hereto as **Exhibit 1** (the "**Bidding Procedures**"), are hereby authorized, approved and made a

part of this Order as if fully set forth herein.

     6.     In conjunction with the provisions of this Order, the procedures governing

the assumption and assignment of executory contracts and unexpired leases attached hereto as

**Exhibit 2** (the "**Assumption and Assignment Procedures**"), are hereby authorized, approved

and made a part of this Order as if fully set forth herein; provided, however, all assumed

executory contracts or unexpired leases must be disclosed before the close of the sale hearing.

     7.     Subject to decretal paragraph [7] above, the form of Notice of the Debtors'

Intent to Assume and Assign Certain Executory Contracts and Unexpired Leases and of the

3449087v.2

(Page 7)

| | |
|---|---|
| Debtors: | SAINT MICHAEL'S MEDICAL CENTER, INC. |
| Case No. | 15- |
| Caption of Order: | ORDER PURSUANT TO 11 U.S.C. §§ 363 AND 365 AND FED. R. BANKR. P. 2002, 6004 AND 6006: (1) APPROVING "STALKING HORSE" ASSET PURCHASE AGREEMENT FOR THE SALE OF SUBSTANTIALLY ALL THE DEBTORS' ASSETS; (2) APPROVING BIDDING PROCEDURES AND FORM, MANNER AND SUFFICIENCY OF NOTICE; (3) SCHEDULING (A) AN AUCTION SALE AND (B) A HEARING TO CONSIDER APPROVING THE HIGHEST AND BEST OFFER; (4) AUTHORIZING THE DEBTORS TO SELL SUBSTANTIALLY ALL THEIR ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (5) AUTHORIZING THE DEBTORS TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (6) GRANTING OTHER RELATED RELIEF |

---

Associated Cure Amounts (the "**Notice of Possible Assumption and Assignment**"), which identifies, among other things, the amounts necessary to cure defaults under executory contracts and unexpired leases ("**Cure Amounts**"), attached hereto as **Exhibit 3**, is approved.

        8.      Within ten (10) days after the entry of this Order, the Debtors shall serve by first class or overnight mail or electronic mail the Notice of Possible Assumption and Assignment on all non-debtor parties to the Assumed Contracts and Leases.  The Notice of Possible Assumption and Assignment shall identify the Assumed Contracts and Leases and provide the Cure Amounts that the Debtors believe must be paid to cure all defaults under the Assumed Contracts and Leases as of the projected date of closing.  Notice of publication of the Bidding Procedures, as provided in section II.H. of the Bidding Procedures, shall occur no later than fourteen (14) days from the entry of this Order.

        9.      As set forth in the Assumption and Assignment Procedures, any objection to (a) the scheduled Cure Amount, (b) the assumption and assignment to the Proposed Purchaser of such executory contract and unexpired leases listed among the Assumed Contracts and Leases

3449087v.2

(Page 8)

| | |
|---|---|
| Debtors: | SAINT MICHAEL'S MEDICAL CENTER, INC. |
| Case No. | 15- |
| Caption of Order: | ORDER PURSUANT TO 11 U.S.C. §§ 363 AND 365 AND FED. R. BANKR. P. 2002, 6004 AND 6006: (1) APPROVING "STALKING HORSE" ASSET PURCHASE AGREEMENT FOR THE SALE OF SUBSTANTIALLY ALL THE DEBTORS' ASSETS; (2) APPROVING BIDDING PROCEDURES AND FORM, MANNER AND SUFFICIENCY OF NOTICE; (3) SCHEDULING (A) AN AUCTION SALE AND (B) A HEARING TO CONSIDER APPROVING THE HIGHEST AND BEST OFFER; (4) AUTHORIZING THE DEBTORS TO SELL SUBSTANTIALLY ALL THEIR ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (5) AUTHORIZING THE DEBTORS TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (6) GRANTING OTHER RELATED RELIEF |

and/or (c) the ability of the Proposed Purchaser to provide adequate assurance of future performance, shall be filed and served (in accordance with paragraph 13 below) by no later than fourteen (14) days before the Sale Hearing (as defined below).

10.     Unless a non-debtor party to an Assumed Contract and Lease timely files an objection in accordance with the preceding paragraph, but subject to paragraph 9 below, such non-debtor party shall be (i) deemed to have stipulated that the Cure Amount(s) as determined by the Debtors is correct, (ii) forever barred, estopped and enjoined from asserting or claiming against the Debtors or the Proposed Purchaser that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Assumed Contract and Lease(s) or that there is any objection or defense to the assumption and assignment of such Assumed Contract(s) and Lease(s), (iii) forever barred from objecting to the assignment of the Assumed Contract and Lease(s) to the Proposed Purchaser, including from any argument that there exist conditions to assumption and assignment that must be satisfied under such Assumed Contract and Lease before it can be assumed and assigned to the Proposed Purchaser or that any

8

(Page 9)
Debtors:           SAINT MICHAEL'S MEDICAL CENTER, INC.
Case No.          15-
Caption of Order:   ORDER PURSUANT TO 11 U.S.C. §§ 363 AND 365 AND FED. R.
BANKR. P. 2002, 6004 AND 6006: (1) APPROVING "STALKING
HORSE" ASSET PURCHASE AGREEMENT FOR THE SALE OF
SUBSTANTIALLY ALL THE DEBTORS' ASSETS; (2) APPROVING
BIDDING PROCEDURES AND FORM, MANNER AND SUFFICIENCY
OF NOTICE; (3) SCHEDULING (A) AN AUCTION SALE AND (B) A
HEARING TO CONSIDER APPROVING THE HIGHEST AND BEST
OFFER; (4) AUTHORIZING THE DEBTORS TO SELL
SUBSTANTIALLY ALL THEIR ASSETS FREE AND CLEAR OF
LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (5)
AUTHORIZING THE DEBTORS TO ASSUME AND ASSIGN CERTAIN
EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (6)
GRANTING OTHER RELATED RELIEF

---

required consent to assignment has not been given, (iv) forever barred from objecting to the

adequacy of the Proposed Purchaser's assurance of future performance and/or (v) that there

exists any other basis on which to object to such assumption and assignment.

      11.     If the bid of the Proposed Purchaser is not the Successful Bidder, the non-

debtor parties to the Assumed Contracts and Leases shall have until the Sale Objection Deadline

(as defined in paragraph 14 below) to object to the assumption and assignment of such Assumed

Contract and Lease solely on the issue of whether the Successful Bidder (if other than the

Proposed Purchaser) can provide adequate assurance of future performance as required by

section 365 of the Bankruptcy Code.

      12.     If a non-debtor counterparty to an executory contract or unexpired lease

among the Assumed Contracts and Leases files an objection asserting a cure amount higher than

the proposed Cure Amount (a "**Disputed Cure Amount**"), then (a) the Debtors shall attempt to

resolve such Disputed Cure Amount prior to the Sale Hearing or (b) to the extent the parties are

unable to consensually resolve the dispute prior to the Sale Hearing, then the amount to be paid

9

(Page 10)

| | |
|---|---|
| Debtors: | SAINT MICHAEL'S MEDICAL CENTER, INC. |
| Case No. | 15- |
| Caption of Order: | ORDER PURSUANT TO 11 U.S.C. §§ 363 AND 365 AND FED. R. BANKR. P. 2002, 6004 AND 6006: (1) APPROVING "STALKING HORSE" ASSET PURCHASE AGREEMENT FOR THE SALE OF SUBSTANTIALLY ALL THE DEBTORS' ASSETS; (2) APPROVING BIDDING PROCEDURES AND FORM, MANNER AND SUFFICIENCY OF NOTICE; (3) SCHEDULING (A) AN AUCTION SALE AND (B) A HEARING TO CONSIDER APPROVING THE HIGHEST AND BEST OFFER; (4) AUTHORIZING THE DEBTORS TO SELL SUBSTANTIALLY ALL THEIR ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (5) AUTHORIZING THE DEBTORS TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (6) GRANTING OTHER RELATED RELIEF |

under section 365 of the Bankruptcy Code with respect to such Disputed Cure Amount will be determined at the Sale Hearing.  All other objections to the proposed assumption and assignment of an executory contract or unexpired lease among the Assumed Contracts and Leases will be heard at the Sale Hearing.

13.    A hearing to confirm the results of the Auction, if such Auction is conducted, and/or to authorize and direct the Debtors to sell the Assets and otherwise consummate the transactions contemplated by the APA or such other competing asset purchase agreement memorializing a higher and better offer, including the assumption and assignment of the executory contracts or unexpired leases among the Assumed Contracts and Leases, will be held before the Honorable _____, United States Bankruptcy Judge, at the United States Bankruptcy Court, Martin Luther King, Jr. Federal Building, 50 Walnut Street, Third Floor, Newark, New Jersey 07102 on _____, 2015, at __:__ __.m. (the "**Sale Hearing**").

3449087v.2

(Page 11)

| | |
|---|---|
| Debtors: | SAINT MICHAEL'S MEDICAL CENTER, INC. |
| Case No. | 15- |
| Caption of Order: | ORDER PURSUANT TO 11 U.S.C. §§ 363 AND 365 AND FED. R. BANKR. P. 2002, 6004 AND 6006: (1) APPROVING "STALKING HORSE" ASSET PURCHASE AGREEMENT FOR THE SALE OF SUBSTANTIALLY ALL THE DEBTORS' ASSETS; (2) APPROVING BIDDING PROCEDURES AND FORM, MANNER AND SUFFICIENCY OF NOTICE; (3) SCHEDULING (A) AN AUCTION SALE AND (B) A HEARING TO CONSIDER APPROVING THE HIGHEST AND BEST OFFER; (4) AUTHORIZING THE DEBTORS TO SELL SUBSTANTIALLY ALL THEIR ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (5) AUTHORIZING THE DEBTORS TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (6) GRANTING OTHER RELATED RELIEF |

14.      The Sale Hearing may be continued, from time to time, without further notice to creditors or other parties in interest other than by announcement of said continuance before the Court on the date scheduled for such hearing or in the hearing agenda for such hearing.

15.      Within two (2) business days after entry of this Order (the "**Mailing Date**"), the Debtors shall serve a notice regarding the sale of the Assets substantially in the form attached hereto as **Exhibit 4** (the "**Sale Notice**"), together with copies of this Order and each of the Exhibits hereto via electronic mail or telecopy or, if not available, overnight mail upon the following parties: (a) all potential purchasers as identified by the Debtors regarding the Assets; (b) the Office of the United States Trustee (Attn: Mitchell B. Hausman Esq.), One Newark Center, Suite 2100, Newark, NJ  07102; (c) counsel for the Proposed Purchaser, Troy A. Schell, Esq., General Counsel, Prime Healthcare Management, Inc.; (d) proposed counsel to the Committee, [_____]; (e) the New Jersey Health Care Facilities Financing Authority (Attn: Mr. Mark Hopkins, Executive Director), Station Plaza Building #4, 22 S.

11

(Page 12)

| | |
|---|---|
| Debtors: | SAINT MICHAEL'S MEDICAL CENTER, INC. |
| Case No. | 15- |
| Caption of Order: | ORDER PURSUANT TO 11 U.S.C. §§ 363 AND 365 AND FED. R. BANKR. P. 2002, 6004 AND 6006: (1) APPROVING "STALKING HORSE" ASSET PURCHASE AGREEMENT FOR THE SALE OF SUBSTANTIALLY ALL THE DEBTORS' ASSETS; (2) APPROVING BIDDING PROCEDURES AND FORM, MANNER AND SUFFICIENCY OF NOTICE; (3) SCHEDULING (A) AN AUCTION SALE AND (B) A HEARING TO CONSIDER APPROVING THE HIGHEST AND BEST OFFER; (4) AUTHORIZING THE DEBTORS TO SELL SUBSTANTIALLY ALL THEIR ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (5) AUTHORIZING THE DEBTORS TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (6) GRANTING OTHER RELATED RELIEF |

Clinton Ave., Trenton, NJ 08609-1212; (f) counsel to the Bank of New York Mellon, as

indenture trustee, McManimon & Scotland, L.L.C. (Attn: Tricia M. Gasparine, Esq.), One

Riverfront Plaza – 4th Floor, Newark, NJ 07102-5408; (g) the Internal Revenue Service,

Insolvency Section; (h) the Internal Revenue Service, Department of Treasury; (i) the New

Jersey Department of Treasury; (j) the New Jersey Department of Health (Attn: Mr. William

Conroy, Deputy Commissioner), 369 S. Warren St., Trenton, NJ 08608; (k) the Office of the

Attorney General of the State of New Jersey; (l) the Office of the United States Attorney (Attn:

Anthony J. LaBruna, Assistant U.S. Attorney), 970 Broad Street, Suite 700, Newark, NJ 07102;

(m) counsel to Trinity Health Corporation, Buchanan Ingersoll & Rooney PC (Attn: William H.

Schorling, Esq.), Two Liberty Place, 50 S. 16th Street, Suite 3200, Philadelphia, PA 19102-

2555; (n) the Debtors' twenty (20) largest unsecured creditors; (o) all parties-in-interest who

have requested notice pursuant to Bankruptcy Rule 2002; and (p) all parties who are known to

possess or assert a lien, claim, encumbrance or interest in or upon any of the Assets.  In addition,

by the Mailing Date, the Debtors shall serve, by first-class mail, postage prepaid, the Sale Notice

3449087v.2

(Page 13)

| | |
|---|---|
| Debtors: | SAINT MICHAEL'S MEDICAL CENTER, INC. |
| Case No. | 15- |
| Caption of Order: | ORDER PURSUANT TO 11 U.S.C. §§ 363 AND 365 AND FED. R. BANKR. P. 2002, 6004 AND 6006: (1) APPROVING "STALKING HORSE" ASSET PURCHASE AGREEMENT FOR THE SALE OF SUBSTANTIALLY ALL THE DEBTORS' ASSETS; (2) APPROVING BIDDING PROCEDURES AND FORM, MANNER AND SUFFICIENCY OF NOTICE; (3) SCHEDULING (A) AN AUCTION SALE AND (B) A HEARING TO CONSIDER APPROVING THE HIGHEST AND BEST OFFER; (4) AUTHORIZING THE DEBTORS TO SELL SUBSTANTIALLY ALL THEIR ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (5) AUTHORIZING THE DEBTORS TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (6) GRANTING OTHER RELATED RELIEF |

only upon all known creditors, to the extent not otherwise served in accordance with the preceding sentence.

16.     Except as set forth to the contrary above, Objections, if any, whether to final approval of the Sale and assumption contemplated by the APA shall (i) be in writing, (ii) state with particularity the basis of the objection; and (iii) be filed with the Clerk of the United States Bankruptcy Court electronically by attorneys who regularly practice before the Bankruptcy Court in accordance with D.N.J. LBR 5005-1 and the Appendix thereto, *Administrative Procedures For Filing, Signing And Verifying Documents By Electronic Means* (the "**Administrative Procedures**") (a copy of the aforementioned rule and the Administrative Procedures can be found at www.njb.uscourts.gov, the official website for the Bankruptcy Court) and, by all other parties-in-interest, and shall be served in accordance with the service requirements of the Administrative Procedures by no later than seven (7) days before the Sale Hearing (the "**Sale Objection Deadline**").

3449087v.2

(Page 14)

| | |
|---|---|
| Debtors: | SAINT MICHAEL'S MEDICAL CENTER, INC. |
| Case No. | 15- |
| Caption of Order: | ORDER PURSUANT TO 11 U.S.C. §§ 363 AND 365 AND FED. R. BANKR. P. 2002, 6004 AND 6006: (1) APPROVING "STALKING HORSE" ASSET PURCHASE AGREEMENT FOR THE SALE OF SUBSTANTIALLY ALL THE DEBTORS' ASSETS; (2) APPROVING BIDDING PROCEDURES AND FORM, MANNER AND SUFFICIENCY OF NOTICE; (3) SCHEDULING (A) AN AUCTION SALE AND (B) A HEARING TO CONSIDER APPROVING THE HIGHEST AND BEST OFFER; (4) AUTHORIZING THE DEBTORS TO SELL SUBSTANTIALLY ALL THEIR ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (5) AUTHORIZING THE DEBTORS TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (6) GRANTING OTHER RELATED RELIEF |

17.    The Debtors, in consultation with the Committee, are authorized to take all of the actions reasonably necessary as contemplated by or consistent with this Order, the Bidding Procedures and the Assumption and Assignment Procedures.

18.    Nothing herein or in the APA shall prevent the Committee from seeking reasonable access to any acquired books and records.

19.    This Court shall retain jurisdiction: (a) to interpret, implement and enforce the terms and provisions of this Order; (b) to enter Orders in aid or furtherance of this Order; and (c) to adjudicate any and all remaining issues concerning the Debtors' right and authority to assume, assign and/or sell the Assets, including to approve the sale at the Sale Hearing.

3449087v.2

**EXHIBIT 9.4**

To be prepared and agreed upon prior to Closing