# Exhibit A

## Amended DIP Term Sheet

**Summary of Terms and Conditions**
**For DIP Credit Facility**
**August 7, 2015**

| | |
|---|---|
| **Debtors/Borrowers:** | Saint Michael's Medical Center, Inc.; Columbus Acquisition Corp.; Saint James Care, Inc.; and University Heights Property Company, Inc. (collectively, the "**Debtors**"). |
| **Lender:** | Trinity Health Corporation ("**Lender**"). |
| **Revolving Loan Facility:** | Debtor-In-Possession Revolving Credit Facility (the "**DIP Loan**") up to $15,000,000.00 (the "**Commitment**"). |
| **Initial Availability:** | Upon entry of an interim financing order (the "**Interim Order**") by the Court under Bankruptcy Code § 364(c) (in form and substance agreeable to the Lender), $5,000,000.00 of the Commitment shall be made available by the Lender to the Debtors pursuant to the Budget (as defined below) (the "**Initial Commitment Date**") and this Term Sheet. |
| **Final Availability:** | Upon entry of a final financing order (the "**Final Order**") by the Court under Bankruptcy Code § 364(c) (in form and substance agreeable to the Lender), the balance of the Commitment shall be made available by the Lender to the Debtors pursuant to the Budget and this Term Sheet (the "**Final Commitment Date**"). |
| **Closing Date:** | Closing of the DIP Loan with respect to the Initial Commitment Date shall occur as soon as practicable after the entry of the Interim Order, but no later than two (2) business days after entry of such order (the "**Final Closing Date**"). |
| **Amortization:** | All DIP Loan Principal will be due on the Due Date (as defined below). |
| **Interest Rate:** | 6% per annum ("**Interest**"). Interest will be calculated on actual days earned over 360 day calendar basis. If the DIP Loan is not fully repaid at the Due Date or upon an Event of Default (as defined below), the interest rate becomes 8% per annum ("**Default Interest**"). Interest shall accrue and become payable on the Due Date. |
| **Use of Proceeds:** | Proceeds of the DIP Loan shall be utilized as follows: (i) general working capital and operational expenses; (ii) administration of the bankruptcy case (in each case of (i) and (ii), in accordance with a weekly cash flow budget prepared by the Debtors in form and substance acceptable to the Lender on a line by line basis |

(the "**Budget**"); and (iii) costs, expenses, closing payments, and all other payment amounts contemplated herein.

The DIP Loan shall be subject to the Budget in all respects and shall be in the form of advances on an as needed basis for (i) payments made by the Lender to vendors and third-party service providers of the Debtors on account of services rendered or goods provided to the Debtors pursuant to which the Lender is entitled to reimbursement from the Debtors; and/or (ii) advances of credit by the Lender to the Debtors on account of services rendered or goods provided to the Debtors under its certain shared services arrangements among the Lender and the Debtors pursuant to which the Lender is entitled to reimbursement from the Debtors; and/or (iii) loans to pay Bankruptcy Professionals (as defined below).

Neither the proceeds of the DIP Loan nor the Carve-Out (as defined below) shall be utilized (i) to attack the validity, priority or enforceability of any of the liens or security interests of the Lender, (ii) to research, review, analyze or investigate with respect to or in connection with any litigation, claim, objection or cause of action of any kind or nature whatsoever against the Lender (whether or not arising from or related to pre-petition or post-petition liens, security interests, acts, omissions or other conduct); provided, however, that the official committee of unsecured creditors (the "**Committee**") may use up to $75,000.00 in proceeds of the DIP Loan or Carve-Out to investigate but not pursue any potential claim against the Lender, or (iii) to file, prosecute or otherwise pursue any litigation, claim, objection or cause of action of any kind or nature whatsoever against the Lender (whether or not arising from or related to post-petition liens, security interests, acts. omissions or other conduct).

**Term**: The term of the DIP Facility shall commence on the Final Closing Date and shall end on the Due Date (as defined below).

Any and all then outstanding principal amount of the DIP Loan (the "**DIP Loan Principal**") plus any unpaid accrued Interest or Default Interest (as the case may be) plus any Costs and Expenses (as defined below) and other amounts due under the DIP Loan, this Term Sheet, the Interim Order and the Final Order (each, a "**DIP Loan Obligation**" and collectively, the "**DIP Loan Obligations**") shall become due and payable in full in cash upon the earlier of the following (the "**Due Date**"): (i) April 1, 2016; (ii) the substantial consummation (as defined in Bankruptcy Code § 1101) of a confirmed plan of reorganization; (iii) conversion of any of the bankruptcy cases to a case under Chapter 7 of the Bankruptcy Code; (iv) appointment of a trustee for any of the Debtors; (v) dismissal of any of the bankruptcy cases; (vi) October 19, 2015 if the Final Order has not been

entered; (vii) the date on which the Court enters a final order approving a post-petition financing between the Debtors and another lender(s) or investor(s) (as the case may be) (other than the Lender); (viii) consummation of a sale of substantially all of the Debtors' assets under Bankruptcy Code § 363; and (ix) five (5) business days after the Lender notifies the Debtors and their counsel in writing of an Event of Default which is not subsequently cured or waived by the end of such notice period. The Lender may extend the Due Date in its sole discretion.

**Collateral:**

The DIP Loan shall be secured by: (i) a first priority mortgage lien on certain real property surrounded by James Street, Boyden Street, Orange Street and M.L. King Blvd., with the following lot and block information: lots 1, 2, 10, 11, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30 in block 2857 and lots 10, 12, 14, 15, 16, 23, 43 and 50 in block 2858 (the "**Parking Lot**"); and (ii) a perfected lien on any and all current and future assets of the Debtors of any nature or type whatsoever, including, without limitation, real estate, cash, accounts, accounts receivable, goods, instruments, deposit accounts, investment accounts, investment property (including, without limitation, ownership interests in corporations, partnerships and limited liability companies), inventory, general intangibles, payment intangibles, healthcare receivables, vehicles, customer lists, trademarks, copyrights, brands, know-how and other intellectual property, minerals, mineral rights, plant and equipment, patents, trade secrets, tax assets, real property and/or leasehold rights, personal property, the proceeds of any causes of action under the Bankruptcy Code or applicable non-bankruptcy law, including causes of action and recoveries pursuant to Chapter 5 of the Bankruptcy Code, all other tangible and intangible assets, and any and all proceeds of the foregoing (collectively, the "**Operating Assets**" and together with the Parking Lot, the "**Collateral**").

The lien priority of the DIP Loan shall be as follows: (x) as to the Parking Lot, a first priority perfected lien and security interest in favor of the Lender; (y) as to the Operating Assets that are not subject to a valid, enforceable and properly perfected preexisting lien and security interest, the Lender shall have a first priority perfected security interest and lien in such Operating Assets; and (y) as to the Operating Assets that are subject to a valid, enforceable and duly perfected preexisting lien and security interest, a second priority perfected security interest and lien junior only to the pre-petition liens and security interests in such Operating Assets (including post-petition replacement and/or adequate protection liens granted to Bank of New York Mellon (the "**Trustee**") as Master Trustee with respect to those certain New Jersey Health Care Facilities Financing Authority State Contract Bonds Series 2008A Bonds issued on July 31, 2008 on account of the diminution in value of its pre-petition

first priority collateral but only to the extent that such adequate protection liens attach to the same collateral as held by the Trustee pre-petition).

**Priority**: The DIP Loan shall be authorized and approved by the Court pursuant to Bankruptcy Code § 364(c)(1) to be incurred as, and shall constitute, claims with a priority over all administrative expenses of the kind specified in Bankruptcy Code §§ 503(b) or 507(b) (the "**DIP Superpriority Claim**"), subject and subordinate only to the Carve-Out. The security interests and liens in the Collateral securing the DIP Loan shall also be authorized and approved by the Court pursuant to Bankruptcy Code §§ 364(c)(2) and (3), to constitute a lien on and in the Collateral ranking prior to all other claims and liens of the Debtors, except for and subject to (x) valid, enforceable and duly perfected preexisting liens and security interests on the Operating Assets, and (y) the Carve-Out (as defined below) (the "**DIP Liens**"). The DIP Liens shall not be subject to challenge and shall attach and become valid, enforceable and perfected without the requirement of any further action by the Lender.

**Carve-Out**: Except as otherwise provided below and above, the administrative expense claims (including the DIP Superpriority Claim), adequate protection liens and/or claims and the DIP Liens hereunder shall in all cases be subject and subordinate only to the Carve-Out. "Carve-Out" means the sum of (i) all fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Court that are incurred prior to the Termination Date, with respect to the U.S. Trustee, in such amounts as agreed to by the U.S. Trustee or determined by order of the Court (for the avoidance of doubt, there is no limitation on the obligations of the Debtors and their estates with respect to unpaid fees payable to the U.S. Trustee and Clerk of the Court pursuant to 28 U.S.C. § 1930), (ii) unpaid fees and expenses of the Debtors Professionals (as defined below) and the Committee's Professionals (as defined below) (a) incurred (x) prior to the occurrence of an Event of Default, in an amount not to exceed the amount set forth for such fees in the Budget, or (y) after the occurrence of an Event of Default, an amount equal to any accrued but unpaid fees of the Debtors' Professionals and the Committee's Professionals as of the date of the Event of Default in an amount not to exceed the amount set forth for such fees in the Budget through the date of such Event of Default plus an additional amount not to exceed $175,000 for the Debtors' Professionals and $75,000 to the Committee's Professionals (the "Post-Default Fee Cap"), (b) subsequently allowed by the Court under Sections 328, 330, 331 or 363 of the Bankruptcy Code, and (c) not otherwise payable from retainers or any professional expense escrow account established by the Debtors; and (iii) unpaid fees and expenses of any healthcare ombudsman appointed by the Court allowed by an order of Court in an not to

exceed the amount set forth for such fees in the Budget; provided, however, any amounts not used in a prior week by any Professional may be applied to increase the budgeted fees for subsequent weeks and the actual fees incurred in a prior week by a Professional that exceed the budgeted amount for that week may be applied against the budgeted amounts in subsequent weeks. The Carve-Out for the Debtors' Professionals and the Committee's Professionals will be reduced dollar for dollar (x) by all payments made on account of professional fees so that the amount paid to professionals on account of fees incurred through the date of an Event of Default will never exceed the Budget through the date of such Event of Default, and (y) by all payments made after an Event of Default so that the amount paid to professionals after an Event of Default will never exceed the Post-Default Fee Cap. The Carve-Out for all other Professionals will be reduced dollar for dollar by all payments made on account of professional fees so that the amount paid to professionals on account of fees incurred through the date of an Event of Default will never exceed the Budget through the date of such Event of Default. "Debtor Professionals" shall mean professional persons (including attorneys, financial advisors, accountants, investment bankers, appraisers, and consultants) retained by any Debtor with Court approval or as an ordinary course professional. "Committee Professionals" shall mean professional persons (including attorneys, financial advisors, accountants, investment bankers, appraisers, and consultants) retained by the Committee with Court approval.

**506(c) Waiver**: The Debtors (and any successors thereto or any representatives thereof, including any trustees or professionals appointed in the bankruptcy cases or any successor cases) agree not to assert any rights, benefits or causes of action under Section 506(c) of the Bankruptcy Code as they may relate to or be asserted against the Lender, the DIP Liens, or the Collateral, subject only to and effective upon entry of the Final Order.

**Cost and Expenses**: The Lender shall be entitled to add to the balance due under the DIP Loan, all reasonable costs incurred in connection with the DIP Loan, and the DIP Loan Obligations, including, without limitation, reasonable legal fees, advisor fees, consultant fees, costs and expenses, collateral valuations, appraisals, surveys, field examinations, third party diligence, lien searches, filing fees, and all other out-of-pocket costs and expenses in any way related to the DIP Loan and/or the DIP Loan Obligations and the enforcement and collection thereof (collectively, the "**Costs and Expenses**"). In the event that the DIP Loan is not consummated, the Lender shall have the right to seek reimbursement of all reasonable Costs and Expenses incurred with respect thereto as an administrative expense of the Debtors' estates pursuant to Bankruptcy Code § 503(b), and the Debtors hereby acknowledge

and agree that such amount shall constitute an administrative expense of the Debtors' estates.

**Representations and Warranties**:

The Debtors make usual and customary representations and warranties for transactions of this nature at the closing and at the time of each extension of credit, including, without limitation, good standing of the Debtors; no consent or approval is required other than the Interim Order and the Final Order; due authorization, execution and delivery of this Term Sheet or any other documents associated with the DIP Loan; no violation of any material agreements entered into or assumed after the commencement of the bankruptcy cases; no violation of law as a result of the execution of the documents associated with the DIP Loan; no liens on the assets of the Debtors except for valid, perfected and non-avoidable liens and security interests in existence as of the commencement of the bankruptcy cases and certain other liens permitted by the Lender; compliance with applicable laws and regulations; no material change in business; no unstayed litigation that is reasonably likely to have a Material Adverse Effect (as defined below) on the Debtors; no information furnished by the Debtors to the Lender or the Court contains any material misstatement of fact or omits to state a material fact necessary to make the statements therein not materially misleading; taxes paid to the extent required by law and all material tax returns filed.

"Material Adverse Effect" shall mean: a material adverse effect on (a) the condition (financial or otherwise), results of operations, assets, business or properties or prospects of the Debtors taken as a whole, (b) the Debtors' ability, taken as a whole, to duly and punctually pay or perform in its post-petition obligations, (c) the value of the Collateral, (d) Lender's liens on the Collateral or the priority of any such Lien, or (e) the practical realization of the benefits of Lender's rights and remedies under this Term Sheet, the Interim Order or the Final Order.

**Covenants:**

The Debtors shall comply with all of the following covenants:

1. The Debtors shall promptly provide the Lender with updates of any material developments in connection with the Debtors' reorganization efforts under the bankruptcy cases, whether in connection with an asset sale, plan of reorganization or otherwise;

2. The Debtors shall provide Lender with an initial 90-day Budget on or before the Final Closing Date. Thereafter, on or before Thursday of each week for each subsequent week, the Debtors shall deliver a weekly budget to actual variance analysis (in form and substance acceptable to the Lender) of the Debtors' cash flow (receipts and disbursements) to the Budget. After the

6th week of the initial and subsequent Budgets, the Debtors will provide a new 13-week Budget for approval by the Lender. The Debtors will also provide weekly census/admissions data and monthly financial reporting;

3.  The Debtors shall not pay any expenses which are not contained in the Budget without the approval of the Lender. The Debtors shall operate their business in accordance with the Budget. The Debtors' compliance with this covenant shall be measured on aggregate disbursements on a rolling five (5) week cumulative basis. Commencing from and after the completion of the fifth week for which the DIP Loan is available to the Debtors, the Debtors shall submit to the Lender on a weekly basis a variance report comparing actual expenditures to the Budget for the immediately preceding five (5) week period. The Debtors' actual expenditures for each five (5) week period shall not exceed the Budget plus a permitted variance of up to 15% in the aggregate for such period (the "**Permitted Variance**") (provided that the Permitted Variance shall not apply to amounts budgeted for fees of Professionals). Expenses not paid in prior weeks may be carried over in subsequent weeks in the Budget. During the initial five (5) week period prior to commencement of compliance testing as set forth above, the Debtor shall not make any disbursements which exceed the amounts set forth in the accounts payable line-item on the Budget (subject to a permitted variance up to 15% in the aggregate for each week plus any unspent amounts from prior weeks may be carried over in subsequent weeks accounts-payable budget).

4.  Notwithstanding the deemed perfection of the Lender's liens and security interests in the Collateral, the Debtors shall (i) execute and deliver to the Lender any and all instruments, mortgages or other documents deemed necessary or desirable by the Lender to further evidence or perfect the Lender's liens and security interests in the Collateral (ii) stipulate and agree in the Interim Order and Final Order to modify the automatic stay to permit the Lender to file and/or record any such documents delivered by the Lender hereunder.

5.  Without the prior written consent of the Lender, the Debtors shall not seek or consent to occur any of the following:

    a.  Any modification, stay, vacation or amendment to the Interim Order or the Final Order to which the Lender has not consented in writing;

    b.  A priority claim or administrative expense or unsecured claim against any of the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including without limitation, any administrative expense of the kind specified in Bankruptcy Code § 105, 326, 328, 330, 331, 364(c)

503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114) equal or superior to the priority claim of the Lender in respect of the obligations hereunder, except with respect to the Carve-Out;

c. Any lien on any Collateral having a priority equal or superior to the lien securing the obligations hereunder, other than with respect to the Carve-Out;

d. Any order which authorizes the payment of any indebtedness incurred prior to the petition date other than first day orders acceptable to Lender;

e. Any order seeking authority to take any action that is prohibited by the terms of this Term Sheet, the Interim Order or the Final Order or refrain from taking any action that is required to be taken by the terms of this Term Sheet, the Interim Order or the Final Order; and

f. Any other action that would result in a Material Adverse Effect without the prior written consent of the Lender.

**Events of Default**:

Each of the following shall constitute an **"Event of Default,"** unless otherwise waived by the Lender in its sole discretion:

1. Any report, certificate or other document delivered to the Lender pursuant to this Term Sheet, the Interim Order or the Final Order shall have been incorrect in any material respect when so made or deemed made;

2. The failure of the Debtors to comply in all material respects with any covenant, agreement or terms and conditions of the Interim Order, the Final Order and this Term Sheet;

3. Any Debtor is enjoined, restrained or in any way prevented by the order of any court or any governmental authority from conducting all or any material part of its business for more than three (3) consecutive days;

4. Any Debtor fails to have all certificates, accreditations and licenses reasonably necessary to conduct its business;

5. Any Debtor fails to maintain all current material payor contracts and all agreements with health insurers, health maintenance organizations, preferred provider organizations, managed care organizations or other entity that is licensed by a state for the provision or arrangement of health insurance, health benefits or health care services;

6. The loss by any Debtor of the right to receive Medicare or Medicaid reimbursement, any Material Adverse Effect upon such reimbursements or any material change in coverage for services or material change in payment rates;

7. Any investigation, survey, review, audit or change of law, rule or regulation which could be reasonably expected to have a Material Adverse Effect upon any Debtor's Medicare or Medicaid reimbursement;

8. The surcharge, recoupment or setoff of accounts receivable of any Debtor (or the Debtors collectively) exceeding $750,000.00 on a cumulative post-petition basis;

9. Any material damage to, or loss, theft or destruction of, any Collateral, whether or not insured, or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty (whether or not insured) which causes, for more than three (3) consecutive days, the cessation or substantial curtailment of revenue producing activities at any facility of the Debtors, if any such event or circumstance could reasonably be expected to have a Material Adverse Effect;

10. (i) the Bankruptcy Court shall enter an order reversing, amending, supplementing, staying, vacating or otherwise amending, supplementing or modifying the Interim Order or the Final Order, (ii) the Interim Order or Final Order, as applicable, shall cease to create valid and perfected liens on the Collateral in favor of the Lender, or (iii) any provision of the Interim Order or the Final Order shall cease to be valid and binding and in full force and effect, all without the express written consent of the Lender;

11. The conversion of any of the bankruptcy cases to a case under Chapter 7 of the Bankruptcy Code;

12. The appointment of a trustee for any Debtor;

13. The dismissal of any of the bankruptcy cases; provided that the Lender has not consented in writing to such dismissal;

14. The entry of any order which provides relief from the automatic stay otherwise imposed pursuant to Bankruptcy Code § 362 that permits any creditor to (i) realize upon, or to exercise any right or remedy with respect to, any material portion of the Collateral, or (ii) to terminate any permit, license or similar agreement, where in either case the exercise of such right or remedy or such realization or termination would be reasonably likely to have a Material Adverse Effect;

15. Subject to the allowance and payment of any amounts due under the Carve-Out, the filing of any application by the Debtors without the express written consent of the Lender for the approval of a super-priority claim in the bankruptcy cases which is *pari passu* with or senior to the priority of the claims of the Lender, or there shall arise or be granted and/or allowed any such *pari passu* or senior super-priority claim under the Bankruptcy Code;

16. The discharge by any Debtor of any prepetition indebtedness without the written consent of the Lender except as authorized by the Bankruptcy Court in those certain orders issued by the Bankruptcy Court in connection with the "first day hearings" (collectively, the "First Day Orders") provided that such First Day Orders are in form and substance acceptable to Lender;

17. The filing of any motion by any Debtor seeking the entry of any order in the bankruptcy cases: (a) permitting working capital or other financing (other than (i) purchase money security financing and equipment leases not to exceed $250,000 in the aggregate on a cumulative post-petition basis, (ii) ordinary course trade debt, or (iii) unsecured debt) for the Debtors from any person other than the Lender (unless the proceeds of such financing are to be used to pay in full in cash all obligations arising under this Term Sheet, the Interim Order and the Final Order); (b) granting a lien on, or security interest in, any of the Collateral (other than a purchase money security interest not to exceed $250,000 in the aggregate on a cumulative post-petition basis), other than with respect to this Term Sheet (unless such liens are granted in connection with a financing, the proceeds of which are to be applied to the payment in full in cash of all obligations arising under this Term Sheet, the Interim Order and the Final Order, and other than liens granted as adequate protection for preexisting liens and security interests on the Debtors' assets, which adequate protection liens are junior in priority to the DIP Liens); (c) except as permitted by this Term Sheet, the Interim Order or the Final Order, (i) permitting the use, sale or lease of any of the Collateral pursuant to Bankruptcy Code § 363(c) outside of the ordinary course of business without the prior written consent of the Lender, or (ii) seeking an order in the bankruptcy cases charging any of the Collateral under section 506(c) of the Bankruptcy Code against the Lender; or (d) dismissing the Bankruptcy Cases, unless the Lender has sought or consented in writing to such relief;

18. The filing of a motion or other pleading by any Debtor seeking the entry of an order confirming a plan of reorganization (and/or approving a disclosure statement related thereto) that does not require payment in full in cash of all obligations under this Term Sheet, the Interim Order and the Final Order on the

consummation date of such plan of reorganization, and as to which Lender has not consented in writing;

19. The filing of any pleading by any Debtor challenging the validity, priority, perfection or enforceability of this Term Sheet, the Interim Order or the Final Order or the obligations hereunder, or any lien granted pursuant to this Term Sheet, the Interim Order or the Final Order is determined to be null and void, invalid or unenforceable by the Court or another court of competent jurisdiction in any action commenced or asserted by any other party in interest in the bankruptcy cases; and

20. If a sale of substantially all of the assets of the Debtors is not consummated on or before December 31, 2015.

**Default Remedies**:  Upon five (5) business days' written notice to the Debtors and their counsel of an Event of Default, which is not subsequently cured or waived during such notice period:

1. The commitment shall terminate, the DIP Loan shall mature and any and all DIP Loan Obligations shall become due and payable in full in cash provided, however, the DIP Liens shall remain subject to the Carve Out.

2. The Lender shall have standing to move for an order to cause the Debtors to engage in a process to liquidate its assets pursuant to Bankruptcy Code § 363; and

3. The automatic stay shall terminate without further application or motion to, or order from, the Court, to allow the Lender to foreclose or otherwise enforce its security interests and liens on any or all of the Collateral or to exercise any other remedies available to the Lender under applicable law; neither Section 105 or any other Section of the Bankruptcy Code shall be utilized to prohibit the Lender from exercising or enforcing its rights and remedies upon an Event of Default regardless of any change in circumstances (whether or not foreseeable). If any of the Debtors, the Committee or any other person challenges the occurrence of an Event of Default, any such objector's remedies shall be limited to requesting a hearing before the Court (i) solely for the purpose of obtaining a judicial determination that no Event of Default has occurred and solely as to the Committee, the circumstances giving rise to the default, and (ii) based on any such judicial determination, seeking to enjoin the Lender from exercising its rights and remedies. In any such hearing, the sole issue for determination shall be whether an Event of Default has occurred and the Debtors, the Committee or any other party that is permitted to intervene or be heard at such hearing shall be precluded from raising or litigating any other issue, defense,

claims or counterclaim (including, without limitation, any defense or claim based on adequate protection).

**Waivers and Amendments**: The Lender shall have the right in the exercise of its sole discretion to waive any Event of Default, default or other violation by any Debtor under this Term Sheet, any documents entered into in connection herewith, the Interim Order or the Final Order. No waiver shall be effective absent a written agreement which has been executed by the Lender and each Debtor. Amendments to this Term Sheet shall be governed by Paragraph 20 of the Interim Order and Final Order.

**Conditions Precedent**: This Term Sheet is subject to, amongst other items, (i) the Entry of the Interim Order and Final Order by the Court, authorizing borrowing pursuant to this Term Sheet each in form and substance acceptable to the Lender and its counsel and (ii) the Court shall have entered an order in form and substance acceptable to the Lender permitting the Debtors to continue their pre-petition cash management system.

Among other things, the Interim Order shall contain the following:

*Lender Release*: Subject to the rights of the Committee, creditors or other party in interest as provided below, the Debtors shall execute a release (the "**Lender Release**") in favor of the Lender and each of its respective employees, affiliates, attorneys, accountants, agents, advisors from any and all causes of action, suits and damages relating to matters prior to the petition date, whether known or unknown, including, without limitation, causes of action arising under Chapter 5 of the Bankruptcy Code (collectively, the "**Lender Release Claims**").

*Allowed Lender Claim*: The Debtors shall stipulate and agree to an allowed general unsecured claim in favor of the DIP Lender in an amount equal to $135,000,000, free from any offset, counterclaim or defense (the "**Stipulated Lender Pre-Petition Claim**"). Notwithstanding the foregoing, the Committee or other party in interest may file an objection to the Stipulated Lender Pre-Petition Claim or prosecute or otherwise pursue any Lender Released Claims on or before the later of: (i) in the case of a party in interest with requisite standing other than the Committee, including a trustee appointed under chapter 7 or chapter 11 of the Bankruptcy Code, 75 days; (ii) in the case of the Committee, November 23, 2015, (iii) any such later date agreed to in writing by the DIP Lender, in its sole discretion, and (iv) any such later date ordered by the Bankruptcy Court for cause shown after notice and an opportunity to be heard, provided that such order is entered before the expiration of any applicable period as set forth in clauses (i) through (iii) of this section (each of (i) through (iv), the "Challenge Period"). For

the avoidance of doubt, if the Challenge Deadline has not expired before the date of conversion of the Debtors' bankruptcy cases to ones under chapter 7 of the Bankruptcy Code, the remaining period prior to expiration of the Challenge Deadline shall be available to any Chapter 7 trustee appointed or elected in a Successor Case. Upon expiration of the Challenge Period, (x) the Stipulated Pre-Petition Claim shall be deemed allowed, binding upon and shall not be subject to objection, challenge or attack by any creditor, the Committee or any party-in-interest including, without limitation, any subsequently appointed trustee and (y) the Lender Release shall be binding upon the Committee, all creditors and parties-in-interest.

**Inconsistency:** In the event of any conflict or inconsistency between (a) this Term Sheet and (b) the Final Order, the Final Order shall control unless this Term Sheet provides explicitly to the contrary.

[SIGNATURES TO FOLLOW]

[SIGNATURE PAGE TO DIP LOAN TERM SHEET]

DEBTORS:

SAINT MICHAEL'S MEDICAL CENTER, INC.

By: [signature]
Its: President & CEO

COLUMBUS ACQUISITION CORP.

By: [signature]
Its: President & CEO

SAINT JAMES CARE, INC.

By: [signature]
Its: President & CEO

UNIVERSITY HEIGHTS PROPERTY COMPANY, INC.

By: [signature]
Its: President & CEO

DIP LENDER:

TRINITY HEALTH CORPORATION

By:________________________
Its:________________________

[SIGNATURE PAGE TO DIP LOAN TERM SHEET]

DEBTORS:

SAINT MICHAEL'S MEDICAL CENTER, INC.

By:______________________
Its:______________________

COLUMBUS ACQUISITION CORP.

By:______________________
Its:______________________

SAINT JAMES CARE, INC.

By:______________________
Its:______________________

UNIVERSITY HEIGHTS PROPERTY COMPANY, INC.

By:______________________
Its:______________________

DIP LENDER:

TRINITY HEALTH CORPORATION

By:______________________
Its: EVP & CFO

# **Exhibit B**

| Saint Michael's Medical Center<br>Liquidity Projection<br>2nd DIP Budget | week 1<br>Projected<br>09/27/15 | week 2<br>Projected<br>10/04/15 | week 3<br>Projected<br>10/11/15 | week 4<br>Projected<br>10/18/15 | week 5<br>Projected<br>10/25/15 | week 6<br>Projected<br>11/01/15 | week 7<br>Projected<br>11/08/15 | week 8<br>Projected<br>11/15/15 | week 9<br>Projected<br>11/22/15 | week 10<br>Projected<br>11/29/15 | week 11<br>Projected<br>12/06/15 | week 12<br>Projected<br>12/13/15 | week 13<br>Projected<br>12/20/15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Receipts** | | | | | | | | | | | | | |
| DAILY DEPOSITS (040) | 922,503 | 922,503 | 922,503 | 830,253 | 830,253 | 830,253 | 738,002 | 738,002 | 738,002 | 738,002 | 830,253 | 830,253 | 830,253 |
| Bank Transfer (040) | - | - | - | - | - | - | 750,000 | 750,000 | 750,000 | 750,000 | 750,000 | 750,000 | 750,000 |
| Foundation unrestricted funds support (040) | - | - | - | 1,600,000 | - | - | - | 300,000 | - | - | - | - | 300,000 |
| DAILY DEPOSITS (244) | 2,663,829 | 3,006,366 | 1,014,166 | 2,904,949 | 2,121,649 | 2,904,949 | 61,333 | 2,053,533 | 61,333 | 3,262,433 | 162,749 | 2,154,949 | 162,749 |
| TRANSFER from 340B account | - | 200,000 | - | - | - | 100,000 | - | - | - | - | 100,000 | - | - |
| **Total Receipts** | 3,586,332 | 4,128,869 | 1,936,669 | 5,335,202 | 2,951,902 | 3,835,202 | 1,549,335 | 3,841,535 | 1,549,335 | 4,750,435 | 1,843,002 | 3,735,202 | 2,043,002 |
| **Disbursments** | | | | | | | | | | | | | |
| Bond Payments (040) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Med Realty (040) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| ED Payments (040) | 128,779 | 128,779 | 128,779 | 128,779 | 128,779 | 128,779 | 128,779 | 128,779 | 128,779 | 128,779 | 128,779 | 128,779 | 128,779 |
| Senior Health Outreach (040) | 6,461 | 6,461 | 6,461 | 6,461 | 6,461 | 6,461 | 6,461 | 6,461 | 6,461 | 6,461 | 6,461 | 6,461 | 6,461 |
| Practice Operating Expenses (040) | 11,433 | 21,902 | 21,902 | 21,902 | 21,902 | 21,902 | 21,902 | 21,902 | 21,902 | 21,902 | 21,902 | 21,902 | 21,902 |
| Unemployment Contribution (040) | - | - | - | - | - | - | - | 100,000 | - | - | - | - | - |
| Wage Index Escrow (040) | 11,668 | 11,668 | 11,668 | 11,668 | 11,668 | 11,668 | 11,668 | 11,668 | 11,668 | 11,668 | 11,668 | 11,668 | 11,668 |
| Clinical Professional Services (040) | 6,502 | 6,502 | 6,502 | 6,502 | 6,502 | 6,502 | 6,502 | 6,502 | 6,502 | 6,502 | 6,502 | 6,502 | 6,502 |
| Other (040) | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 |
| Utility Deposit (040) | 39,244 | 120,000 | - | - | - | 39,244 | - | - | - | - | - | - | - |
| Accounts Payable (244) | 1,000,000 | 2,358,678 | 1,592,835 | 1,592,835 | 2,426,252 | 2,426,252 | 1,592,835 | 1,592,835 | 1,592,835 | 1,592,835 | 1,592,835 | 1,592,835 | 1,592,835 |
| Payroll (244) | 2,910,188 | 3,110,188 | - | 3,110,188 | - | 3,110,188 | - | 3,110,188 | - | 3,110,188 | - | 3,110,188 | - |
| Prepaid Payroll (244) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Shared Services (244) | 243,843 | 243,843 | 243,843 | (346,157) | 243,843 | 243,843 | 243,843 | 243,843 | 243,843 | 243,843 | 243,843 | 243,843 | 243,843 |
| Medical and Life Benefits (244) | 246,654 | 246,655 | 246,656 | 246,657 | 246,658 | 246,659 | 246,660 | 246,661 | 246,662 | 246,663 | 246,664 | 246,665 | 246,666 |
| Check (244) | 2,102 | 2,102 | 2,102 | 2,102 | 2,102 | 2,102 | 2,102 | 2,102 | 2,102 | 2,102 | 2,102 | 2,102 | 2,102 |
| Physician Billing (244) | 5,069 | 5,069 | 5,069 | 5,069 | 5,069 | 5,069 | 5,069 | 5,069 | 5,069 | 5,069 | 5,069 | 5,069 | 5,069 |
| Autopay Card Services (244) | 1,802 | 1,802 | 1,802 | 1,802 | 1,802 | 1,802 | 1,802 | 1,802 | 1,802 | 1,802 | 1,802 | 1,802 | 1,802 |
| Flexspending (244) | 1,188 | 1,188 | 1,188 | 1,188 | 1,188 | 1,188 | 1,188 | 1,188 | 1,188 | 1,188 | 1,188 | 1,188 | 1,188 |
| Mercy Health (244) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Corporate Analysis Charge (244) | 581 | 581 | 581 | 581 | 581 | 581 | 581 | 581 | 581 | 581 | 581 | 581 | 581 |
| Credits/Fees/Returns (244) | 47 | 47 | 47 | 47 | 47 | 47 | 47 | 47 | 47 | 47 | 47 | 47 | 47 |
| CAPEX from AP Shared (244) | - | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 |
| Other wage adjustment (244) | - | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 |
| Restructuring (244) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Disbursements** | 4,665,562 | 6,371,466 | 2,375,436 | 4,895,625 | 3,208,855 | 6,358,289 | 2,375,440 | 5,585,629 | 2,375,442 | 5,485,631 | 2,375,444 | 5,485,633 | 2,375,446 |
| **Net Cash Flow** | (1,079,230) | (2,242,598) | (438,767) | 439,577 | (256,953) | (2,523,087) | (826,105) | (1,744,094) | (826,107) | (735,196) | (532,442) | (1,750,431) | (332,444) |
| Beginning Balance (Operating Account 040) | 5,147,444 | 5,815,859 | 4,893,049 | 4,340,239 | 5,295,179 | 5,225,119 | 5,115,814 | 4,953,504 | 4,991,193 | 4,828,882 | 4,666,572 | 4,596,511 | 4,526,451 |
| Total Receipts | 922,503 | 922,503 | 922,503 | 2,430,253 | 830,253 | 830,253 | 1,488,002 | 1,788,002 | 1,488,002 | 1,488,002 | 1,580,253 | 1,580,253 | 1,880,253 |
| Total Disbursements | 254,088 | 345,313 | 225,313 | 225,313 | 225,313 | 264,557 | 225,313 | 325,313 | 225,313 | 225,313 | 225,313 | 225,313 | 225,313 |
| Bank Transfers | - | 1,500,000 | 1,250,000 | 1,250,000 | 675,000 | 675,000 | 1,425,000 | 1,425,000 | 1,425,000 | 1,425,000 | 1,425,000 | 1,425,000 | 1,425,000 |
| Ending 040 Balance | 5,815,859 | 4,893,049 | 4,340,239 | 5,295,179 | 5,225,119 | 5,115,814 | 4,953,504 | 4,991,193 | 4,828,882 | 4,666,572 | 4,596,511 | 4,526,451 | 4,756,390 |
| Total 244 Receipts | 2,663,829 | 3,206,366 | 1,014,166 | 2,904,949 | 2,121,649 | 3,004,949 | 61,333 | 2,053,533 | 61,333 | 3,262,433 | 262,749 | 2,154,949 | 162,749 |
| Bank Transfers | - | 1,500,000 | 1,250,000 | 1,250,000 | 675,000 | 675,000 | 1,425,000 | 1,425,000 | 1,425,000 | 1,425,000 | 1,425,000 | 1,425,000 | 1,425,000 |
| Total 244 Disbursements | 4,411,475 | 6,026,153 | 2,150,123 | 4,670,312 | 2,983,542 | 6,093,732 | 2,150,127 | 5,260,316 | 2,150,129 | 5,260,318 | 2,150,131 | 5,260,320 | 2,150,133 |
| 244 Change in Cash | (1,747,646) | (1,319,788) | 114,043 | (515,363) | (186,893) | (2,413,782) | (663,794) | (1,781,784) | (663,796) | (572,886) | (462,382) | (1,680,371) | (562,384) |
| *Post Petition Professional Fees incurred* | *223,500* | *191,600* | *226,000* | *226,000* | *256,000* | *171,000* | *171,000* | *171,000* | *171,000* | *171,000* | *171,000* | *201,000* | *201,000* |
| Professional Fees paid from DIP (cash transfer) | - | - | 688,646 | - | 30,000 | - | 730,400 | - | - | - | 156,000 | 1,122,761 | - |
| DIP Borrowings (due to/due from) | 1,747,646 | 1,319,788 | (114,043) | 515,363 | 186,893 | 2,413,782 | 663,794 | 1,781,784 | 663,796 | 572,886 | 462,382 | 1,680,371 | 562,384 |
| Weekly DIP Borrowings/Repayments | 1,747,646 | 1,319,788 | 574,603 | 515,363 | 216,893 | 2,413,782 | 1,394,194 | 1,781,784 | 663,796 | 572,886 | 618,382 | 2,803,133 | 562,384 |
| DIP Interest (accrued) | - | 638 | 1,301 | 1,896 | 2,146 | 4,331 | 6,540 | 8,596 | 9,362 | 10,023 | 10,736 | 13,971 | 14,619 |
| Beginning DIP Balance | (2,514,449) | (766,803) | 553,623 | 1,129,526 | 1,646,785 | 1,865,824 | 4,284,538 | 5,685,272 | 7,475,651 | 8,148,809 | 8,731,718 | 9,360,835 | 12,177,939 |
| Borrowings/Repayments | 1,747,646 | 1,320,426 | 575,904 | 517,259 | 219,039 | 2,418,714 | 1,400,734 | 1,790,379 | 673,158 | 582,908 | 629,118 | 2,817,103 | 577,003 |
| **Ending DIP Balance** | (766,803) | 553,623 | 1,129,526 | 1,646,785 | 1,865,824 | 4,284,538 | 5,685,272 | 7,475,651 | 8,148,809 | 8,731,718 | 9,360,835 | 12,177,939 | 12,754,942 |
| **Professional Fee Carve Out Reserve** | 1,451,210 | 1,642,210 | 1,179,565 | 1,405,565 | 1,631,565 | 1,802,565 | 1,243,165 | 1,414,165 | 1,585,165 | 1,756,165 | 1,771,165 | 849,404 | 1,050,404 |
| **Adjusted DIP Balance (including Reserve)** | 684,408 | 2,195,833 | 2,309,091 | 3,052,350 | 3,497,389 | 6,087,103 | 6,928,437 | 8,889,816 | 9,733,974 | 10,487,883 | 11,132,000 | 13,027,342 | 13,805,345 |
| **Availability ($15.0 million facility)** | 14,315,592 | 12,804,167 | 12,690,909 | 11,947,650 | 11,502,611 | 8,912,897 | 8,071,563 | 6,110,184 | 5,266,026 | 4,512,117 | 3,868,000 | 1,972,658 | 1,194,655 |
| Operating Cash | 5,815,859 | 4,893,049 | 4,340,239 | 5,295,179 | 5,225,119 | 5,115,814 | 4,953,504 | 4,991,193 | 4,828,882 | 4,666,572 | 4,596,511 | 4,526,451 | 4,756,390 |
| Non Operating Account Cash Balance (Estimate) | 12,923,159 | 12,923,159 | 12,923,159 | 12,923,159 | 12,923,159 | 12,923,159 | 12,173,159 | 11,423,159 | 10,673,159 | 9,923,159 | 9,173,159 | 8,423,159 | 7,673,159 |
| Base Change in Accounts Receivable | - | (2,457,947) | - | - | - | (1,333,333) | - | - | - | - | (500,000) | - | - |
| Estimated ICD-10 Impact | - | - | - | - | - | - | 750,000 | 750,000 | 750,000 | 750,000 | 750,000 | 750,000 | 750,000 |
| Estimated Net Accounts Receivable including Credit Balanc | 19,883,552 | 17,425,605 | 17,425,605 | 17,425,605 | 17,425,605 | 16,092,272 | 16,842,272 | 17,592,272 | 18,342,272 | 19,092,272 | 19,342,272 | 20,092,272 | 20,842,272 |
| Change in Other Receivables | | 1,322,929 | | | | | | | | | | | |
| Estimated Other Receivables | 2,921,095 | 4,244,024 | 4,244,024 | 4,244,024 | 4,244,024 | 4,244,024 | 4,244,024 | 4,244,024 | 4,244,024 | 4,244,024 | 4,244,024 | 4,244,024 | 4,244,024 |
| Estimated Total Cash + Net Accounts Receivable | 41,543,665 | 39,485,837 | 38,933,027 | 39,887,967 | 39,817,906 | 38,375,269 | 38,212,958 | 38,250,648 | 38,088,337 | 37,926,026 | 37,355,966 | 37,285,906 | 37,515,845 |
| Temporary Cash Held by DIP Lender | - | - | - | - | - | - | - | | | | | | |